Eric Bensamochan, Esq. SBN 255482
The Bensamochan Law Firm, Inc.
2566 Overland Ave. Suite 650
Los Angeles, CA. 90064
Telephone: (818) 574-5740

Proposed Counsel for Debtor and
Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re<br><br>SUN GIR INCORPORATED,<br><br>Debtor and<br>Debtor-in-Possession.<br><br>Affects:<br><br>Harshad & Nasir, Incorporated,<br>Senior Classic Leasing, LLC,<br>DFG Restaurants, Incorporated,<br>Second Star Holdings, LLC, and<br>Third Star Investments, LLC | Case No. 8:26-bk-11056-SC<br><br>Chapter 11<br><br>Jointly Administered With:<br><br>8:26-bk-11057-SC<br>8:26-bk-11058-SC<br>8:26-bk-11060-SC<br>8:26-bk-11061-SC<br>8:26-bk-11062-SC<br><br>**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING CONTINUED USE OF PRE-EXISTING CASH MANAGEMENT SYSTEMS PURSUANT TO 11 U.S.C. §§ 105, 345, AND 363; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HARSHAD DHAROD IN SUPPORT THEREOF**<br><br>Hearing Date/Time/Location:<br>Date:  TBD<br>Time:  TBD<br>Location:  Courtroom 5C<br>411 West Fourth Street<br>Santa Ana, California 92701 |

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, AND OTHER INTERESTED PARTIES:**

Sun Gir Incorporated ("SGI"), the debtor and debtor-in-possession ("Debtor"), together with its affiliated debtors (collectively, the "Debtors"), hereby submit this *Emergency Motion for Interim and Final Orders Authorizing Continued Use of Pre-Existing Cash Management Systems Pursuant to 11 U.S.C. §§ 105, 345, and 363* (the "Motion").

The Motion seeks entry of interim and final orders allowing the Debtors to maintain prepetition bank accounts at Cathay Bank, BMO, and Commercial Bank pursuant to §§105(a), 345, and 363, and on an emergency basis in accordance with Local Bankruptcy Rule 9075-1(a). The Debtors submit that, if they are required to close their prepetition bank accounts, customer payments may be delayed, misdirected, or irretrievably lost, thereby disrupting the Debtors' operations.

In support of the Motion, the Debtors submit the following memorandum of points and authorities and the attached declaration of Harshad Dharod (the "Dharod Declaration").

The Debtors respectfully request that this Court enter interim and final orders:

1. Authorizing the Debtors to maintain their prepetition bank accounts at Cathay Bank, BMO, and Commercial Bank;

2. Authorizing the Debtors to continue using their existing cash management system;

3. Authorizing the Debtors to continue using existing business forms, including checks and payment methods;

4. Authorizing the Debtors to continue intercompany transfers in the ordinary course of business;

5. Authorizing the Debtors to continue to transmit funds directly to the Debtors' debtor-in-possession accounts on a daily basis, or at such intervals as necessary to ensure funds on hand are protected; and

6. Granting such other and further relief as the Court deems just and proper.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

Dated:  April 7, 2026

/s/Eric Bensamochan
ERIC BENSAMOCHAN
Proposed Counsel for Debtor and
Debtor-in-Possession

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

3

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.   STATEMENT OF FACTS**

### A.  Background

Sun Gir Incorporated ("SGI"), the debtor and debtor-in-possession ("Debtor"), together with its affiliated debtors (collectively, the "Debtors"), is the lead debtor in a group of six affiliated chapter 11 debtors that collectively operate a chain of fifty-nine (59) Carl's Jr. restaurant locations in California, consisting of fifty-two (52) locations in Southern California and seven (7) locations in Northern California.

The Debtors operate an integrated business across multiple affiliated entities with centralized management, shared employees, and coordinated administrative functions. The Debtors' operations depend on high-volume daily customer transactions, including cash and credit card payments processed through point-of-sale systems. These revenues are essential to funding payroll, paying vendors, and maintaining ongoing operations.

