Eric Bensamochan, Esq. SBN 255482
The Bensamochan Law Firm, Inc.
2566 Overland Ave. Suite 650
Los Angeles, CA. 90064
Telephone: (818) 574-5740

Proposed Counsel for Debtor and
Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re | Case No. 8:26-bk-11056-SC |
| SUN GIR INCORPORATED, | Chapter 11 |
|          Debtor and<br>         Debtor-in-Possession. | Jointly Administered With: |
| | 8:26-bk-11057-SC<br>8:26-bk-11058-SC<br>8:26-bk-11060-SC<br>8:26-bk-11061-SC<br>8:26-bk-11062-SC |
| Affects:<br><br>Harshad & Nasir, Incorporated,<br>Senior Classic Leasing, LLC,<br>DFG Restaurants, Incorporated,<br>Second Star Holdings, LLC, and<br>Third Star Investments, LLC | **EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING PAYMENT OF PREPETITION CLAIMS OF CRITICAL VENDORS PURSUANT TO 11 U.S.C. SECTIONS 105(a), 363(b), 503(b)(9), 1107(a), AND 1108 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 6003 AND 6004; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HARSHAD DHAROD IN SUPPORT THEREOF**<br><br>Hearing Date/Time/Location:<br>Date:  TBD<br>Time:  TBD<br>Location:  Courtroom 5C<br>411 West Fourth Street<br>Santa Ana, California 92701 |

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, AND OTHER INTERESTED PARTIES:**

Sun Gir Incorporated ("SGI"), the debtor and debtor-in-possession ("Debtor"), together with its affiliated debtors (collectively, the "Debtors"), hereby submit this *Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b)(9), 1107(a), and 1108 and Federal Rules of Bankruptcy Procedure 6003 and 6004: (I) Authorizing Payment of Certain Prepetition Claims of Critical Vendors; and (II) Granting Related Relief (the "Motion").*

By this Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay certain prepetition, undisputed, and liquidated claims (the "Critical Vendor Claims") of vendors that are essential to the continued operation of the Debtors' business (the "Critical Vendors"), in an aggregate amount not to exceed $1,000,000 on an interim basis and $1,750,000 on a final basis, and granting related relief.

The Debtors believe that failure to grant the relief requested herein will result in immediate disruption to their supply chain and operations.

In support of the Motion, the Debtors submit the following memorandum of points and authorities and the attached declaration of Harshad Dharod (the "Dharod Declaration").

The Debtors respectfully request that this Court enter interim and final orders:

1. Authorizing, but not directing, the Debtors to pay prepetition claims of certain critical vendors (the "Critical Vendors") in the ordinary course of business, in an aggregate amount not to exceed $1,000,000 on an interim basis and $1,750,000 on a final basis;

2. Authorizing the Debtors to continue paying such Critical Vendors on account of both prepetition and postpetition obligations in the ordinary course of business consistent with prepetition practices;

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

2

3. Authorizing the Debtors, in their sole discretion, to determine which vendors are Critical Vendors and the amount of payments necessary to maintain operations;

4. Authorizing all applicable banks and financial institutions to receive, process, honor, and pay any and all checks, drafts, wire transfers, and automated clearing house transfers issued by the Debtors on account of Critical Vendor Claims, whether issued before, on, or after the Petition Date, provided that sufficient funds are available;

5. Authorizing the Debtors to issue replacement checks or effect replacement transfers to the extent any payment is dishonored or rejected; and

6. Granting such other and further relief as the Court deems just and proper.

Dated:  April 7, 2026

*/s/Eric Bensamochan*
ERIC BENSAMOCHAN
Proposed Counsel for Debtor and
Debtor-in-Possession

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

<div style="text-align:left; writing-mode: vertical-rl;">

**The Bensamochan Law Firm**
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

</div>

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   STATEMENT OF FACTS

#### A.  Background

Sun Gir Incorporated ("SGI"), the debtor and debtor-in-possession ("Debtor"), together with its affiliated debtors (collectively, the "Debtors"), is the lead debtor in a group of six affiliated chapter 11 debtors that collectively operate a chain of fifty-nine (59) Carl's Jr. restaurant locations in California, consisting of fifty-two (52) locations in Southern California and seven (7) locations in Northern California.

The Debtors' restaurant operations depend on the uninterrupted supply of food, beverages, and related inventory to prepare and serve food, receive and store inventory, maintain sanitation and health compliance, support daily restaurant operations, and continue generating revenue.

