Eric Bensamochan, Esq. SBN 255482
The Bensamochan Law Firm, Inc.
2566 Overland Ave. Suite 650
Los Angeles, CA. 90064
Telephone: (818) 574-5740

Proposed Counsel for Debtor and
Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:26-bk-11056-SC |
| | Chapter 11 |
| SUN GIR INCORPORATED, | Jointly Administered With: |
| | 8:26-bk-11057-SC<br>8:26-bk-11058-SC<br>8:26-bk-11060-SC |
| Debtor and Debtor-in-<br>Possession. | 8:26-bk-11061-SC<br>8:26-bk-11062-SC |

Affects:

☐ Harshad & Nasir, Incorporated

☐ Senior Classic Leasing, LLC

☐ DFG Restaurants, Incorporated

☐ Second Star Holdings, LLC

☐ Third Star Investments, LLC

☒ Affects All Debtors

**NOTICE OF MOTION AND MOTION OF THE DEBTOR AND DEBTOR-IN-POSSESSION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE REJECTION OF A CERTAIN UNEXPIRED LEASE OF NONRESIDENTIAL REAL PROPERTY EFFECTIVE AS OF APRIL 2, 2026 (THE "PETITION DATE") PURSUANT TO 11 U.S.C. § 365; AND (II) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF ALEX KALINSKY IN SUPPORT THEREOF**

**Date**: June 03, 2026
**Time**: 1:30 p.m.
**Ctrm**: 5C
    411 West Fourth Street
    Santa Ana, California 92701
    Or Via Zoom.gov

MOTION TO REJECT LEASE

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, ALL SECURED CREDITORS, THE TWENTY LARGEST UNSECURED CREDITORS, IF KNOWN, AND ALL PARTIES IN INTEREST:**

PLEASE TAKE NOTICE THAT on the following date and time and in the indicated courtroom, Movant in the above captioned matter will move this court for an order granting the relief sought as set forth in the Motion accompanying supporting documents served and filed herewith. Said motion is based on the grounds set forth in the attached Motion and accompanying documents.

YOUR RIGHTS MAY BE AFFECTED. You should read these papers carefully and discuss them with your attorney, if you have one.

DEADLINE FOR OPPOSITION PAPERS: This motion is being heard on regular notice pursuant to LBR 9013-1. If you wish to oppose the Motion, you must file a written response with the Court and serve a copy of it upon the Movant or Movant's attorney at the address set forth above no less than fourteen (14) days prior to the above hearing date. If you fail to file a written response to this Motion within such time period, the court may treat such failure as a waiver of your right to oppose the Motion and may grant the requested relief.

## I.      INTRODUCTION

Sun Gir Incorporated, on behalf of itself and its affiliated debtor and debtor-in-possession entities in the above-captioned jointly administered chapter 11 cases (collectively, the "Debtors"), hereby files this *Motion for an Order Authorizing the Debtors to Reject a Certain Unexpired Lease of Nonresidential Real Property Effective as of April 2, 2026 (the "Petition Date") Pursuant to 11 U.S.C. § 365 (the "Motion").*

In support of this Motion, the Debtors submit the following memorandum of points and authorities and the Declaration of Alex Kalinsky (the "Declaration"). The Debtors operate a chain of fifty-nine (59) Carl's Jr. restaurant locations across California, employing approximately 1,000 employees.

*The Bensamochan Law Firm*
*2566 Overland Ave., Suite 650*
*Los Angeles, CA 90064*

2

The location subject to this Motion is Store No. 7393 located at 573 N. Azusa Avenue, Covina, California 91722 (the "Subject Location"), which is operated pursuant to a direct lease between Covina Properties, LLC, as landlord, and Senior Classic Leasing, LLC, as tenant.

As reflected in **Exhibit 1**, the Subject Location is operating at a sustained loss. For the period from April 1, 2024 through March 31, 2026, the store generated approximately $2,421,446 in revenue, incurred approximately $2,069,221 in operating expenses, and incurred approximately $364,621 in rent and facility costs, resulting in a net operating loss of approximately ($12,396).

Importantly, this figure excludes general and administrative expenses ("G&A") required to support operation of the store, including accounting, legal, human resources, and administrative services. The Debtors allocate at least 2.5% of sales for these required support services, which would add approximately $60,536 in additional losses to the bottom line. Including these required operating costs, the Subject Location is materially more unprofitable and represents a continuing financial burden on the estate.

These losses are ongoing and materially impair the Debtors' restructuring efforts. The Subject Location is an unnecessary financial burden on the estate and does not provide sufficient economic benefit to justify continued lease obligations.

In the exercise of their sound business judgment, the Debtors have determined that this certain unexpired lease of nonresidential real property (the "Subject Lease"), identified on **Exhibit 2** attached hereto, is burdensome to the estate and should be rejected.

The Debtors seek authority to reject the Subject Lease effective as of the Petition Date. Retroactive rejection is warranted because the Debtors determined as of the Petition Date that the Subject Lease was economically burdensome, the Subject Location is operating at a sustained negative cash flow, and continued performance under the lease only increases administrative expenses without corresponding benefit to the estate. Given the foregoing, the Debtors filed the instant motion.

This Motion is based upon this Motion, the accompanying memorandum of points and authorities, the Declaration, the pleadings and papers on file in these chapter 11 cases, and such other evidence or argument as may be presented at or before the hearing on this Motion. The

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

Debtors' analysis of the Subject Lease is supported by (i) a summary of the financial performance of the Subject Location attached hereto as **Exhibit 1**, and (ii) copies of the Subject Lease and related agreement attached collectively as **Exhibit 2**.

**II.  STATEMENT OF FACTS**

**A.  Background**

Sun Gir Incorporated is the lead debtor in a group of six affiliated chapter 11 debtors (collectively, the "Debtors") that operate a chain of fifty-nine (59) Carl's Jr. restaurant locations throughout California, including fifty-two (52) locations in Southern California and seven (7) locations in Northern California. The Debtors employ approximately 1,000 employees across their operations.

On April 2, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtors continue to operate their businesses and manage their affairs as debtors-in-possession.

The Debtors' financial distress is the result of, among other things, increased operating costs, including labor expenses, declining sales, and competitive pressures within the quick-service restaurant industry. As a result, certain of the Debtors' locations are operating at a negative cash flow and are not economically sustainable.

The subject of the instant motion is Store No. 7393 located at 573 N. Azusa Avenue, Covina, California 91722, which is operated pursuant to a direct lease between Senior Classic Leasing, LLC and Covina Properties, LLC.

The Debtors' lease obligations for this location are particularly burdensome because the store is operating at a negative cash flow while continuing to incur substantial rent, tax, insurance, and maintenance obligations.

**B.  The Subject Lease**

Senior Classic Leasing, LLC is party to an unexpired lease of nonresidential real property for the Subject Location.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

**The Bensamochan Law Firm**
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

The lease commenced on November 1, 2002, and imposes ongoing monthly rent obligations currently reflected at approximately $15,192.54 per month, together with additional obligations for property taxes, insurance, and maintenance.

Based on the Debtors' financial review, the Debtors determined that the Subject Lease is burdensome and imposes an ongoing financial loss on the estate without providing sufficient economic benefit.

The financial analysis attached as **Exhibit 1** demonstrates that for the period from April 1, 2024 through March 31, 2026, the Subject Location generated approximately $2,421,446 in revenue, incurred approximately $2,069,221 in operating expenses, and incurred approximately $364,621 in rent and facility costs, resulting in a net operating loss of approximately ($12,396).

This net loss excludes G&A expenses required to operate the store, including accounting, legal, human resources, and administrative support. Applying the Debtors' standard G&A allocation of at least 2.5% of sales adds approximately $60,536 in additional losses, further demonstrating that continued operation of the Subject Location is not economically viable.

The Debtors have determined, in the exercise of their sound business judgment, that rejection of the Subject Lease is necessary to reduce expenses, preserve liquidity, and maximize value for creditors.

Rejection of the Subject Lease will eliminate continuing losses and allow the Debtors to focus operations on more profitable locations as part of their restructuring strategy.

**III.    MEMORANDUM OF POINTS AND AUTHORITIES**

**A.  Rejection of the Subject Lease Is a Proper Exercise of the Debtors' Business Judgment**

Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Courts in the Ninth Circuit afford substantial deference to a debtor's business judgment in determining whether to reject an unexpired lease. See *In re Chi-Feng Huang*, 23 B.R. 798, 800 (B.A.P. 9th Cir. 1982) (holding that rejection decisions should be approved unless they are the

5

product of bad faith or a gross abuse of discretion); *In re Onecast Media, Inc.*, 439 F.3d 558, 563 (9th Cir. 2006) (same).

Rejection is particularly appropriate where a lease is not economically beneficial to the estate or imposes ongoing financial burdens. See *In re Pacific Shores Dev., LLC*, 461 B.R. 750, 755 (Bankr. S.D. Cal. 2011) (approving rejection where property was not economically viable).

The decision to assume or reject an executory contract or unexpired lease is committed to the sound business judgment of the debtor. See *In re Pomona Valley Med. Grp., Inc.*, 476 F.3d 665, 670 (9th Cir. 2007); *Durkin v. Benedor Corp. (In re G.I. Indus., Inc.)*, 204 F.3d 1276, 1282 (9th Cir. 2000). Under this standard, a court should approve a debtor's decision to reject this lease so long as the decision represents a reasonable exercise of business judgment.

In applying the business judgment standard, courts generally defer to the debtor's determination unless it is shown that the decision is so manifestly unreasonable that it could not be based on sound business judgment. *Pomona Valley*, 476 F.3d at 670–71.

Here, the Debtors have determined that the Subject Lease is burdensome and no longer beneficial to the estate. The Subject Location at 573 N. Azusa Avenue, Covina, California is operating at a sustained loss and contributes negative cash flow to the Debtors' operations.

As reflected in **Exhibit 1**, for the period from April 1, 2024 through March 31, 2026, the Subject Location generated approximately $2,421,446 in revenue, incurred approximately $2,069,221 in operating expenses, and incurred approximately $364,621 in rent and facility costs, resulting in a net operating loss of approximately ($12,396). This figure excludes required general and administrative expenses, including accounting, legal, human resources, and administrative support. Applying the Debtors' standard G&A allocation of at least 2.5% of sales adds approximately $60,536 in additional losses, further demonstrating that continued operation of the Subject Location is economically unsustainable.

Continued assumption of the Subject Lease would require the estate to continue funding losses at a location that is not financially sustainable, thereby diminishing recoveries for creditors and impairing the Debtors' restructuring efforts.

6

Rejection of the Subject Lease will allow the Debtors to reduce ongoing expenses, preserve liquidity, and focus operations on profitable locations that support a successful chapter 11 reorganization.

Accordingly, rejection of the Subject Lease represents a proper exercise of the Debtors' business judgment and should be approved.

**B. Rejection Should Be Approved Effective as of the Petition Date**

Bankruptcy courts in the Ninth Circuit have the equitable authority to approve rejection of a lease retroactive to a date prior to entry of the order where the equities favor such relief. See *In re At Home Corp.*, 392 F.3d 1064, 1072 (9th Cir. 2004).

In determining whether retroactive rejection is appropriate, courts consider the totality of the circumstances, including whether the debtor promptly sought rejection, whether the lease is burdensome, and whether retroactive relief will avoid unnecessary administrative expenses. *Id*.

Retroactive rejection is especially appropriate where continued lease obligations would unnecessarily increase administrative expenses and unfairly burden the estate to the detriment of creditors. See *At Home*, 392 F.3d at 1072–73.

Here, retroactive rejection to the Petition Date is warranted. The Debtors determined as of the Petition Date that the Subject Lease was economically burdensome and inconsistent with the Debtors' restructuring strategy. The Subject Location is operating at a negative cash flow and imposes continuing obligations for rent, taxes, insurance, and maintenance without generating sufficient value to justify those expenses.

The Debtors filed this Motion as soon as reasonably practicable after completing their operational and financial review of underperforming locations and determining that rejection was necessary.

Allowing rejection only as of the date of entry of an order would improperly saddle the estate with unnecessary postpetition administrative expenses for a burdensome lease that the Debtors had already determined should be rejected as of the Petition Date.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

7

The landlord suffers no unfair prejudice from retroactive rejection because the Debtors' intent to reject is clear, the premises are not necessary for reorganization, and continued lease obligations serve only to diminish estate value.

Under these circumstances, the balance of equities strongly favors approval of rejection of the Subject Lease effective as of April 2, 2026, the Petition Date.

**IV.    CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court enter an order:

1. Authorizing the rejection of the unexpired lease of nonresidential real property located at 573 N. Azusa Avenue, Covina, California 91722, effective as of April 2, 2026, pursuant to 11 U.S.C. § 365; and

2. Granting such other and further relief as the Court deems just and proper.

Dated:  April 28, 2026

/s/Eric Bensamochan
ERIC BENSAMOCHAN
Proposed Counsel for Debtor and
Debtor-in-Possession

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

8

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

## <u>DECLARATION OF ALEX KALINSKY</u>

I, Alex Kalinsky, declare as follows:

1. I am the General Counsel of Sun Gir, Incorporated, the debtor and debtor-in-possession ("Debtor") in the above-captioned chapter 11 case ("Case"). I am also an officer, manager, or authorized representative of each of the affiliated debtors in these jointly administered cases (collectively, the "Debtors").

2. I am familiar with the Debtors' day-to-day operations, business affairs, lease obligations, and financial condition.

3. I know each of the following facts to be true of my own personal knowledge or information and belief and, if called as a witness, I could and would competently testify with respect thereto.

4. On April 2, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

5. The Debtors operate a multi-location quick-service restaurant business consisting of approximately fifty-nine (59) Carl's Jr. franchise locations throughout California. As part of the restructuring efforts, the Debtors evaluated the performance and financial impact of each location and its corresponding lease obligations.

6. Based on this evaluation, the Debtors determined that the lease identified as **Exhibit 2** to the Motion (the "Subject Lease"), relating to Store No. 7393 located at 573 N. Azusa Avenue, Covina, California 91722 (the "Subject Location"), is economically burdensome and imposes significant costs on the estates. The Subject Lease is a direct lease between Senior Classic Leasing, LLC, as tenant, and Covina Properties, LLC, as landlord.

7. The Subject Location remains operational but is performing at a sustained financial loss and contributes negative cash flow to the Debtors' estates.

8.    As of the Petition Date, the Debtors determined that the Subject Lease should be rejected as part of their restructuring strategy in order to reduce expenses, preserve liquidity, and maximize value for creditors.

9.    Based on my review of the Debtors' financial records, the Subject Location is not generating sufficient revenue to cover operating expenses, including rent obligations, taxes, insurance, and maintenance, and is a continuing financial burden on the estates.

10.   A summary of the financial performance of the Subject Location is attached hereto as **Exhibit 1**. Based on my review of the Debtors' books and records, for the period from April 1, 2024 through March 31, 2026, the Subject Location generated approximately $2,421,446 in revenue, incurred approximately $2,069,221 in operating expenses, and incurred approximately $364,621 in rent and facility costs, resulting in a net operating loss of approximately ($12,396). This figure excludes G&A expenses necessary to operate the store, including accounting, legal, human resources, and administrative services. Applying the Debtors' standard G&A allocation of at least 2.5% of sales adds approximately $60,536 in additional losses, further increasing the actual economic burden of this location on the estates.

11.   Continued assumption of the Subject Lease would require the Debtors to continue funding losses at a location that is not financially sustainable and would impair the Debtors' ability to successfully reorganize.

12.   Copies of the Subject Lease, including the underlying lease agreement and related documents, are attached collectively as **Exhibit 2**.

13.   The Debtors filed this Motion as soon as reasonably practicable after the Petition Date and after completing their review of underperforming locations and determining that rejection of the Subject Lease was necessary.

