Michael J. Agoglia
Cal Bar No. 154180
ALSTON & BIRD LLP
55 Second Street, Suite 2100
San Francisco, CA 94105
Telephone: 415-243-1000
Facsimile: 415-243-1001
michael.agoglia@alston.com

– and –

Jacob A. Johnson
Ga. Bar No. 849407 (*pro hac vice*)
ALSTON & BIRD LLP
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: 404-881-7000
Facsimile: 404-844-9026
jacob.johnson@alston.com

*Attorneys for McLane Foodservice, Inc.*

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No. 8:26-BK-11056-SC |
| Sun Gir Incorporated, | Chapter 11 |
| Debtor. | Jointly Administered With:<br>8:26-BK-11057-SC<br>8:26-BK-11058-SC<br>8:26-BK-11060-SC<br>8:26-BK-11061-SC<br>8:26-BK-11062-SC |
| Affects: | |
| ☐ Sun Gir, Incorporated<br>☐ Harshad & Nasir, Incorporated<br>☐ Senior Classic Leasing, LLC<br>☐ DFG Restaurants, Incorporated<br>☐ Second Star Holdings, LLC<br>☐ Third Star Investments, LLC<br><br>☒ All Debtors | **MCLANE FOODSERVICE, INC.'S OBJECTION TO DEBTORS' CONTINUED USE OF CASH COLLATERAL** |

McLane Foodservice, Inc. ("McLane"), by and through its undersigned counsel, hereby files this *Objection to Debtors' Continued Use of Cash Collateral* (the "Objection").

## I.   THE DEBTORS HAVE NOT MET THEIR BURDEN TO DEMONSTRATE ADEQUATE PROTECTION

Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used, sold, or leased . . . the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). The Debtors bear the burden of proving that the secured creditor's interest is adequately protected. 11 U.S.C. § 363(p)(1). Adequate protection must address the diminution in value of the secured party's interest resulting from the proposed use of collateral. *See United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370 (1988).

Here, to McLane's understanding, no party disputes that with respect to Senior Classic Leasing, LLC, McLane entered these cases with a valid, perfected purchase money security interest in all inventory purchased from McLane and all proceeds thereof, pursuant to the Purchase Money Security Agreement and UCC-1 attached as Exhibit A hereto.

At the outset of these cases, the Debtors acknowledged, and the Court recognized, that the Debtors could not then meet their burden to demonstrate adequate protection of the secured lenders' liens. *See* Hr'g Tr. 18:14–18, Apr. 9, 2026 (Debtors' counsel stating the debtor's principal will contribute directly to any shortfall in concession of patent lack of adequate protection). The Debtors obtained interim authority to use cash collateral on this basis solely by consent of the secured parties. Hr'g Tr. 29:1–3, Apr. 9, 2026 ("Well, you also need [an] intercompany -- or an intracompany agreement of some sort in the cash collateral stipulation. You'll have to both enter into that.").

This consent and cash collateral usage was then extended at the April 23, 2026 hearing, though the Court noted that the Debtors "are running out of runway very quickly." Hr'g Tr. 36:20–21, Apr. 23, 2026. Cash collateral usage was continued again to May 13, 2026. At the May 13, 2026 hearing, the Debtors came to the Court with limited consent (consent for one week of cash collateral usage),

– 2 –

LEGAL/51372660v3

yet over McLane's objection, cash collateral usage was extended to June 3, 2026. *See* Hr'g Tr., May 13, 2026 (THE COURT: "I am overruling your objection.").

### A.    The Debtors Have Not Yet Submitted Admissible Evidence In Support of Their Request

At this time, the Debtors have put no evidence into the record, as not a single declaration has been admitted into evidence, nor could they be. Mr. Dharod, the Debtors' original declarant in support of cash collateral [Dkt. 15] and the further declarant on a declaration filed May 13, 2026 [Dkt. 142], has never appeared in Court or been made available for cross-examination. Notably, Mr. Dharod's failure to appear at the May 13, 2026 hearing not only rendered his declaration inadmissible (*see* Fed. R. Evid. 802, hearsay is inadmissible), it was in contempt of a subpoena served by McLane on Mr. Dharod requiring his appearance at that hearing. *See* Exhibit B.

Accordingly, the Debtors have not met their evidentiary burden under Section 363(p)(1) of the Bankruptcy Code in prior hearings. Nor can they.

### B.    The Debtors' Own Projections Show Massive Collateral Depletion

As of April 15, 2026, the Debtors' cash on hand totaled approximately $1,065,656.99 across all of the Debtors' primary operating accounts. [Dkt. 66, ¶21]; *see also* Interim Cash Collateral Order [Dkt. 138] at 2 (Court noting Debtors "had approximately $1,065,656 in cash on hand across their operating accounts"). Even counting Mr. Dharod's purported equity infusion of $850,000 (which, in fact, was a return of an insider preference from Friendly Franchisees Corporation that was an estate asset to begin with, *see* Dkt. 208, p.5), the Debtors' August 10, 2026 projected ending cash balance is only $626,000. [Dkt. 143, p.6]. There is no suggestion in the Debtors' filings that there is other collateral generated to replace this cash. So even with the $850,000 payment, which should not be counted,[1] the Debtors' own declarations acknowledge a shrinkage of collateral and patent lack of adequate protection. Putting aside all of the problems noted above, Mr. Skillman's declaration admits that even operating on all of the flawed assumptions noted above, the Debtors run out of cash in ten

---

[1] It is grossly unfair to count Mr. Dharod's payment as mitigating the adequate protection problems in these cases. The collateral that Mr. Dharod pilfered from the Debtors and their secured lenders on the Petition Date is now being offered back to the lenders as adequate protection. That is offensive.

– 3 –

LEGAL/51372660v3

weeks. [Dkt. 224 p.4, ¶8]. In other words, at the end of the ten-week period, $1 million of cash and $850,000 of returned insider preference recoveries will have evaporated.

### C.    The Projections Rely on Nonexistent Rent Relief

There are other serious concerns with the Debtors' projections. As Mr. Skillman explained to the Court at the April 23, 2026 hearing, the Debtors' budget assumed store closures would occur in April 2026. Hr'g Tr. 19:22-25, Apr. 23, 2026 (Mr. Skillman: "you will see down here that we have assumed that we will reject stores at some point in here and will not pay the rents that are due for the month of May on stores that we would plan to reject"). Indeed, the most recent 13-week forecast assumes rent relief of $185,000 per occurrence (totaling $555,000 over the period) for 14 stores, showing such a benefit on June 1, 2026. *See* [Dkt. 143, p.5]. Yet because lease rejections did not occur in April 2026 or May 2026 as originally represented to the Court and McLane, the projected June 1, 2026 rent relief can only be achieved by blatantly disregarding Section 365(d)(3) of the Bankruptcy Code: "The trustee shall timely perform all the obligations of the debtor … arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365(d)(3).