In the ordinary course of business, the Debtors utilize a centralized cash management system (the "Cash Management System") to collect, transfer, and disburse funds across their operations. The Cash Management System consists of multiple bank accounts maintained at Cathay Bank, BMO, and Commercial Bank, including depository accounts for receipt of revenues, operating accounts used to pay vendors and other expenses, and payroll accounts used to pay employee wages and related obligations.

The Debtors' Cash Management System is designed to efficiently manage liquidity across multiple entities and locations. Revenues generated at restaurant locations are deposited into depository accounts and are incorporated into the Cash Management System, including through transfers and sweeps into operating accounts used to fund payroll, vendor payments, and other operating expenses.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

4

The Debtors also utilize point-of-sale systems provided by Expient and payment processing services provided by Heartland to process customer transactions. Credit card and debit card payments are processed through these systems and deposited into the Debtors' accounts, while cash receipts are deposited into depository accounts in the ordinary course of business.

The Debtors' operations involve a high volume of daily transactions across their restaurant locations, and the Cash Management System allows the Debtors to efficiently manage these transactions and maintain ongoing operations.

If the Debtors were required to discontinue or materially alter their existing Cash Management System, including closing prepetition bank accounts, the Debtors' ability to collect revenues, pay vendors, and fund payroll would be significantly impaired. Any such disruption would result in immediate and irreparable harm to the Debtors' business and estates.

**B.  Bankruptcy Filing**

On April 2, 2026 (the "Petition Date"), SGI filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). SGI remains in possession of its property and continues to operate and manage its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Also on the Petition Date, the following affiliated entities filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in related cases pending before this Court: Harshad & Nasir, Incorporated (Case No. 8:26-bk-11057-SC), Senior Classic Leasing, LLC (Case No. 8:26-bk-11058-SC), DFG Restaurants, Incorporated (Case No. 8:26-bk-11060-SC), Second Star Holdings, LLC (Case No. 8:26-bk-11061-SC), and Third Star Investments LLC (Case No. 8:26-bk-11062-SC). The Debtors are seeking joint administration of the chapter 11 cases under SGI's lead case. No trustee, examiner, or official committee has been appointed in these cases.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

## II.     THE DEBTORS' CASH MANAGEMENT SYSTEM

### A. Overview

The Debtors utilize an integrated cash management system (the "Cash Management System") designed to efficiently collect, transfer, and disburse funds across their multi-entity operations. The Cash Management System has been in place prepetition and is used in the ordinary course of business.

### B. Account Structure

The Debtors maintain multiple bank accounts (collectively, the "Bank Accounts") at Cathay Bank, BMO, and Commercial Bank including:

- general operating accounts used to fund day-to-day operations;
- depository accounts used to receive revenues from restaurant operations; and
- payroll accounts used to pay employee wages and related obligations.

Each Debtor maintains accounts in its own name, and such accounts are used to facilitate the Debtors' day-to-day operations.

### C. ZBA Structure and Flow of Funds

Certain of the Debtors' accounts operate within a zero-balance account ("ZBA") structure. Under this system:

- revenues generated at restaurant locations are deposited into depository accounts;
- funds are automatically swept on a daily basis into centralized operating accounts maintained by Senior Classic Leasing, LLC and Second Star Holdings, LLC, which serve as the primary concentration accounts for the Debtors' operations; and
- such funds are used to fund payroll, pay vendors, and cover operating expenses across the Debtors' businesses.

This structure allows the Debtors to efficiently manage liquidity across multiple entities and locations while maintaining centralized control over cash.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

The Debtors' cash management system is organized into two primary groups: (i) a group consisting of Senior Classic Leasing, LLC, DFG Restaurants, Incorporated, Harshad & Nasir, Incorporated, and SGI, with Senior Classic Leasing, LLC serving as the primary concentration account; and (ii) a group consisting of Second Star Holdings, LLC and Third Star Investments, LLC, with Second Star Holdings, LLC serving as the primary concentration account. Transfers between these groups are tracked as intercompany transactions.