The Debtors rely on a centralized distribution model to supply inventory across their restaurant footprint. In particular, the Debtors depend on McLane Company, Inc. ("McLane"), their primary distributor, to provide substantially all food and beverage inventory used in their operations. The Debtors also rely on Freund Bakery to supply bakery products essential to their menu offerings.

The Debtors procure inventory through McLane pursuant to a franchisor-mandated distribution system implemented by CKE Restaurants Holdings, Inc., and do not maintain a separately negotiated supply agreement with McLane. As a result, the Debtors are not readily able to replace McLane without significant disruption to their operations.

Based on the Debtors' books and records, the Debtors owe approximately $937,940 to trade vendors paid through accounts payable and approximately $672,444 to McLane, for a total estimated balance of approximately $1.6 million owed to Critical Vendors as of the Petition Date. The Debtors further estimate that approximately $54,000 of such amounts is owed to Freund Bakery.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

The Debtors' obligations to vendors and other operational creditors exceed $3.5 million, further highlighting the need for controlled and strategic payments to Critical Vendors to preserve operations.

The Debtors incur substantial and ongoing inventory costs in the ordinary course of business, including approximately $359,000 per week in purchases from McLane alone. This level of ongoing expense reflects the Debtors' significant reliance on uninterrupted supply from their vendors in order to maintain operations. The Debtors' current payment terms with McLane are net 14.

McLane has advised the Debtors that, absent payment of outstanding amounts, it may impose materially more burdensome payment terms, including requiring additional weekly payments of approximately $25,000 and the establishment of a reserve of approximately $550,000, and may shorten payment terms significantly. These requirements would significantly constrain the Debtors' liquidity and threaten their ability to continue operating.

If deliveries from Critical Vendors are disrupted, the Debtors' operations would be affected immediately, which would materially harm the Debtors' business, estates, employees, customers, and creditors. The Debtors therefore seek authority to pay certain prepetition claims of Critical Vendors where necessary to ensure the uninterrupted operation of their business and to preserve the value of their estates.

**B. Bankruptcy Filing**

On April 2, 2026 (the "Petition Date"), SGI filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). SGI remains in possession of its property and continues to operate and manage its business as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5

Also on the Petition Date, the following affiliated entities filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in related cases pending before this Court: Harshad & Nasir, Incorporated (Case No. 8:26-bk-11057-SC), Senior Classic Leasing, LLC (Case No. 8:26-bk-11058-SC), DFG Restaurants, Incorporated (Case No. 8:26-bk-11060-SC), Second Star Holdings, LLC (Case No. 8:26-bk-11061-SC), and Third Star Investments LLC (Case No. 8:26-bk-11062-SC). The Debtors are seeking joint administration of the chapter 11 cases under SGI's lead case. No trustee, examiner, or official committee has been appointed in these cases.

## II.   CRITICAL VENDORS

In the ordinary course of business, the Debtors rely on certain vendors that provide essential goods and services necessary to operate their restaurant locations.

These Critical Vendors include, among others:

- McLane Company, Inc. (primary distributor, including food and beverage supply)
- Freund Bakery (bakery products)

The Debtors' beverage supply, including Coca-Cola and Dr Pepper products, is provided through McLane.

The goods provided by these vendors are integral to the Debtors' daily operations and, in many instances, are not readily replaceable without significant disruption.

The Debtors' relationship with McLane is governed by a franchisor-mandated distribution system, and the Debtors are not able to readily transition to an alternative distributor.

The Debtors have identified Critical Vendors based on several factors, including:

- the necessity of the goods or services to ongoing operations;

- whether the vendor is a sole-source or limited-source provider;

- the availability of alternative suppliers;

- the time required to transition to replacement vendors; and

- the risk that vendors will cease doing business with the Debtors absent payment of prepetition amounts.

III.   **AMOUNTS OWED TO CRITICAL VENDORS**

Failure to maintain relationships with these Critical Vendors would result in immediate disruption to the Debtors' operations.

As of the Petition Date, the Debtors estimate that they owe approximately $937,940 to trade vendors paid through accounts payable and approximately $672,444 to McLane Company, Inc., for a total estimated Critical Vendor Claims balance of approximately $1.6 million.

The Debtors further estimate that approximately $54,000 of such amounts is owed to Freund Bakery.