14.   In my business judgment, rejection of the Subject Lease is in the best interests of the Debtors' estates and their creditors.

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 28th day of April, 2026, at La Palma, CA.

_____
Alex Kalinsky

The Bensamochan Law Firm
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

11

# Exhibit 1

| Senior Classic Leasing LLC | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 4/2024-3/31/26 REVENUE | 4/1/2024-3/30/2026 Operating Expenses ($) | 4/1/2024-3/31/26 Rent Fx/Cam/PT/PLI/Rent % ($) | 4/1/2024-3/31/26 Net Loss ($) |
|---|---|---|---|---|---|---|
| 4/30/24 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 101,020.23 | 95,898.13 | 13,596.14 | (8,474.04) |
| 5/31/24 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 98,399.57 | 79,451.89 | 14,136.00 | 4,811.68 |
| 6/30/24 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 97,109.49 | 72,242.37 | 24,642.61 | 224.51 |
| 7/31/24 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 93,612.11 | 79,968.38 | 14,136.73 | (493.00) |
| 8/31/24 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 94,522.00 | 73,493.32 | 14,873.02 | 6,155.66 |
| 9/30/24 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 94,656.76 | 93,954.04 | 14,147.93 | (13,445.21) |
| 10/31/24 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 105,299.57 | 82,320.39 | 14,145.28 | 8,833.90 |
| 11/30/24 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 101,345.41 | 81,724.11 | 14,145.28 | 5,476.02 |
| 12/31/24 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 113,526.11 | 84,816.65 | 14,145.28 | 14,564.18 |
| 1/31/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 98,619.82 | 88,314.36 | 14,569.18 | (4,263.72) |
| 2/28/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 95,315.35 | 81,005.62 | 14,145.28 | 164.45 |
| 3/31/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 105,665.23 | 97,810.62 | 14,145.28 | (6,290.67) |
| 4/30/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 96,278.59 | 86,160.25 | 14,145.28 | (4,026.94) |
| 5/31/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 102,426.30 | 80,355.00 | 14,145.26 | 7,926.04 |
| 6/30/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 99,290.24 | 86,135.13 | 27,446.15 | (14,291.04) |
| 7/31/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 98,850.57 | 87,953.95 | 14,145.26 | (3,248.64) |
| 8/31/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 102,537.32 | 82,885.09 | 14,867.36 | 4,784.87 |
| 9/30/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 101,225.07 | 101,491.32 | 14,151.02 | (14,417.27) |
| 10/31/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 103,549.31 | 88,827.37 | 14,153.33 | 568.61 |
| 11/30/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 104,499.99 | 88,536.88 | 14,146.87 | 1,816.24 |
| 12/31/25 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 113,275.56 | 86,436.72 | 14,149.42 | 12,689.42 |
| 1/31/26 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 99,412.89 | 91,941.35 | 14,160.30 | (6,688.76) |
| 2/28/26 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 93,371.60 | 78,995.18 | 14,156.12 | 220.30 |
| 3/31/26 | 7393 | 573 N. Azusa Ave.,Covina, CA 91722 | 107,637.22 | 98,502.84 | 14,126.51 | (4,992.13) |
| TOTAL | 7393 | | 2,421,446 | 2,069,221 | 364,621 | (12,396) |

# Exhibit 2

**STANDARD SHOPPING CENTER LEASE**

**BY AND BETWEEN**

COVINA PROPERTIES, LLC ,

**AS OWNER**

**AND**

Senior Classic Leasing, LLC ,

**AS TENANT**

| Section | | Page |
|---|---|---|

## ARTICLE I
### BASIC LEASE PROVISIONS

| | | |
|---|---|---|
| Section 1.01. | Date of Lease | 1 |
| Section 1.02. | Tenant's Trade Name | 1 |
| Section 1.03. | Shopping Center | 1 |
| Section 1.04. | Premises | 1 |
| Section 1.05. | Floor Area | 1 |
| Section 1.06. | Term | 1 |
| Section 1.07. | Time to Complete Tenant's Work | 1 |
| Section 1.08. | Minimum Annual Rental | 1 |
| Section 1.09. | Percentage Rent Rate | 1 |
| Section 1.10. | Use of Premises | 1 |
| Section 1.11. | Contribution to Promotional Fund (Grand Opening) | 1 |
| Section 1.12. | Annual Contribution to Promotional Fund | 1 |
| Section 1.13. | Security Deposit | 1 |
| Section 1.14. | Guarantor | 1 |
| Section 1.15. | Initial Monthly Impound | 1 |
| Section 1.16. | Address for Notices to Tenant | 1 |

## ARTICLE II
### LEASED PREMISES

| | | |
|---|---|---|
| Section 2.01. | Leased Premises | 2 |
| Section 2.02. | Reservations | 2 |
| Section 2.03. | Right to Relocate | 2 |
| Section 2.04. | Conditions of Record | 2 |

## ARTICLE III
### TERM

| | | |
|---|---|---|
| Section 3.01. | Commencement of Term | 2 |

## ARTICLE IV
### RENT

| | | |
|---|---|---|
| Section 4.01. | Commencement of Rent | 2 |
| Section 4.02. | Adjustment to Minimum Rent | 2 |
| Section 4.03. | Percentage Rent | 2 |
| Section 4.04. | Late Payment | 2 |
| Section 4.05. | Gross Receipts Defined | 2 |
| Section 4.06. | Additional Rental | 3 |

## ARTICLE V
### CONSTRUCTION OF LEASED PREMISES

| | | |
|---|---|---|
| Section 5.01. | Owner's And Tenant's Obligations | 3 |
| Section 5.02. | Possession | 3 |
| Section 5.03. | Construction Activities | 3 |
| Section 5.04. | Delay in Possession | 3 |

## ARTICLE VI
### RECORDS AND BOOKS OF ACCOUNT

| | | |
|---|---|---|
| Section 6.01. | Tenant's Records | 3 |
| Section 6.02. | Reports By Tenant | 3 |
| Section 6.03. | Annual Balance Sheet | 4 |

## ARTICLE VII
### AUDIT

| | | |
|---|---|---|
| Section 7.01. | Right To Examine Books | 4 |
| Section 7.02. | Audit | 4 |

## ARTICLE VIII
### TAXES

| | | |
|---|---|---|
| Section 8.01. | Real Property Taxes | 4 |
| Section 8.02. | Personal Property Taxes | 4 |

## ARTICLE IX
### SECURITY DEPOSIT

| | | |
|---|---|---|
| Section 9.01. | Amount of Deposit | 4 |
| Section 9.02. | Use and Return of Deposit | 4 |
| Section 9.03. | Transfer of Security Deposit | 4 |

## ARTICLE X
### CONDUCT OF BUSINESS BY TENANT

| | | |
|---|---|---|
| Section 10.01. | Use of Premises | |
| Section 10.02. | Operation of Business | 5 |

Section 10.03.   Competition .......................................................................... 5
Section 10.04.   Storage, Office Space ............................................................. 5
Section 10.05.   Hazardous Or Toxic Materials ................................................. 5
.......................................................................................................... 5

## ARTICLE XI
### MAINTENANCE AND REPAIRS

Section 11.01.   Owner's Maintenance Obligations ...........................................
Section 11.02.   Owner's Right of Entry ...........................................................
Section 11.03.   Tenant's Maintenance Obligations ......................................... 5
Section 11.04.   Plate Glass ......................................................................... 6
.......................................................................................................... 6

## ARTICLE XII
### COMMON AREA

Section 12.01.   Definition of Common Area .....................................................
Section 12.02.   Maintenance and Use of Common Area .................................... 6
Section 12.03.   Control of and Changes to Common Area .................................. 6
Section 12.04.   Common Area Expenses ......................................................... 6
Section 12.05.   Proration of Common Area Expenses ........................................ 6
Section 12.06.   Parking ................................................................................ 6
.......................................................................................................... 7

## ARTICLE XIII
### UTILITIES

Section 13.01.   Utility Charges ..............................................

Section                                                                                    Page

## ARTICLE XIV
### ALTERATIONS, SIGNS AND FIXTURES

Section 14.01.   Installation ......................................................................... 7
Section 14.02.   Removal by Tenant ............................................................... 7
Section 14.03.   Liens .................................................................................. 7
Section 14.04.   Signs, Awnings and Canopies ................................................ 7

## ARTICLE XV
### SURRENDER OF PREMISES

Section 15.01.   Surrender of Premises ........................................................... 7

## ARTICLE XVI
### INSURANCE AND INDEMNITY

Section 16.01.   Liability and Personal Property Insurance .................................. 7
Section 16.02.   Fire Insurance and Other Insurance Premiums ........................... 8
Section 16.03.   Indemnification of Owner ....................................................... 8
Section 16.04.   Boiler, HVAC and Evaporative Cooler Insurance ........................ 9
Section 16.05.   Waiver of Subrogation ........................................................... 9
Section 16.06.   Waiver of Loss and Damage ................................................... 9
Section 16.07.   Notice By Tenant .................................................................. 9

## ARTICLE XVII
### OFFSET STATEMENT, ATTORNMENT, SUBORDINATION,
### MORTGAGE PROTECTION CLAUSE

Section 17.01.   Offset Statement .................................................................. 9
Section 17.02.   Attornment ......................................................................... 8
Section 17.03.   Subordination ...................................................................... 9
Section 17.04.   Mortgagee Protection Clause .................................................. 9

## ARTICLE XVIII
### ASSIGNMENT AND SUBLETTING

Section 18.01.   Consent Required ................................................................. 9
Section 18.02.   Sale of Premises .................................................................. 10
Section 18.03.   Permitted Assignment Or Subletting ........................................ 10
Section 18.04.   Concessionaires ................................................................... 10

## ARTICLE XIX
### ADVERTISING AND PROMOTION FUND

Section 19.01.   Advertising and Promotion Fund .............................................. 10
Section 19.02.   Advertising of Tenant ............................................................ 10

## ARTICLE XX
### DESTRUCTION OF PREMISES

Section 20.01.   Total or Partial Destruction ..................................................... 10
Section 20.02.   Partial Destruction of Shopping Center ..................................... 11
Section 20.03.   Proceeds ............................................................................ 11
Section 20.04.   Waiver of Termination ........................................................... 11

## ARTICLE XXI
### EMINENT DOMAIN

Section 21.01.    Total Condemnation ........................................................................... 11
Section 21.02.    Total Parking Area ........................................................................... 11
Section 21.03.    Partial Condemnation ........................................................................... 11
Section 21.04.    Partial Condemnation of Parking Area ........................................................ 11
Section 21.05.    Allocation of Award ........................................................................... 11

## ARTICLE XXII
### DEFAULT

Section 22.01.    Notice and Remedies ........................................................................... 11
Section 22.02.    Waiver of Rights of Redemption ............................................................... 11
Section 22.03.    Default By Owner ........................................................................... 12

## ARTICLE XXIII
### HOLDING OVER, SUCCESSORS

Section 23.01.    Holding Over ........................................................................... 12
Section 23.02.    Successors ........................................................................... 12

## ARTICLE XXIV
### QUIET ENJOYMENT

Section 24.01.    Owner's Covenant ........................................................................... 12

## ARTICLE XXV
### MISCELLANEOUS

Section 25.01.    Index ........................................................................... 12
Section 25.02.    Waiver ........................................................................... 12
Section 25.03.    Accord and Satisfaction ........................................................................... 12
Section 25.04.    Entire Agreement ........................................................................... 12
Section 25.05.    No Partnership ........................................................................... 12
Section 25.06.    Force Majeure ........................................................................... 12
Section 25.07.    Notices ........................................................................... 13
Section 25.08.    Captions and Section Numbers ............................................................... 13
Section 25.09.    Tenant Defined. Use of Pronoun ............................................................. 13
Section 25.10.    Partial Invalidity ........................................................................... 13
Section 25.11.    No Option ........................................................................... 13
Section 25.12.    Recording ........................................................................... 13
Section 25.13.    Legal Expenses ........................................................................... 13
Section 25.14.    Rights Cumulative ........................................................................... 13
Section 25.15.    Authority ........................................................................... 13
Section 25.16.    Mortgage Changes ........................................................................... 13
Section 25.17.    Time of the Essence ........................................................................... 13
Section 25.18.    Lease Appendix and Rider ..................................................................... 13

**Exhibits:**

Rider to Lease ~~Guaranty~~ (two pages) of Lease
~~Lease Appendix~~
~~A    Site Plan~~
~~A-1    Floor Plan~~
~~B    Construction of Premises~~

STANDARD SHOPPING CENTER LEASE

THIS LEASE is made and entered on the ___3rd___ day of __September__ xx 2002 ("Date of Lease")
by and between _____Covina Properties, LLC_____ ("Owner"), and
___Senior Classic Leasing LLC_____ ("Tenant").

ARTICLE I
BASIC LEASE PROVISIONS

Section 1.01. Delivery of Possession Date. ___November 1, 2002_____

Section 1.02. Tenant's Trade Name. ___Senior Classic Leasing LLC_____

Section 1.03. Shopping Center. ___Covina Plaza Shopping Center_____
_____, located in the City of ___Covina_____, County of
___Los Angeles_____, State of ___CA_____.

Section 1.04. Premises. Address: ___573 N. Azusa Avenue_____
___Covina, CA 91722_____

Section 1.05. Floor Area. Approximately ___4,003___ square feet.

Section 1.06. Term. ____240_____ months.

Section 1.07. Time to Complete Tenant's Work. ____N.A._____

Section 1.08. Minimum Annual Rental.

| Dollars Per Annum | Dollars Per Month | Months of Term |
|---|---|---|
| $ 84,000.00 | $ 7,000.00 | 1 – 5 years |
| $ 96,000.00 | $ 8,050.00 | 6 – 10 years |
| $111,090.00 | $ 9,257.50 | 11 – 15 years |
| $127,754.00 | $ 10,646.12 | 16 – 20 years |

Subject to adjustment pursuant to Section 4.02

Section 1.09. Percentage Rent Rate. ___None___ %

Section 1.10. Use of Premises. Carl's Jr. fast food restaurant, containing a second
or "dual" concept, designated as Green Burrito Grill, or any lawful
purpose, provided such use shall not be deemed to compete with any
existing exclusive use related to the Covina Plaza Shopping Center.
_____. The Premises shall be used solely for the use stated above and for no other use or purpose.

Section 1.11. Contribution to Promotional Fund (Grand Opening). $ __Not Applicable_____

Section 1.12. Annual Contribution to Promotional Fund. $ __Not Applicable_____ per square foot of floor area of the Premises per annum.

Section 1.13. Security Deposit. $ __None_____.

Section 1.14. Guarantor. __Sun Gir, Inc. shall issue a guaranty in favor of the owner,
under the conditions stated in the Guaranty of Lease.__

Section 1.15. Initial Monthly Impound. __$1,157.00._____

Section 1.16. Address For Notices To Tenant. __401 W. Carl Karcher Way, Anaheim, CA 92801__
__1 Centerpointe Drive # 315, La Palma, CA 90623__

Telephone Number: (714) 736-8900

LEASED PREMISES

**Section 2.01. Leased Premises.**

Owner hereby leases to Tenant, and Tenant hereby rents from Owner, those certain premises and improvements located in the Shopping Center, consisting of a store having floor area of approximately that square footage stated in Section 1.05 (the "Premises"). "Floor area" means all areas designated by Owner for the exclusive use of Tenant measured from the outside of the exterior walls and the center of the interior demising walls. The boundaries and location of the Premises are depicted and outlined in red on the site plan of the Shopping Center, which is attached hereto as Exhibit "A" (the "Site Plan") and shall be deemed to include the entryway to such store. The shape and dimensions of the floor area of the Premises are depicted on Exhibit A.