### D.    The Projections Fail to Account for McLane's Actual Trade Terms

The Debtors' forecast is further flawed because it fails to account for McLane's actual trade terms. Dkt. 143 p.5 (forecast assumes "McLane payments on 14-day terms"). McLane intends to seek direction from the Court on how it would like the issues of McLane's trade terms to be addressed, but McLane can clearly demonstrate that whatever McLane's postpetition arrangement is with the Debtors, they are currently in postpetition breach.

First, as to McLane's arrangement with the Debtors, the history speaks for itself.

On March 31, 2026, prior to the bankruptcy, due to the deterioration in the Debtors' financial position and the impending termination of the Debtors' franchise agreements, McLane notified the Debtors that: "existing credit conditions will be adjusted to .. payment terms of <u>Net 2 days</u> … <u>effective today</u>." *See* Exhibit C. Mr. Kalinsky requested a concession from this change in terms, stating: "The change to 2 day billing would represent an impossibly difficult impact to our business given the

– 4 –

LEGAL/51372660v3

resultant double payments over a 2 week period." *Id.* (Mr. Kalinsky's statement was not true—Mr. Dharod had other plans for the cash, namely, a $1 million insider payment on stale insider debts.) McLane, acting in good faith reliance on Mr. Kalinsky's untrue statements, agreed to forego "***for now***" an all-at-once reduction to Net 2 terms in favor of a gradual reduction to Net 2 terms via $25,000-per-week deposits. Specifically, McLane stated: "we will need to secure a <u>$25k weekly deposit every Friday starting this coming Friday, 04.03.26</u>. We must accumulate a security deposit to support existing credit terms until we've obtained sufficient funds to reduce exposure equal to average Net 2 days of outstanding balances." *Id.*

At the April 9, 2026 hearing, McLane sought to convey to the Court that McLane had placed the Debtors on Net-2 day terms prepetition, that McLane had offered to bring terms down over time through this $25,000-per-week payment "at least for now," and further that the terms of such a concession were still being negotiated:

> **MR. JOHNSON:** Your Honor, McLane had actually previously put this entity on a two-day terms pre-petition. It's a concession for it to maintain 14-day terms through the case --
>
> **THE COURT:** So you're telling me that you'll continue going --
>
> **MR. JOHNSON:** -- as a business arrangement that needs to be reached.
>
> **THE COURT:** -- you'll revert to 14-day terms if this pre-petition is paid?
>
> **MR. JOHNSON:** But there was a negotiation ongoing with -- between the parties.
>
> **THE COURT:** I didn't ask you what the negotiation was. I'm asking you is it your position that you will allow 14-day terms if this 345,000 estimated is paid pre-petition?
>
> **MR. JOHNSON:** So if all of the pre-petition is rolled up, … [McLane's] position is that it requires a $25,000 per week payment on -- to

– 5 –

reduce its exposure in these cases and that is where things were left between the parties. And I've been speaking with debtor's counsel about that and I don't know where the current status of that, but that's McLane's current position and I'm not authorized to go beyond that.

Hr'g Tr. 32:17–33:13, Apr. 9, 2026.

When the Court pressed the Debtors on whether they would proceed on this basis, Debtors' counsel stated:

**THE COURT:** What's the debtor say about that deal?

**MR. BENSAMOCHAN:** I think that the debtors balked at that a little bit. They just wanted to continue with the 14-day terms. I don't think the debtors object to paying the pre-petition balance for the goods received.

**THE COURT:** How much would that be?

**MR. BENSAMOCHAN:** My understanding is 345,000.

**THE COURT:** Okay. So you're okay with this?

**MR. BENSAMOCHAN:** Yeah. Listen, McLane is absolutely necessary. There is no operation without their products.

Hr'g Tr. 33:8–17, Apr. 9, 2026.

The Court approved the roll-up payment of the prepetition trade credit and approved the Debtors' payment of the $25,000-per-week payments:

**THE COURT:** All right. Well, very good. I will approve the $345,000 payment to McLane to cover the numbers that have been tossed around today on the pre-petition. Mr. Johnson, if we're off by $1,000 or so, are you going to complain?

**MR. JOHNSON:** No, Your Honor. I would request that we also get blessing from the Court for what's already been paid --

**THE COURT:** Oh, yeah, either that --

**MR. JOHNSON:** -- because I'm very conscious of those issues.

– 6 –

MCLANE FOODSERVICE, INC.'S OBJECTION TO
DEBTORS' CONTINUED USE OF CASH COLLATERAL

LEGAL/51372660v3

**THE COURT:** -- or I'm going to convert it to a -- I'm going to appoint a Chapter 11 trustee. Do you want to play with the -- you want to play with a Chapter 11 trustee instead, Mr. Johnson?

**MR. JOHNSON:** Your Honor, we do want to support these cases, which is why we've tried to accommodate the business solution.

**THE COURT:** Thank you. Okay. Yes, I'll give you -- I don't want to say post hoc. I will give you a deferment on the money that's already been paid. And I'll approve the $25,000 per period to reduce their claim.

Hr'g Tr. 35:4–25, Apr. 9, 2026.

As further detailed in McLane's response to the Debtors' ex parte motion to enforce the critical vendor order, Debtors' counsel accepted edits deleting any requirement to provide trade credit in the critical vendor order and declined McLane's invitations to clean this up in a formal negotiated agreement. *See* Response in Opposition to Ex Parte Application to Enforce Critical Vendor Order [Dkt. 134] at 2, 5; Johnson Decl. ¶¶ 3–6. The Debtors continued to make the $25,000 weekly payments to McLane. *See id.* at 5. Then, in the midst of a short recess in the ex parte hearing, Debtors refused to continue to make the $25,000 weekly payments going forward. To give the parties further time to discuss, McLane agreed that, notwithstanding the nonpayment of the $25,000 weekly payment, it would not stop shipping without coming back to the Court on the Debtors' ex parte motion. The Debtors continue to refuse to make these payments, stating that Mr. Dharod's $850,000 "equity" contribution was not large enough to make these payments. Given that the $850,000 "equity" payment is merely a partial return of Friendly Franchisees' blatant pillaging of the Debtors, McLane's sympathy for these arguments is obviously at an all-time low.

Accordingly, even if there is a binding arrangement for McLane to provide trade credit to the Debtors,[2] that arrangement requires at minimum payment of all of the $25,000-per-week payments since March 31, 2026. McLane seeks direction from the Court on when the hearing on Docket 125

---

[2] McLane does not concede any obligation to extend postpetition trade credit on the facts, but reserves rights on this issue at this time.