### D.  Revenue Collection and POS Systems

The Debtors utilize point-of-sale systems provided by Expient and payment processing services provided by Heartland to process customer transactions at their restaurant locations.

Credit card and debit card payments are processed through these systems and deposited into the Debtors' depository accounts, and cash receipts are deposited into depository accounts. These funds are incorporated into the Debtors' Cash Management System and swept into operating accounts.

### E.  Intercompany Transactions

In the ordinary course of business, the Debtors transfer funds among affiliated entities in the ordinary course of business as necessary to support operations, including funding payroll, vendor payments, and other expenses.

These intercompany transactions are an integral part of the Debtors' operations and are conducted in the ordinary course of business.

In addition, in the ordinary course of business, the Debtors utilize a centralized payroll structure across affiliated entities. Certain employees are employed by one Debtor entity but provide services across multiple Debtor-operated restaurant locations, and certain Debtor entities rely on affiliated entities for staffing and management services. Payments and transfers related to payroll and staffing are made in the ordinary course and are necessary to support ongoing operations.

7

**F. Operational Necessity**

The Debtors' operations involve high-volume daily transactions across approximately fifty-nine (59) restaurant locations. Revenues are collected and processed on a continuous basis through cash deposits, point-of-sale systems, and credit card processors.

Any disruption to the Cash Management System would impair the Debtors' ability to collect revenues, pay vendors, and fund payroll, and would result in immediate and irreparable harm to the Debtors' estates.

The Debtors' ability to collect revenues, process customer transactions, and fund payroll and vendor obligations is entirely dependent on the uninterrupted operation of the Cash Management System.

**III.     RELIEF REQUESTED**

The Debtors request authority to:

- maintain their prepetition bank accounts at Cathay Bank, BMO, and Commercial Bank;
- continue using their existing Cash Management System;
- continue using their existing business forms, including checks and payment methods;
- continue intercompany transfers in the ordinary course of business; and
- continue to transmit funds directly to the Debtors' debtor-in-possession accounts on a daily basis, or at such intervals as necessary to ensure funds on hand are protected.

**IV.     BASIS FOR RELIEF**

**A. Legal Standard**

Pursuant to §§105(a), 345(b), and 363(c) of the Code, the Debtors seek authorization to maintain the existing POS/Cash Management System.

The U.S. Trustee Guidelines require a chapter 11 debtor-in-possession to close all existing accounts immediately upon filing and open a minimum of three

8

new bank accounts: general, payroll, and tax.  The U.S. Trustee Guidelines also require that new bank accounts be opened in certain financial institutions designated as authorized depositories by the U.S. Trustee.  *See Guidelines and Requirements for Chapter 11 Debtors in Possession* at https://www.justice.gov/ust-regions-r16/region-16-general-information.  As described in the U.S. Trustee Guidelines, the requirements are designed to draw a clear line of demarcation between pre-petition and post-petition transactions and operations and prevent the inadvertent post-petition payment of prepetition claims.

Section 363(c)(1) of the Code authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The authority granted by section 363(c)(1) extends to a debtor in possession's continued use of its customary cash management system and, thus, supports the relief requested.  *See, e.g., Charter Co. v. Prudential Ins. Co. Am. (In re Charter Co.)*, 778 F.2d 617, 621 (11th Cir. 1985) (indicating that an order authorizing the debtor to employ a cash management system that was "usual and customary in the past" was "entirely consistent" with section 363(c)(1)) (internal quotation omitted).

To the extent that use of the existing cash management system is beyond the ordinary course of the debtor's business, such use is permitted by §§ 363(b)(1) and 105(a) of the Code.  Section 363(b)(1) of the Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 105(a) of the Code further provides that the Court may "issue any order … that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code."  11 U.S.C. § 105(a).

Where there is a valid business justification for using property outside of the ordinary course of business, the law presumes that, "in making a business

<div style="writing-mode: vertical">The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064</div>

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

decision the directors of a corporation acted on an informed basis, in good faith[,] and in the honest belief that the action was taken in the best interest of the company." *Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (internal quotation marks omitted) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).  Indeed, bankruptcy courts routinely permit chapter 11 debtors to continue using their existing cash management system, generally treating requests for such relief as a relatively simple matter.  *See In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987); *see also In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992) (recognizing that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash.").