The Debtors are continuing to reconcile their books and records, and these amounts remain subject to adjustment.

Accordingly, the Debtors request authority to pay Critical Vendor Claims in an aggregate amount not to exceed $1,000,000 on an interim basis and $1,750,000 on a final basis, in the Debtors' business judgment.

The Debtors will exercise such authority only to the extent necessary to ensure the continued supply of essential goods and services and to avoid disruption to their operations.

The Debtors' total outstanding obligations, including vendor claims and other operational liabilities, exceed $3.5 million.

IV.   **RELIEF REQUESTED**

The Debtors respectfully request that this Court enter interim and final orders:

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

7

1. Authorizing, but not directing, the Debtors to pay prepetition claims of certain critical vendors (the "Critical Vendors") in the ordinary course of business, in an aggregate amount not to exceed $1,000,000 on an interim basis and $1,750,000 on a final basis;

2. Authorizing the Debtors to continue paying such Critical Vendors on account of both prepetition and postpetition obligations in the ordinary course of business consistent with prepetition practices;

3. Authorizing the Debtors, in their sole discretion, to determine which vendors are Critical Vendors and the amount of payments necessary to maintain operations;

4. Authorizing all applicable banks and financial institutions to receive, process, honor, and pay any and all checks, drafts, wire transfers, and automated clearing house transfers issued by the Debtors on account of Critical Vendor Claims, whether issued before, on, or after the Petition Date, provided that sufficient funds are available;

5. Authorizing the Debtors to issue replacement checks or effect replacement transfers to the extent any payment is dishonored or rejected; and

6. Granting such other and further relief as the Court deems just and proper

## V.   BASIS FOR RELIEF

### A. Legal Standard

Section 105(a) of the Bankruptcy Code provides that the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. This provision codifies the Court's equitable powers to authorize relief necessary to preserve a debtor's business and maximize the value of the estate.

Section 363(b) of the Bankruptcy Code further permits a debtor to use property of the estate outside the ordinary course of business where such use is supported by sound business judgment.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

8

Courts have consistently recognized that, under appropriate circumstances, payment of prepetition claims is permissible where necessary to preserve the debtor's operations. This principle is commonly referred to as the "doctrine of necessity," which permits the payment of prepetition claims where such payment is critical to the continued operation of the debtor's business. See, e.g., *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989).

The Ninth Circuit has likewise acknowledged that, in furtherance of a debtor's rehabilitation, payment of certain prepetition claims may be appropriate where necessary to maintain operations. See *Burchinal v. Cent. Wash. Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987).

**B. The Relief Is Necessary and Appropriate**

The Critical Vendors are essential to the Debtors' ongoing operations and the preservation of the value of the Debtors' estates.

The Debtors operate a multi-location restaurant business that depends on the uninterrupted supply of food, beverages, and related inventory. The Debtors rely on Critical Vendors—including their primary distributor, McLane Company, Inc.—for the delivery of goods necessary to operate their restaurant locations. The Debtors' relationship with McLane is not easily replaceable due to the franchisor-mandated distribution structure, further underscoring the critical nature of the vendor.

The Debtors incur approximately $359,000 per week in purchases from McLane, reflecting the Debtors' substantial dependence on this relationship.

If the Debtors are unable to pay Critical Vendor Claims:

- Critical Vendors may cease deliveries or refuse to provide services;
- The Debtors' supply chain will be disrupted;
- Restaurant operations may be curtailed or halted; and

**The Bensamochan Law Firm**
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

- The Debtors will suffer immediate and irreparable harm.

Indeed, even a short disruption in supply would impair the Debtors' ability to serve customers, damage customer relationships, and significantly reduce revenue. In particular, the Debtors cannot operate their restaurant locations without continued deliveries from McLane Company, Inc.

Moreover, replacing these vendors would be costly, time-consuming, and, in many cases, impracticable in the near term.

Accordingly, payment of Critical Vendor Claims is necessary to preserve the Debtors' operations, maintain going-concern value, and maximize recoveries for creditors.

The harm to the Debtors' estates from disruption of these vendor relationships would far exceed the amount of the Critical Vendor Claims.

**C. The Requested Relief Reflects Sound Business Judgment**

The Debtors have exercised sound business judgment in determining that payment of Critical Vendor Claims is necessary to maintain operations and preserve value.