**Section 2.02. Reservations.**

Owner reserves the right at any time to make alterations or additions to and to build additional stories on the building in which the Premises are contained (the "Building"). Owner also reserves the right to construct other buildings or improvements in the Shopping Center and to make alterations or additions thereto and to build additional stories on the Building or any other such buildings. These alterations and additions however shall not materially impair the visibility of or impede reasonable access to the Premises. Easements for light and air are not included in the Premises. Owner further reserves the right to go on the roof of the Premises for the purpose of effecting certain items of repair and maintenance as provided in this Lease.

**Section 2.03. Right to Relocate.**

The purpose of the Site Plan is to show the approximate location of the Premises. Owner reserves the right at any time to make changes to the various buildings, parking, and other common areas as shown on the Site Plan. However, Owner may not materially relocate the Premises without Tenant's prior consent, which consent will not be unreasonably withheld.

**Section 2.04. Conditions of Record.**

Owner's title is subject to: (a) the effect of any covenants, conditions, restrictions, easements, development agreements, mortgages or deeds of trust, ground leases, rights of way, and other matters or documents of record now or hereafter recorded against Owner's title, (b) the effects of any zoning laws of the city, county and state where the Shopping Center is situated and (c) general and special taxes not delinquent. Tenant agrees (i) that as to its leasehold estate it, and all persons in possession or holding under it, will conform to and will not violate said matters of record, and (iii) that this Lease is and shall be subordinate to said matters of record and any amendments or modifications thereto.

ARTICLE III
TERM

**Section 3.01. Commencement of Term.**

The term of this lease (the "Term") shall commence on the Delivery of Possession Date and shall continue for the number of months specified in Section 1.06 unless sooner terminated in accordance with the provisions of this Lease. If the Term commences prior to Tenant's obligation to pay rent, Tenant shall be required to pay all sums set forth in Section 4.06 of this Lease on the day the Term commences.

ARTICLE IV
RENT

**Section 4.01. Commencement of Rent.**

Tenant's obligation to pay Minimum Rent and ~~Percentage Rent~~ under this Lease shall commence the first to occur of: (a) the date Tenant first opens for business to the public in the Premises; (b) the expiration of period set forth as time to complete Tenant's Work in Section 1.07; or (c)___November 1___ x19 2002 The period of time to complete Tenant's Work shall commence on Owner's notice to Tenant that the Premises are substantially completed and ready for occupancy as provided in Section 5.02. If the day Tenant's obligation to pay rent does not occur on the first day of the month, Tenant shall pay rent for the fractional month on a per diem basis (calculated on the basis of a thirty day month) until the first day of the month next succeeding the date Tenant's obligation to pay rent commences. The minimum Rent shall be paid thereafter in equal monthly installments on the first day of each month in advance. The Minimum Rent to be paid by Tenant during the Term of this Lease is set forth in Section 1.06.

~~Section 4.02. Adjustments to Minimum Rent.~~

~~The Minimum Rent payable pursuant to this Lease shall be adjusted as provided in the Lease Appendix to reflect any changes in the cost of living in accordance with the Index as defined herein.~~

~~Section 4.03. Percentage Rent.~~

~~During the Term, Tenant shall pay to Owner Percentage Rent as set forth in the Lease Appendix.~~

**Section 4.04. Late Payment.**

If the Tenant fails to pay the Minimum Rent or any installment thereof ~~or Percentage Rent, if any, as defined herein~~ or any other additional rent under this Lease within five (5) days after the same has become due, both Tenant and Owner agree that Owner will incur additional expenses consisting of extra collection efforts, handling costs, and potential impairment of credit on loans for which may be secured by this Lease. Both parties agree that should Tenant so fail to pay its rent, Owner is entitled to compensation for detriment caused by the failure, but that it is extremely difficult and impractical to ascertain the extent of the detriment. The parties therefor agree that should Tenant fail to pay any rent due hereunder within five (5) days after the same becomes due, Owner shall be entitled to recover from Tenant five (5%) percent of the amount past due as liquidated damage. Such past due amounts shall also bear interest at the maximum rate allowed by law from the date due until paid. Tenant further agrees to pay Owner any costs incurred by Owner in the collection of such past due rent including but not limited to fees of an attorney and/or collection agency. Nothing herein contained shall limit any other remedy of Owner under this Lease. Owner shall also have the right to require Tenant to pay any past due sums by cashier's check or money order.

Further, should Tenant fail to pay rent or any other charges due hereunder in the time periods set forth herein, two (2) or more times during any calendar year of the Term, Owner may require Tenant to thereafter pay Minimum Rent in quarterly installments in advance for the balance of the Term.

All Minimum Rent shall be paid in advance, without deduction or offset on or before the first day of each successive calendar month during the Term. Minimum Rent for any period which is for less than one (1) month shall be a prorated portion of the monthly rent installment based upon a thirty (30) day month.

~~Section 4.05. Gross Receipts Defined.~~

~~"Gross Receipts" means (a) the entire amount charged for the full price at the time of the initial transaction for all merchandise sold or delivered or services rendered by Tenant whether for cash or credit; (b) the gross amount received or charged by Tenant for merchandise sold or services rendered pursuant to orders received by telephone, mail, house to house, or by other canvassing attributable to the Premises whether or not filled elsewhere; and (c) all gross amount of Tenant from any operation in, at, from or~~

through the use of the Premises and rental; ~~(b) sales taxes, excise taxes, other similar taxes; (c) franchise~~ ~~royalties not to exceed~~ ~~five (5%) percent of Gross Receipts; (d) proceeds from sales of fixtures, equipment, or property which is not stock-in-trade; and~~ ~~(e) sales to employees representing discounts or compensation benefits and for which Tenant realizes no monetary profit.~~

**Section 4.06. Additional Rental.**

All other sums required to be paid by Tenant to Owner pursuant to this Lease in addition to Minimum Rent ~~and Percentage Rent,~~ whether or not designated as rent, shall be deemed to be additional rent.

ARTICLE V

CONSTRUCTION OF LEASED PREMISES

**Section 5.01.   Owner's And Tenant's Obligations.**

Subject to delay as provided herein, Owner shall, at its own cost and expense, develop the Premises in accordance with plans and specifications prepared by Owner or Owner's architect, incorporating in such construction all items of work to be performed by Owner as described in Exhibit "B" attached hereto ("Owner's Work"), as soon as practical after all final drawings and specifications for the improvements of the Premises have been adopted and approved as provided in Exhibit "B". Any work to be performed by Tenant as specified in Exhibit B, any permits, fees or applications for such work, or any work in addition to any of the items listed in Exhibit "B" shall be performed or obtained by the Tenant at its sole cost and expense (collectively "Tenant's Work"). Any equipment or work other than those items listed in Exhibit "B" requested by Tenant to be installed in or constructed on the Premises by Owner shall be paid for by the Tenant prior to commencement of construction or installation of such additional items.

**Section 5.02.   Possession.**

Upon substantial completion by Owner of Owner's Work on the Premises, Owner shall notify Tenant in writing. Upon the delivery of such notice, Tenant will accept the Premises in the condition which it may then be and waives any right or claim against the Owner for any cause directly or indirectly, arising out of the condition of the Premises, appurtenances thereto, the improvements thereon and the equipment thereof. Tenant shall thereafter save and hold harmless the Owner from liability as provided in this Lease. Owner shall not be liable for any latent or patent defects therein, provided however that Owner warrants the Building against latent defects for a period of one (1) year from completion of original construction.

"Substantially completed" means completed to such extent that Tenant may reasonably commence its construction of improvements to and fixturization of the Premises without undue interference with the balance of the work to be performed by Owner in the Premises, or undue interference by Owner with the Tenant's construction activities. If the Premises have been previously occupied, Tenant agrees to accept the Premises "as is" and in the condition delivered. Tenant acknowledges that it has inspected the Premises and that they are in good and satisfactory condition.

**Section 5.03.   Construction Activities.**

Prior to commencement of Tenant's Work, Tenant shall notify Owner in writing of the date Tenant will commence construction and shall deliver to Owner certificates of insurance evidencing the existence of insurance as required by Section 15.01 herein. Tenant's contractor shall commence the construction of Tenant's Work promptly upon delivery of possession of the Premises and shall diligently pursue such construction to completion within the time period required by Section 1.07 herein. Tenant will record within ten (10) days of completion of Tenant's Work, and thereafter deliver a copy of a Notice of Completion and appropriate lien releases relative to any improvements made by Tenant and/or Tenant's contractor on the Premises prior to Tenant opening for business.

Unless otherwise agreed to in writing by Owner, any work performed on the Premises in connection with the heating, ventilation, air-conditioning equipment ("HVAC"), any roof penetrations, or automatic sprinklers shall be performed by Owner and/or Owner's contractor and paid for by Tenant. If Tenant does not use Owner's roofer and/or HVAC contractor or sprinkler contractor, Owner reserves the right to have Owner's contractor inspect Tenant's improvements at Tenant's expense and correct any defects at Tenant's expense. Until such time as any substandard work has been repaired by Owner's contractor, Tenant will be responsible for any necessary repairs and/or service calls.

**Section 5.04.   Delay In Possession.**

Owner shall not be liable for failure to deliver possession of the Premises to Tenant on the date or at the time specified herein; provided, however, that if Owner fails to deliver possession of the Premises on or before the expiration of one (1) year from the date specified in Section 1.01 herein, either party may terminate this Lease by giving thirty (30) days written notice to the other party. Thereafter, neither party shall have any further liability to the other in connection with this Lease. Owner shall not be deemed to be in default with respect to the performance of any of its construction obligations herein if such default is due to any strike, lockout, civil commotion or invasion, rebellion, hostilities, sabotage, governmental regulations or controls, inability to obtain materials, services or financing, inclement weather, acts of God, delay on the part of Tenant or other causes beyond the control of Owner.

~~ARTICLE VI~~

~~RECORDS AND BOOKS OF ACCOUNT~~

~~Section 6.01.   Tenant's Records.~~

~~Tenant shall maintain and keep on the Premises or at Tenant's main office for a period of not less than three (3) years following the end of each year during the Term, adequate records which show Gross Receipts, inventories and receipts of merchandise at the Premises, and daily receipts from all sales and other transactions on the Premises by Tenant and any other persons conducting any business upon the Premises. Tenant shall record at the time of sale, in the presence of the customer, all receipts from sales or other transactions, whether for cash or credit, in a cash register or in cash registers having a cumulative total which shall be sealed in a reasonable manner, and having such other reasonable features as may be appropriate or required in order to properly account for and record all sales or other transactions in and from the Premises. If upon an audit of Tenant's books and records by Owner as permitted herein, Owner determines that Tenant's manner of recording sales is inadequate, Tenant agrees to adopt such measures as Owner may reasonably request to correct such inadequacies. Tenant further agrees to keep on the Premises or at Tenant's main office for at least three (3) years following the end of each year during the Term all pertinent original sales records. Original sales records may include any or all of the following: (a) cash register tapes, including tapes from temporary registers; (b) serially numbered sales slips; (c) computer printouts and computerized sales slips; (d) the originals of all mail orders at and to the Premises; (e) the original records of all telephone orders at and to the Premises; (f) settlement report sheets of transactions with subtenants, concessionaires and licensees; (g) the original records showing that merchandise returned by customers was purchased at the Premises by such customers; (h) memorandum receipts or other records of merchandise taken out on approval; (i) records of inventory purchases; (j) such other sales records, if any, which would normally be examined by an independent accountant pursuant to generally accepted auditing standards in performing an audit of Tenant's sales; and (k) the records specified in (a) to (j) above for subtenants, assignees, concessionaires or licensees of Tenant.~~

~~Section 6.02.   Reports by Tenant.~~

~~Tenant shall submit to Owner on or before the 30th day following each monthly period during the Term hereof (including the 30th day of the month following the end of the Term) at the place then fixed for the payment of rent, or at such other place designated by Owner, a written statement signed by Tenant, and certified by it to be true and correct, showing in reasonable accurate detail, the amount of Gross Receipts for each preceding month and fractional month, if any. If Tenant fails to timely submit to Owner the monthly written statement described above, Tenant shall pay to Owner, as additional rent and without limiting any other remedy Owner may have against Tenant under this Lease as a result of this breach, a $50.00 charge for each and every month that the Tenant fails to timely submit such written statement.~~

~~Tenant shall submit to the Owner ... and certified to be true and correct showing ... accurate detail payment of rent, a written statement ... by Tenant, and certified to be true and correct showing ... accurate detail satisfactory in scope to Owner, the amount of Gross Receipts during the preceding calendar year. At Owner's option, the written statement shall be duly certified to Tenant and Owner by independent certified public accountants of recognized standing. The accounting statements referred to in this section shall be in such form and style and contain such details and breakdown as the Owner may reasonably require.~~

### Section 6.03.   Annual Balance Sheet.

Tenant shall provide Owner, whenever reasonably requested by Owner, a current annual balance sheet for Tenant's business at the Premises, either certified by Tenant to be true and correct or accompanied by a report of an independent certified public accountant.

~~ARTICLE VII~~
~~AUDIT~~

~~Section 7.01.   Right to Examine Books.~~

~~The acceptance by the Owner of payments of Percentage Rent shall be without prejudice to Owner's right to examine Tenant's books and records concerning Gross Receipts from the Premises.~~

~~Section 7.02.   Audit.~~

~~At its option, Owner may cause, at any reasonable time and upon five (5) days prior written notice to Tenant, a complete audit to be made of Tenant's entire business affairs and records relating to the Premises for the period covered by any statement issued by the Tenant in accordance with Section 6.02. If such audit discloses that Tenant has under-reported Gross Receipts by more than three (3%) percent for such period, Tenant shall promptly pay to Owner within ten (10) days the cost of its audit in addition to any deficiency in amounts owed as disclosed by the audit. In the event that it is determined that Tenant has under-reported Gross Receipts by more than three (3%) percent through two successive audits, Owner may terminate this Lease upon five (5) days written notice to Tenant.~~

ARTICLE VIII
TAXES

### Section 8.01.   Real Property Taxes.

Tenant agrees to pay its pro rata share of all general and special real property taxes and assessments (collectively "Real Property Taxes") which may be levied or assessed by any lawful authority against the Shopping Center applicable to the period from the commencement of the Term until the expiration or sooner termination of this Lease. Tenant's pro rata share shall be apportioned according to the floor area of the Premises as it relates to the total leasable floor area of the Building or buildings located within the Shopping Center (including the Premises). Notwithstanding the foregoing provisions, if the Real Property Taxes are not levied and assessed against the entire Shopping Center by means of a single tax bill (i.e., if the Shopping Center is separated into two (2) or more separate tax parcels for purposes of levying and assessing the Real Property Taxes), then, at Owner's option, Tenant shall pay Tenant's pro rata share of all Real Property Taxes which may be levied or assessed by any lawful authority against the land and improvements of the separate tax parcel on which the Building containing the Premises is located. Tenant's pro rata share under such circumstances shall be apportioned according to the floor area of the Premises as it relates to the total leasable floor area of the Building or buildings situated in the separate tax parcel in which the Premises is located.

All Real Property Taxes for the tax year in which the Term commences and for the tax year in which this Lease terminates shall be apportioned and adjusted so that Tenant shall not be responsible for taxes and assessments for a period of time occurring prior to the time the Term commences or subsequent to the Term.

The amount to be paid pursuant to the provisions of this Section 8.01 shall be paid monthly in advance as estimated by the Owner based on the most recent tax bills and estimates of reappraised values (if reappraisal is to occur), commencing with the month (or partial month on a prorated basis if such be the case) that the Term commences. The initial estimated monthly charge is included in the Monthly Impound set forth in, and to be adjusted in accordance with, Section 12.05 herein.