– 7 –

can be reconvened on an evidentiary basis to address these issues. But the relevant point with respect to cash collateral is that the Debtors' cash forecast is clearly flawed with respect to its forecasting of payments to McLane.

A separate but related point is that whatever McLane's arrangement with the Debtors is, it clearly includes the longstanding requirement of a first priority PMSI on the Senior Classic Leasing, LLC inventory. McLane no longer has that protection. [Dkt. 175] (Interim Cash Collateral Order of May 22, 2026, striking McLane's lien securing postpetition credit). McLane understands that the Debtors need to properly seek such relief from the Court, but the requirement itself cannot be ignored; the lack of a replacement lien on replacement trade credit constitutes a postpetition breach of whatever prepetition arrangement is construed to exist between the Debtors and McLane.

## V.    CONCLUSION AND REQUESTED RELIEF

On this record, the Debtors cannot obtain use of cash collateral without consent of their secured lenders. Yet the Debtors have not even reached out to McLane to request consent in connection with the June 3, 2026 hearing. Debtors should also be required to tell the Court what efforts, if any, they took to obtain the consent of Northern Trust Company or McLane prior to the June 3, 2026 hearing. The Debtors have not specified the period for which they seek continued use of cash collateral or the terms of the proposed order. For these reasons, McLane objects to any further extensions of use of cash collateral at this time.

To the extent that the Court approves further use of cash collateral over McLane's objection, McLane requests: (1) the Court set an evidentiary hearing on the matters raised herein; (2) limit the use of cash collateral to the end of the week beginning June 8, 2026 (where Mr. Skillman's most recent forecast terminates) [Dkt. 166, p.8]; (3) require that the Debtors provide a forecast that includes a chapter 11 trustee (*see* McLane's Reply to Debtors' Response to Order to Show Cause, Dkt. 226); (4) prohibit any payments, including lease payments, to any entity affiliated with Mr. Dharod unless and until there is a full investigation by a chapter 11 trustee of such payments and the arrangements between the Debtors and such affiliates; and (5) require that the Debtors file a new motion with respect to any further requests for cash collateral usage.

– 8 –

LEGAL/51372660v3

*[Continued on next page]*

MCLANE FOODSERVICE, INC.'S OBJECTION TO
DEBTORS' CONTINUED USE OF CASH COLLATERAL

LEGAL/51372660v3

Respectfully submitted this 3rd day of June, 2026.

**ALSTON & BIRD LLP**

*/s/ Michael J. Agoglia*
Michael J. Agoglia
Cal Bar No. 154180
55 Second Street, Suite 2100
San Francisco, CA 94105
Telephone: 415-243-1000
Facsimile: 415-243-1001
michael.agoglia@alston.com

– and –

Jacob A. Johnson
Ga. Bar No. 849407
(Admitted *pro hac vice*)
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: 404-881-7000
Facsimile: 404-844-9026
jacob.johnson@alston.com

*Attorneys for McLane Foodservice, Inc.*

– 10 –

MCLANE FOODSERVICE, INC.'S OBJECTION TO
DEBTORS' CONTINUED USE OF CASH COLLATERAL

LEGAL/51372660v3

# EXHIBIT A

## PURCHASE MONEY SECURITY AGREEMENT

**THIS PURCHASE MONEY SECURITY AGREEMENT** dated as of April 8 ,2025 executed and delivered by **SENIOR CLASSIC LEASING, LLC** a Limited Liability Company, organized under the laws of California with its principal place of business and chief executive office located a 1 Centerpointe Drive, Suite 400, La Palma California 90623 (the "Debtor"), in favor of McLane Foodservice, Inc. on behalf of itself and its affiliate, McLane Foodservice Distribution, Inc. with an office located at 2085 Midway Road Carrollton, TX  75006 (the "Secured Party").

**WHEREAS**, the Secured Party has agreed to sell goods to the Debtor from time to time on credit.

**WHEREAS**, it is a condition precedent to the Secured Party's extension of credit to the Debtor that the Debtor execute and deliver this Agreement, among other things, to grant a security interest in certain of the Debtor's assets as security for the Obligations;

**NOW, THEREFORE,** in consideration of the above premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Debtor, the Debtor hereby agrees with the Secured Party as follows:

**Section 1. <u>Grant of Security</u>.**  To secure the prompt and complete payment, observance and performance when due (whether at stated maturity, by acceleration or otherwise) of all of the Obligations, the Debtor hereby mortgages, pledges and hypothecates to the Secured Party, and grants to the Secured Party a security interest in, all of the Debtor's right, title and interest in, to and under the Collateral.

**Section 2. <u>Representations and Warranties</u>.**  The Debtor represents and warrants to the Secured Party as follows:

(a)    <u>Name; Tax ID Number</u>.  The Debtor's exact legal name is set forth in the first paragraph of this Agreement, and the Debtor does not conduct and, during the five-year period immediately preceding the date of this Agreement, has not conducted, business under any name other than **SENIOR CLASSIC LEASING, LLC** the social security number or Internal Revenue Service taxpayer identification number, as applicable, of the Debtor is 33-0803884 .

(b)    <u>Organization; Power; Qualification</u>.  The Debtor is duly organized, validly existing and in good standing under the laws of the jurisdiction stated in the first paragraph of this Agreement, has the power and authority to own its properties and to carry on its business as now being and hereafter proposed to be conducted and is duly qualified and authorized to do business as a foreign corporation in each jurisdiction in which the character of its properties or the nature of its business requires such qualification or authorization.

Rev. 08.02.18

(c)    <u>Authorization</u>.  The Debtor has the right and power, and has taken all necessary action to authorize it, to execute, deliver and perform this Agreement in accordance with its terms.  This Agreement, the instruments, agreements and other documents to which the Debtor is a party and which evidence or relate in any way to the Obligations have been executed and delivered by the authorized officers of the Debtor, and each is a legal, valid and binding obligation of the Debtor enforceable against the Debtor in accordance with its terms.

(d)    <u>Chief Executive Office; Jurisdiction of Formation; Etc.</u>  The chief executive office and principal place of business of the Debtor are located at the address set forth in the first paragraph of this Agreement and have been located there for the five-year period immediately preceding the date hereof.  The Debtor is organized under the laws of the jurisdiction stated in the first paragraph of this Agreement, and during the five-year period immediately preceding the date hereof, the Debtor has not changed its name, identity, jurisdiction of organization, or corporate or other organizational structure in any way.