### B.  The Relief Is Necessary and Appropriate

The Debtors' Cash Management System is essential to the continued operation of their business.

Requiring the Debtors to close existing accounts or implement a new system would be unnecessarily disruptive and would risk interruption of payroll processing, vendor payments, and day-to-day operations.

To the extent the Debtors' existing bank accounts do not comply with the requirements of 11 U.S.C. § 345(b), the Debtors respectfully request a waiver of such requirements. Cause exists for such waiver because the Cash Management System is well-established, necessary to the Debtors' operations, and disruption would result in immediate and irreparable harm.

Continuation of the Debtors' Cash Management System will facilitate an orderly transition into chapter 11 and preserve value for creditors.

### V.   REQUEST FOR INTERIM RELIEF

10

The Debtors request that the Court grant the relief requested herein on an interim basis to avoid immediate and irreparable harm pending a final hearing.

## VI.    NOTICE

Notice of this Motion has been provided to the Office of the United States Trustee, the Debtors' largest creditors, secured creditors, and other parties requesting notice. The Debtors submit that no further notice is required.

## VII.    CONCLUSION

In light of the foregoing, the Court should enter interim and final orders:

1. Authorizing the Debtors to maintain their prepetition bank accounts at Cathay Bank, BMO, and Commercial Bank;

2. Authorizing the Debtors to continue using their existing cash management system;

3. Authorizing the Debtors to continue using existing business forms, including checks and payment methods;

4. Authorizing the Debtors to continue intercompany transfers in the ordinary course of business;

5. Authorizing the Debtors to continue to transmit funds directly to the Debtors' debtor-in-possession accounts on a daily basis, or at such intervals as necessary to ensure funds on hand are protected; and

6. Granting such other and further relief as the Court deems just and proper.

Dated:  April 7, 2026

*/s/Eric Bensamochan*
ERIC BENSAMOCHAN
Proposed Counsel for Debtor and
Debtor-in-Possession

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

11

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

12

**The Bensamochan Law Firm**
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

## DECLARATION OF HARSHAD DHAROD

I, Harshad Dharod, declare as follows:

**I.    INTRODUCTION**

1. I am an officer of Sun Gir, Incorporated, the debtor and debtor-in-possession ("Debtor") in the above-captioned chapter 11 case ("Case"). I am also an officer, manager, or authorized representative of each of the affiliated debtors in these jointly administered cases (collectively, the "Debtors").

2. I am familiar with the Debtors' day-to-day operations, business affairs, and financial condition.

3. I know each of the following facts to be true of my own personal knowledge or information and belief and, if called as a witness, I could and would competently testify with respect thereto.

4. I am submitting this Declaration in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the Debtors' first day motions (the "First Day Motions").

**II.    THE DEBTORS AND THEIR BUSINESS**

5. On April 2, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

6. The Debtors operate a multi-location quick-service restaurant business consisting of approximately fifty-nine (59) Carl's Jr. franchise locations throughout Southern California pursuant to franchise agreements with CKE Restaurants Holdings, Inc. Many of the Debtors' locations are operated from premises subleased from third-party landlords.

7. The Debtors conduct their operations through multiple affiliated entities, including:

- Sun Gir, Incorporated ("SGI")

- Harshad & Nasir, Incorporated

- Senior Classic Leasing, LLC

- DFG Restaurants, Incorporated ("DFG")

- Second Star Holdings, LLC

- Third Star Investments, LLC

8. SGI and DFG are the entities responsible for employing and paying the Debtors' workforce and are referred to herein as the "Payroll Debtors."

9. Each Debtor entity owns and operates one or more restaurant locations, and together the Debtors operate an integrated enterprise with shared management, centralized financial oversight, and coordinated administrative functions.