Courts routinely defer to a debtor's business judgment where the debtor demonstrates a valid business justification for the requested relief.

Here, the Debtors have determined that the Critical Vendors provide essential goods and services and that failure to pay such vendors would result in immediate and material harm to the estates.

Accordingly, the requested relief is appropriate under sections 105(a) and 363(b) of the Bankruptcy Code.

**VI.     BANKRUPTCY RULE 6003**

Bankruptcy Rule 6003 provides that, within the first 21 days of a chapter 11 case, the Court shall not grant certain relief—including payment of prepetition claims—absent a showing that such relief is necessary to avoid immediate and irreparable harm.

10

The relief requested herein satisfies this standard. The Debtors' operations depend on the continued supply of goods and services from Critical Vendors. If the Debtors are unable to pay such vendors, deliveries may cease, operations may be disrupted, and the Debtors may be unable to continue operating their business.

Even a short interruption in supply would materially harm the Debtors' operations, damage customer relationships, and significantly reduce revenue. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm.

**VII.** **REQUEST FOR WAIVER OF BANKRUPTCY RULE 6004(h)**

To implement the foregoing successfully, the Debtors request a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

Absent such waiver, the Debtors will be unable to timely pay Critical Vendors, which could result in immediate disruption to operations and harm to the estates.

Accordingly, cause exists to waive the stay.

**VIII.** **RESERVATION OF RIGHTS**

Nothing contained herein shall be deemed or construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' rights to dispute any claim, (iii) an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code, or (iv) a waiver of any of the Debtors' rights or defenses under applicable law.

The Debtors expressly reserve all rights with respect to any claims or obligations.

**IX.** **REQUEST FOR INTERIM RELIEF**

The Debtors request that the Court grant the relief requested herein on an interim basis to avoid immediate and irreparable harm pending a final hearing.

11

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

**X.     NOTICE**

Notice of this Motion has been provided to the Office of the United States Trustee, the Debtors' largest creditors, secured creditors, and other parties requesting notice. The Debtors submit that no further notice is required.

**XI.    CONCLUSION**

Based on the foregoing, the Debtors respectfully request that the Court enter interim and final orders:

1.  Authorizing, but not directing, the Debtors to pay prepetition claims of certain critical vendors (the "Critical Vendors") in the ordinary course of business, in an aggregate amount not to exceed $1,000,000 on an interim basis and $1,750,000 on a final basis;

2.  Authorizing the Debtors to continue paying such Critical Vendors on account of both prepetition and postpetition obligations in the ordinary course of business consistent with prepetition practices;

3.  Authorizing the Debtors, in their sole discretion, to determine which vendors are Critical Vendors and the amount of payments necessary to maintain operations;

4.  Authorizing all applicable banks and financial institutions to receive, process, honor, and pay any and all checks, drafts, wire transfers, and automated clearing house transfers issued by the Debtors on account of Critical Vendor Claims, whether issued before, on, or after the Petition Date, provided that sufficient funds are available;

5.  Authorizing the Debtors to issue replacement checks or effect replacement transfers to the extent any payment is dishonored or rejected; and

6.  Granting such other and further relief as the Court deems just and proper

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

12

Dated:  April 7, 2026

/s/Eric Bensamochan
ERIC BENSAMOCHAN
Proposed Counsel for Debtor and
Debtor-in-Possession

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

**The Bensamochan Law Firm**
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

## DECLARATION OF HARSHAD DHAROD

I, Harshad Dharod, declare as follows:

### I.     INTRODUCTION

1.     I am an officer of Sun Gir, Incorporated, the debtor and debtor-in-possession ("Debtor") in the above-captioned chapter 11 case ("Case"). I am also an officer, manager, or authorized representative of each of the affiliated debtors in these jointly administered cases (collectively, the "Debtors").

2.     I am familiar with the Debtors' day-to-day operations, business affairs, and financial condition.

3.     I know each of the following facts to be true of my own personal knowledge or information and belief and, if called as a witness, I could and would competently testify with respect thereto.

4.     I am submitting this Declaration in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the Debtors' first day motions (the "First Day Motions").

### II.     THE DEBTORS AND THEIR BUSINESS

5.     On April 2, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

6.     The Debtors operate a multi-location quick-service restaurant business consisting of approximately fifty-nine (59) Carl's Jr. franchise locations throughout Southern California pursuant to franchise agreements with CKE Restaurants Holdings, Inc. Many of the Debtors' locations are operated from premises subleased from third-party landlords.