If at any time during the Term under the laws of the United States, or the state, county, municipality, or any political subdivision thereof in which the Shopping Center is located, a tax or excise on rent or any other tax however described is levied or assessed by any such political body against Owner on account of rent payable to Owner hereunder or any tax based on or measured by expenditures made by Tenant on behalf of Owner, such tax or excise shall be considered "Real Property Taxes" for purposes of this Section 8.01, and shall be payable in full by Tenant. At Owner's option, such taxes or excises shall be payable monthly in advance on an estimated basis as provided in this Section 8.01 or shall be payable within ten (10) days after Tenant's receipt of the tax bill therefor from Owner.

### Section 8.02.   Personal Property Taxes.

Tenant shall pay prior to delinquency all federal, municipal, county or state taxes, charges, assessments and fees assessed during the Term against any leasehold interest or personal property of any kind, owned by or placed in, upon or about the Premises by Tenant.

~~ARTICLE IX~~
~~SECURITY DEPOSIT~~

~~Section 9.01.   Amount of Deposit.~~

~~Upon signing this Lease, Tenant shall deposit with Owner the sum set forth in Section 1.13 herein ("Security Deposit"). This Security Deposit shall be held by Owner, without liability for interest, as partial security for the full and faithful performance by Tenant of all the terms, covenants, and conditions of this Lease to be performed by Tenant. Owner may commingle the Security Deposit and shall not be required to keep it separate from its general funds.~~

~~Section 9.02.   Use and Return of Deposit.~~

~~In the event of the failure of Tenant to abide by any of the terms, covenants and conditions of this Lease, then Owner, at its option, may use any amount of the Security Deposit to compensate Owner for any loss or damage sustained or suffered due to such failure by Tenant. The entire Security Deposit, or any portion thereof, also may be applied by Owner for the payment of overdue rent or other sums due and payable to Owner by Tenant hereunder. Tenant shall, upon the written demand of Owner, immediately remit to Owner a sufficient amount in the form of a cashier's check to restore the Security Deposit to the original sum deposited. Failure to do so within five (5) days after such demand shall constitute a material breach of this Lease. Should Tenant comply with all of the terms, covenants and conditions of this Lease and promptly pay when due all of the rent herein provided and all other sums payable by Tenant to Owner, the Security Deposit will be returned in full to Tenant within three (3) months following the end of the Term.~~

~~Section 9.03.   Transfer of Security Deposit.~~

~~Owner may deliver the Security Deposit to the purchaser of Owner's interest in the Premises, in the event that such interest is sold, and upon delivery, Owner shall be discharged from any further liability with respect to repayment of the Security Deposit to Tenant.~~

## ARTICLE X

### CONDUCT OF BUSINESS BY TENANT

#### Section 10.01.   Use of Premises.

Tenant shall use the Premises solely for the use and under the trade name specified in Sections 1.10 and 1.02. respectively, herein.

Tenant shall occupy the Premises for the conduct of such business within a reasonable period of time after the date of the notice provided for in Section 5.01 herein and shall thereafter open and operate for business to the public in the Premises.

Tenant shall at no time allow gaming machines (slots or otherwise) and/or arcade amusement machines (pinball, video, etc.) to be used, operated or kept within the Premises. Tenant shall not commit or suffer to be committed any waste upon the Premises or any nuisance or other act or thing which may disturb the quiet enjoyment of any other tenants or their customers in the Shopping Center.

Tenant shall not use, or permit the Premises, or any part thereof, to be used for any purposes other than the purposes for which the Premises are hereby leased. No use shall be made or permitted to be made of the Premises, nor acts done, which will increase the existing rate of insurance upon the Building, or cause a cancellation of any insurance policy covering the Building or any part thereof. Nor shall Tenant sell or permit to be kept, used, stored or sold in or about Premises any article which may be prohibited by standard form fire insurance policies. Tenant shall, at its sole cost, comply with any and all requirements, pertaining to the use of the Premises, of any insurance organization or company necessary for the maintenance of the fire and public liability insurance described in this Lease covering the building and its appurtenances. If Tenant's use of the Premises, as recited in this Section 10.01, results in a rate increase for the Building, Tenant shall pay within ten (10) days of billing from Owner, as additional rent, a sum equal to the additional premium caused by such rate increase.

#### Section 10.02.   Operation of Business.

Tenant shall operate 100% of the Premises during the entire Term with due diligence and efficiency so as to maximize the Gross Receipts which may be produced by Tenant's business therein. Tenant shall carry at all times in the Premises a stock of merchandise of such size, character and quality as shall be reasonably designed to produce the maximum return to Owner and Tenant. Tenant shall conduct its business in the Premises during the usual and customary days and hours for such type of business, or during times designated by Owner for other tenants at the Shopping Center. In the latter event, Owner will notify Tenant in writing of the designated Shopping Center days and hours. Tenant shall install and maintain at all times displays of merchandise in the display windows (if any) for the Premises, Tenant shall keep the display windows and signs, if any, in the Premises well lighted during the hours from sundown to 11:00 p.m.

This provision however shall not apply if the Premises should be closed and the business of Tenant temporarily discontinued therein for not more than three (3) days out of respect to the memory of any deceased officer or employee of Tenant, or the relative of any such officer or employee. In the event that Tenant intends to terminate this Lease regardless of the reason, or abandon the Premises without the prior approval or consent of Owner, which termination is prior to the end of the Term, Tenant agrees to immediately notify Owner in writing of its intention to do so and thereafter keep the Premises open for business during its customary business days and hours for a period of ninety (90) days. In addition to any other remedies Owner may have, Owner may enforce, and Tenant agrees to be bound by, this ninety (90) day provision by way of an action for specific performance and in the form of an injunction. Tenant shall keep the Premises during this ninety (90) day period adequately stocked with merchandise and with sufficient sales personnel to care for the patronage, and conduct its business in accordance with sound business practices.

In the event of breach by the Tenant of any of the conditions contained in this Section 10.02, Owner shall have, in addition to any and all remedies herein provided, the right at its option to collect not only the Minimum Rent, but additional rent at the rate of 1/30th of the monthly Minimum Rent for each day that the Tenant shall fail to conduct its business in accordance with this Article. This additional rent is intended to compensate Owner for the loss of any Percentage Rent that could have been earned during this period.

#### ~~Section 10.03.   Competition.~~

~~During the Term, neither Tenant, nor any entity owned or controlled directly or indirectly by Tenant, its partners, shareholders or directors, shall, without the prior written consent of Owner, directly or indirectly engage in any similar or competing business with that to be operated by Tenant in the Premises within a radius of two (2) miles from the outside boundary of the Shopping Center.~~   ~~1 mile~~

#### Section 10.04.   Storage. Office Space.

Tenant shall warehouse, store and/or stock in the Premises only such goods, wares and merchandise as Tenant intends to offer for retail sale at, in, from or upon the Premises. This shall not preclude occasional emergency transfers of merchandise to the other stores of Tenant, if any, not located in the Shopping Center. Tenant shall use for office, clerical or other non-selling purposes only such space in the Premises as is from time to time reasonably required for Tenant's business in the Premises. No auction, "fire", bankruptcy or sidewalk sales may be conducted in or upon the Premises without Owner's prior written consent.

#### Section 10.05.   Hazardous Or Toxic Materials.

Tenant shall not store, use or permit to be used in, on or about the Premises any toxic or hazardous substances including, but not limited to, asbestos or polychlorinated biphenyls. Tenant shall comply, at its expense, with all federal, state and local statutes or regulations concerning environmental conditions, emissions, pollutants and controls.

## ARTICLE XI

### MAINTENANCE AND REPAIRS

#### Section 11.01.   Owner's Maintenance Obligations.

Owner on behalf of Tenant and the other occupants of the Building shall maintain in good condition and repair the foundations, roofs and exterior surfaces of the exterior walls of the Building (exclusive of doors, door frames, door checks, windows, window frames, and store fronts); provided however if any repairs or replacements are necessitated by the negligence, gross negligence, or willful acts of Tenant or anyone claiming under Tenant or by reason of Tenant's failure to observe or perform any provisions contained in this Lease or caused by alterations, additions or improvements made by Tenant or anyone claiming under Tenant, the cost of such repairs and replacements shall be solely borne by Tenant. It is acknowledged by Tenant that the cost of Owner's maintenance obligations referenced in the preceding sentence (excluding the costs of maintaining the structural portions of the walls and foundation of the Building) shall be prorated and paid by Tenant as Common Area Expenses, as defined herein. Notwithstanding anything to the contrary contained in this Lease, Owner shall not be liable for failure to make repairs required to be made by Owner under the provisions of this Lease unless Tenant has previously notified Owner in writing of the need for such repairs and Owner has failed to commence and complete the repairs within a reasonable period of time following receipt of Tenant's written notification. Tenant waives any right of offset against any rent due hereunder and agrees not to assert as an affirmative defense in any judicial proceeding or arbitration brought by Owner against Tenant on claims made under this Lease the provisions of Sections 1941 and 1942 of the California Civil Code, or any superseding statute, and of any other law permitting Tenant to make repairs at Owner's expense.

#### Section 11.02.   Owner's Right of Entry.

Owner, its agents, contractors, employees and assigns may enter the Premises at all reasonable times (a) to examine the Premises; (b) to perform any obligation of, or exercise any right or remedy of, Owner under this Lease; (c) to make repairs, alterations, improvements or additions to the Premises, the Building or to other portions of the Shopping Center as Owner deems necessary; (d) to perform work necessary to comply with laws, ordinances, rules or regulations of any public authority or of any insurance underwriter; (e) to show prospective tenants the Premises during the last six (6) months of the Term; and, (f) to perform work that Owner deems necessary to prevent waste or deterioration in connection with the Premises should Tenant fail to commence to make, and diligently pursue to completion, its required repairs within three (3) days after written demand therefor by Owner.

Section 11.03.   Tenant's Maintenance Obligations.

Tenant, at its sole cost and expense, shall keep the Premises in first class order, condition and repair and shall make all replacements necessary to keep the Premises in such condition. All replacements shall be of a quality equal to or exceeding that of the original. Should Tenant fail to make these repairs and replacements or otherwise so maintain the Premises for a period of three (3) days after written demand by Owner, or should Tenant commence, but fail to complete, any repairs or replacements within a reasonable time after written demand by Owner, Owner may make such repairs or replacements without liability to Tenant for any loss or damage that may occur to Tenant's stock or business, and Tenant shall pay to Owner the costs incurred by Owner in making such repairs or replacements together with interest thereon at the maximum rate permitted by law from the date of commencement of the work until repaid. Tenant shall, at its expense, repair promptly any damage to the Building or the Shopping Center caused by Tenant or its agents or employees or caused by the installation or removal of Tenant's personal property. Tenant shall contract with a service company licensed and experienced in servicing HVAC equipment and approved by Owner for the quarterly maintenance of the HVAC equipment serving the Premises and shall provide Owner with a copy of the service contract within thirty (30) days following its execution, or Owner, at its option, may contract with a service company of its own choosing, or provide such service itself, for the maintenance of the HVAC equipment, and bill Tenant for the cost of same. The sum so billed to Tenant shall become immediately due to Owner as additional rent.

Tenant shall, at its own expense, comply with all requirements, including the installation and periodic maintenance of fire extinguishers or automatic dry chemical extinguishing system, of the insurance underwriters and other governmental authority having jurisdiction there over, necessary for maintenance of reasonable first and extended coverage insurance for the Premises.

Section 11.04.   Plate Glass.

Tenant shall replace, at its expense, any and all plate and other glass damaged or broken from any cause whatsoever (except Owner's direct act) in and about the Premises. Tenant shall have the option either to insure this risk or to self insure.

ARTICLE XII

COMMON AREA

Section 12.01.   Definition of Common Area.

The term "Common Area," as used in this Lease means all areas within the exterior boundaries of the Shopping Center now or later made available for the general use of Owner and other persons entitled to occupy floor area in the Shopping Center including the exterior surfaces and roof of the Building. Without limiting this definition, Owner may include in the Common Area those portions of the Shopping Center presently or later sold or leased to purchasers or tenants, as the case may be, until the commencement of construction of the building(s) thereon, at which time there shall be withdrawn from the Common Area those areas not provided by such owner or lessee for common use. Common Area shall not include (i) the entryway to a tenant's premises, (ii) any improvements installed by a tenant outside of its premises, whether with or without Owner's knowledge or consent, or (iii) any areas or facilities that could be considered as Common Area except that the areas or facilities are included in the description of premises leased to a tenant.

Section 12.02.   Maintenance and Use of Common Area.

The manner in which the Common Area shall be maintained shall be solely determined by Owner. If any owner or tenant of any portion of the Shopping Center maintains its own Common Area (Owner shall have the right in its sole discretion to allow any purchaser or tenant to so maintain its own Common Area and be excluded from participation in the payment of Common Area Expenses as provided below], Owner shall not have any responsibility for the maintenance of that portion of the Common Area; Tenant hereby waives any claims or damages arising out of any failure of such owner or tenant to so maintain its portion of the Common Area.

The use and occupancy by Tenant of the Premises shall include the right to use the Common Area (except those portions of the Common Area on which have been constructed or placed permanent or temporary kiosks, displays, carts and stands and except areas used in the maintenance or operation of the Shopping Center), in common with Owner and other tenants of the Shopping Center and their customers and invitees, subject to such reasonable, non-discriminatory rules and regulations concerning the use of the Common Area as may be established by Owner from time to time. Written notice of such rules and regulations and amendments and supplements thereto, if any, shall be given to Tenant thirty (30) days prior to their effective date. Tenant agrees to promptly comply with all such rules and regulations upon receipt of written notice from Owner.

Tenant and Tenant's employees and agents shall not solicit business in the Common Areas, nor shall Tenant distribute any handbills or other advertising matter on automobiles parked in the Common Areas.

Section 12.03.   Control of and Changes to Common Area.

Owner shall have the sole and exclusive control of the Common Area, as well as the right to make reasonable changes to the Common Area. Owner's rights shall include, but not be limited to, the right to (a) restrain the use of the Common Area by unauthorized persons; (b) cause Tenant to remove or restrain persons from any unauthorized use of the Common Area if they are using the Common Area by reason of Tenant's presence in the Shopping Center; (c) utilize from time to time any portion of the Common Area for promotional, entertainment and related matters; (d) place permanent or temporary kiosks, displays, carts and stands in the Common Area and to lease same to tenants; (e) temporarily close any portion of the Common Area for repairs, improvements or alterations, to discourage non-customer use, to prevent dedication or an easement by prescription, or for any other reason deemed sufficient in Owner's judgment; and (f) reasonably change the shape and size of the Common Area, add, eliminate or change the location of improvements to the Common Area, including, without limitation, buildings, lighting, parking areas, roadways and curb cuts, and construct buildings on the Common Area. Owner may determine the nature, size and extent of the Common Area and whether portions of the same shall be surface, underground or multiple-deck; as well as make changes to the Common Area from time to time which in Owner's opinion are deemed desirable for the Shopping Center.

Section 12.04.   Common Area Expenses.