(e)    <u>Places of Business</u>.  The Debtor has no places of business where Collateral is located other than at the street address set forth in the first paragraph herein and at the addresses to which the Secured Party delivers.

(f)    <u>Inventory</u>. All Inventory is located at the Debtor's location set forth in the first paragraph herein or at the addresses to which the Secured Party delivers or is in transit to such locations.

(g)    <u>Security Interest</u>.  It is the intent of the Debtor that this Agreement create a valid "purchase money security interest" (as such term is defined under the Uniform Commercial Code) in the Collateral, securing the payment of the Obligations.

**Section 3.  <u>Continued Priority of Security Interest</u>.**

(a)    The security interest in the Collateral in favor of the Secured Party shall at all times be a valid, perfected security interest and enforceable against the Debtor, in accordance with the terms of this Agreement, as security for the Obligations.  The Debtor shall, at its sole cost and expense, take all action that may be necessary or desirable, or that the Secured Party may request, so as at all times to maintain the validity, perfection, enforceability and priority of the security interests in the Collateral in conformity with the immediately preceding sentence, or to enable the Secured Party to exercise or enforce its rights hereunder, including, but not limited to, the filing of any financing statements under the Uniform Commercial Code (or similar laws) in effect in any jurisdiction with respect to the security interests created by this Agreement.

(b)    The Debtor authorizes the Secured Party, and its counsel or other representatives, at any time and from time to time, to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral in such form and in such offices as the Secured Party reasonably determines appropriate to perfect the security interests of the Secured Party under this Agreement.  Further, to the

extent permitted by Applicable Law, a carbon, photographic, xerographic, or other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction.

## Section 4. Covenants Regarding Collateral.

(a)      Maintenance of Collateral.  The Debtor shall maintain all physical property that constitutes Collateral in good condition, with reasonable allowance for wear and tear, and shall exercise proper custody over all such property.

(b)      Insurance.  The Debtor shall at all times maintain insurance on the Collateral against loss or damage by fire, theft, burglary, pilferage, loss in transit and such other hazards and risks as the Secured Party shall specify, in amounts (which shall not be less than the aggregate amount of the Obligations) and under policies issued by insurers acceptable to the Secured Party.  All premiums on such insurance shall be paid by the Debtor and certified copies of the policies, or other evidence of insurance acceptable to the Secured Party, shall be delivered to the Secured Party promptly upon the Secured Party's request.  The Debtor will not use or permit the Collateral to be used unlawfully or outside of any insurance coverage.  All insurance policies required under this Section shall contain loss payable clauses on New York standard loss payee forms or other forms satisfactory to the Secured Party, naming the Secured Party as lender's loss payee, and providing that no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy and such policies and loss payable clauses may not be canceled, amended or terminated with respect to the Secured Party unless prior written notice is given to the Secured Party.  If, at any time, the Debtor shall fail to obtain or maintain any of the policies of insurance required above or to pay all premiums relating thereto, the Secured Party may, upon written notice to the Debtor, obtain and maintain such policies of insurance and pay such premiums; provided, however, that the Secured Party shall have no obligation to obtain insurance for the Debtor or pay any insurance premiums. By obtaining insurance for the Debtor or paying any insurance premiums, the Secured Party shall not be deemed to have waived any Event of Default arising from the Debtor's failure to have maintained such insurance or pay any premiums.  All sums disbursed by the Secured Party to obtain such insurance or to pay any insurance premiums shall be payable on demand by the Debtor to the Secured Party and shall be additional Obligations hereunder secured by the Collateral.

(c)      Changes in Locations, Names, Etc.  Unless the Debtor shall have given the Secured Party at least 30 days' prior written notice (or such shorter time as may be acceptable to the Secured Party) and shall have delivered to the Secured Party all documents reasonably requested by the Secured Party to maintain the validity, perfection and priority of the security interests provided herein, the Debtor shall not do any of the following:

(i)      permit any Inventory (except for Inventory in transit) and any books and records to be kept at a location other than at the street address set forth in the first paragraph herein and at the addresses to which the Secured Party delivers.

- 3 -

(ii)    change its jurisdiction of organization from that referred in paragraph 1 of this Agreement; or

(iii)    change its legal name or organizational identification number, if any, or corporate, limited liability company or other organizational structure.

(c)    Other Information.  The Debtor shall furnish to the Secured Party such other information with respect to the Collateral as the Secured Party may reasonably request from time to time.

**Section 5.  The Secured Party Appointed Attorney-in-Fact.**  The Debtor hereby irrevocably appoints the Secured Party the Debtor's attorney-in-fact, with full authority in the place and stead of the Debtor and in the name of the Debtor or otherwise, from time to time in the Secured Party's discretion to take any action and to execute any instrument or document which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement and to exercise any rights and remedies the Secured Party may have under this Agreement or Applicable Law, including, without limitation: (i) to obtain and adjust insurance required to be maintained pursuant to Section 4.(b) hereof; (ii) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral; (iii) to receive, endorse, and collect any drafts or other Instruments, Documents and Chattel Paper, in connection with clause (i) or (ii) above; and (iv)  to file any claims or take any action or institute any proceedings that the Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Secured Party with respect to any of the Collateral. The power-of-attorney granted hereby shall be irrevocable and coupled with an interest.  The Secured Party shall not exercise the foregoing power of attorney prior to the existence of a Default or Event of Default.

**Section 6.  The Secured Party May Perform.**  If the Debtor fails to perform any agreement contained herein, the Secured Party may, without notice to the Debtor, itself perform, or cause performance of, such agreement, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Debtor under Section 10. hereof.

**Section 7. Remedies.**  The Secured Party may take any or all of the following actions upon the occurrence of an Event of Default hereunder.

(a)    Acceleration.  Upon the occurrence of an Event of Default specified in clauses (f) or (g) of the definition thereof, all of the Obligations shall become automatically due and payable without presentment, demand, protest, or other notice of any kind, all of which are expressly waived, notwithstanding anything in this Agreement or any other agreement evidencing any Obligations to the contrary.  If any other Event of Default shall have occurred and be continuing, the Secured Party may declare all of the Obligations to be forthwith due and payable, whereupon the same shall immediately become due and payable without presentment, demand, protest or other notice of any kind, all of which are

- 4 -

expressly waived, anything in this Agreement or any other agreement evidencing any Obligations to the contrary notwithstanding.

       (b)     <u>Inventory</u>.

       (i)     <u>Entry</u>. The Secured Party may enter upon any premises on which Inventory may be located and, without resistance or interference by the Debtor, take physical possession of any or all thereof and maintain such possession on such premises or move the same or any part thereof to such other place or places as the Secured Party shall choose, without being liable to the Debtor on account of any loss, damage or depreciation that may occur as a result thereof, other than for actions that were not taken in good faith.