10. The Debtors employ approximately 1,000 employees across all locations, including restaurant staff, managers, and administrative personnel. These employees are essential to maintaining the Debtors' operations.

III. **EVENTS LEADING TO THE FILING**

11. The Debtors commenced these chapter 11 cases on an emergency basis to preserve operations, stabilize their business, and maximize value for creditors and other stakeholders. Absent immediate relief, the Debtors faced the risk of operational disruption that would have adversely affected employees, vendors, and ongoing business operations.

12. The Debtors began experiencing financial distress approximately two years prior to the Petition Date. This distress was driven by a significant increase in labor costs following changes to California law establishing a $20 per hour minimum wage for fast food workers, which materially increased operating expenses.

13. At the same time, the Debtors experienced declining sales, which the Debtors attribute in part to reduced marketing effectiveness and lack of innovation at the franchisor level, as well as increased competition in the

14

quick-service restaurant market. Turnover at the franchisor's executive level further contributed to operational challenges.

14. As a result of these combined factors—rising costs and declining revenue— the Debtors' financial condition deteriorated, ultimately leading to the commencement of these chapter 11 cases.

**IV.** **CASH MANAGEMENT SYSTEM**

15. The Debtors maintain a cash management system (the "Cash Management System") consisting of multiple bank accounts, including general operating accounts, depository accounts, and payroll accounts, maintained by the Debtor entities in the ordinary course of business.

16. In the ordinary course of operations, the Debtors' restaurant locations generate revenue through cash and credit card transactions processed through point-of-sale systems. Cash receipts are deposited into the Debtors' depository accounts, and credit card and electronic payments are processed through systems provided by Expient and Heartland and deposited into the Debtors' accounts.

17. Certain of the Debtors' accounts operate within a zero-balance account ("ZBA") structure, whereby funds deposited into depository accounts are automatically swept on a daily basis into centralized operating accounts. These centralized accounts are used to fund payroll, pay vendors, and satisfy other operating expenses across the Debtors' businesses.

18. The Debtors' operations involve a high volume of daily transactions across approximately fifty-nine (59) restaurant locations. These transactions are processed and cleared on a continuous basis through the Cash Management System.

19. This Cash Management System enables the Debtors to efficiently manage liquidity, fund payroll, pay vendors, and maintain ongoing operations across multiple entities and locations.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

15

20. Any disruption to the Cash Management System would significantly impair the Debtors' ability to collect revenues, meet payroll, and satisfy vendor obligations, and would result in immediate and irreparable harm to the Debtors' estates.

**V.    EMPLOYEES AND PAYROLL**

21. The Debtors rely on their employees to operate their restaurants and maintain customer service and revenue generation.

22. Payroll is processed through centralized systems across the Debtors' entities, including designated payroll accounts.

23. The Debtors process payroll on a bi-weekly basis. The Debtors' most recent payroll prior to the Petition Date was fully funded and paid on March 30, 2026. The Debtors' next scheduled payroll is April 13, 2026, which covers the pay period beginning at 12:01 a.m. on March 24, 2026 and ending at 12:01 a.m. on April 7, 2026. Because this pay period spans the Petition Date, a substantial portion of the April 13 payroll relates to work performed prior to April 2, 2026. Specifically, nine (9) of the fourteen (14) days in the pay period occurred prior to the Petition Date, and approximately sixty-four percent (64%) of such payroll constitutes prepetition wages.

24. The Payroll Debtors employ and pay the Debtors' workforce, all of whom continue to provide services in the ordinary course of business. SGI employs approximately 832 hourly employees whose schedules vary based on operational needs, and DFG employs approximately 57 employees, including approximately 49 hourly employees and 8 salaried employees. No insiders are included in the Payroll Debtors' payroll.

25. The Debtors are in the process of finalizing payroll calculations for the April 13, 2026 payroll. Because these chapter 11 cases were filed on an expedited basis, the payroll amounts described in the First Day Motions are based on good-faith estimates derived from the Debtors' books and records

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

16

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

and prior payroll data. To the extent there are any material changes to such amounts once payroll is finalized, the Debtors will promptly notify the Court.