7.     The Debtors conduct their operations through multiple affiliated entities, including:

- Sun Gir, Incorporated ("SGI")

14

- Harshad & Nasir, Incorporated

- Senior Classic Leasing, LLC

- DFG Restaurants, Incorporated ("DFG")

- Second Star Holdings, LLC

- Third Star Investments, LLC

8. SGI and DFG are the entities responsible for employing and paying the Debtors' workforce and are referred to herein as the "Payroll Debtors."

9. Each Debtor entity owns and operates one or more restaurant locations, and together the Debtors operate an integrated enterprise with shared management, centralized financial oversight, and coordinated administrative functions.

10. The Debtors employ approximately 1,000 employees across all locations, including restaurant staff, managers, and administrative personnel. These employees are essential to maintaining the Debtors' operations.

**III.    EVENTS LEADING TO THE FILING**

11. The Debtors commenced these chapter 11 cases on an emergency basis to preserve operations, stabilize their business, and maximize value for creditors and other stakeholders. Absent immediate relief, the Debtors faced the risk of operational disruption that would have adversely affected employees, vendors, and ongoing business operations.

12. The Debtors began experiencing financial distress approximately two years prior to the Petition Date. This distress was driven by a significant increase in labor costs following changes to California law establishing a $20 per hour minimum wage for fast food workers, which materially increased operating expenses.

13. At the same time, the Debtors experienced declining sales, which the Debtors attribute in part to reduced marketing effectiveness and lack of innovation at the franchisor level, as well as increased competition in the

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

quick-service restaurant market. Turnover at the franchisor's executive level further contributed to operational challenges.

14. As a result of these combined factors—rising costs and declining revenue—the Debtors' financial condition deteriorated, ultimately leading to the commencement of these chapter 11 cases.

IV. **CASH MANAGEMENT SYSTEM**

15. The Debtors maintain a cash management system (the "Cash Management System") consisting of multiple bank accounts, including general operating accounts, depository accounts, and payroll accounts, maintained by the Debtor entities in the ordinary course of business.

16. In the ordinary course of operations, the Debtors' restaurant locations generate revenue through cash and credit card transactions processed through point-of-sale systems. Cash receipts are deposited into the Debtors' depository accounts, and credit card and electronic payments are processed through systems provided by Expient and Heartland and deposited into the Debtors' accounts.

17. Certain of the Debtors' accounts operate within a zero-balance account ("ZBA") structure, whereby funds deposited into depository accounts are automatically swept on a daily basis into centralized operating accounts. These centralized accounts are used to fund payroll, pay vendors, and satisfy other operating expenses across the Debtors' businesses.

18. The Debtors' operations involve a high volume of daily transactions across approximately fifty-nine (59) restaurant locations. These transactions are processed and cleared on a continuous basis through the Cash Management System.

19. This Cash Management System enables the Debtors to efficiently manage liquidity, fund payroll, pay vendors, and maintain ongoing operations across multiple entities and locations.

16

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

20. Any disruption to the Cash Management System would significantly impair the Debtors' ability to collect revenues, meet payroll, and satisfy vendor obligations, and would result in immediate and irreparable harm to the Debtors' estates.

**V.   <u>EMPLOYEES AND PAYROLL</u>**

21. The Debtors rely on their employees to operate their restaurants and maintain customer service and revenue generation.

22. Payroll is processed through centralized systems across the Debtors' entities, including designated payroll accounts.

23. The Debtors process payroll on a bi-weekly basis. The Debtors' most recent payroll prior to the Petition Date was fully funded and paid on March 30, 2026. The Debtors' next scheduled payroll is April 13, 2026, which covers the pay period beginning at 12:01 a.m. on March 24, 2026 and ending at 12:01 a.m. on April 7, 2026. Because this pay period spans the Petition Date, a substantial portion of the April 13 payroll relates to work performed prior to April 2, 2026. Specifically, nine (9) of the fourteen (14) days in the pay period occurred prior to the Petition Date, and approximately sixty-four percent (64%) of such payroll constitutes prepetition wages.

24. The Payroll Debtors employ and pay the Debtors' workforce, all of whom continue to provide services in the ordinary course of business. SGI employs approximately 832 hourly employees whose schedules vary based on operational needs, and DFG employs approximately 57 employees, including approximately 49 hourly employees and 8 salaried employees. No insiders are included in the Payroll Debtors' payroll.