The term "Common Area Expenses" as used in this Lease means all costs and expenses incurred by Owner, in (a) operating, managing, policing, insuring, repairing and maintaining the Common Area and, if applicable, the security offices, management offices, merchant association offices, postal services, non-profit community buildings and child care centers located in the Shopping Center from time to time (the "Common Facilities"), (b) maintaining, repairing and replacing the exterior surface of exterior walls and maintaining, repairing and replacing roofs of the buildings from time to time constituting the Shopping Center including the Building; and (c) operating, insuring, repairing, replacing and maintaining the Common Utility Facilities. "Common Utility Facilities" are defined to include but are not limited to, sanitary sewer lines and systems, gas lines and systems, water lines and systems, fire protection lines and systems, electric power, telephone and communication lines and systems, and storm drainage and retention facilities not exclusively serving the premises of any tenant or store located in the Shopping Center. Common Area Expenses shall include, without limitation, the following: expenses for maintenance, landscaping, repaving, resurfacing, repairs, replacements, painting, lighting, cleaning, trash removal, security, fire protection and similar items; non-refundable contributions toward one or more reserves for replacements other than equipment; rental on equipment; charges, surcharges and other levies related to the requirements of any Federal, State or local governmental agency; expenses related to the Common Utility Facilities; real and personal property taxes and assessments on the improvements and land comprising the Common Area and Common Facilities; public liability and property damage insurance on the Common Area and Common Facilities; fire with extended coverage insurance with vandalism and malicious mischief endorsements with, at Owner's option, an earthquake damage endorsement, rental loss coverage and any additional coverages required pursuant to Section 16.02, and a sum payable to Owner for administration and overhead in an amount equal to fifteen (15%) percent of the Common Area Expenses for the applicable year. **Management fee for common area is 15% of all charges and expenses.**

Section 12.05.   Proration of Common Area Expenses.

Portions of the Shopping Center may be owned or leased from time to time by various persons or entities occupying freestanding facilities or other facilities containing a substantial amount of floor area and designated by Owner as "Other Stores".

The contributions, if any, of the Other Stores towards the Common Area Expenses shall be credited towards payment of Common Area Expenses and the balance thereof shall be prorated in the following manner:

(a)   From and after the commencement of the Term, Tenant shall pay to Owner, on the first day of each calendar month, an amount estimated by Owner to be the monthly amount of Tenant's share of the Common Area Expenses ("Monthly Impound"). Tenant's initial Monthly Impound under this Lease is set forth in Section 1.15. The Monthly Impound may be adjusted periodically by Owner based on Owner's reasonable estimation of anticipated costs.

(b)   Within one hundred twenty (120) days following the end of each calendar year of the Term, or, at Owner's option, its fiscal year, Owner shall furnish Tenant with a statement covering the calendar or fiscal year (as the case may be) just expired, showing the actual Common Area Expenses for that year, the amount of Tenant's share of Common Area Expenses for said calendar or fiscal year and the Monthly Impound payments made by Tenant during that year. If Tenant's share of the Common Area Expenses exceed Tenant's prior Monthly Impound payments, Tenant shall pay Owner the deficiency within ten (10) days after receipt of the annual statement. If Tenant's Monthly Impound payments for the calendar or fiscal year exceed Tenant's actual share of Common Area Expenses, and provided Tenant is not in arrears as to the payment of any rent or additional rent, Tenant may offset the excess against the next Monthly Impound due Owner.

(c)   Common Area Expenses may be broken down by Owner into expenses related to the maintenance of all Common Areas exclusive of the Building and other buildings and those expenses related to the operation, management, maintenance and repair of the Building and other buildings. Tenant's share of the Common Area Expenses related to the Building shall be determined by multiplying the amount of such expenses by a fraction, the numerator of which is the number of square feet of floor area in the Premises and the denominator of which is the number of square feet of leasable floor area in the Building as of the commencement of the applicable calendar year or fiscal year (as the case may be) or, at Owner's option, each calendar or fiscal quarter or pursuant to such other fair or equitable manner as determined by Owner. Tenant's share of the Common Area Expenses exclusive of those related to the Building or other buildings if they are also separately identified and billed to tenants, shall be determined by multiplying the Common Area Expenses that remain after applying the contributions, if any, from the Other Stores, by a fraction the numerator of which is the number of square feet of floor area in the Premises and the denominator of which is the number of square feet of leasable floor area in the Shopping Center as of the commencement of the applicable calendar year or fiscal year (as the case may be) or, at Owner's option, each calendar or fiscal quarter, exclusive of the floor area occupied by the Other Stores and exclusive of the Common Facilities; or pursuant to such other fair or equitable manner as determined by Owner.

(d)   Notwithstanding anything contained in this Section 12.05 to the contrary, tenants in the Shopping Center that with Owner's approval maintain, repair and replace the roofs located above their stores, shall not be included in the proration of Common Area Expenses relative to other roofs in the Shopping Center and the Floor Area of their stores shall be excluded from the calculations made pursuant to Section 12.05(c) with respect to those other roofs.

### Section 12.06.   Parking.

Tenant and its employees shall park their vehicles only in those portions of the Common Area from time to time designated for such purpose by Owner. Further, Owner shall have the right to adopt and implement such parking programs as may be necessary to alleviate parking problems during peak traffic periods, including requiring the use of offsite parking. Tenant shall pay to Owner its proportionate share of the cost of any such offsite parking program based on the ratio of the floor area of the Premises to the total floor area of the premises of all tenants in the Shopping Center required to participate in such program.

Tenant shall furnish Owner with a list of its employees and the license numbers of their vehicles within fifteen (15) days after Tenant opens for business in the Premises. Tenant shall be responsible for ensuring that its employees comply with all the provisions of this section and such other parking rules and regulations as may be adopted and implemented by Owner from time to time, including but not limited to systems of validation, shuttle transportation or any other programs which may be deemed necessary or appropriate by Owner to control, regulate or assist parking by customers of the Shopping Center.

### ARTICLE XIII

### UTILITIES

### Section 13.01.   Utility Charges.

Tenant shall be solely responsible for and shall promptly pay all charges for heat, water, gas, electricity or any other utility used, consumed or provided in, or furnished, or attributable to the Premises at the rates charged by the supplying utility companies. Should Owner elect to supply any or all of such utilities, Tenant agrees to purchase and pay for the same as additional rent as apportioned by the Owner. The rate to be charged by Owner to Tenant shall not exceed the rate charged Owner by any supplying utility plus any expenses incurred by Owner in connection with billing and supplying such utility service to Tenant. In no event shall Owner be liable for any interruption or failure in the supply of any such utilities to the Premises. Tenant agrees to reimburse Owner within ten (10) days of billing for fixture charges and/or water tariffs, if applicable, which are charged by local utility companies. Owner will notify Tenant of this charge as soon as it becomes known. This charge will increase or decrease with current charges being charged Owner by the local utility company, and will be due as additional rent.

### ARTICLE XIV

### ALTERATIONS, SIGNS AND FIXTURES

### Section 14.01.   Installation.

Tenant shall not make or cause to be made any alterations, additions or improvements or install or cause to be installed any trade fixtures, exterior signs, floor covering, interior lighting, plumbing fixtures, shades or awnings or make any changes to the store front of the Premises without Owner's prior written consent. Tenant shall present Owner with plans and specifications for such work concurrently with the request for approval. If required by Owner, Tenant shall also provide security for the lien free completion of such work in the form of a bond or other security satisfactory to Owner.

### Section 14.02.   Removal by Tenant.

All alterations, decorations, additions and improvements made by the Tenant, or made by the Owner on the Tenant's behalf by agreement under this Lease, shall remain the property of the Tenant for the Term, or any extension of renewal thereof. Any alterations, decorations, additions and improvements made by Tenant shall not be removed from the Premises without Owner's prior written consent. During the Term, Tenant shall not remove any of its trade fixtures or other personal property, without the immediate replacement thereof with comparable fixtures or property. Upon expiration of this Lease, or any renewal term thereof, at Owner's option, Tenant shall remove all such alterations, decorations, additions, and improvements, and restore the Premises as provided in Section 15.01 hereof. If the Tenant fails to remove such alterations, decorations, additions and improvements and restore the Premises, then upon the expiration of this Lease, or any renewal thereof, and upon Tenant's removal from the Premises, all such alterations, decorations, additions and improvements shall become the property of Owner and Tenant shall reimburse Owner for the cost of removal and/or storage of such alterations, decorations, additions and improvements.

### Section 14.03.   Liens.

Tenant shall keep the Premises free from any kinds of liens arising out of work performed or materials furnished Tenant and shall promptly pay all contractors and materialman used by Tenant to improve the Premises, so as to minimize the possibility of a lien attaching thereto, and should any such lien be made or filed, Tenant shall bond against or discharge the same within 10 days after written request by Owner.

Tenant shall indemnify, defend and hold Owner, the Premises and the Shopping Center and every part thereof free and harmless any and against any and all liability, damage, claims, demands, suits, actions or expense (including attorney's fees) arising out of any work done on or about the Premises by Tenant, its employees, representatives, successors, contractors, subcontractors, materialmen and assigns.

**Section 14.04.   Signs, Awnings and Canopies.**

Tenant will not place or suffer to be placed or maintained on the roof or on any exterior door, wall or windows (or within 48 inches of any windows) of the Premises any sign, awning or canopy, or advertising matter on the glass of any window or door of the Premises without Owner's prior written consent. Tenant further agrees to maintain such sign, awning, canopy, decoration, lettering or advertising matter as may be approved in good condition and repair at all times. The requirements of Section 14 shall not apply to advertising materials required by Carl Karcher Enterprises. Tenant agrees, at Tenant's sole cost, to obtain a canopy type sign and any other sign as required by Owner in strict conformance with Owner's sign criteria as set forth on Exhibit "C" attached hereto ("Sign Criteria") as to design, material, color, location, size and letter style from the source designated by Owner. Tenant's sign shall be installed prior to Tenant's opening for business and shall therafter be maintained by Tenant at its own expense. If Tenant fails to maintain such sign, Owner may do so and Tenant shall reimburse Owner for such cost plus a twenty (20%) percent overhead fee. If, without Owner's prior written consent, Tenant installs a sign that does not conform to Owner's Sign Criteria, Owner may have Tenant's sign removed and stored at Tenant's expense. The removal and storage costs shall bear interest until paid at the maximum rate allowed by law.

Owner reserves the right to revise the Sign Criteria, at any time as a result of any governmental requirement or Owner's renovation of the Premises, the Building or Shopping Center. Within ninety (90) days of Owner's request and provided that Tenant has been in occupancy of the Premises for at least five (5) years. Tenant shall remove Tenant's existing sign, patch the fascia, and install a new sign, at Tenant's sole cost and expense, in accordance with Owner's then Sign Criteria.

## ARTICLE XV

## SURRENDER OF PREMISES

**Section 15.01.   Surrender of Premises.**

At the expiration of the tenancy hereby created, Tenant shall surrender the Premises in a first class, clean condition in accordance with the requirements of Section 14.02 herein, reasonable wear and tear and damage by unavoidable casualty excepted, except to the extent that the same is covered by Owner's fire insurance policy with extended coverage endorsement, and shall surrender all keys for the Premises to Owner at the place then fixed for the payment of rent and shall inform Owner of all combinations on locks, safes and vaults, if any, in the Premises. Tenant shall remove all of its trade fixtures, and any alterations or improvements if required as provided in Section 14.02 hereof, before surrendering the Premises to Owner and shall repair any damage to the Premises caused thereby. Tenant's covenant shall survive the expiration or other termination of this Lease.

If the Premises were occupied by another tenant prior to the commencement of the Term, then Tenant shall, upon Owner's written request, upon the expiration of the Term, remove all or a portion of, as designated by Owner, interior improvements made by the prior tenant, and deliver the Premises in a condition acceptable to Owner.

Tenant shall provide Owner with a written statement, at Tenant's sole expense from a reputable company licensed and experienced in HVAC repair and maintenance approved by Owner that certifies that the HVAC equipment serving the Premises was inspected and serviced, if necessary, within the last thirty (30) days of the Term and is in good working order.

## ARTICLE XVI

## INSURANCE AND INDEMNITY

**Section 16.01.   Liability and Personal Property Insurance.**

During the Term Tenant shall keep in full force and effect a policy of comprehensive general liability insurance including premises/operations, contractual liability, independent contractors, personal injury, products/completed operations and, if applicable, liquor liability insurance with respect to the Premises and the business operated by the Tenant and subtenants and concessionaires of Tenant in the Premises of which the combined single limit of general liability shall not be less than $1,000,000 per occurrence for bodily injury and property damage. Tenant shall also maintain in full force and effect insurance covering all trade fixtures, merchandise and personal property in or upon the Premises in amounts no less than one hundred (100%) percent of the replacement value thereof, providing protection against any peril included within the classification of "Fire and Extended Coverage" including sprinkler damage, if any, vandalism and malicious mischief.

The policy shall name Owner, and any person, firms, or corporations designated by Owner, as Additional Insureds. Said entities shall not, by reason of their inclusion under said policy, incur liability for payment of any premium. The policy shall contain a clause that insurer will not cancel or change such coverage without first giving the Owner ten (10) days prior written notice. All insurance required hereunder shall be issued by an insurance company having not less than a financial rating of Class 6X as rated in the most current available "Best's Key Rating Guide" and a copy of the policy or certificate of insurance shall be delivered to Owner prior to Tenant's occupancy of the Premises. All public liability, property damage and other casualty policies shall be written as primary policies, not contributing with and not in excess of coverage which the Owner may carry.

**Section 16.02.   Fire Insurance and Other Insurance Premiums.**

Owner shall, subject to reimbursement as provided herein, maintain fire with extended coverage insurance with a vandalism and malicious mischief endorsement, rental loss insurance or any other insurance coverages deemed necessary by Owner or Owner's lender (collectively "Owner Carried Insurance" herein) throughout the Term, which insurance coverages shall be in amounts from time to time deemed reasonably necessary by Owner or Owner's lender. The Owner Carried Insurance may be obtained through a blanket policy or other form of pooled insurance coverage covering not only the Shopping Center, but other property owned by Owner or its affiliates. The fire and extended coverage insurance shall be in an amount equal to at least ninety (90%) percent of the replacement value (exclusive of foundation and excavation costs) of the Premises and/or the Building. During the Term, Tenant hereby agrees to reimburse Owner for Tenant's pro rata share of any Owner Carried Insurance attributable to the building or the Premises as part of the Common Area Expenses. In determining Tenant's pro rata share of the premiums for Owner Carried Insurance, the schedule issued by the organization making the insurance rate on the improvements, areas and/or risks covered, showing the various components of such rates, shall be conclusive evidence of the charges which make up the insurance rate and the pro rata share to be charged to the Premises. If such a schedule cannot be obtained, then Tenant's pro rata share shall be a proportion of the premiums for such Owner Carried Insurance based on the ratio of the square footage of the floor area of the Premises to the total square footage of the floor area of all building space covered by such Owner Carried Insurance.

**Section 16.03.   Indemnification of Owner.**

Tenant will, during the Term, indemnify, defend and save Owner harmless from and against any and all claims, demands, actions, damages, liability and expense (including reasonable attorney's fees and costs of investigation with respect to any claim, demand or action) in connection with loss of life, personal injury and/or damage to property arising from or connected with the conduct or management of the business conducted by Tenant on the Premises, or the occupancy or use by Tenant of the Premises or any part thereof, or from any breach or default on the part of Tenant in the performance of any covenant or agreement on the part of Tenant to be performed pursuant to this Lease, or from violations of or noncompliance with any governmental requirements or insurance requirements, or from any acts or omissions of Tenant or any person on the Premises by license or invitations of Tenant or occupying the Premises or any part thereof under Tenant whether such injury occurs in, on or about the Premises or the Common Area. In case Owner shall be made a party to any litigation commenced by or against Tenant, Tenant shall accept any tender of defense by Owner and shall, notwithstanding any allegations of negligence or misconduct on the part of Owner, its agents or employees, defend Owner and protect and hold Owner harmless and pay all costs, expenses and reasonable attorneys' fees incurred or paid by Owner in connection with such litigation; provided, however, Tenant shall not be liable for any such injury or damage to the extent and in the proportion such injury or damage is ultimately determined to be attributable to the negligence or misconduct of Owner, its agents or employees, unless covered by insurance required to be carried by Tenant. Owner may, at its option, require Tenant to assume Owner's defense in any action covered by this section through counsel satisfactory to Owner.