       (ii)     <u>Assembly</u>. The Debtor shall, upon request of and without charge to the Secured Party, assemble the Inventory and maintain or deliver it into the possession of the Secured Party or any agent or representative of the Secured Party at such place or places as the Secured Party may designate and as are reasonably convenient to both the Secured Party and the Debtor.

       (c)     <u>Rights as a Secured Creditor</u>. The Secured Party may exercise all of the rights and remedies of a secured party under the Uniform Commercial Code and under any other Applicable Law, including, without limitation, the right, without notice except as specified below and with or without taking possession thereof, to sell the Collateral or any part thereof in one or more parcels at public or private sale at any location chosen by the Secured Party, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Secured Party may deem commercially reasonable. The Debtor agrees that, to the extent notice of sale shall be required by Applicable Law, at least 10 days' prior notice to the Debtor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification, but notice given in any other reasonable manner or at any other reasonable time shall constitute reasonable notification. The Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given. The Secured Party may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

       (d)     <u>Waiver of Marshaling</u>. The Debtor hereby waives any right to require any marshaling of assets and any similar right.

       (e)     <u>Writ of Possession; Appointment of Receiver</u>. The Debtor hereby acknowledges that the Obligations arose out of a commercial transaction and agrees that while an Event of Default exists, the Secured Party shall have the right to an immediate writ of possession with respect to the Collateral without notice or the requirement of posting a bond. The Secured Party shall have the right to the appointment of a receiver for the properties and assets of the Debtor, and the Debtor hereby consents to such rights and

such appointment and hereby waives any objection the Debtor may have thereto or the right to have a bond or other security posted by the Secured Party.

**Section 8. <u>Application of Proceeds</u>.** All proceeds from each sale of, or other realization upon, all or any part of the Collateral following an Event of Default shall be applied or paid over as follows:

(a)  First:  to the payment of all costs and expenses incurred in connection with such sale or other realization, including reasonable attorneys' fees if the Secured Party endeavored to collect the Obligations by or through an attorney at law;

(b)  Second:  to the payment of the interest due upon any of the Obligations, in any order which the Secured Party may elect;

(c)  Third:  to the payment of the principal due upon any of the Obligations in any order which the Secured Party may elect; and

(d)  Fourth:  the balance (if any) of such proceeds shall be paid to the Debtor or to whomsoever may be legally entitled thereto.

The Debtor shall remain liable and shall pay, on demand, any deficiency remaining in respect of the Obligations, together with interest thereon at a rate per annum equal to the highest rate then payable hereunder on such Obligations, which interest shall constitute part of the Obligations.

**Section 9. <u>Rights Cumulative</u>.** The rights and remedies of the Secured Party under this Agreement and each other document or instrument evidencing or securing the Obligations shall be cumulative and not exclusive of any rights or remedies which it would otherwise have.  In exercising its rights and remedies the Secured Party may be selective and no failure or delay by the Secured Party in exercising any right shall operate as a waiver of it, nor shall any single or partial exercise of any power or right preclude its other or further exercise or the exercise of any other power or right.

**Section 10. <u>Expenses</u>.** The Debtor will pay, on demand, all out-of-pocket expenses incurred by the Secured Party in connection with:  (a) this Agreement and any document or instrument evidencing any of the Obligations whenever the same shall be executed and delivered; (b) the collection or enforcement of the Obligations including the fees and disbursements of counsel to the Secured Party, including reasonable attorney's fees, if such collection or enforcement is done through or by an attorney; and (c) the exercise by the Secured Party of any right or remedy granted to it under this Agreement.

**Section 11.  <u>Amendments, Etc.</u>** No amendment or waiver of any provision of this Agreement nor consent to any departure by the Debtor here from shall in any event be effective unless the same shall be in writing and signed by the parties hereto, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

- 6 -

Section 12. **Notices.**  Unless otherwise provided herein, communications provided for hereunder shall be in writing and shall be mailed, telecopied or delivered, if to the Debtor at its address stated in the first paragraph of this Agreement, Attn, Harshad Dharod Email address: Harshad.dharod@ffcorp.org; if to the Secured Party, at its address at 2085 Midway Road Carrollton, TX  75006, Attn: Thomas DiFonzo, telecopy number: (972) 364-2131; or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties.  All such notices and other communications to the Debtor shall be effective (i) if mailed, when received or three calendar days after mailing, whichever is earlier; (ii) if telecopied, when receipt is evidenced by a confirmation; or (iii) if hand delivered, when delivered.  All such notices or communications to the Secured Party shall be effective when actually received.

Section 13. **Continuing Security Interest.**  This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect until indefeasible payment in full of the Obligations, (ii) be binding upon the Debtor, its successors and assigns and (iii) inure the benefit of the Secured Party, and its successors and assigns.  The Debtor's successors and assigns shall include, without limitation, a receiver, trustee or debtor-in-possession thereof or therefor.

Section 14. **Governing Law; Severability.**  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provisions shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

Section 15. **Waiver.**  THE DEBTOR WAIVES (i) ANY NOTICE PRIOR TO THE TAKING POSSESSION OR CONTROL OF THE COLLATERAL OR ANY POSTING OF ANY BOND OR SECURITY WHICH MIGHT BE REQUIRED BY ANY COURT PRIOR TO ALLOWING THE SECURED PARTY TO EXERCISE ANY OF SECURED PARTY'S REMEDIES SET FORTH HEREIN, INCLUDING THE ISSUANCE OF AN IMMEDIATE WRIT OF POSSESSION AND (ii) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAWS.

Section 16. **Indemnification.**  The Debtor agrees to indemnify and hold the Secured Party harmless from and against any claim, loss, damage, action, cause of action, liability, cost and expense or suit of any kind or nature whatsoever, brought against or incurred by the Secured Party, in any manner arising out of or, directly or indirectly, related to or connected with any action taken by the Secured Party pursuant to the terms of this Agreement except for any of the foregoing caused solely by the gross negligence or willful misconduct of the Secured Party (as determined by a court of final appeal).

- 7 -

**Section 17.** **Counterparts.** This Agreement may be executed in several counterparts, each of which shall be an original and all of which, taken together, shall constitute but one and the same instrument. In making proof of this Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto. Delivery of an executed counterpart of this Agreement by telecopier or Portable Document Format (PDF) shall have the same force and effect as delivery of an original executed counterpart of this Agreement.

**Section 18.** **Definitions.** (a) For the purposes of this Agreement:

"Agreement" means this Purchase Money Security Agreement, as the same may be amended, supplemented, restated or otherwise modified from time to time.