26. In the ordinary course of business, the Debtors also provide employee benefits, including health insurance provided through Cal Choice, Humana, and Covered California, with aggregate monthly premiums of approximately $22,319.88. The Debtors pay premiums and make contributions in connection with such benefit plans on behalf of their employees. Maintaining these benefits is critical to employee welfare and retention. Any interruption in employee health coverage would impose significant hardship on employees and their families and would likely result in additional employee attrition, which would impair the Debtors' operations. A portion of these amounts represent withholdings held in trust.

27. Employees rely on regular payroll and benefits to meet ordinary living expenses, including housing, food, and healthcare costs. In my business judgment, failure to pay wages and maintain benefits in the ordinary course would result in immediate employee attrition and the inability to operate the Debtors' restaurant locations.

28. In the ordinary course of business, the Debtors utilize a centralized payroll structure across affiliated entities. For the Debtors' Southern California operations, hourly employees, including cooks, cashiers, and shift leaders are employed through SGI, while general managers and district managers are employed through DFG.

29. Certain Debtor entities do not directly employ personnel but operate restaurant locations supported by employees of affiliated entities.

30. Failure to pay employees in the ordinary course would result in employee attrition, disruption of operations, and the Debtors' inability to operate their restaurant locations.

VI. **VENDORS AND OPERATIONS**

17

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

31. The Debtors rely on numerous vendors to operate their business, including food suppliers, franchise licensors, maintenance providers, and point-of-sale and payment processing providers.

32. The Debtors rely on key vendors to supply food, beverages, and other essential inputs necessary to operate their restaurant locations, including McLane Company, Inc. ("McLane") as the Debtors' primary distributor of substantially all food and beverage inventory, and Freund Bakery as a supplier of bakery products.

33. The Debtors procure substantially all food and beverage inventory through McLane pursuant to a franchisor-mandated distribution system and do not maintain a separately negotiated agreement with McLane.

34. These vendors typically deliver inventory to the Debtors' restaurant locations two to three times per week, depending on store volume. The goods provided by these vendors are essential to daily operations, and there are limited, if any, practical alternative suppliers for many of these products.

35. McLane has advised the Debtors that, absent payment of outstanding amounts, it may impose materially more burdensome payment terms, including requiring additional weekly payments of approximately $25,000 until a reserve of approximately $550,000 is established, and may shorten payment terms significantly. The Debtors cannot operate their restaurant locations without continued deliveries from McLane.

36. The Debtors' current payment terms with McLane are net 14.

37. The Debtors incur approximately $359,000 per week in purchases from McLane, reflecting the Debtors' substantial reliance on McLane for ongoing operations.

38. If payments are not made in the ordinary course, vendors are likely to cease deliveries within a short period of time, which would immediately disrupt the

Debtors' operations. Even a brief interruption in vendor deliveries would force the Debtors to curtail or cease operations at multiple locations.

39. The Debtors rely on point-of-sale and payment processing systems provided by Expient and Heartland to process customer transactions. These systems are essential to the Debtors' operations, and the Debtors would be unable to operate their restaurant locations without them.

40. The Debtors' operations are highly dependent on continuous access to employees, vendors, and operating systems. If payroll is not paid or vendors cease delivering goods, the Debtors would be forced to shut down restaurant operations within a matter of days.

**VII.   UTILITIES**

41. The Debtors depend on utility services, including electricity, gas, water, and trash removal, to operate their restaurant locations. These services are necessary to prepare and serve food, maintain sanitation and health compliance, preserve inventory, and continue generating revenue.

42. Based on the Debtors' books and records reflected in the Debtors' utility schedule, the Debtors' average monthly utility expense is approximately $411,098.96, consisting of approximately $41,493.06 for water, $82,566.15 for gas, $234,093.96 for electricity, and $52,945.79 for trash removal.

43. If utility service is interrupted at one or more restaurant locations, the Debtors' operations would be disrupted immediately, which would materially harm the Debtors' business and estates. In my business judgment, uninterrupted utility service is essential to the Debtors' continued operations.