25. The Debtors are in the process of finalizing payroll calculations for the April 13, 2026 payroll. Because these chapter 11 cases were filed on an expedited basis, the payroll amounts described in the First Day Motions are based on good-faith estimates derived from the Debtors' books and records

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

17

and prior payroll data. To the extent there are any material changes to such amounts once payroll is finalized, the Debtors will promptly notify the Court.

26. In the ordinary course of business, the Debtors also provide employee benefits, including health insurance provided through Cal Choice, Humana, and Covered California, with aggregate monthly premiums of approximately $22,319.88. The Debtors pay premiums and make contributions in connection with such benefit plans on behalf of their employees. Maintaining these benefits is critical to employee welfare and retention. Any interruption in employee health coverage would impose significant hardship on employees and their families and would likely result in additional employee attrition, which would impair the Debtors' operations. A portion of these amounts represent withholdings held in trust.

27. Employees rely on regular payroll and benefits to meet ordinary living expenses, including housing, food, and healthcare costs. In my business judgment, failure to pay wages and maintain benefits in the ordinary course would result in immediate employee attrition and the inability to operate the Debtors' restaurant locations.

28. In the ordinary course of business, the Debtors utilize a centralized payroll structure across affiliated entities. For the Debtors' Southern California operations, hourly employees, including cooks, cashiers, and shift leaders are employed through SGI, while general managers and district managers are employed through DFG.

29. Certain Debtor entities do not directly employ personnel but operate restaurant locations supported by employees of affiliated entities.

30. Failure to pay employees in the ordinary course would result in employee attrition, disruption of operations, and the Debtors' inability to operate their restaurant locations.

VI. **VENDORS AND OPERATIONS**

18

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

31. The Debtors rely on numerous vendors to operate their business, including food suppliers, franchise licensors, maintenance providers, and point-of-sale and payment processing providers.

32. The Debtors rely on key vendors to supply food, beverages, and other essential inputs necessary to operate their restaurant locations, including McLane Company, Inc. ("McLane") as the Debtors' primary distributor of substantially all food and beverage inventory, and Freund Bakery as a supplier of bakery products.

33. The Debtors procure substantially all food and beverage inventory through McLane pursuant to a franchisor-mandated distribution system and do not maintain a separately negotiated agreement with McLane.

34. These vendors typically deliver inventory to the Debtors' restaurant locations two to three times per week, depending on store volume. The goods provided by these vendors are essential to daily operations, and there are limited, if any, practical alternative suppliers for many of these products.

35. McLane has advised the Debtors that, absent payment of outstanding amounts, it may impose materially more burdensome payment terms, including requiring additional weekly payments of approximately $25,000 until a reserve of approximately $550,000 is established, and may shorten payment terms significantly. The Debtors cannot operate their restaurant locations without continued deliveries from McLane.

36. The Debtors' current payment terms with McLane are net 14.

37. The Debtors incur approximately $359,000 per week in purchases from McLane, reflecting the Debtors' substantial reliance on McLane for ongoing operations.

38. If payments are not made in the ordinary course, vendors are likely to cease deliveries within a short period of time, which would immediately disrupt the

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

Debtors' operations. Even a brief interruption in vendor deliveries would force the Debtors to curtail or cease operations at multiple locations.

39. The Debtors rely on point-of-sale and payment processing systems provided by Expient and Heartland to process customer transactions. These systems are essential to the Debtors' operations, and the Debtors would be unable to operate their restaurant locations without them.

40. The Debtors' operations are highly dependent on continuous access to employees, vendors, and operating systems. If payroll is not paid or vendors cease delivering goods, the Debtors would be forced to shut down restaurant operations within a matter of days.

**VII. UTILITIES**

41. The Debtors depend on utility services, including electricity, gas, water, and trash removal, to operate their restaurant locations. These services are necessary to prepare and serve food, maintain sanitation and health compliance, preserve inventory, and continue generating revenue.

42. Based on the Debtors' books and records reflected in the Debtors' utility schedule, the Debtors' average monthly utility expense is approximately $411,098.96, consisting of approximately $41,493.06 for water, $82,566.15 for gas, $234,093.96 for electricity, and $52,945.79 for trash removal.