Owner will, during the Term hereof, indemnify Tenant and save it harmless from and against any and all claims, demands, actions, damages, liability and expense solely arising out of the negligence or gross misconduct of the Owner.

**Section 16.04.   Boiler, HVAC and Evaporative Cooler Insurance.**

Tenant, at its sole expense, shall procure and maintain in full force and effect, for the Term, boiler and machinery insurance on all air-conditioning equipment, evaporative coolers, boilers, and other pressure vessels and systems, whether fired or unfired, located in the Premises, and if said objects and the damage that may be caused by them or result from them are not covered by Tenant's extended coverage insurance, then such boiler insurance shall be in an amount satisfactory to Owner and equal to 100% of the replacement value of such equipment.

**Section 16.05.   Waiver of Subrogation.**

Each party waives its rights of recovery against the other party, its successors, assigns, directors, agents and representatives in connection with any loss or damage caused to the insured's property and covered by any property insurance policies of the insured. Each party hereby waives on behalf of its carriers any right of subrogation it may have against the other and shall notify its carrier of the waiver contained herein.

**Section 16.06.   Waiver of Loss and Damage.**

Owner shall not be liable for any damage to property of Tenant, or of others, located in, on or about the Premises, nor for the loss of or damage to any property of Tenant or of others by theft or otherwise. Owner shall not be liable to Tenant, Tenant's employees or representatives for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or leaks from any part of the Premises or from the pipes, appliance or plumbing works or from the roof, street or sub-surface or from any other places or by dampness or by any other cause of whatsoever nature. Owner shall not be liable to Tenant, Tenant's employees or representatives for any such damage caused by other tenants or persons in the Premises, occupants of adjacent property, of the Shopping Center, or the public, or caused by operations in construction of any private, public or quasi-public work. Owner shall not be liable for any latent defects in the Premises or in the Building except for a period of one (1) year from the date of original completion of the Building by Owner's contractor. All property of Tenant kept or stored on the Premises shall be so kept or stored at the sole risk of Tenant and Tenant shall hold Owner harmless from any claims arising out of damage to the same, including subrogation claims by Tenant's insurance carriers, unless such damage shall be caused by the willful act or gross neglect of Owner.

**Section 16.07.   Notice by Tenant.**

Tenant shall give immediate notice to Owner in case of fire or accidents in the Premises or in the Building or of any damage or defects in the Premises, the Building or any fixtures or equipment therein.

## ARTICLE XVII

### OFFSET STATEMENT, ATTORNMENT, SUBORDINATION, MORTGAGE PROTECTION CLAUSE

**Section 17.01.   Offset Statement.**

Within ten (10) days after Owner's written request, or in the event of any sale, assignment or hypothecation of the Premises and/or the land thereunder by Owner, Tenant agrees to deliver in recordable form a certificate to any proposed mortgagee or purchaser, or to Owner, certifying that this Lease is in full force and effect, that there does not exist nor has there existed any toxic materials or hazardous waste in, on or about the Premises, that no more than one month's rent has been paid in advance, the essential terms of the Lease and that there are no defenses or offsets thereto, or stating those claimed by Tenant. Failure by Tenant to execute said offset statement shall be considered a material default by Tenant under this Lease.

**Section 17.02.   Attornment.**

Tenant shall, in the event any proceedings are brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by the Owner covering the Premises, attorn to the purchaser upon any such foreclosure or sale and recognize such purchaser as the Owner under this Lease, provided that any purchaser or mortgagee shall recognize this Lease as remaining in full force and effect so long as Tenant is not in default hereunder.

**Section 17.03.   Subordination.**

Upon the written request of Owner, and provided such mortgagee confirms in writing the nondisturbance provisions of Section 17.02 above, Tenant will immediately subordinate its rights hereunder to the lien of any mortgage or mortgages or the lien resulting from any other method of financing or refinancing, now or hereafter in force against the land and buildings of which the Premises are a part or upon any buildings hereafter placed upon the land of which the Premises are a part, and to all advances made or hereafter to be made upon the security thereof. This section shall be self-operative and no further instrument of subordination shall be required unless requested by Owner's mortgagee. Tenant covenants and agrees that it will execute such additional subordination agreements at any time thereafter upon Owner's written request without compensation being made therefor. However, if Owner so elects, this Lease shall be deemed prior in lien to any mortgage, deed of trust or other encumbrance upon or including the Premises, regardless of date of recording and Tenant will execute a statement in writing to such effect at Owner's request.

**Section 17.04.   Mortgagee Protection Clause.**

Tenant agrees to give any mortgagees and/or trust deed holders, by registered mail, a copy of any notice of default served upon the Owner, provided that prior to such notice Tenant has been notified in writing (by way of notice of assignment of lease, or otherwise) of the addresses of such mortgagees and/or trust deed holders. Tenant further agrees that if Owner shall have failed to cure such default within the time provided for in this Lease, then the mortgagees and/or trust deed holders shall have an additional thirty (30) days within which to cure such default, or if such default cannot be cured within that time, then such additional time as may be necessary, provided such any mortgagees and/or trust deed holders commence such cure within thirty (30) days and diligently pursue the remedies necessary to cure such default (including but not limited to commencement of foreclosure proceedings, if necessary to effect such cure), in which event this Lease shall not be terminated while such remedies are being so diligently pursued.

## ARTICLE XVIII

### ASSIGNMENT AND SUBLETTING

**Section 18.01.   Consent Required.**

Tenant will not assign this Lease in whole or in part, nor sublet all or any part of the Premises, without the prior written consent of Owner except as provided in Sections 18.03 and 18.04 herein. The consent by Owner to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. This prohibition against assigning or subletting shall be construed to include a prohibition against any assignment or subletting by operation of law. If this Lease is assigned by Tenant, or if the Premises or any part thereof are sublet or occupied by any person or entity other than Tenant, Owner may collect rent from the assignee, subtenant or occupant, and apply the net amount collected to the rent herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver on the part of Owner, or the acceptance of the assignee, subtenant or occupant as tenant, or a release of Tenant from the further performance by Tenant of covenants on the part of Tenant herein contained unless expressly made in writing by Owner, irrespective of any assignment or sublease. Tenant shall remain fully liable under this Lease and shall not be released from performing any of the terms, covenants and conditions of this Lease. It is agreed that Owner will not be acting unreasonably in refusing to consent to an assignment or sublease if, in Owner's opinion, the quality of the merchandising operation of the proposed assignee or subtenant is not equal to that of the Tenant, such assignee or subtenant may adversely affect the business of the other tenants or the tenant mix in the Shopping Center or Owner's ability to obtain Percentage Rent or if the net worth of such assignee or subtenant is less than that of Tenant. If Tenant assigns this Lease or sublets the Premises to a third party who is not in any way affiliated or connected with Tenant by way of a merger, reorganization,

~~consolidation or otherwise, any rent or additional rent paid to Tenant in addition to the rent payable to Owner as set forth in this Lease shall be paid by Tenant to Owner under this Section 18.01.~~

~~If the Tenant is a corporation, or is an unincorporated association or partnership, the transfer, assignment or hypothecation of any stock or interest in such corporation, association or partnership in the aggregate in excess of forty-nine (49%) percent shall be deemed an assignment within the meaning and provisions of this Section 18.01.~~

Tenant shall pay Owner a non-refundable processing fee of $500.00 for each requested assignment or sublease to cover Owner's costs. This fee shall accompany any request for assignment or sublease. In addition, Tenant shall pay all costs incurred by Owner in connection with reviewing a request to consent to an assignment or sub-lease, including all of Owner's attorney's and accountant's fees.

### Section 18.02.   Sale of Premises.

In the event Owner shall sell, convey, transfer or exchange the Premises, the Shopping Center or the Building, Tenant agrees to recognize and attorn to the purchaser, or transferee, as the Owner hereunder and Owner shall be and is hereby relieved and released from any liability under any and all of its covenants and obligations under the Lease arising out of any act, occurrence or event arising after such sale, conveyance, transfer or exchange.

### Section 18.03.   Permitted Assignment or Subletting.

Tenant may assign its interest herein or sublet all or part of the Premises once to a bonafide franchisee or licensee of Tenant's *[franchisor]* without the payment of the fee described in Section 18.01 (but subject to all other conditions contained therein), provided there shall be no change in the use of the Premises, provided Tenant notifies Owner in writing thirty (30) days prior to such subletting or assignment and provided further such assignee or sub-tenant meets all of *[the more than]* nationwide franchise requirements including payment of the applicable standard franchise fee. Any subsequent subletting or assignment shall be subject to the payment of the fee described in Section 18.01 herein. *[franchisor's]*

### Section 18.04.   Concessionaires.

Tenant may grant concessions for the operation of one or more departments of the business which Tenant is permitted by Section 10.01 to conduct in or upon the Premises; provided however that (a) each such concession may be allowed only upon receipt by Tenant of the prior written consent of the Owner and shall be subject to all the terms and provisions of this Lease; (b) the Gross Receipts, as defined in Section 4.05 hereof, from the operation of each such concession shall be deemed to be a part of the Gross Receipts of Tenant for the purpose of determining the Percentage Rent payable to Owner; (c) all of the provisions hereof applying to the business of Tenant including the provisions concerning reports and audits shall apply to each such concession; and (d) at least seventy-five (75%) percent of the sales floor area of the Premises shall at all times be devoted solely to the business operated by Tenant.

~~ARTICLE XIX~~

~~ADVERTISING AND PROMOTION FUND~~

~~Section 19.01.   Advertising and Promotion Fund.~~

~~Owner may, from time to time, establish an advertising and promotion service designed to furnish and maintain professional advertising and sales promotions for the benefit of all tenants in the Shopping Center. In conjunction therewith, Owner will establish a separate fund to be known as the Promotion Fund, the proceeds of which are to be expended solely for advertising, promotion, public relations designed to promote the Shopping Center and administrative expenses, at such times and in such manner as shall be determined by the Owner.~~

~~Tenant hereby agrees to pay monthly, as additional rent, into the Promotion Fund for said advertising and promotion service an amount equal to the sum per square foot of the floor area of the Premises per year specified in Section 1.12 herein to be payable on a monthly basis. Owner agrees to pay into the Promotion Fund an amount equal to 1/4th of the amounts paid into the Promotion Fund by all of the tenants of the Shopping Center or Owner may choose to provide promotional and administrative services in lieu of a monetary contribution. The amount of Tenant's payment into the Promotion Fund shall be increased each January during the Term by an amount equal to the annual increase in the Index, for each year of the Term using the November preceding the first January following the Term as the Base Month and each succeeding November as the Comparison Month, but in no event shall the annual increase be less than four (4%) percent of the prior year's payment into the Promotion Fund by the Tenant.~~

~~Should Owner elect to have a "Grand Opening" promotion, in addition to the above, Tenant agrees to pay to Owner, within thirty (30) days of Owner's billing, as its pre opening contribution, the sum set forth in Section 1.11 herein which is equal to Tenant's pro rata share, based on the square footage of the floor area of the Premises to the total square footage of the floor area leased within the Shopping Center, of Owner's budget for funds to be expended for promotion and advertising of the Shopping Center.~~

~~Any balance remaining in the Promotion Fund at the end of any calendar year shall be carried forward to the next calendar year to be used as provided herein.~~

~~An Advertising and Promotion Service Committee composed of a representative of Owner, a representative of each store exceeding a size of 25,000 square feet of floor area in the Shopping Center, and two (2) representatives of the other tenants in the Shopping Center will be formed to review all of the activities sponsored by the service.~~

~~Section 19.02.   Advertising of Tenant.~~

~~With the exception of national or regional advertising, Tenant, at its sole expense, agrees to refer to the Shopping Center by the name provided in Section 1.03, if one is so provided, in designating the location of the Premises in all local newspaper or other advertising, stationery, other printed material and in all other references to location, and to include the address and identity of its business activity in the Premises in all advertisements made by Tenant for its operation at the Shopping Center.~~

### ARTICLE XX

### DESTRUCTION OF PREMISES

### Section 20.01.   Total or Partial Destruction.

If the Premises shall be damaged by fire, the elements or other casualty insured against under the provisions of Section 18.02 but are not thereby rendered untenantable in whole or in part, Owner shall, at its own expense, cause such damage to be repaired as soon as reasonably practical, and any rent or other charges payable hereunder shall not be abated. Tenant shall be responsible for the concurrent prompt repair and restoration of its furniture, fixtures and equipment in the Premises damaged by such event. If by reason of such occurrence, the Premises shall be rendered untenantable only in part, the damage shall be repaired as described above, and the Minimum Rent shall be abated proportionately based on the portion of the Premises rendered untenantable. If the Premises shall be rendered wholly untenantable by reason of such occurrence, the damage shall be repaired as described above, and the Minimum Rent shall be abated only to the extent of proceeds received by Owner from rental loss insurance carried by Owner, if any, for which the premiums have been paid by Tenant pursuant to Section 12.04 herein, except that Owner shall have the right, to be exercised by written notice delivered to Tenant within sixty (60) days from and after said occurrence, to elect not to reconstruct the Premises, and in such event this Lease and the tenancy hereby created shall cease as of the date of said damage, the rent to be adjusted as of such date. In the event the Premises are damaged as a result of casualty not covered by insurance required to be maintained hereunder, Owner, within sixty (60) days following the date of such damage may commence such repair or reconstructed work or may elect to terminate this Lease on the expiration of sixty (60) days following delivery of written notice to Tenant of Owner's election not to repair or restore such damage. Nothing in this Section shall be construed to permit the abatement in whole or in part of any Percentage Rent, but the computation of Percentage Rent shall be based upon the revised Minimum Rent as the same may be abated pursuant to this Section 20.01.

**Section 20.02. Partial Destruction of Shopping Center.**

In the event that fifty (50%) percent or more of the leasable area of the Shopping Center shall be damaged or destroyed by fire or other cause, notwithstanding that the premises may be unaffected by such fire or other cause, Owner shall have the right, to be exercised by written notice delivered to the Tenant within sixty (60) days from and after said occurrence, to elect to cancel and terminate this Lease. Upon the giving of such notice to Tenant, the Term shall expire by lapse of time upon the 3rd day after such notice is given, and Tenant shall vacate the Premises and surrender the same to Owner in the condition required pursuant to Section 15.01 herein.

**Section 20.03. Proceeds.**

All proceeds from the insurance required to be kept under Section 16.02 shall be delivered to and constitute the property of Owner and the proceeds of all property insurance covering Tenant's leasehold improvements which would constitute the property of Owner upon termination of the Lease shall also be paid to Owner. Tenant shall be entitled to retain the proceeds of its insurance carried pursuant to Section 16.01 covering its trade fixtures, merchandise, signs and other personal property which it would be entitled to remove upon the expiration of the Lease.

**Section 20.04. Waiver of Termination.**

Tenant hereby waives any statutory rights which it may have to terminate the Lease in the event of the partial or total destruction of the Premises, it being agreed that the provisions of this Article XX shall control.

ARTICLE XXI

EMINENT DOMAIN

**Section 21.01. Total Condemnation.**

If the whole of the Premises shall be acquired for any public or quasi-public use or purpose or taken by eminent domain, then the Term shall cease and terminate as of the date possession or title is given to such condemning authority in such proceeding and all rentals shall be paid up to that date.

**Section 21.02. Total Parking Area.**

If the entire portion of the Common Areas used for parking in the Shopping Center ("Parking Area") shall be acquired for any public or quasi-public use or purpose or taken by eminent domain, then the Term shall cease and terminate as of the date possession or title is given to such condemning authority in such proceeding unless Owner shall provide other parking facilities substantially equal to the previously existing ratio between the Parking Area and the Premises within ninety (90) days from the date of such taking. In the event that Owner shall provide such other parking facilities, then this Lease shall continue in full force and effect without abatement of rent or other charges.