"Applicable Law" means all applicable provisions of constitutions, statutes, laws, rules, regulations and orders of all governmental bodies and all orders, rulings and decrees of all courts and arbitrators.

"Collateral" means all of the Debtor's right, title and interest in and to each of the following, and whether now or hereafter existing, or now owned or hereafter acquired or arising:

(a) all Inventory;

(b) all Documents pertaining to any of the Inventory;

(c) all books and records pertaining to any of the property described in this definition; and

(d) any and all Proceeds of any of the foregoing (including, but not limited to, any claims to any items referred to in this definition, and any claims of the Debtor against third parties for loss of, damage to or destruction of, any or all of the Collateral or for proceeds payable under policies of insurance) in whatever form, including, but not limited to, Cash Proceeds.

"Debtor" has the meaning set forth in the first paragraph hereof.

"Default" means any of the events specified in the definition of Event of Default, whether or not there has been satisfied any requirement for giving of notice, lapse of time or the happening of any other condition.

"Event of Default" means any of the following events, whatever the reason for such event and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment or order of any court or any order, rule or regulation of any governmental or nongovernmental body:

- 8 -

(a)      failure of the Debtor to pay any principal with respect to any of the Obligations when due or failure to pay interest or any other amount within three (3) calendar days of the date when due;

(b)      failure of the Debtor to perform or observe any term, covenant or condition or agreement in Section 4 of this Agreement;

(c)      the failure of the Debtor to comply with any of the terms and provisions of this Agreement (and not mentioned in the preceding clauses (a) and (b) or any of the documents or instruments evidencing any of the Obligations within twenty (20) calendar days after the earlier to occur of notice by the Secured Party or knowledge of the Debtor;

(d)      any oral or written representation or warranty made at any time by the Debtor to the Secured Party shall prove to have been materially incorrect or misleading in any material respect when made;

(e)      a default, event of default, or event which with the giving of notice or the passage of time or both would constitute a default or event of default, shall have occurred under any other document, instrument, contract or agreement now or hereafter entered into by the Debtor and Secured Party or executed by the Debtor in favor of the Secured Party, or the Debtor shall in any way fail to comply with the terms, covenants or conditions contained in any such document, instrument, contract or agreement and not cure such failure within curative periods applicable thereto;

(f)      the Debtor shall (i) commence a voluntary case under the Bankruptcy Code of 1978, as amended or other federal bankruptcy law (as now or hereafter in effect); (ii) file a petition seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition for adjustment of debts; (iii) apply for the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign; (iv) be unable to, or admit in writing its inability to, pay its debts as they become due; (v) make a general assignment for the benefit of creditors; (vi) make a conveyance fraudulent as to creditors under any state or federal law; (vii) take any corporate or company action for the purpose of effecting any of the foregoing; or

(g)      a case or other proceeding shall be commenced against the Debtor in any court of competent jurisdiction seeking (i) relief under the Bankruptcy Code of 1978, as amended or other federal bankruptcy law (as now or hereafter in effect) or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts or (ii) the appointment of a trustee, receiver, custodian, liquidator or the like for the Debtor of all or any substantial part of the assets, domestic or foreign, of the Debtor.

"Inventory" means all Inventory of the Debtor purchased from the Secured Party, including, but not limited to, beef, chicken, turkey, other poultry, pork, fish/seafood, deli meats, dairy, cheese, fresh produce, fruits, vegetables, fries/hash browns/chips, prepared

- 9 -

salads, dressings, rice, pasta/grains, bakery breads/ingredients, desserts/snacks, mixes, soup, entrees, ethnic food, nuts, cereals, crackers, appetizers, sauces/sauce bases, gravies/gravy bases, dips, oils/shortenings/fats, spices/seasonings, condiments, beverages, disposables sold with meal, disposables used for preparation or storage, disposable supplies, supplies, advertising items, resale items and janitorial supplies.

"Obligations" means all obligations and indebtedness owing by the Debtor to the Secured Party and all future advances made to the Debtor by the Secured Party, however and whenever created, arising or evidenced, now or hereafter existing, including without limitation, all such obligations and indebtedness incurred by the Debtor in connection with the purchase of Inventory from the Secured Party.

"Person" means an individual, corporation, partnership, association, trust or unincorporated organization, or a government or any agency or political subdivision thereof.

"Secured Party" has the meaning set forth in the first paragraph hereof.

"Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State of Texas, as the same may be amended from time to time; provided, however, to the extent that, by reason of mandatory provisions of law, any of the attachment, perfection, or priority of, or remedies with respect to, the Secured Party's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Texas, the term Uniform Commercial Code shall mean the Uniform Commercial Code as in effect in such other jurisdiction solely for purpose of the provisions hereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

(b)      Unless otherwise set forth herein to the contrary, all terms not otherwise defined herein that are defined in the Uniform Commercial Code are used herein with the meanings ascribed to them in the Uniform Commercial Code, and if defined in more than one article of the Uniform Commercial Code, such terms shall have the meaning defined in Article 9 of the Uniform Commercial Code, including the following terms (which are capitalized herein):  "Cash Proceeds," "Chattel Paper," "Documents," "Instruments," "Inventory" and "Proceeds."

[Signatures on Next Page]

- 10 -

**IN WITNESS WHEREOF**, the Debtor has caused this Purchase Money Security Agreement to be duly executed and delivered under seal by its duly authorized officers as of the day first above written.

**SENIOR CLASSIC LEASING, LLC**

By: _____

    Name:  Harshad Dharod

    Title:  Manager

Attest: _____

    Name:  Alex Kalinsky

    Title:  General Counsel

(CORPORATE SEAL)

Agreed and accepted as of the
date first written above.

McLane Foodservice, Inc. on
behalf of itself and its affiliate
McLane Foodservice Distribution,
Inc.