44. The Debtors propose to provide adequate assurance of payment to utility providers through the timely payment of all undisputed postpetition utility charges in the ordinary course of business. In the event the Debtors fail to timely pay any undisputed postpetition utility charge, the Debtors shall have ten (10) days from the due date reflected on the applicable billing statement

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

19

to cure such nonpayment. Pending resolution of any timely request for additional adequate assurance, the applicable utility provider shall not alter, refuse, or discontinue service to the Debtors.

45. In my business judgment, the Debtors' proposed adequate assurance procedures are reasonable under the circumstances. The Debtors are continuing to operate their restaurant business, the Debtors require uninterrupted utility services to preserve operations and value, and the Debtors' proposed procedures appropriately balance the Debtors' need to preserve liquidity during the early stages of these chapter 11 cases with utility providers' interest in protection against an unreasonable risk of nonpayment.

## VIII.  NEED FOR FIRST DAY RELIEF

46. The First Day Motions are necessary to allow the Debtors to continue operating their business without interruption.

47. The requested relief will enable the Debtors to:

- maintain payroll and employee benefits;
- continue relationships with vendors;
- preserve their cash management system; and
- maintain essential services and operations.

48. Without the requested relief, the Debtors would face immediate and irreparable harm, including disruption of operations, loss of employees, and significant diminution in the value of the Debtors' estates.

49. The Debtors do not currently have access to debtor-in-possession financing or any other alternative source of liquidity. As a result, the Debtors' ability to continue operating their business is dependent on immediate access to cash collateral.

## IX.  CASH COLLATERAL AND NEED FOR IMMEDIATE USE

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

20

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

50. I am informed and believe that the Debtors' cash on hand and incoming revenues may constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code, to the extent any entity is determined to hold a valid interest therein. The Debtors require immediate authority to use such cash to continue operating their business in the ordinary course.

51. The Debtors operate a large, multi-location restaurant business that generates approximately $6 to $7 million in monthly revenue. In order to generate this revenue, the Debtors must continuously fund substantial operating expenses, including payroll, food and inventory purchases, rent, utilities, royalties, advertising, and other ordinary-course expenses.

52. Based on the Debtors' books and records, the Debtors generated approximately $19.9 million in net sales during the first three months of 2026, but have operated at a loss during that period, with net losses exceeding $2 million. As a result, the Debtors face immediate liquidity constraints and do not have sufficient unrestricted cash to operate their business without access to cash collateral.

53. Based on my review of the Debtors' books and records, as of April 6, 2026, the Debtors had approximately $900,000 in available cash across their accounts. As of the same time, the Debtors had approximately $3.54 million in outstanding obligations, including amounts owed to vendors, landlords, and other operational creditors. These obligations include approximately $695,978 owed to McLane Company, Inc., approximately $54,015 owed to Freund Bakery, approximately $1.7 million in accounts payable and accrued expenses, and approximately $771,606 in rent and related occupancy costs. These amounts significantly exceed the Debtors' available cash on hand.

54. Absent immediate authority to use cash collateral, the Debtors will be forced to curtail or cease operations within days.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

55. Continued operation of the Debtors' business as a going concern will preserve value for creditors and other stakeholders, whereas any interruption in operations would result in a rapid and significant diminution of value.

56. The Debtors' operations are highly cash-intensive and require daily expenditures across approximately fifty-nine (59) restaurant locations. The Debtors must purchase food and supplies on a continual basis, meet payroll obligations for approximately 1,000 employees, and satisfy ongoing rent and utility obligations in order to keep their locations open and operating.

57. The Debtors also incur approximately $33,959 per month in insurance premiums necessary to maintain coverage for their operations, with the next payment due on or about April 15, 2026. Failure to maintain insurance coverage would expose the Debtors to significant operational and financial risk and could result in the inability to continue operating their business.