43. If utility service is interrupted at one or more restaurant locations, the Debtors' operations would be disrupted immediately, which would materially harm the Debtors' business and estates. In my business judgment, uninterrupted utility service is essential to the Debtors' continued operations.

44. The Debtors propose to provide adequate assurance of payment to utility providers through the timely payment of all undisputed postpetition utility charges in the ordinary course of business. In the event the Debtors fail to timely pay any undisputed postpetition utility charge, the Debtors shall have ten (10) days from the due date reflected on the applicable billing statement

to cure such nonpayment. Pending resolution of any timely request for additional adequate assurance, the applicable utility provider shall not alter, refuse, or discontinue service to the Debtors.

45. In my business judgment, the Debtors' proposed adequate assurance procedures are reasonable under the circumstances. The Debtors are continuing to operate their restaurant business, the Debtors require uninterrupted utility services to preserve operations and value, and the Debtors' proposed procedures appropriately balance the Debtors' need to preserve liquidity during the early stages of these chapter 11 cases with utility providers' interest in protection against an unreasonable risk of nonpayment.

## VIII. NEED FOR FIRST DAY RELIEF

46. The First Day Motions are necessary to allow the Debtors to continue operating their business without interruption.

47. The requested relief will enable the Debtors to:

- maintain payroll and employee benefits;
- continue relationships with vendors;
- preserve their cash management system; and
- maintain essential services and operations.

48. Without the requested relief, the Debtors would face immediate and irreparable harm, including disruption of operations, loss of employees, and significant diminution in the value of the Debtors' estates.

49. The Debtors do not currently have access to debtor-in-possession financing or any other alternative source of liquidity. As a result, the Debtors' ability to continue operating their business is dependent on immediate access to cash collateral.

## IX. CASH COLLATERAL AND NEED FOR IMMEDIATE USE

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

50.   I am informed and believe that the Debtors' cash on hand and incoming revenues may constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code, to the extent any entity is determined to hold a valid interest therein. The Debtors require immediate authority to use such cash to continue operating their business in the ordinary course.

51.   The Debtors operate a large, multi-location restaurant business that generates approximately $6 to $7 million in monthly revenue. In order to generate this revenue, the Debtors must continuously fund substantial operating expenses, including payroll, food and inventory purchases, rent, utilities, royalties, advertising, and other ordinary-course expenses.

52.   Based on the Debtors' books and records, the Debtors generated approximately $19.9 million in net sales during the first three months of 2026, but have operated at a loss during that period, with net losses exceeding $2 million. As a result, the Debtors face immediate liquidity constraints and do not have sufficient unrestricted cash to operate their business without access to cash collateral.

53.   Based on my review of the Debtors' books and records, as of April 6, 2026, the Debtors had approximately $900,000 in available cash across their accounts. As of the same time, the Debtors had approximately $3.54 million in outstanding obligations, including amounts owed to vendors, landlords, and other operational creditors. These obligations include approximately $695,978 owed to McLane Company, Inc., approximately $54,015 owed to Freund Bakery, approximately $1.7 million in accounts payable and accrued expenses, and approximately $771,606 in rent and related occupancy costs. These amounts significantly exceed the Debtors' available cash on hand.

54.   Absent immediate authority to use cash collateral, the Debtors will be forced to curtail or cease operations within days.

22

55. Continued operation of the Debtors' business as a going concern will preserve value for creditors and other stakeholders, whereas any interruption in operations would result in a rapid and significant diminution of value.

56. The Debtors' operations are highly cash-intensive and require daily expenditures across approximately fifty-nine (59) restaurant locations. The Debtors must purchase food and supplies on a continual basis, meet payroll obligations for approximately 1,000 employees, and satisfy ongoing rent and utility obligations in order to keep their locations open and operating.

57. The Debtors also incur approximately $33,959 per month in insurance premiums necessary to maintain coverage for their operations, with the next payment due on or about April 15, 2026. Failure to maintain insurance coverage would expose the Debtors to significant operational and financial risk and could result in the inability to continue operating their business.

58. In addition, as described above, the Debtors have received multiple notices of default from the franchisor relating to various restaurant locations. These notices assert defaults under franchise agreements and sublease arrangements and warn of potential termination of franchise rights if such defaults are not addressed. The Debtors require access to cash collateral to stabilize operations and address these defaults.