**Section 21.03. Partial Condemnation.**

If any part of the Premises shall be acquired or taken by eminent domain for any public or quasi-public use or purpose, and in the event that such partial taking or condemnation shall render the Premises unsuitable for the operation of Tenant's business, then the Lease shall cease and terminate as of the date possession or title is given to such condemning authority in such proceeding. In the event of a partial taking or condemnation which is not extensive enough to render the Premises unsuitable for the operation of Tenant's business, then Owner shall promptly restore the Premises to a condition comparable to its condition at the time of such condemnation less the portion lost in the taking, and this Lease shall continue in full force and effect and the Minimum Rent shall be equitably reduced based on the percentage of floor area of the Premises lost in the taking.

**Section 21.04. Partial Condemnation of Parking Area.**

If any part of the Parking Area shall be acquired or condemned by eminent domain for any public or quasi-public use or purpose and if, as the result of such partial taking the ratio of square feet of Parking Area to square feet of the sales floor area of the entire Shopping Center is reduced to a ratio below 2 to 1, then the Lease shall cease and terminate from the date possession or title is given to such condemning authority in such proceeding, unless the Owner shall provide reasonable evidence of its ability to increase the parking ratio to a ratio in excess of 2 to 1 or Owner can provide substitute parking either in or outside the Shopping Center, in which event this Lease shall be unaffected and remain in full force and effect as between the parties.

**Section 21.05. Allocation of Award.**

Except as provided below, in the event of any condemnation or taking as herein provided, whether whole or partial, Tenant shall not be entitled to any part of the award, as damages or otherwise, for such condemnation and Owner is to receive the full amount of such award; Tenant expressly waiving any right or claim to any part thereof, including the right or claim for the value of the unexpired portion of the Term or diminution in value of Tenant's leasehold interest, or for the value of any option to extend the Term or renew this Lease. Tenant shall, however, have the right, provided such award shall not diminish Owner's award, to claim and recover from the condemning authority, but not from Owner, such compensation as may be separately awarded or recoverable by Tenant in Tenant's own right on account of any and all damage to Tenant's business by reason of the condemnation and for or on account of any cost or loss to which Tenant might incur in removing Tenant's merchandise, furniture, fixtures and equipment from the Premises.

ARTICLE XXII

DEFAULT

five (5) day

**Section 22.01. Notice and Remedies.**

In the event of Tenant's failure to pay rent or to perform any of Tenant's other obligations under this Lease, or any part thereof, when due or called for hereunder, Tenant shall have a period of 3 days after service of written notice by Owner specifying the nature of Tenant's default within which to cure such defaults, provided that if the nature of a non-monetary default is such that it cannot be fully cured within said three (3) day period, Tenant shall have such additional time as may be reasonably necessary to cure such default not to exceed thirty (30) days so long as Tenant commences such cure promptly after service of Owner's notice and proceeds diligently at all times to complete such cure. Tenant agrees that a notice served in accordance with the provisions of California Code of Civil Procedure Section 1161 (or its successor) will be deemed compliance with the notice requirements of this Section. If Tenant fails to comply with the foregoing provisions, Tenant shall be deemed to be in material breach of this Lease, and Owner with or without further notice or demand may either:

(a) Terminate Tenant's right to possession of the premises because of such breach, and recover from Tenant all damages allowed under Section 1951.2 of the California Civil Code, as amended, including, without limitation, the worth at the time of the award of the amount by which the unpaid rent for the balance of the Term after the time of award exceeds the amount of such rental loss for the same period that Tenant proves could be reasonably avoided; or,

(b) Not terminate Tenant's right to possession because of such breach, but continue this Lease in full force and effect; and in that event (1) Owner may enforce all rights and remedies under this Lease and under the provisions of Section 1951.4 of the California Civil Code, as amended, including the right to recover the rent and all other charges due hereunder as such rent and other charges become due hereunder, and (2) Tenant may assign its interest in this Lease with Owner's prior written consent as provided in Section 18.01 herein.

**Section 22.02. Waiver of Rights of Redemption.**

Tenant expressly waives any and all rights of redemption granted by or under any present or future laws in the event of Tenant being evicted or dispossessed for any cause, or in the event of Owner obtaining possession of the Premises, by reason of the

**Section 22.03.   Default By Owner.**

If Owner fails to perform any of the covenants or conditions required on its part to be performed pursuant to this Lease, where such failure continues for a period of thirty (30) days after receipt of written notice specifying the nature and extent of such default in detail (provided, however, that if such default is of a nature that it cannot reasonably be cured within such thirty (30) day period, Owner shall have such additional time as may be required to effect such cure provided Owner commences the cure within such thirty (30) day period), Owner shall be liable to Tenant for all damages sustained as a direct result of such breach, subject to the additional rights of any mortgagee of Owner as provided in Section 17.04 herein.

## ARTICLE XXIII

### HOLDING OVER, SUCCESSORS

**Section 23.01.   Holding Over.**

Any holding over after the expiration of the Term, with the consent of the Owner, shall be construed to be a tenancy from month to month at a rent specified by Owner in its sole discretion, which rent shall never be less than the then prevailing market rate for the Shopping Center (as determined solely by Owner) and shall otherwise be on the terms and conditions herein specified, so far as applicable.

**Section 23.02.   Successors.**

All rights and liabilities herein given to, or imposed upon, the respective parties hereto shall extend to and bind the several respective heirs, executors, administrators, successors, and assigns of said parties; and if there shall be more than one tenant, they shall all be bound jointly and severally by the terms, covenants and agreements herein. No rights, however, shall inure to the benefit of any assignee of Tenant unless the assignment to such assignee has been approved by Owner in writing as provided in Section 18.01 hereof.

## ARTICLE XXIV

### QUIET ENJOYMENT

**Section 24.01.   Owner's Covenant.**

Upon timely payment by the Tenant of the rents herein provided, and upon the observance and performance of all of the covenants, terms and conditions on Tenant's part to be observed and performed hereunder, Tenant shall peaceably and quietly hold and enjoy the Premises for the Term without unreasonable hindrance or interruption by Owner or any other person or persons lawfully or equitably claiming by, through or under the Owner, subject, nevertheless, to the terms and conditions of this Lease.

## ARTICLE XXV

### MISCELLANEOUS

**Section 25.01.   Index.**

Wherever in this Lease there is a reference to the Index, such reference shall refer to the following:

(a)   The "Index" as used in this Lease shall be deemed to mean The United States Department of Labor, Bureau of Labor Statistics Consumer Price Index for All Urban Consumers, U.S. City Average, Subgroup "All Items", (1982-84=100) (the "Index"). If at any time there shall not exist the Index in the format recited herein, Owner shall substitute any official Index published by the Bureau of Labor Statistics or successor or similar substitute any official Index published by the Bureau of Labor Statistics, or successor or similar governmental agency, as may then be in existence and shall, in Owner's opinion, be most nearly equivalent thereto.

(b)   The sum to be increased in accordance with the provisions of the Index shall be increased using the following formula: Such sum shall be increased by a percentage equal to the percentage increase, if any, in the Index published for the Comparison Month over the Index published for the Base Month; provided, however, in no event shall said sum be less than that which was due immediately preceding the date of adjustment.

**Section 25.02.   Waiver.**

The waiver by Owner of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of rent hereunder by Owner shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular rental so accepted, regardless of Owner's knowledge of such preceding breach at the time of acceptance of such rent. No covenant, term or condition of Owner's knowledge of such preceding breach at the time of acceptance of such rent. No covenant, term or condition of this Lease shall be deemed to have been waived by Owner, unless such waiver is in writing by Owner.

**Section 25.03.   Accord and Satisfaction.**

No payment by Tenant or receipt by Owner of a lesser amount than the rent herein stipulated shall be deemed to be other than, on account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Owner may accept such check or payment without prejudice to Owner's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

**Section 25.04.   Entire Agreement.**

This Lease and the Exhibits, if any, attached hereto and forming a part hereof, set forth all the representations, covenants, promises, agreements, conditions and understandings between Owner and Tenant concerning the Premises and there are no representations, covenants, promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Owner or Tenant unless reduced to writing and signed by them.

**Section 25.05.   No Partnership.**

Owner does not, in any way or for any purpose, become a partner of Tenant in the conduct of its business, or otherwise, or joint venturer or a member of a joint enterprise with Tenant by reason of this Lease. ~~The provisions of this Lease relating to the Percentage Rent payable hereunder are included solely for the purpose of providing a method whereby rent is to be measured and ascertained.~~

**Section 25.06.   Force Majeure.**

In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, governmental moratorium, riots, insurrection, war or other reason of a like nature not the fault of the party delaying in performing work or doing acts required under the terms of this Lease (but excluding delays due to financial inability), then performance of such act shall be excused for the period of the delay and period for the performance of any such act shall be extended for a period equivalent to the period of such delay. The provisions of this Section 25.06 shall not operate or excuse Tenant from the prompt payment of Minimum Rent, Percentage Rent, additional rent or any other payments required by the terms of this Lease.

All notices hereunder must be served personally or by certified mail postage prepaid of said address to Tenant at the address specified in Section 1.16 and to Owner at the address given below or at such other address as Owner or Tenant may designate by written notice pursuant to this Section. Any notice given by mail shall be deemed given 48 hours after deposit in the mails.

NOTICE SHALL BE SENT TO:

Tenant / Owner: Senior Classic Leasing, LLC  —  CARL KARCHER ENTERPRISES, INC

1 Centerpointe Dr. #315  —  401 W. Carl Karcher Way

La Palma, CA 90623  —  Anaheim CA 92801

Phone: (714) 736-8900  —  Owner: COVINA PROPERTIES LLC

545 Evelyn Place, Beverly Hills CA 90210

### Section 25.08. Captions and Section Numbers.

The captions, section numbers, article numbers, and index appearing in this Lease are inserted only as a matter of convenience and in no way define, limit, construe, or describe the scope or intent of such sections or articles of this Lease nor in any way affect this Lease.

### Section 25.09. Tenant Defined. Use of Pronoun.

The word "Tenant" means each and every person or party mentioned as a Tenant herein, be the same one or more; and if there shall be more than one Tenant, any notice required or permitted by the terms of this Lease may be given by or to anyone thereof, and shall have the same force and effect as if given by or to all thereof. The use of the neuter singular pronoun to refer to Owner or Tenant shall be deemed a proper reference even though Owner or Tenant may be an individual, a partnership, a corporation, or a group of two or more individuals or corporations. The necessary grammatical changes required to make the provisions of this Lease apply in the plural sense where there is more than one Owner or Tenant and to either corporations, associations, partnerships, or individuals, males or females, shall in all instances be assumed as though in each case fully expressed.

### Section 25.10. Partial Invalidity.

If any term, covenant or condition of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and be enforced to the fullest extent permitted by law.

### Section 25.11. No Option.

The submission of this Lease for examination does not constitute a reservation of or option for the Premises and this Lease becomes effective as a Lease only upon execution and delivery thereof by Owner to Tenant.

### Section 25.12. Recording.

Tenant shall not record this Lease or a memorandum thereof without the written consent of Owner.

### Section 25.13. Legal Expenses.

In the event that at any time during the Term either the Owner or the Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease, or any default hereunder, or engage an attorney to enforce such provision then, and in that event, the unsuccessful party in such action or proceeding agrees to reimburse the successful party for the actual expenses of attorneys' fees and disbursements incurred therein by the successful party.

The successful party in such suit shall be entitled to its costs of suit and actual attorney's fees whether or not such action is prosecuted to judgment. "Successful party" within the meaning of this Section shall include, without limitation, a party who brings an action against the other or who defends against an action brought by the other and whose position is substantially upheld.

### Section 25.14. Rights Cumulative.

The rights and remedies of Owner specified in this Lease shall be cumulative and in addition to any other rights and remedies provided by law.

### Section 25.15. Authority.

If Tenant is a corporation or partnership, each individual executing this Lease on behalf of such entity represents or warrants that he or she is duly authorized to execute and deliver this Lease on behalf of such entity and that such entity shall be bound by all the terms and provisions hereof.

### Section 25.16. Mortgage Changes.

Tenant shall not unreasonably withhold its consent to changes or amendments to this Lease requested by the holder of any mortgage or deed of trust covering Owner's interest in the Premises so long as such changes do not materially alter the economic terms of this Lease or otherwise materially diminish the rights or materially increase the obligations of Tenant hereunder.

### Section 25.17. Time Of The Essence.

Time is of the essence of each and every provision of this Lease except for delivery of possession of the Premises as set forth herein.

### Section 25.18. Lease Appendix and Rider.

A Lease Appendix consisting of __0__ pages and a Rider consisting of __2__ pages are attached hereto and made a part hereof. Guaranty of Lease is likewise attached herewith (2 pages). Exhibits "A" through "C" are attached.

IN WITNESS WHEREOF: Owner and Tenant have signed and sealed this lease as of the day and year first above written.

OWNER: __Covina Properties, LLC__

_R-movi_

_Mangy Reston_

Owner's Signature and Title

Phone: __(323) 277-7500__

Date: __10-14-02__

TENANT: __Senior Classic Leasing, LLC__

HAROLD PHAN, Manager

Tenant's Signature and Title

Date: __10/8/02__

Home Phone: _____

Business Phone __(714) 736-____

Section 26. - Extension of Term

Provided that Tenant shall have fully and completely and timely the terms and conditions of this Lease, providing Tenant has not assigned or sublet the Premises in whole or in part Tenant shall have the right to extend the term of this Lease for __TWO__ ( __2__ ) additional __five__ year period(s) under the same terms and conditions as the original Lease. It is understood that this option is unique to __Senior Classic Leasing LLC or CKE or its designee__ , and upon any assignment or subletting, with or without Owner's consent, the option shall be rendered null and void. *

During the __two__ ( __2__ ) __five__ ( __5__ ) year option period, the Minimum Rent payable pursuant to Section 4.01 hereof for the first year of the option period shall be the market rental for the Premises as determined below or a rent equal to the Minimum Rent as increased by the Index as set forth in Section __*__ of the Lease Appendix whichever is greater. After the Minimum Rent for the first year of the option period is established, the Minimum Rent shall be increased commencing with the beginning of the thirteenth (13th) month of the option term in the same method as set forth in the Lease Appendix.

In order to exercise such option to renew or extend this Lease, Tenant shall give to Owner notice, in writing, of his intention to do so at least one hundred eighty (180) days prior to expiration of this Lease, and if Tenant shall fail to give such notice within said time limit, all rights and privileges as granted to Tenant to renew or extend this Lease shall thereupon be null and void.

If the Tenant shall exercise the option to extend the term as set forth herein, then the Minimum Rent shall be agreed upon by the parties in writing. If the parties are unable to agree on the Minimum Rent during the first sixty (60) days of the one hundred eighty (180) day notification period, then the Minimum Rent shall be determined by arbitration subject to provisions of this Section.

Within fifteen (15) days after the expiration of such 60 day period, each party shall appoint a duly qualified real estate broker with a well known firm (e.g., Coldwell Banker, Grubb & Ellis, Michael Epstein & Associates, Terranomics, etc.) who has at least five (5) years experience, and who specializes in retail leasing and sale of retail commercial properties to act as an arbitrator. Within fifteen (15) days thereafter, the two arbitrators so appointed shall appoint a third person similarly qualified to act as the third arbitrator. If the two arbitrators appointed by the parties are unable to agree on the third arbitrator, then the parties hereto (or either of them) shall diligently apply to the Presiding Judge of Superior Court in the State of __California__ , County of __Los Angeles__ , for the appointment of such a person. Within thirty (30) days after appointment of the third arbitrator, the three arbitrators shall determine the market rental for the space taking into account the terms of this Lease, the location of the Shopping Center and its major co-tenants, and the market rental value of similar space within the Shopping Center, and the amount so determined shall be used as the basis for a computation by them of the Minimum Rent hereunder. In the event the arbitrators are unable to reach a unanimous agreement, the vote of two shall control and the decision of the arbitrators shall be final and binding upon the parties hereto. Owner and Tenant shall each bear one-half of the cost of the arbitration.