By: _____

    Name:  Thomas DiFonzo
    Title:   Director – Credit/Collections

# iLien Cover Page

Date Printed:  04/10/2025

Debtor:
SENIOR CLASSIC LEASING, LLC
1 Centerpointe Drive, Suite 400
La Palma, CA  90623

Concept:
Owner #:  907492
REF3:  111612
REF4:
Ref5:
Ref6:
Ref7:
Secondary Bill Code (Not Required):

iLien File #:  94537379
Order Confirmation #:  103689589

UserID:  339918
UserName:  JAN EZELL
Number of Collateral Pages Attached:  0

Transaction Type:  Original
Jurisdiction:  CA, Secretary of State

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**Lien Solutions**
Representation of filing

**This filing is Completed**
File Number : U250124990229
File Date   : 4/9/2025 12:00:00 AM

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT SUBMITTER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)    13481 - McLane

Lien Solutions          103689589
P.O. Box 29071
Glendale, CA  91209-9071    CALI

File with: Secretary of State, CA
SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| SENIOR CLASSIC LEASING, LLC | | | |

| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1 Centerpointe Drive, Suite 400 | La Palma | CA | 90623 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| MCLANE FOODSERVICE, INC. | | | |

| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2085 Midway Road | Carrollton | TX | 75006 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtor's right, title and interest in and to each of the following, and whether now or hereafter existing, or now owned or hereafter acquired or arising: (a) all inventory of the Debtor purchased from the secured party, including, but not limited to, beef, chicken, turkey, other poultry, pork, fish/seafood, deli meats, dairy, cheese, fresh produce, fruits, vegetables, fries/hash browns/chips, prepared salads, dressings, rice, pasta/grains, bakery breads/ingredients, desserts/snacks, mixes, soup, entrees, ethnic food, nuts, cereals, crackers, appetizers, sauces/sauce bases, gravies/gravy bases, dips, oils/shortenings/fats, spices/seasonings, condiments, beverages, disposables sold with meal, disposables used for preparation or storage, disposable supplies, supplies, advertising items, resale items and janitorial supplies; (b) all documents pertaining to any of the inventory; (c) all books and records pertaining to any of the property described herein; and (d) any and all proceeds of any of the foregoing (including, but not limited to, any claims to any items referred to herein, and any claims of the Debtor against third parties for loss of, damage to or destruction of, any or all of the collateral or for proceeds payable under policies of insurance) in whatever form, including, but not limited to, cash proceeds.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
103689589                                               907492

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

# EXHIBIT B

## Johnson, Jacob

| | |
|---|---|
| **From:** | Johnson, Jacob |
| **Sent:** | Wednesday, May 13, 2026 12:01 PM |
| **To:** | Eric Bensamochan |
| **Subject:** | FW: URGENT: Letter to McLane March 30, 2026/CKE DEFAULT NOTICE - Harshad Dharod |

Eric – for your records.  Here is where McLane – prepetition – reduced Debtors' terms to net 2 days, but conceded to having that reduction occur via the $25,000 weekly adder payment.

Jacob Johnson
Partner
**ALSTON & BIRD**
1201 West Peachtree Street
Atlanta, GA 30309
+1 404 881 7282 (O)
+1 404 844 9026 (M)
Jacob.Johnson@alston.com

---

**From:** Joe Reyna <Joe.Reyna@McLaneFS.com>
**Sent:** Tuesday, March 31, 2026 5:17 PM
**To:** Alex Kalinsky <AKalinsky@ffcorp.org>
**Cc:** Olusola Popoola <Olusola.Popoola@McLaneFS.com>; Chantel Sharp <Chantel.Sharp@mclaneFS.com>; Kelcey Gazaway <Kelcey.Gazaway@mclanefs.com>; Tom DiFonzo <Tom.DiFonzo@McLaneFS.com>; Harshad Dharod <harshad.dharod@ffcorp.org>; Ben Zandi <Ben.Zandi@ffcorp.org>; Allison Cunningham <Allison.Cunningham@mclaneco.com>; Johnson, Jacob <Jacob.Johnson@alston.com>; Bodnarek, Kennedy <Kennedy.Bodnarek@alston.com>
**Subject:** RE: URGENT: Letter to McLane March 30, 2026/CKE DEFAULT NOTICE - Harshad Dharod

**EXTERNAL SENDER – Proceed with caution**

---

Alex,
I see you're general counsel for Mr. Dharod.  In that case, I've added our counsel team as well in case you may need connect with them.

McLane understands how this abrupt decision may negatively impact operations, however until we secure an updated notice from CKE stating the default has been cured, we must implement a plan to reduce our overall exposure.

We'll forego reducing terms to Net 2-day payment terms for now, however we will need to secure a $25k weekly deposit every Friday starting this coming Friday, 04.03.26.  We must accumulate a security deposit to support existing credit terms until we've obtained sufficient funds to reduce exposure equal to average Net 2 days of outstanding balances.

Please advise once wires are sent so that we may credit the account accordingly.

Thank you,

**Customer Wiring Instructions:**      **To:** McLane Foodservice Inc.
(BofA - Chicago)      **ABA:  026009593**
     **Account:**  8188404528
     **FBO:**  Dharod Group
     **Attn:   Mike Popoola**
**Bank Address:**      135 S. LaSalle St.
     Chicago IL  60603

Joe Reyna
Manager, Sr. Credit/Collections
972-364-2090

---

**From:** Alex Kalinsky <AKalinsky@ffcorp.org>
**Sent:** Tuesday, March 31, 2026 3:47 PM
**To:** Joe Reyna <Joe.Reyna@McLaneFS.com>
**Cc:** Olusola Popoola <Olusola.Popoola@McLaneFS.com>; Chantel Sharp <Chantel.Sharp@mclaneFS.com>; Kelcey Gazaway <Kelcey.Gazaway@mclanefs.com>; Joe Reyna <Joe.Reyna@McLaneFS.com>; Tom DiFonzo <Tom.DiFonzo@McLaneFS.com>; Harshad Dharod <harshad.dharod@ffcorp.org>; Ben Zandi <Ben.Zandi@ffcorp.org>
**Subject:** Re: URGENT: Letter to McLane March 30, 2026/CKE DEFAULT NOTICE - Harshad Dharod

**\*\* STOP. THINK. External Email \*\***
_____

Hi Joe,

We cannot accommodate the change to 2 day billing. I understand the nature of the letter that you received from CKE and we are currently working through with CKE on the payment issues. The change to 2 day billing would represent an impossibly difficult impact to our business given the resultant double payments over a 2 week period.

We request no changes be made to our current billing structure. All of our payments to McLane have always been current and those current payments will continue.

Thank you,
Alex

---

**From:** Joe Reyna <Joe.Reyna@McLaneFS.com>
**Sent:** Tuesday, March 31, 2026 12:33:42 PM
**To:** Alex Kalinsky <akalinsky@ffcorp.org>
**Cc:** Olusola Popoola <Olusola.Popoola@McLaneFS.com>; Chantel Sharp <Chantel.Sharp@mclaneFS.com>; Kelcey Gazaway <Kelcey.Gazaway@mclanefs.com>; Joe Reyna <Joe.Reyna@McLaneFS.com>; Tom DiFonzo <Tom.DiFonzo@McLaneFS.com>
**Subject:** URGENT: Letter to McLane March 30, 2026/CKE DEFAULT NOTICE - Harshad Dharod

You don't often get email from joe.reyna@mclanefs.com. Learn why this is important

Good afternoon, Mr. Dharod!
I'm writing regarding attached notice we received from HARDEE'S relating to: **Franchisee Defaults – Restaurants Owned by Harshad Dharod.**

Due to the uncertainty involved with the outcome of this default, per McLane's credit & collection policy we must move forward to safeguard our accounts receivable amounts as listed below. To immediately reduce our exposure and mitigate risk, existing credit conditions will be adjusted to the lowest possible Carl's Jr. contractual payment terms of Net 2 days with early pay discount of .07 per case effective today.