58. In addition, as described above, the Debtors have received multiple notices of default from the franchisor relating to various restaurant locations. These notices assert defaults under franchise agreements and sublease arrangements and warn of potential termination of franchise rights if such defaults are not addressed. The Debtors require access to cash collateral to stabilize operations and address these defaults.

59. Without immediate authority to use cash collateral, the Debtors will be unable to fund critical operating expenses necessary to continue their business. Specifically, the Debtors would be unable to meet payroll, purchase food and inventory, pay rent and utilities, maintain insurance coverage, or satisfy franchise-related obligations.

60. Any interruption in these payments would result in immediate disruption to operations, closure of restaurant locations, loss of revenue, and substantial diminution of the value of the Debtors' estates.

22

61. In my business judgment, the Debtors' continued operation will preserve the value of their business and maximize value for creditors. To the extent any entity is determined to hold a valid interest in cash collateral, such entity will be adequately protected because the Debtors' operations will maintain or enhance the value of the business.

62. The Debtors will use cash collateral solely in the ordinary course of business and in accordance with their business judgment to fund necessary operating expenses.

**X.** **CONCLUSION**

63. The relief requested in the First Day Motions is in the best interests of the Debtors, their estates, creditors, and all parties in interest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 6th day of April, 2026, at La Palma, CA.

_____
Harshad Dharod

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

23

| In re:<br><br>Sun Gir Incorporated | CHAPTER: 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 8:26-bk-11056 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.   My business address is:
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

**A true and correct copy of the foregoing document entitled (*specify*) EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING CONTINUED USE OF PRE-EXISTING CASH MANAGEMENT SYSTEMS PURSUANT TO 11 U.S.C. §§ 105, 345, AND 363; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HARSHAD DHAROD IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On   April 7, 2026   , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Eric Bensamochan Eric@eblawfirm.us
United States Trustee ustpregion16.sa.ecf@usdoj.gov
Kenneth Misken DOJ-UST Kenneth.M.Misken@usdoj.gov
William Schumacher wschumacher@winthrop.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On   April 7, 2026   , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.   Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott C. Clarkson
U.S. Bankruptcy Court, Ronald Reagan Federal Building
411 West Fourth St., Ste. 5130
Santa Ana, CA 92701-4593

John Youens-Crowe LLP john.youens@crowe.com

McLane Foodservice Inc c/o Alston & Bird-Jacob Johnson and Kennedy Bodnarek
Jacob.Johnson@alston.com
Kennedy.Bodnarek@alston.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 7, 2026 | Jennifer Svonkin | /s/ Jennifer Svonkin |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.   It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June  2012*

**9013-3.1.PROOF.SERVICE**

Label Matrix for local noticing
0973-8
Case 8:26-bk-11056-SC
Central District of California
Santa Ana
Tue Apr  7 13:23:37 PDT 2026

Sun Cir Incorporated
1 Centerpointe Dr., Suite 400
La Palma, CA 90623-2530

Santa Ana Division
411 West Fourth Street, Suite 2030,
Santa Ana, CA 92701-4500

Carl's Jr. Restaurants LLC
c/o DLA Piper LLP
1201 W Peachtree St., Ste 2800
Atlanta, GA 30309-3450

Carl's Jr. Restaurants LLC
c/o Eric Goldberg, Esq.
2000 Avenue of the Stars, Ste 400 N Towe
Los Angeles, CA 90067-4735

The Northern Trust Company
50 South LaSalle Street
Chicago, IL 60603-1003

US Securities & Exchange Commission
444 S Flower St., # 900
Los Angeles, CA 90071-2934

United States Trustee
411 W Fourth Street
Santa Ana, CA 92701-4504

United States Trustee (SA)
411 W Fourth St., Suite 7160
Santa Ana, CA 92701-4500

Attn:Will Schumacher The Northern Trust Comp
Winthrop & Weinstine, P.A.
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402-4629

Eric Bensamochan
The Bensamochan Law Firm, Inc.
2566 Overland Ave, Ste 650
Los Angeles, CA 90064-3371

End of Label Matrix
Mailable recipients    10
Bypassed recipients     0
Total                  10