59. Without immediate authority to use cash collateral, the Debtors will be unable to fund critical operating expenses necessary to continue their business. Specifically, the Debtors would be unable to meet payroll, purchase food and inventory, pay rent and utilities, maintain insurance coverage, or satisfy franchise-related obligations.

60. Any interruption in these payments would result in immediate disruption to operations, closure of restaurant locations, loss of revenue, and substantial diminution of the value of the Debtors' estates.

23

61. In my business judgment, the Debtors' continued operation will preserve the value of their business and maximize value for creditors. To the extent any entity is determined to hold a valid interest in cash collateral, such entity will be adequately protected because the Debtors' operations will maintain or enhance the value of the business.

62. The Debtors will use cash collateral solely in the ordinary course of business and in accordance with their business judgment to fund necessary operating expenses.

## X.    CONCLUSION

63. The relief requested in the First Day Motions is in the best interests of the Debtors, their estates, creditors, and all parties in interest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 6th day of April, 2026, at La Palma, CA.

Harshad Dharod

24

| In re:<br>Sun Gir Incorporated<br><br>Debtor(s). | CHAPTER: 11<br>CASE NUMBER: 8:26-bk-11056 |
|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.   My business address is:
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

**A true and correct copy of the foregoing document entitled (*specify*): EMERGENCY MOTION FOR INTERIM AND FINAL
ORDERS AUTHORIZING PAYMENT OF PREPETITION CLAIMS OF CRITICAL VENDORS PURSUANT TO 11 U.S.C. SECTIONS
105(a), 363(b), 503(b)(9), 1107(a), AND 1108 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 6003 AND 6004;
MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF HARSHAD DHAROD IN SUPPORT THEREOF**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner
stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and
LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On   April 7, 2026   , I checked the
CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail
Notice List to receive NEF transmission at the email addresses stated below:

Eric Bensamochan Eric@eblawfirm.us
United States Trustee ustpregion16.sa.ecf@usdoj.gov
Kenneth Misken DOJ-UST Kenneth.M.Misken@usdoj.gov
William Schumacher wschumacher@winthrop.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On   April 7, 2026   , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary
proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and
addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours
after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each
person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on   ____ , I served the following persons and/or entities by
personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission
and/or email as follows.   Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be
completed no later than 24 hours after the document is filed.

The Honorable Scott C. Clarkson
U.S. Bankruptcy Court, Ronald Reagan Federal Building
411 West Fourth St., Ste. 5130
Santa Ana, CA 92701-4593

John Youens-Crowe LLP john.youens@crowe.com

McLane Foodservice Inc c/o Alston & Bird-Jacob Johnson and
Kennedy Bodnarek
Jacob.Johnson@alston.com
Kennedy.Bodnarek@alston.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 7, 2026 | Jennifer Svonkin | /s/ Jennifer Svonkin |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.   It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June  2012*                                                                                          **9013-3.1.PROOF.SERVICE**

Label Matrix for local noticing
0973-8
Case 8:26-bk-11056-SC
Central District of California
Santa Ana
Tue Apr  7 13:23:37 PDT 2026

Sun Cir Incorporated
1 Centerpointe Dr., Suite 400
La Palma, CA 90623-2530

Santa Ana Division
411 West Fourth Street, Suite 2030,
Santa Ana, CA 92701-4500

Carl's Jr. Restaurants LLC
c/o DLA Piper LLP
1201 W Peachtree St., Ste 2800
Atlanta, GA 30309-3450

Carl's Jr. Restaurants LLC
c/o Eric Goldberg, Esq.
2000 Avenue of the Stars, Ste 400 N Towe
Los Angeles, CA 90067-4735

The Northern Trust Company
50 South LaSalle Street
Chicago, IL 60603-1003

US Securities & Exchange Commission
444 S Flower St., # 900
Los Angeles, CA 90071-2934

United States Trustee
411 W Fourth Street
Santa Ana, CA 92701-4504

United States Trustee (SA)
411 W Fourth St., Suite 7160
Santa Ana, CA 92701-4500

Attn:Will Schumacher The Northern Trust Comp
Winthrop & Weinstine, P.A.
225 South Sixth Street, Suite 3500
Minneapolis, MN 55402-4629

Eric Bensamochan
The Bensamochan Law Firm, Inc.
2566 Overland Ave, Ste 650
Los Angeles, CA 90064-3371

End of Label Matrix
Mailable recipients    10
Bypassed recipients     0
Total                  10