Pending determination of such adjusted rental, the Minimum Rent shall be equal to that paid in the last year of the original term, and upon agreement being reached as to the new Minimum Rent, then the previous Minimum Rent shall be retroactively adjusted and paid within thirty (30) days of such agreement.

* Section 26 A.  It is understood that upon an assignment or subletting
with or without Owner's consent, the options provided herein will remain
intact and effective.  This provision is only good for Carl's Jr.
affiliates.

** Section B.  Provided that this Lease shall be in full force and
effect and that Tenant shall not be in default under any terms and
conditions hereof, Tenant shall have the option to extend the term
of this Lease for two (2) additional consecutive term(s) of five (5)
years each, ten (10) years in total if each of the options are exer-
cise by Tenant to commence upon the expiration of the new lease term
on October 31, 2022.  The rental during the two (2) option periods
shall follow the same rules for rent increases under the new Lease
computed as follows:

| Year | Monthly Rent | Annual REnt Due |
|---|---|---|
| 21 - 25 years | $ 12,243.04 | $146,916.46 |
| 26 - 30 years | $ 14,079.50 | $168,953.95 |

** Section 26C. The option(s) shall be exercise by Tenant giving
written notice thereof to Landlord at least one hundred eighty days
(180), but in any event not more than three hundred (300) days, prior
to the expiration of the current term (Option Notice), and Tenant's
right to exercise any consecutive options shall be contingent upon
Tenant's exercise of the previous option.

Signage:  Landlord shall give Tenant a space in the existing aqua green
pylon sign in the shopping center and shall assist Tenant in getting
the approval of the City of Covina.

Tenant needs to send monthly sales report.

RIDER TO LEASE



This is a rider to the Lease between Covina Properties LLC and Senior Classic Leasing LLC for the premises located in 573 N. Azusa Avenue, Covina CA of even date:

## Carl Karcher Enterpises, Inc.'s (CKE)  Lease Provisions

A. The Landlord consents to Developer's (Tenant's) use of the proprietary signs, distinctive exterior and interior designs and layouts, and the Proprietary marks prescribed by CKE, and upon termination or the earlier expiration of the lease, consents to permit Developer (Tenant) , at Developer's (Tenant's) expense, to remove all such items and other trade fixtures, so long as Developer (Tenant) makes repairs to the building caused by such removal.

B. The Landlord agrees to provide CKE (at the same time sent to Developer [Tenant]) a copy of all amendments and assignments and notices of default pertaining to the lease and the leased premises.

C. CKE shall have the right to enter the leased premises to make any modifications or alterations necessary to protect the System and the Proprietary Marks and to cure, within the time periods provided by the lease, any default under the lease, all without being guilty of trespass or other tort and to charge Developer (Tenant) for these costs.

D. The Landlord agrees that Developer (Tenant) shall be solely responsible for all obligations, debts and payments under the lease.

E. The Landlord agrees that, following the termination or earlier expiration of the Franchise or License Agreement, Developer (Tenant) shall have the right to make those alterations and modifications to the premises as may be necessary to clearly distinguish to the public the premises from a Carl's Jr. Restaurant and also make those specific additional changes as CKE may reasonably request for that purpose. The Landlord also agrees that, if Developer (Tenant) fails to promptly make these alterations and modifications, CKE shall have the right to do so without being guilty of trespass or other tort so long as CKE makes repairs to the building caused by such removal.

F. The Landlord agrees not to amend or otherwise modify the lease in any manner that would affect any of the foregoing requirements without CKE's prior written consent, which consent shall not be unreasonably withheld.

G. Developer (Tenant) may assign the lease to CKE or its designee, with Landlord's consent (which consent shall not be unreasonably withheld) and without payment of any assignment fee or similar charge or increase in any rentals payable to the Landlord.

H. The Landlord agrees to consent to Developer (Tenant) collaterally assigning the lease to CKE or its designee, granting CKE the option, but not the obligation, to assume the lease from the date CKE takes possession of the leased premises, without payment of any assignment fee or similar charge or increase in any rentals payables to the Landlord.

*and such designee must meet CKE's then current requirements,*

Landlord's Initial _____
Tenant's Initial _____

# GUARANTY OF LEASE

THIS GUARANTY OF LEASE (this "Guaranty"), dated as of October 8, 02 is executed by SUN GIR, INC., a California corporation (the "Guarantor") for the benefit of COVINA PROPERTIES LLC, a California limited liability company (collectively "Landlord"), with reference to the following facts:

A. Concurrently herewith, SENIOR CLASSIC LEASING LLC, a California limited liability company ("Tenant") and Landlord are entering into that certain Lease Agreement (the "Lease"), of even date herewith, with respect to certain premises located in 573 N. AZUSA AVENUE, COVINA CA 91722.

B. Guarantor desires that Landlord enter into the Lease with Tenant, and the Lease is in the best interests and will benefit Tenant.

C. In order to induce Landlord to enter into the Lease with Tenant, Guarantor has offered to execute this Guaranty in favor of Landlord. Landlord would not enter into the Lease with Tenant without this Guaranty.

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged by Guarantor, Guarantor hereby agrees and covenants in favor of Landlord as follows:

1.      Guaranty. The Guarantor hereby guarantees the due, punctual, full and faithful payment and performance of any and all lawful obligations of Tenant under the Lease (the "Obligations"), provided that Guarantor may assert any defense or any right of cure Tenant may have.

In the event that the equity of Senior Classic Leasing LLC reaches Five Million Dollars ($5,000,000), this Guaranty shall terminate. The Landlord herein shall be provided with a written notice by Tenant that such $5,000,000 equity has been reached and the Guaranty shall terminate upon receipt by Landlord of a copy of the financial statements from the Tenant showing the total equity of Tenant as of a given date.

Nothing contained herein requires the Tenant or the Guarantor to seek Landlord's consent to perform a merger, consolidation, or any form of company organization or reorganization. Such decision shall rest solely upon the Tenant and/or the Guarantor. In the event of merger or consolidation of Tenant and Guarantor (together or with any other entity), which will result in the newly formed, reorganized or merged entity then encompassing Tenant, reaching the $5,000,000 equity required herein, this Guaranty shall terminate upon receipt by Landlord of a copy of the financial statements from the Tenant showing the combined total equity as a result of the merger, consolidation and other type of corporate reorganization.

2.      Representations, Warranties and Agreements. Guarantor represents and warrants that (a) Guarantor has the full right, power and authority to enter into this Guaranty and to perform its obligations under the terms of this Guaranty; (b) this Guaranty is the legal, valid and binding obligation of the Guarantor, enforceable in accordance with its terms; (c) neither the execution and delivery of this Guaranty, nor the consummation of the transactions herein contemplated, nor compliance with the terms and provisions hereof, will contravene any law or regulation to which the Guarantor is subject or will conflict or will be inconsistent with, or will result in any breach of, any of the terms, covenants or provisions of, or constitute a default under, or result in the creation or imposition of any mortgage, pledge, lien, charge, encumbrance or security interest upon any of the property or assets of the Guarantor pursuant to the terms of any indenture, mortgage, deed of trust, agreement or other instrument to which the Guarantor is a party or by which the Guarantor may be bound; (d) no order, consent, license, authorization or approval of, or exemption by, or the giving of notice to, or registration with, any governmental agency or public authority is required in connection with the execution, delivery or performance of this Guaranty, and (e) all financial statements which have heretofore been furnished by Guarantor to Landlord in connection with this Guaranty, and all financial statements which may hereafter be furnished by Guarantor to Landlord, have been, and shall be, prepared in accordance with generally accepted accounting principles consistently applied, except as disclosed therein, and all such financial statements are and shall be true, correct and complete, as of the respective dates thereof, and Guarantor certifies that there has been no material adverse change in the financial condition of Guarantor from that represented to Landlord in connection with this Guaranty.

3.      Notices; Payments. Except as otherwise specified herein, all notices, demand or other communications pursuant hereto shall be deemed to have been duly given or made upon the earlier of (i) expiration of seventy two (72) hours after deposit in the United States mail, registered or certified, postage prepaid, return receipt requested or (ii) upon receipt by the addressee as indicated in the return receipt, to the following addresses:

2

If to Guarantor: SUN GIR, INC.
1 CENTERPOINTE DRIVE, SUITE 315
LA PALMA CA 90623
T (714) 736-8900
F (714) 736-8909

If to Landlord:  COVINA PROPERTIES LLC
595 EVELYN PLACE
BEVERLY HILLS CA 90210
T (323) 277-7500
F (323) 277-7501

Any payments made hereunder shall be payable at the office of the Landlord referred to herein, or such other office as the Landlord may elect, and shall be made in United States dollars.

4.    No Waiver; Remedies Cumulative. No failure or delay on the part of the Landlord in exercising any right, power or privilege hereunder and no course of dealing between the Guarantor and the Landlord or the Tenant and the Landlord shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which the Landlord would otherwise have, including, without limitation, any and all rights or remedies of Landlord against any other guarantor, or surety or other party or under the Lease, at law or equity.

5.    Assignment by Landlord. This Guaranty is unique to the Landlord and hence, Landlord cannot assign this Guaranty.

6.    Benefit of Guaranty.  This Guaranty shall be binding upon and inure to the benefit of the successors and assigns of the Landlord and the heirs and assigns of the Guarantor; provided, however, that Guarantor may not assign any of his obligations hereunder without the prior written consent of the Landlord. Nothing contained in this Guaranty shall impair or affect any of the Obligations of Tenant.

7.    Governing Law. This Guaranty shall be construed in accordance with and be governed by the laws of the State of California, and all legal proceedings concerning this Guaranty shall have their venue in Los Angeles County, California.

8.    Effectivity. This Guaranty shall remain valid during the effectivity of the Lease or until terminated pursuant to Section 1 hereof.

9.    Entire Agreement; Amendments. This Guaranty contains the entire agreement between the parties with respect to the subject matter hereof, and supersedes any and all prior agreements and understandings relating to such subject matter, and this Guaranty cannot be amended or supplemented except by a written agreement signed by Guarantor and Landlord.

IN WITNESS WHEREOF, the Guarantor has executed and delivered this Guaranty as of the date first above written.

Guarantor:

SUN GIR, INC.

Harshad Dharod, President
Date: October 8, 2002

Initials: _____



| In re:<br><br>Sun Gir Incorporated<br><br>Debtor(s). | CHAPTER: 11<br><br>CASE NUMBER: 8:26-bk-11056 |
| --- | --- |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
2566 Overland Ave., Suite 650
Los Angeles, CA 90064

**A true and correct copy of the foregoing document entitled (***specify***): NOTICE OF MOTION AND MOTION OF THE DEBTOR AND DEBTOR-IN-POSSESSION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE REJECTION OF A CERTAIN UNEXPIRED LEASE OF NONRESIDENTIAL REAL PROPERTY EFFECTIVE AS OF APRIL 2, 2026 (THE "PETITION DATE") PURSUANT TO 11 U.S.C. § 365; AND (II) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF ALEX KALINSKY IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On _April 30, 2026_, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:
Eric Bensamochan Eric@eblawfirm.us
United States Trustee ustpregion16.sa.ecf@usdoj.gov
Kenneth Misken DOJ-UST Kenneth.M.Misken@usdoj.gov
William Schumacher wschumacher@winthrop.com
Eric D Goldberg eric.goldberg@dlapiper.com
Dustin P Branch branchd@ballardspahr.com
Nahal Zarnighian zarnighiann@ballardspahr.com
Michael John Agoglia  michael.agoglia@alston.com
Jacob A. Johnson jacob.Johnson@alston.com
Dustin P. Branch branchd@ballardspahr.com
Neama Cory Barari nbarari@caskeyholzman.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On _April 30, 2026_, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott C. Clarkson
U.S. Bankruptcy Court, Ronald Reagan Federal Building
411 West Fourth St., Ste. 5130
Santa Ana, CA 92701-4593

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _April 30, 2026_ I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| April 30, 2026 | Jennifer Svonkin | /s/ Jennifer Svonkin |
| --- | --- | --- |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June  2012*                                                                    **9013-3.1.PROOF.SERVICE**

| In re: Sun Gir Incorporated | CHAPTER 11 |
| Debtor(s). | CASE NUMBER 8:26-bk-11056 |

Freund: Sherry.W@Freundbakery.com

Sectran Security Inc spulido@sectransecurity.com

Flue Steam Inc. summer@fluesteam.com

John Youens-Crowe LLP john.youens@crowe.com

Covina Properties LLC bettina@packagemore.com

The Wasserstrom Company reneepennington@wasserstrom.com

Hewlett-Packard Financial Services Co
P.O Box 402582
Atlanta GA 30384-2582

Securities & Exchange Commission
Attn: Bankruptcy Counsel
444 South Flower Street, Suite 900
Los Angeles, California 90071-9591

LA Dept of Water & Power
PO Box 30808
Los Angeles, CA 90030-0808

Southern California Edison
P.O. BOX 300
Rosemead, CA 91772-0002

Los Angeles County Tax Collector
P.O Box 54018
Los Angeles, CA 90054-0018

Orchid Bay LLC c/o Columbia Bank
110.S. Fairfax Avenue
Los Angeles, CA 90036

Crosspoint Realty Services, Inc
P.O. Box 889288
Los Angeles, CA 90088

Xenial Inc
PO Box 930157
Atlanta, GA 31193-0157

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

Label Matrix for local noticing
0973-8
Case 8:26-bk-11056-SC
Central District of California
Santa Ana
Thu Apr 30 11:23:00 PDT 2026

McLane Foodservice, Inc.
c/o Alston & Bird LLP
Attn: Jacob Johnson
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3467

Sun Gir Incorporated
1 Centerpointe Dr., Suite 400
La Palma, CA 90623-2530

The Northern Trust Company
50 South LaSalle Street
Chicago, IL 60603-1003

Watt Laverne, LLC
c/o Ballard Spahr LLP
2029 Century Park East
Suite 1400
Los Angeles, CA 90067-2915

Santa Ana Division
411 West Fourth Street, Suite 2030,
Santa Ana, CA 92701-4500

Carl's Jr. Restaurants LLC
c/o DLA Piper LLP
1201 W Peachtree St., Ste 2800
Atlanta, GA 30309-3450

Carl's Jr. Restaurants LLC
c/o Eric Goldberg, Esq.
2000 Avenue of the Stars, Ste 400 N Towe
Los Angeles, CA 90067-4735

INTERNAL REVENUE SERVICE
P.O. BOX 7346
PHILADELPHIA, PA 19101-7346

The Wasserstrom Company
4500 E Broad St
Columbus, OH 43213-1360

US Securities & Exchange Commission
444 S Flower St., # 900
Los Angeles, CA 90071-2934

United States Trustee
411 W Fourth Street
Santa Ana, CA 92701-4504

United States Trustee (SA)
411 W Fourth St., Suite 7160
Santa Ana, CA 92701-4500

Watt Laverne, LLC
c/o Dustin P. Branch, Esq.
Ballard Spahr LLP
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915

Eric Bensamochan
The Bensamochan Law Firm, Inc.
2566 Overland Ave, Ste 650
Los Angeles, CA 90064-3371

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Carl's Jr. Restaurants, LLC

(d)The Northern Trust Company
50 South LaSalle Street
Chicago, IL 60603-1003

(u)Nydia Del Socorro Lazo

End of Label Matrix
Mailable recipients   14
Bypassed recipients    3
Total                 17