The remaining outstanding balances will be collected as it comes due on existing Net 14-day payment terms until paid in full. Please plan accordingly, as payments will overlap over the next two weeks.

Please keep us updated on status of default.

We value our partnership, your cooperation and trust you understand our position!

| Chain | Chain Name | Parent Link | Cust Acct # | Cust Name | Active Units | TERMS | Total Net A/R |
|-------|-----------|-------------|-------------|-----------|--------------|-------|---------------|
| 013 | CARL'S | DHA | 111612 | SENIOR CLASSIC LEASING, LLC | 43 | N14I | $492,821 |
| 013 | CARL'S | DHA | 111710 | DFG RESTAURANTS, INC. | 5 | N14I | $57,063 |

3

| 013 | CARL'S | DHA | 111630 | SECOND STAR HOLDINGS LLC | 4 | N14I | $47,936 |
|---|---|---|---|---|---|---|---|
| 013 | CARL'S | DHA | 111627 | THIRD STAR INVESTMENTS LLC | 3 | N14I | $39,036 |
| 013 | CARL'S | DHA | 111610 | SUN GIR INCORPORATED | 2 | N14I | $19,723 |
| 013 | CARL'S | DHA | 111711 | HARSHAD & NASIR CORPORATION | 3 | N0I | $0 |
| | | | | | 60 | | 656,580.64 |

Joe Reyna
McLane
Manager – Sr. Credit/Collections
972.364.2090 (Office) | 469-226-0560 (Cell)  Joe.Reyna@McLaneFS.com

4

# EXHIBIT C

B2550 (Form 2550 – Subpoena to Appear and Testify at a Hearing or Trial in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Central District of California

In re ____Sun Gir Incorporated, Inc.____
Debtor

*(Complete if issued in an adversary proceeding)*

_____
Plaintiff
v.
_____
Defendant

Case No. ____8:26-bk-11056-SC____

Chapter 11

Adv. Proc. No. _____

### SUBPOENA TO APPEAR AND TESTIFY
### AT A HEARING OR TRIAL IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: _____**Harshod Dharod**_____
*(Name of person to whom the subpoena is directed)*

☑ **YOU ARE COMMANDED** to appear in the United States Bankruptcy Court at the time, date, and place set forth below to testify at a hearing or trial in this bankruptcy case (or adversary proceeding). When you arrive, you must remain at the court until the judge or a court official allows you to leave.

| PLACE: | COURTROOM 5C |
|---|---|
| 411 WEST FOURTH STREET, SANTA ANA, CA 92701 | DATE AND TIME: <br> **MAY 13, 2026 AT 1:30 P.M.** |

You must also bring with you the following documents, electronically stored information, or objects *(leave blank if not applicable)*:



The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: __May 12, 2026____

CLERK OF COURT

OR

_____        ____*/s/ Jacob A. Johnson*_____
*Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)* _**McLane Foodservice, Inc.**____ , who issues or requests this subpoena, are:
JACOB A. JOHNSON, ALSTON & BIRD LLP
1201 WEST PEACHTREE STREET, SUITE 4900, ATLANTA, GEORGIA 30309

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. **8:26-bk-11056-SC**

# PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* **Harshod Dharod**
on *(date)* **May 12, 2026**

☑ I served the subpoena by delivering a copy to the named person as follows: I left the subpoena with **Paola Ariza, Maid, Authorized person to accept service of process** at **38 Shoreridge, Newport Coast, CA 92657** on *(date)* **5/13/2026** at **10:00 AM**.

☐ I returned the subpoena unexecuted because; _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

My fees are $ .00 for travel and $  for services, for a total of $ .00

I declare under penalty of perjury that this information is true.

Date: **5/13/2026**

_____
*Server's signature*

**Joshua Burnett**
*Printed name and title*
**Ace Attorney Service, Inc.**
**800 S. Figueroa Street, Suite 900, Los Angeles, CA 90017**
**Phone: (213) 623-3979 / Fax: (213) 623-7527**
**Registration No.: 6435 / County: ORANGE**
*Server's Address*

Additional information regarding attempted service, etc.:

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
350 South Grand Avenue, 51st Floor, Los Angeles, CA 90071

A true and correct copy of the foregoing document entitled (*specify*): **MCLANE FOODSERVICE, INC.'S OBJECTION TO DEBTORS' CONTINUED USE OF CASH COLLATERAL**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 6/3/2026_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) 6/3/2026, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 6/3/2026 | Melanie Mizrahie | /s/ Melanie Mizrahie |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                    **F 9013-3.1.PROOF.SERVICE**

## SERVICE LIST

### TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):

- Michael John Agoglia michael.agoglia@alston.com, melanie.Mizrahie@alston.com
- Neama Cory Barari nbarari@caskeyholzman.com
- Eric Bensamochan eric@eblawfirm.us, G63723@notify.cincompass.com;services@infotrack.com;paulinab@eblawfirm.us
- Dustin P Branch branchd@ballardspahr.com, carolod@ballardspahr.com;zarnighiann@ballardspahr.com
- Martin P Eramo MPEramo@aol.com
- Eric D Goldberg eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
- Michael I. Gottfried mgottfried@elkinskalt.com, lwageman@elkinskalt.com,docketing@elkinskalt.com,lmasse@elkinskalt.com
- David S Hagen davidhagenlaw@gmail.com,
- LawOfficesofDavidSHagenCA1@jubileebk.net
- Kenneth Misken Kenneth.M.Misken@usdoj.gov
- Atle T. Saterbak asaterbak@winthrop.com
- William Schumacher wschumacher@winthrop.com, mfinley@winthrop.com;breznecheck@winthrop.com
- Andrew J Steil asteil@winthrop.com
- United States Trustee (SA) ustpregion16.sa.ecf@usdoj.gov
- Nahal Zarnighian zarnighiann@ballardspahr.com, garciaej@ballardspahr.com;carolod@ballardspahr.com

### SERVED BY UNITED STATES MAIL:

Honorable Scott C. Clarkson
United States Bankruptcy Court
411 West Fourth Street, Suite 5130 / Courtroom
5C Santa Ana, CA 92701-4593

1