**RAINES FELDMAN LITTRELL LLP**
Kyra E. Andrassy (State Bar No. 207959)
*kandrassy@raineslaw.com*
Robert S. Marticello (State Bar No. 244256)
*rmarticello@raineslaw.com*
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

-- and --

Jordan N. Kelly, PA State Bar No. 328896 (*Admitted Pro Hac Vice*)
jkelly@raineslaw.com
11 Stanwix Street, Suite 1500
Pittsburgh, PA 15222
Telephone: 412899-6487

Counsel for Bradley D. Sharp,
Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

In re:

SUN GIR INCORPORATED, *et al.*,

Debtor.

☐ Affects Sun Gir Incorporated
☐ Affects Harshad & Nasir, Incorporated
☒ Affects Senior Classic Leasing, LLC
☒ Affects DFG Restaurants Incorporated
☒ Affects Second Star Holdings, LLC
☒ Affects Third Star Investments, LLC
☐ **Affects All Debtors**

Case No.: 8:26-bk-11056-SC

Chapter: 11

(Jointly Administered with Case Nos. 8:26-bk-11057-SC; 8:26-bk-11058-SC; 8:26-bk-11060-SC; 8:26-bk-11061-SC; 8:26-bk-11062-SC)

**NOTICE OF SUBMISSION OF THE FULLY EXECUTED COPY OF EXHIBIT 1 TO THE TRUSTEE'S EMERGENCY MOTION FOR ORDER: (A) AUTHORIZING AND APPROVING THE SALE OF ESTATE PROPERTY FOR 21 LOCATIONS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE LEASES, SUBLEASES, AND EXECUTORY CONTRACTS AND UNEXPIRED LEASES FOR THE 21 LOCATIONS; AND (C) REJECTION OF THREE LEASES**

**Hearing Information**:
DATE: September 10, 2026
TIME: 10:00 a.m.
CTRM: 5C, 411 West Fourth Street
Santa Ana, CA 92701

[Zoom instructions available on Court's calendar]

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, AND PARTIES ON THE ELECTRONIC NOTICE LIST:**

Bradley D. Sharp, the duly appointed Chapter 11 trustee (the "**Trustee**") for the above-captioned debtors (the "**Debtors**"), hereby submits the fully executed copy of Exhibit 1 to the *Trustee's Emergency Motion for Order: (A) Authorizing and Approving the Sale of Estate Property for 21 Locations Free and Clear of All Liens, Claims, Encumbrances, and Interests; (B) Authorizing and Approving the Assumption and Assignment of the Leases, Subleases, and Executory Contracts and Unexpired Leases for the 21 Locations; and (C) Rejection of Three Leases* [Dkt. No. 444].

Dated: September 8, 2026

**RAINES FELDMAN LITTRELL LLP**

By: /s/ Kyra E. Andrassy
Kyra E. Andrassy
Robert S. Marticello
Jordan N. Kelly
Counsel for Bradley D. Sharp, Chapter 11 Trustee

# EXHIBIT 1

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is executed and entered into as of September __, 2026 (the "**Execution Date**"), by and among one or more of the following parties as indicated on the signature blocks below (each a "**Party**" and collectively, the "**Parties**"): (a) Bradley Sharp, solely in his capacity as the chapter 11 trustee (the "**Trustee**" or "**Seller**") for the bankruptcy estates of Senior Classic Leasing, LLC, DFG Restaurants, Incorporated, Second Star Holdings, LLC, and Third Star Investments, LLC (collectively, the "**Debtors**"); and (b) CTO Foods, LLC, a Wyoming company and CTW Foods, LLC, a Wyoming limited liability company (collectively, together with any Buyer Designee to which either such entity assigns any of its rights or obligations pursuant to Section 7.8, "**Buyer**").

## RECITALS

A. On April 2, 2026 (the "**Petition Date**"), the Debtors and two of their affiliates filed their respective voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court, Central District of California (Santa Ana) (the "**Bankruptcy Court**"), thereby initiating their respect bankruptcy cases with the Bankruptcy Court. The Debtors' bankruptcy cases are jointly administered under Case No. 8:26-bk-11056-SC (the "**Bankruptcy Case**"). By order entered on June 16, 2026, the Trustee accepted his appointment as the chapter 11 trustee.

B. The Seller, as chapter 11 trustee for the Debtors and three other affiliates, operates approximately 49 Carl's Jr. Restaurants, including the 21 locations described on Exhibit A hereto that are together owned by the Debtors (each a "**Store**" and collectively, the "**Stores**"). In this Agreement, the operation of such Stores is referred to as the "**Business**".

C. The Buyer desires to purchase from Seller, and the Seller desires to sell and assign to Buyer, all of the Debtors' right, title and interest in and to the assets described in Section 2.1 of this Agreement (the "**Transaction**"). The entire Transaction is subject to the approval of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions of this Agreement, the Parties hereby agree as follows:

## ARTICLE 1

## BANKRUPTCY COURT APPROVAL OF THIS AGREEMENT

**1.1 Binding Effect; Entry of Approval Order**. Article 1, Section 2.3.1, Section 2.3.3, and Article 4 of this Agreement are effective upon the Execution Date. Except for the foregoing, this Agreement will become effective only upon the entry by the Bankruptcy Court of an order in the Bankruptcy Case (the "**Approval Order**") (a) approving this Agreement and the sale of the Property (as defined below) to Buyer pursuant to this Agreement, free and clear of liens, claims, encumbrances, and interests pursuant to Section 363(f) of the Bankruptcy Code, and (b) approving the assumption by the Debtors and assignment to Buyer of Assumed Contracts (as defined below) pursuant to

Section 365 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, no lease, sublease, or executory contract that has been rejected by the Debtors pursuant to an order of the Bankruptcy Court shall constitute an Assumed Contract or be assigned to Buyer. The Parties acknowledge that the Transaction is intended to receive the protections afforded by section 363(m) of the Bankruptcy Code. Upon entry of the Approval Order, the Parties shall proceed toward Closing as promptly as practicable unless a stay pending appeal is entered.

**1.2 Bankruptcy Court Approval**.

**1.2.1 Filing of Sale Motion**. Seller and Buyer acknowledge and agree that this Agreement and the Transaction contemplated hereby are subject to an auction and/or other opportunity for overbid by other parties and that the Seller reserves the right to accept a superior bid. Seller will have this right until just prior to the hearing on the motion to be filed by Seller for approval of the Transaction. Seller shall promptly confer with Buyer regarding any written objections filed with the Bankruptcy Court to the sale motion (the "**Sale Motion**") to be filed with the Bankruptcy Court.

**1.2.2 Obligation to Seek Approval Order**. Subject to the right to receive qualified overbids, Seller shall use its reasonable best efforts to promptly obtain entry of the Approval Order. Any changes to the form of the Approval Order affecting the economic terms of the Transaction, or the closing conditions thereto, must be approved by Buyer and by Seller in its sole and absolute discretion. Any other changes to the form of the Approval Order must be approved by Buyer in its reasonable discretion and by Seller in its reasonable discretion. The Approval Order shall establish, among other things, that: (a) Seller is authorized to transfer to Buyer all interests of Seller in the Property free and clear of liens (as defined in Section 101(37) of the Bankruptcy Code, claims (as defined in Section 101(5) of the Bankruptcy Code, including without limitation claims for successor liability under any theory of law or equity), encumbrances, and interests of any nature whatsoever, to the fullest extent allowable under the Bankruptcy Code; (b) Seller is authorized to assume and assign the Assumed Contracts to Buyer pursuant to section 365 of the Bankruptcy Code. Seller shall keep Buyer reasonably informed regarding the status of its efforts to obtain entry of the Approval Order. The Approval Order shall also determine that Buyer is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and shall enjoin the assertion against Buyer or the Purchased Assets of any liability that is not expressly assumed by Buyer under this Agreement.

**1.3 Cooperation in Bankruptcy Court Matters**. Buyer agrees that it will promptly take such actions as are reasonably requested by to assist in obtaining entry of the Approval Order. Such actions shall, include, without limitation, the furnishing of affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement, including with regard to providing evidence of financial assurance, or other documents or information for filing with the Bankruptcy Court, and Buyer shall make its employees and representatives available to be interviewed by Seller's attorneys and to testify before the Bankruptcy Court and at depositions in connection with the foregoing, if necessary. Additionally, with regard to each of the Assumed Contracts, Buyer shall use commercially reasonable efforts to provide adequate assurance of Buyer's future performance as required by Section 365(b)(1)(C) of the Bankruptcy Code. If a written objection to the Sale Motion is filed that, if upheld, would prohibit or otherwise prevent the Closing (as defined below) from occurring pursuant to the terms of this Agreement, Seller and Buyer shall use commercially reasonable efforts to have such objection overruled.

ARTICLE 2

**PURCHASE AND SALE OF ASSETS; PURCHASE PRICE; DEPOSIT**

**2.1 Purchase and Sale of Property; Transfer of Assumed Contracts; Assumption of Liabilities**. Subject to the terms and conditions of this Agreement, including, without limitation, approval of the Bankruptcy Court, Seller hereby agrees to sell, transfer, assign, convey and deliver to Buyer, free and clear of liens, (as defined in Section 101(37) of the Bankruptcy Code, claims (as defined in Section 101(5) of the Bankruptcy Code, including without limitation claims for successor liability under any theory of law or equity), encumbrances, and interests pursuant to Section 363(f) of the Bankruptcy Code, and Buyer agrees to purchase, assume and accept from Seller, all of Seller's right, title and interest in and to the following (collectively, the "**Property**" or the "**Purchased Assets**"), AS-IS, WHERE IS, without any representation or warranty, express or implied, to the extent the same are the Property of the Debtors and located at a Store or used or held for use primarily in connection with the Stores or the Business, whether located at a Store, the Debtors' headquarters or another location:

(a) The real property leases to which Debtors are a party for the locations identified on Exhibit A hereto as may be amended to delete Store 7466 in Santa Rosa (the "**Leases**"), together with all rights to any lease or utility deposits and allowances due from landlords under any Leases;

(b) All machinery, equipment, tools, computers, information technology infrastructure (switches, routers, modems, etc.) fixtures, furniture, POS machines and transferable software, signs, smallwares, cooking utensils, and other personal property owned by the Debtors and used primarily in connection with the Stores, whether located at a Store, Debtor's headquarters or another location (exclusive of cash (other than Standbanks as defined below), checks, deposits, receivables, funds payable to Seller under pending credit and debit card transactions, bank accounts, and other cash equivalents). Seller shall provide Buyer a Store-by-Store schedule identifying, to Seller's knowledge and based solely on the Debtors' existing books and records, without independent investigation or verification, all material equipment, its location, and whether it is owned by Seller, leased, financed or, to Seller's knowledge, owned by a landlord, vendor, CKE or another third party, together with copies of the applicable agreements in Seller's possession, payment obligations, and Seller's good faith estimate of Cure Costs for any such agreement proposed to be assumed and assigned pursuant to Section 365 of the Bankruptcy Code, together with any transfer or consent requirements known to Seller. Seller shall deliver such schedule and copies of the applicable agreements in Seller's possession no later than five (5) business days after the Execution Date and shall supplement such information as and when additional information becomes available to Seller through Closing. The schedule shall identify any material equipment that Seller believes cannot be transferred and Seller shall reasonably cooperate, at Buyer's sole cost and exopense, with Buyer's efforts to obtain any required consent or to arrange for replacement or transition arrangements with respect thereto;

(c) All on-site usable inventories of food, paper, operating supplies, and new uniforms as of the Closing Date at the Stores (the "**Inventory**"), and further including all supplies, goods, finished goods, materials, raw materials, work in process, perishable inventory and operating stock in trade owned by Seller, whether or not prepaid, and wherever located, held or owned, including all fresh and frozen foodstuffs, beverages, disposable paper goods (such as napkins and paper towels), soaps

and detergents, condiments, retail merchandise, replacement and spare parts and fuels and other similar items;

(d) Seller customarily maintains approximately Six Hundred Dollars ($600.00) in cash at each Store for operational and change-fund purposes (the "**Standbanks**"). The Standbanks shall remain property of Seller and shall not constitute Purchased Assets. To the extent any Standbanks or other cash are transferred to Buyer at Closing, the amount thereof shall be added to the Purchase Price as an adjustment payable by Buyer at Closing;

(e) All permits, licenses, authorizations, registrations, consents and approvals relating to the Stores and/or Business (collectively, the "**Permits**"), whether governmental or otherwise to the extent they are assignable or transferable in connection with the Transaction;

(f) All telephone numbers and attendant telephone systems, facsimile numbers, email addresses, etc. for the Stores;

(g) The executory contracts and unexpired equipment leases, if any, listed on Exhibit B hereto and the Leases for the Stores identified on Exhibit A (collectively, the "**Assumed Contracts**");

(h) Subject to applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court with respect to the retention of records, copies of all books and records of each of the Debtors relating to the Stores and/or Business, including Store-level financial and operational records, vendor information, equipment records, Permit records and, to the extent permitted by applicable law, employee information reasonably necessary for Buyer to evaluate and make offers of employment; provided, however, that the foregoing shall not include any corporate minute books, stock books or similar corporate records of any Debtor, nor, with respect to personnel records, any gratuitous, subjective or other information which Seller, in his discretion, determines that he may not disclose to Buyer under applicable law. Seller shall deliver Store-related data maintained in excluded software or at the Debtors' headquarters in a commercially reasonable and usable electronic format;

(i) Prepaid expenses, deposits, rebates, credits, refunds, returns, promotional allowances, rights of setoff or recoupment, and similar amounts attributable to the Purchased Assets (collectively, the "**Prepaid Expenses and Rebates**") shall be prorated as of the Closing Date and reflected as a purchase price adjustment in favor of Seller. Notwithstanding anything herein to the contrary, any tax refunds, tax attributes, employee retention credits, CARES Act credits, tariff refunds, governmental incentive payments, litigation recoveries, insurance recoveries, or similar claims arising prior to the Closing Date shall constitute Excluded Property and shall remain property of Seller.

(j) The leasehold interest or right to purchase or acquire the equipment, machinery and other tangible personal property used at the Stores (collectively, **"Leased Equipment"**), including the items described on Exhibit C hereto. Seller shall identify, to Seller's knowledge and based solely on the Debtors' existing books and records, without independent investigation or verification, all Leased Equipment and the applicable owner, agreement, payment obligations, defaults, Seller's good faith estimate of Cure Costs for any such agreement proposed to be assumed and assigned pursuant to Section 365 of the Bankruptcy Code, together with any transfer or consent requirements known to Seller. At Closing, each item of material Leased Equipment shall be transferred to Buyer under an

assigned agreement or a replacement arrangement acceptable to Buyer, unless Buyer otherwise agrees in writing;

(k) all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other person to the extent relating to equipment purchased, products sold, or services provided, to the Debtors for the Stores or to the extent affecting any Property and/or assumed liabilities;

(l) all goodwill of the Debtors associated with the Business or the Purchased Assets acquired hereunder;

(m) all of Seller's transferable rights, if any, under the gift-card and promotional programs administered by CKE or its applicable program administrator that relate to the operation of the Stores from and after Closing, including the right to receive directly from CKE or its program administrator any reimbursement, settlement amount, credit or other payment attributable to gift cards or promotional obligations honored by Buyer after Closing (collectively, the "**Gift Card Settlement Rights**"), together with all related Store-level account information, data and records reasonably necessary for Buyer to receive and administer the Gift Card Settlement Rights. Seller shall execute such notices, directions and other documents as are reasonably necessary to assign or direct the Gift Card Settlement Rights to Buyer as of Closing; provided that Buyer shall not receive a Purchase Price credit for outstanding gift cards or promotional obligations, and no related cash or proceeds shall be transferred by Seller

(n) except for Excluded Property set forth in Section 2.2(b), all other assets of the Debtors utilized in connection with the operation of the Stores.

In addition to the foregoing, and as consideration for the Transaction, Buyer shall assume, pay, perform, satisfy and discharge (i) liabilities arising out of, incurred in connection with or related to the ownership of the Property and operation of the Business solely to the extent arising from acts taken or omissions made from and after the Closing Date or related to the period from and after the Closing Date and (ii) those liabilities specifically identified by type, obligee, amount and applicable Store on Exhibit D hereto, if any (collectively, the "**Assumed Liabilities**"). Buyer shall not assume any liability arising from a pre-Closing breach, default, act, omission, operation or period, except to the extent expressly identified and approved on Exhibit D. For avoidance of doubt, the Parties expressly acknowledge that Buyer is not a joint-employer and has no joint-employment relationship with Seller, such that consequently, Buyer shall not be liable for any pre-Closing employment-related claims under federal, state, local or common law theories of recovery brought by any Business employee as further detailed in Section 7.19.

**2.2 Assumption/Assignment of Contracts and Rights.**

(a) To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts shall be assumed by Seller and assigned to Buyer (or such affiliate of Buyer as Buyer may designate) at the Closing pursuant to Section 365 of the Bankruptcy Code. Buyer shall have the right, by written notice delivered before entry of the Approval Order, to designate the Leases and other contracts to be included as Assumed Contracts and to remove any Lease or other contract from the Assumed Contracts. Seller shall have sole responsibility for paying all amounts and costs due required to cure

defaults and obtan the assumption and assignment of the Assumed Contracts (collectively, "**Cure Costs**"). Seller shall not reject, terminate, materially amend, surrender or otherwise impair an Assumed Contract without Buyer's prior written consent. Neither Buyer nor any direct or indirect owner, manager, affiliate or designee of Buyer shall be required to provide a personal guaranty or accept any material amendment, increased security deposit or other new obligation not approved by Buyer. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Property or any right thereunder if such attempted assignment would not be permitted under Sections 363 or 365 of the Bankruptcy Code and a third party objects to the assignment and it is determined by the Bankruptcy Court that the Seller is incapable as a matter of law of assigning that particular asset. If applicable counterparty consent is not obtained or such assignment is not permitted pursuant to Sections 363 and/or 365 of the Bankruptcy Code as set forth in the preceding sentence, then such assets shall not be transferred hereunder; provided that assignment of the Leases, franchise agreements and other material Assumed Contracts designated by Buyer and necessary to operate the Stores, on terms acceptable to Buyer and without any personal guaranty or other material new obligation not approved by Buyer, shall be a condition to Buyer's obligation to close. If such condition is not satisfied or waived by Buyer, Buyer may terminate this Agreement and receive an immediate return of the Good Faith Deposit. Buyer acknowledges that the franchisor requires a personal guarantee of the franchise agreements and the subleases and has agreed to provide a personal guarantee and further acknowledges that the franchisor will require newly executed franchise agreements and subleases to be executed by the Buyer after the Closing.

(b) **Excluded Property**. Notwithstanding anything to the contrary contained in Section 2.1 or 2.2 above or elsewhere in this Agreement, the Property does not include, Buyer shall not acquire (nor assume any liability related to), and Seller shall retain all right, title and interest in and to the following (collectively, "**Excluded Property**"):

(a) Any personal property owned by the Debtors that is not located on the premises of any Store and is not used or held for use primarily in connection with the Stores or the Business;.

(b) All financial information, books or records and corporate minute books, corporate seals, stock books, charter documents and other corporate books and records pertaining to the existence and organization of the Debtors;

(c) Except to the extent described in Section 2.1(h), assets located in the Debtors' corporate headquarters in La Palma, California that are used exclusively for corporate-level functions and are not used primarily in connection with the Stores or the Business;

(d) Cash (other than Standbanks), checks, accounts and notes receivable, investments, and other cash equivalents;

(e) Prepaid Expenses and Rebates, except for those Prepaid Expenses and Rebates specifically identified on Exhibit E hereto, if any, that are to be acquired by Buyer;

(f) All bank and investment accounts maintained by or for any Debtor;

(g) All rights of each Debtor in, to and under any and all contracts or agreements of any nature for which the obligations of the Debtor party thereto are not expressly assumed by Buyer

pursuant to Section 2.2 above, including such Leased Equipment and Permits relating to the Stores or the Business that by their terms are nontransferable or not assignable, unless designated by Buyer as an Assumed Contract; provided that Seller shall not elect not to seek, or fail to seek, any required consent or approval for an Assumed Contract designated by Buye;

(h) All claims, rights, proceeds or recoveries arising out of any actual, pending, threatened or potential litigation or cause of action to which any Debtor is, or may in the future be, a party;

(i) Any software utilized by the Debtors at the headquarters location described in Section 2.2(b) above, excluding any transferable software used primarily in connection with the Stores and any Store-related data, records, reports, files, configurations or other information maintained in or generated by such software, copies or exports of which shall be delivered to Buyer in a commercially reasonable and usable electronic format;

(j) All rights, claims, refunds, adjustments, recoveries, payments from, and/or proceeds of any insurance policies; provided that this exclusion shall not apply to any insurance proceeds, rights or claims required to be assigned, delivered or credited to Buyer under Section 5.4;

(k) All preference or avoidance claims and actions of Seller or Debtors, and all defenses to claims asserted against the Seller or Debtors and not expressly assumed by Buyer, including, without limitation, any such claims, actions and defenses arising under Sections 502, 510, 544, 545, 547, 548, 549, 550 and/or 553(b) of the Bankruptcy Code;

(l) Any rights to refunds for taxes and assessments, of any kind whatsoever, paid on or with respect to the Property and/or the Business and attributable to any period prior to the Closing Date, or with respect to any Excluded Property;

(m) Any and all claims, credits, refunds, abatements, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Seller or Debtors to the extent related to any Excluded Property or attributable to any period prior to the Closing Date (excluding Prepaid Expenses and Rebates expressly identified on Exhibit E hereto);

(n) All rights of Seller under this Agreement and all other agreements entered into pursuant to, and instruments executed in connection with, this Agreement or the Transaction contemplated hereby;

(o) The assets specifically identified on Exhibit F and approved in writing by Buyer; provided that no asset shall be excluded solely because it is not located at a Store, and no material asset used primarily in connection with the Stores shall be excluded unless specifically identified on Exhibit F and approved by Buyer;

(p) all employee benefit plans (and any assets and liabilities that are part of or arise under such employee benefit plans) unless they are included as assigned contracts;

(q) all amounts owed to Debtors by any one or more of Debtors' Affiliates;

(r) all debts, taxes and liabilities of the Seller or the Debtors, unless expressly assumed hereunder;

(s) any liabilities to any Business employee or former Business employee under any employment or other agreement, including but not limited to any liability of the Debtors to indemnify or advance expenses to any director, officer, employee, agent, or authorized representative arising out of or in connection with any act or omission occurring prior to the Closing, and liabilities under any pension, profit sharing, savings, retirement, health, medical, life, disability, dental, deferred compensation, stock option, bonus, incentive, severance pay, group insurance or other similar employee plans or arrangements, or under any policies, handbooks, or custom or practice, collective bargaining agreement, or any employment agreements, whether express or implied, applicable to any such employees at any time through and including the Closing Date;

(t) any liability of Seller or the Debtors not related to the Business;

(u) any of the costs and expenses incurred by the Seller or the Debtors in connection with the liquidation or dissolution thereof;

(v) any liability for fees and expenses incurred by Sellers or the Debtors in connection with the negotiation of this Agreement of the consummation of the Transaction;

(w) receivables from credit card processors and all other accounts receivable (together with any claims against third parties related to the collectability thereof), in each case arising from sales made, services provided or operations conducted before Closing; provided that any amounts received by Seller that are attributable to sales made, services provided or operations conducted by Buyer from and after Closing shall be remitted to Buyer in accordance with Section 7.1.1, provided that the Gift Card Settlement Rights described in Section 2.1(m) shall constitute Purchased Assets and shall not constitute Excluded Property;

(x) any liabilities of any kind first arising or existing on or prior to the Closing Date, including but not limited to: (i) liabilities arising from illegal, fraudulent or negligent acts of any of Seller or the Debtors or any of their respective directors, officers, agents, or employees; (ii) liabilities imposed on Sellers or Debtors by any governmental authority related to the conduct of the Business prior to the Closing; (iii) liabilities arising out of the breach by Sellers or Debtors of any provision set forth in any assumed contract and vendor-related claims for services or products provided prior to the Closing Date; (iv) all employment-related and workers' compensation liabilities retained by Seller or the Debtors pursuant to Section 7.19, including Sections 9.19.1 and 7.19.2; and (v) any liability arising out of a suit, claim or cause of action relating to any act, omission, event or period occurring on or before Closing; and

(y) Notwithstanding anything herein to the contrary, no personnel files, employee records, payroll records, employment agreements, restrictive covenant agreements, confidentiality agreements, non-competition agreements, non-solicitation agreements, or other employee-related records shall constitute Purchased Assets, provided that Seller shall deliver to Buyer, to the extent permitted by applicable law, copies of the employee information and records reasonably necessary for Buyer to evaluate and make offers of employment, administer any employees hired by Buyer and evaluate employment-related liabilities, as contemplated by Sections 2.1(h) and 7.19. The Parties acknowledge that employees of Seller will be terminated by Seller on or before Closing and may be

offered employment by Buyer pursuant to separate arrangements determined by Buyer in its sole discretion. Any employee offered employment by Buyer shall be employed pursuant to a new and separate employment relationship commencing on the date such employee begins employment with Buyer. Neither Buyer's offer or employment of any such employee nor any other provision of this Agreement shall constitute an assumption by Buyer of any liability, claim or obligation arising out of or relating to such employee's employment by Seller or the Debtors or the termination thereof, all of which shall remain liabilities of Seller and the Debtors.

**2.3** **Purchase Price; Good Faith Deposit**. The purchase price for the Property, excluding the Inventory and Standbanks, shall be Five Million Two Hundred Fifty Thousand Dollars ($5,250,000) (the "**Base Purchase Price**"), subject to adjustment in accordance with this section and/or Section 5.4 (if applicable). The Base Purchase Price shall remain the same even if Store 7466 in Santa Rosa is excluded. Subject to the foregoing, the Buyer intends to acquire all Stores for the Base Purchase Price, without a general Store-exclusion or portfolio-threshold mechanism. The parties shall agree upon a reasonable allocation of the Base Purchase Price among the Stores (each, a "**Store Allocation**"). Except with respect to Store 7466 in Santa Rosa, the Store Allocations shall be used to determine the Purchase Price reduction if Buyer elects not to acquire a Store under Section 5.4 and in preparing the Allocation Statement under Section 2.3.4. Buyer shall receive all other credits and adjustments expressly provided in this Agreement, including credits for Cure Costs or other pre-Closing liabilities paid or assumed by Buyer. In addition, the Buyer shall purchase the Standbanks at face value on the Closing Date and shall purchase the useable Inventory based on Seller's actual third-party invoices for Inventory delivered to the Stores, subject to Buyer's review. Seller shall provide Buyer copies of the applicable third-party Inventory invoices no later than three (3) business days before Closing. Immediately prior to the Closing Date, Seller and Buyer shall take a physical inventory of all Inventory for the purpose of determining the price of the Inventory. The Base Purchase Price, as adjusted under this Agreement, inclusive of the Inventory and Standbanks, is referred to as the "**Purchase Price**." The Purchase Price shall be payable as follows:

**2.3.1** ***Good Faith Deposit***. Within two (2) business days after (i) this Agreement has been fully executed by all Parties, (ii) Buyer has received a complete copy of the fully executed Agreement, and (iii) the fully executed Agreement has been delivered to East West Bank and escrow has been opened for the Transaction, Buyer shall deposit with East West Bank, the escrow agent for the Transaction, an aggregate amount equal to Ten Thousand Dollars ($10,000) per Store included in such Bid (the "**Good Faith Deposit**"). The failure to timely pay the Good Faith Deposit after satisfaction of the foregoing conditions shall render this Agreement of no further force or effect.

Buyer will be entitled to an immediate refund of the Good Faith Deposit if Buyer validly terminates this Agreement or if any condition to Buyer's obligation to close is not satisfied or waived by Buyer, including the required CKE approval, assignment of the designated Leases and material contracts, or entry of the required Approval Order.

**2.3.2** ***Payment of Purchase Price***. The Purchase Price shall be paid to Seller at Closing, as follows:

(a) *Application of Good Faith Deposit*. On the Closing Date, Seller and Buyer shall submit joint written instructions to the Escrow Agent, directing the Escrow Agent to release the Good Faith Deposit to Seller, and the Good Faith Deposit shall be credited against the Purchase Price

accordingly; provided, however, that if, prior to Closing, Buyer has elected not to acquire an affected Store and the Purchase Price has been reduced under Section 5.4, and the Good Faith Deposit is greater than the aggregate Purchase Price for the remaining Property to be purchased by Buyer, the difference between the Good Faith Deposit and the Purchase Price for the remaining Property shall be refunded to Buyer, and the joint written instructions to Escrow Agent shall provide for same.

(b) *Balance of Purchase Price*. On or before 4:00 p.m. (prevailing Pacific Time) on the Closing Date, Buyer shall pay the balance of the Purchase Price (after crediting the amount of the Good Faith Deposit) in cash, wire transfer or certified funds to Seller in accordance with Seller's instructions.

**2.3.3** ***Allocation of Purchase Price***. Within sixty (60) days after Closing, Buyer shall prepare and deliver to Seller a proposed statement (the "**Allocation Statement**") allocating the Purchase Price (together with the Assumed Liabilities) among the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision. The Store Allocations as determined pursuant to Section 2.3 above shall be taken into account in preparing the Allocation Statement. Seller shall have twenty (20) business days after receipt of the proposed Allocation Statement to deliver written notice to Buyer identifying each disputed item and stating in reasonable detail the basis for Seller's objection and Seller's proposed alternative allocation. Any item not specifically disputed in such notice shall be final and binding upon the Parties. If Seller does not timely deliver an objection notice, the proposed Allocation Statement shall be deemed accepted and shall be final and binding upon the Parties. Buyer and Seller shall use commercially reasonable efforts to resolve any disputed items within fifteen (15) business days after Buyer receives Seller's objection notice. If the Parties are able to agree upon the allocation of the Purchase Price, Buyer and Seller shall report and file all tax returns consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or other proceedings). Buyer and Seller shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules, including any required amendments to such forms, consistently with the final Allocation Statement and shall not take any position inconsistent with it in any tax return, audit, examination or other proceeding, except as required by a final determination of a taxing authority. Any adjustment to the Purchase Price or Assumed Liabilities after the Allocation Statement becomes final shall be allocated in a manner consistent with the final Allocation Statement. The preparation or resolution of the Allocation Statement shall not delay or constitute a condition to Closing. Notwithstanding any other provisions of this Agreement, if the Parties mutually agree on the allocation or the Purchase Price, Buyer and Seller's obligations under this Section shall survive Closing.

## ARTICLE 3

## CLOSING

**3.1** **Closing Date and Place**. Each Party shall perform all acts required of such Party pursuant to this Agreement to enable the Closing (as defined in Section 3.2 hereof) to occur as soon as reasonably practicable following entry of the Approval Order and satisfaction or waiver of the conditions to Closing set forth herein, unless otherwise ordered by the Bankruptcy Court. The Parties acknowledge and agree that the Transaction is intended to close promptly following entry of the

Approval Order and shall not be delayed absent the entry of a stay pending appeal by a court of competent jurisdiction. The Closing shall take place at the offices of the Escrow Agent or such other place as may be agreed upon by Buyer and Seller in writing or ordered by the Bankruptcy Court. As used in this Agreement, "**Closing Date**" means the date upon which the Closing occurs, which must occur on or before September 12, 2026. Notwithstanding the foregoing, if the Trustee is able to obtain an extension of the insurance expiration date, the Trustee has the authority to extend the Closing Date by up to thirty (30) days by giving written notice to the Buyer.

**3.2** **Closing**. The “**Closing**” means the occurrence of all of the following events, which the Parties shall cause to occur concurrently pursuant to this Agreement:

(a) Seller has delivered to Buyer a certified copy of the Approval Order. The Parties acknowledge that the Transaction is intended to receive the protections afforded by section 363(m) of the Bankruptcy Code and to close promptly following entry of the Approval Order. Accordingly, absent the entry of a stay pending appeal by a court of competent jurisdiction, the existence of an appeal shall not delay or prevent the Closing, and the Parties shall proceed with consummation of the Transaction in accordance with the Approval Order and this Agreement;

(b) Seller has executed and delivered to Buyer a Bill of Sale in substantially the form attached as Exhibit G hereto, together with an affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code stating that Seller is not a foreign person as defined in Section 1445 of the Code;

(c) Each Party has executed and delivered to the other Party two (2) counterparts to the Assignment and Assumption Agreement in substantially the form attached as Exhibit H hereto;

(d) Seller has received, by bank wire transfer of immediately funds, to the bank account(s) designated by Seller, the Good Faith Deposit from the Escrow Agent;

(e) Buyer has paid to Seller by bank wire transfer of immediately available funds, to the bank account(s) designated by Seller, an amount equal to the balance of the Purchase Price (after crediting the amount of the Good Faith Deposit);

(f) Buyer has previously delivered to Seller a certificate of good standing and evidence reasonably satisfactory to Seller demonstrating Buyer's authority to enter into this Agreement and consummate the Transaction contemplated hereby.

(g) Buyer has paid any and all escrow fees and costs of the Escrow Agent;

(h) The representations of each Party contained in Article 4 hereof are true and correct at and as of the Closing Date with the same effect as though made at and as of the Closing Date;

(i) Each Party has duly performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by such Party;

(j) Neither Party shall have terminated this Agreement pursuant to Section 6.1 hereof; and

**3.3. Conditions To Obligations Of The Buyer**. The obligation of the Buyer to consummate the Transaction is subject to the fulfillment of the following conditions precedent, each of which may be waived in writing in the sole discretion of the Buyer (unless other specified, these conditions must be fulfilled on or before the Closing Date):

**3.3.1** ***Truth of Representations and Warranties of the Seller; Compliance with Covenants and Obligations***. The representations and warranties of the Seller contained in this Agreement and any Exhibit or Schedule attached hereto shall be true and correct in all respects both as of the Effective Date and as of the Closing Date as though such representations and warranties were made on and as of such date, except for any changes consented to in writing by the Buyer and the Buyer shall have received from the Seller a certificate to such effect. The Seller shall have performed and complied with all terms, conditions, covenants, obligations, agreements and restrictions required by this Agreement to be performed or complied with by him prior to or at the Closing Date.

**3.3.2** ***Consents***. The Leases and other material contracts designated by Buyer and necessary to operate the Stores shall have been assumed and assigned to Buyer or its designee on terms acceptable to Buyer, all applicable Cure Costs and pre-Closing defaults shall have been paid or cured by Seller, and no personal guaranty or other material new obligation not approved by Buyer shall be required from Buyer or any owner, manager, affiliate or designee.

**3.3.3** ***Adverse Proceedings***. Except for the Debtors' filing of their Chapter 11 bankruptcy proceedings, there shall be no other Proceeding by or before any Governmental Authority that has been instituted or threatened by any Governmental Authority or Person whatsoever which seeks to restrain, prohibit or invalidate the Transaction or which is likely to affect the right of the Buyer to own or use the Purchased Assets after the Closing Date.

**3.3.4** ***Franchisor Approval***. Buyer shall have received final written approval from Carl's Jr. Restaurants LLC and its affiliates (collectively, "**CKE**") to acquire and operate each Store, and Buyer or its applicable designee shall have entered or have agreed to enter into the applicable franchise and related agreements on terms acceptable to Buyer and CKE. Any CKE right of first refusal, designation right or similar right shall have expired or been waived. Seller shall seek, to the fullest extent legally available, Bankruptcy Court authorization providing that the existing franchise agreements may not be terminated solely because of the bankruptcy or the Transaction and authorizing their assumption and assignment under Section 365 of the Bankruptcy Code. Failure of this condition shall permit Buyer to terminate this Agreement and receive an immediate return of the Good Faith Deposit.

**3.3.5** ***Filing of Motion for Sale***. The transaction contemplated by this agreement requires the Seller to file a motion for sale under the provisions of 11 U.S.C. §363, Rule 2002 and Rule 6004 of the Rules of Bankruptcy Procedures. Seller shall further attempt to close as soon as possible.

**3.3.6.** ***Approval Order***. The Approval Order shall have been entered, shall not have been stayed and shall contain the protections required by Sections 1.1 and 1.2.2 and otherwise be in form and substance reasonably acceptable to Buyer.

**3.3.7** ***Complete Schedules***. Seller shall have delivered complete and accurate Exhibits B through F, together with the supporting agreements and information required by Sections 2.1 and 2.2, sufficiently before Closing to permit Buyer's review. No Assumed Liability or asset identified on Exhibit F as an Excluded Property shall bind Buyer unless expressly approved by Buyer in writing.

ARTICLE 4

## REPRESENTATIONS

**4.1** **Representations of Seller**. Seller hereby makes the following representations and warranties ("**Seller's Representations**") to Buyer. For purposes of the following representations and warranties, "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known by the following individuals after due inquiry:

**4.1.1** **Legal Capacity of Seller; Litigation; Permits; Etc**.

(a) Subject to the requirement of Bankruptcy Court approval of the Transaction, the Seller has the authority to own, lease and operate the Debtors' properties, including the Purchased Assets, and to carry on the Business as now being conducted. Subject to the requirement of Bankruptcy Court approval, the Seller has authority to enter into this Agreement on behalf of the Debtors.

(b) To the actual knowledge of Seller, Debtors are in material compliance with the terms and requirements of each Permit required to conduct and operate the Business in a manner consistent with the current practices of Debtors and no written notice of violation of any Permit has been received from any Governmental Authority and, to the Knowledge of Seller no proceeding is pending seeking to revoke or limit any such Permit.

(c) To the actual knowledge of Seller, Seller will have at Closing good and marketable title to, or a valid leasehold interest in, all of the Purchased Assets. Upon consummation of the transactions contemplated hereby at the Closing, Buyer will have acquired good, valid and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens (other than those liabilities that are expressly assumed) to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code. The Purchased Assets (which, for the avoidance of doubt, do not include Excluded Property) constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used (to the extent the Debtors hold rights, title and interest in such tangible personal property) or held for use by Seller, or otherwise necessary for Buyer to conduct and operate the Business (assuming that the Purchased Assets include all assets that the Buyer has the right to acquire under this Agreement) immediately after the Closing in all material respects as conducted and operated by Seller as presently conducted.

**4.1.2** **Brokers and Finders**. Except for Seller's Sales Agent, National Franchise Sales, Inc., whose fees will be paid from Seller's proceeds, Seller has not retained any broker or finder in connection with the Transaction so as to give rise to any valid claim against Buyer for any brokerage or finder's commission, fee or similar compensation.

**4.1.3** **Anti-Terrorism Laws**. Seller represents and warrants to Buyer that Seller is not, and will not be, a person or entity with whom Buyer is restricted from doing business under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (commonly known as the "USA Patriot Act") and Executive Order Number 13224 on Terrorism Financing, effective September 24, 2001, and regulations promulgated pursuant thereto, including, without limitation, persons and entities named on the Office of Foreign Asset Control Specially Designated Nationals and Blocked Persons List (collectively, **"Anti-Terrorism Laws"**).

**4.1.4** **No Other Representations**. Seller makes no representation or warranty, express or implied, to Buyer, and hereby disclaims any representation or warranty, express or implied, with respect to the Business, the Property, the Stores or any other matter, including any representation or warranty as to merchantability, fitness for a particular purpose or future results, other than as expressly set forth in this Section 4.1. **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 4.1 OF THIS AGREEMENT OR IN ANY CONVEYANCE DOCUMENTS EXECUTED AND DELIVERED BY SELLER, SELLER DISCLAIMS THE MAKING OF ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE ASSETS OR MATTERS AFFECTING THE ASSETS, INCLUDING THE BOUNDARIES OF THE LAND, THE FINANCIAL OR OTHER PERFORMANCE AT THE RESTAURANTS AFTER THE CLOSING, THE PHYSICAL CONDITION OF THE ASSETS OR THE RESTAURANTS (INCLUDING THE CONDITION OF THE BUILDING STRUCTURE, THE ROOF, THE ELECTRICAL, PLUMBING, AND HVAC SYSTEMS, OR THE FURNISHINGS, FIXTURES AND EQUIPMENT), PEST CONTROL MATTERS, SOIL CONDITION, HAZARDOUS WASTE, TOXIC SUBSTANCE, OR OTHER ENVIRONMENTAL MATTERS, COMPLIANCE WITH BUILDING, HEALTH, SAFETY, LAND USE, AND ZONING LAWS, REGULATIONS AND ORDERS, STRUCTURAL AND OTHER ENGINEERING CHARACTERISTICS, TRAFFIC PATTERNS, ECONOMIC PROJECTIONS, FINANCIAL DATA, EMPLOYMENT PRACTICES AND ALL OTHER INFORMATION PERTAINING TO THE ASSETS. BUYER, MOREOVER, ACKNOWLEDGES (1) THAT BUYER HAS ENTERED INTO THIS AGREEMENT WITH THE INTENTION OF MAKING AND RELYING UPON ITS OWN INVESTIGATION OF THE PHYSICAL, ENVIRONMENTAL, ECONOMIC, AND LEGAL CONDITION OF THE ASSETS AND (2) THAT BUYER IS NOT RELYING UPON ANY STATEMENTS, INFORMATION, REPORTS, REPRESENTATIONS, OR WARRANTIES OTHER THAN THOSE SPECIFICALLY SET FORTH IN SECTION 4.1 OF THIS AGREEMENT OR IN ANY CONVEYANCE DOCUMENTS EXECUTED AND DELIVERED BY SELLER, MADE BY SELLER OR ANYONE ACTING OR CLAIMING TO ACT ON SELLER'S BEHALF CONCERNING THE ASSETS, INCLUDING THE RESTAURANT EMPLOYEES OR CONTAINED IN ANY COPIES OF MANAGEMENT PERSONNEL DATA PROVIDED TO BUYER WITH RESPECT TO THE RESTAURANT EMPLOYEES. BUYER FURTHER ACKNOWLEDGES THAT IT HAS NOT RECEIVED FROM SELLER ANY ACCOUNTING, TAX, LEGAL, ARCHITECTURAL, ENGINEERING, PROPERTY MANAGEMENT, OR OTHER ADVICE WITH RESPECT TO THIS TRANSACTION AND IS RELYING SOLELY UPON THE ADVICE OF ITS OWN ACCOUNTING, TAX, LEGAL, ARCHITECTURAL, ENGINEERING, PROPERTY MANAGEMENT, AND OTHER ADVISORS. SUBJECT TO THE PROVISIONS OF SECTION 4.1 OF THIS AGREEMENT AND ANY CONVEYANCE DOCUMENT EXECUTED AND DELIVERED BY SELLER,**

**BUYER WILL PURCHASE THE ASSETS IN THEIR "AS IS", "WHERE-IS" AND "WITH-ALL FAULTS" CONDITION ON THE CLOSING DATE WITHOUT ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE) AND ASSUMES THE RISK THAT ADVERSE PHYSICAL, ENVIRONMENTAL, ECONOMIC, OR LEGAL CONDITIONS MAY NOT HAVE BEEN REVEALED BY ITS INVESTIGATION**. Notwithstanding the foregoing, nothing in this Section 4.1.4 shall limit or modify Seller's express representations, warranties, covenants or obligations under this Agreement; Buyer's closing conditions or termination rights; the allocation of Assumed Liabilities and liabilities retained by Seller; the protections required under the Approval Order; or any claim based upon fraud, intentional misrepresentation, willful misconduct or deliberate concealment.

**4.2** **Representations of Buyer**. Buyer hereby makes the following representations and warranties ("**Buyer's Representations**") to Seller:

**4.2.1** ***Buyer's Status***. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California.

**4.2.2** ***Legal Capacity of Buyer***. (a) Buyer has the requisite power, authority, and legal capacity to make, execute, enter into, and deliver this Agreement and to perform its obligations under this Agreement, (b) any person executing and delivering this Agreement on behalf of Buyer is duly authorized to do so; and (c) neither this Agreement nor the performance by Buyer of any obligation of Buyer under this Agreement will violate any provision of any article, by-law, operating agreement or partnership agreement of Buyer or any contract, covenant, agreement, condition, restriction, injunction or order by which Buyer is bound.

**4.2.3** ***Consents***. Except for the entry of the Approval Order and the conditions set forth in a Sale Procedures Order that may be entered by the Bankruptcy Court, the CKE approval contemplated by Section 3.3.4 and the other consents, approvals and assignments contemplated by Sections 2.2 and 3.3, no consent, approval, authorization, permit, order, filing, registration or qualification of or with any court, governmental authority or third person is required to be obtained by Buyer in connection with the execution and delivery by Buyer of this Agreement or the consummation by Buyer of the Transaction.

**4.2.4** ***Brokers and Finders***. Buyer has not retained any broker or finder in connection with the Transaction so as to give rise to any valid claim against Seller for any brokerage or finder's commission, fee or similar compensation.

**4.2.5** ***Terms of Sale; Investigation***. Buyer has made such investigation as it has deemed appropriate in connection with the decision to enter into this Agreement. Buyer has had the opportunity to inspect the Property, visit with Seller and meet with Seller's representatives to discuss the Business. Buyer is relying on the results of such investigation and the advice of its own advisors and has not relied upon any statement or representation made by Seller or any director, officer, employee, agent, attorney, accountant, or affiliate thereof, other than the covenants, representations and warranties of Seller set forth in this Agreement. Seller makes no representations or warranties, express or implied, of any kind concerning the past, present or future profitability or viability of the Stores or the Business, except as expressly set forth in this Agreement. Buyer acknowledges that

EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT, BUYER WILL ACCEPT THE PROPERTY AND THE ASSUMED LIABILITIES AT THE CLOSING "AS-IS, WHERE-IS" AND "WITH ALL FAULTS" WITHOUT ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED.

**4.2.6** ***Anti-Terrorism Laws***. Buyer represents and warrants to Seller that Buyer is not, and will not be, a person or entity with whom Seller is restricted from doing business under any Anti-Terrorism Laws. The sources of all cash used in connection with the Transaction will be fully disclosed to Seller and the Bankruptcy Court prior to Closing, including any and all funds provided by a foreign national individual or entity of any country other than the United States of America.

ARTICLE 5

## OTHER OBLIGATIONS PENDING CLOSING

**5.1** **Conduct of Business**. Except as otherwise specifically permitted or required by this Agreement or ordered by the Bankruptcy Court, Seller will continue to operate the Stores in the ordinary course through Closing, maintain customary staffing and Inventory levels, preserve the Purchased Assets, Permits, Leases and material contracts, and perform required maintenance. Seller shall not close or materially curtail operations at a Store without Buyer's prior written consent, except temporarily in response to an immediate health or safety emergency, in which case Seller shall promptly notify Buyer and diligently restore operations.

**5.2** **No Inconsistent Actions**. Following the Execution Date, neither Buyer nor Seller will take any action inconsistent with this Agreement pending either the Closing or the termination of this Agreement pursuant to Article 6 hereof.

**5.3** **Third-Party Consents**. Following the Execution Date, Seller and Buyer shall use commercially reasonable efforts to obtain consents and approvals from third parties (as necessary) for the assignment of the Assumed Contracts and transfer of other Property designated by Buyer for transfer or assignment under this Agreement. Seller shall timely seek all consents and approvals required for the assumption and assignment of the Leases and other Assumed Contracts designated by Buyer and shall keep Buyer reasonably informed regarding the status of those efforts.

**5.4** **Casualty Loss.** If, prior to Closing, any Store or material Purchased Asset is materially damaged or destroyed, Seller shall promptly notify Buyer and provide available information regarding the damage, estimated restoration cost, insurance coverage and anticipated operational impact. Except with respect to Store 7466 in Santa Rosa, Buyer may elect either (a) to acquire the affected Store and receive an assignment of the applicable insurance proceeds and credits for Seller's deductible and any uninsured repair or replacement cost, or (b) not to acquire the affected Store and reduce the Purchase Price by the applicable Store Allocation. The Closing Date and Outside Date shall be extended as reasonably necessary for Buyer to evaluate the casualty. Buyer's failure to respond within a specified period shall not constitute a deemed election. Notwithstanding anything in this Agreement to the contrary, the insurance proceeds to be credited or delivered to Buyer pursuant to this Section 5.4 (if applicable) will exclude business interruption or rental loss insurance proceeds, if any, allocable to the period through the Closing Date, which proceeds will be retained by Seller.

**5.5. <u>Certain Restricted Conduct</u>**. Except (i) as set forth on Schedule 5.2; (ii) as otherwise set forth in this Agreement; (iii) as Buyer shall otherwise consent in advance in writing, or (iv) as authorized by the Bankruptcy Court in connection with the sale of the Seller's assets, during the period from the date of this Agreement to the Closing, Seller shall not, with respect to the Purchased Assets:

(a) sell, lease, license, transfer, or dispose of other than in the ordinary course of business any Purchased Assets;

(b) authorize or enter into any contract, arrangement, or commitment other than a contract that is in the ordinary course of business;

(c) other than in the ordinary course, authorize, undertake, make, or enter into any commitments obligating Seller to (i) make or accelerate any capital expenditures or (ii) undertake or approve any material renovation or rehabilitation of any leased real property;

(d) (i) increase any compensation payable to or to become payable to, or enter into or amend any employment, severance or other agreement with, any of Seller's officers, directors or salaried employees, (ii) increase any compensation payable to or to become payable by Seller to any other employee of Seller, except in the ordinary course of business, (iii) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any officer, director or employee, (iv) create or adopt any new employee benefit plan or amend or terminate or increase the coverage or benefits available under any existing Employee Benefit Plan, (v) hire any employee or individual independent contractor with annual compensation in excess of $100,000 (except to the extent such hire is in replacement of an existing employee with comparable compensation), or enter into any employment, severance, deferred compensation, consulting, non-competition or similar agreements to which Seller is a party or involving a director, officer, employee or independent contractor of Seller, or (vi) assume, enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization relating to the Business, any employee, or any Purchased Asset;

(e) permit, offer, agree or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any lien, except for liens already existing prior to the date of this Agreement and liens granted before a Closing in connection with any debtor-in-possession financing facility agreement or order, and/or cash collateral agreement;

(f) do any other act that would, to the knowledge of seller, cause any representation or warranty of Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect;

(g) acquire any material properties or assets that would be Purchased Assets or sell, assign, transfer, convey, lease or otherwise dispose of any Purchased Assets (except acquisitions of inventory, equipment and similar assets in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets);

(h) cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes a Purchased Asset;

(i) transfer, to the extent that following such transfer such amounts would be treated as Excluded Property, any security deposits, prepaid rentals, unbilled charges, fees, deposits or, other than in the ordinary course of business, cash, cash equivalents or negotiable instruments, in each case constituting Purchased Assets;

(j) conduct, outside the ordinary course of business, any promotion between execution of this Agreement and the Closing Date on gift card sales, coupons or rebates or conduct any other promotion that would have the effect of increasing the amount of assumed liabilities related to gift cards, coupons or rebates;

(k) other than in the ordinary course of business, satisfy any Excluded Property with a Purchased Asset;

(l) in each case to the extent it could bind or adversely affect Buyer post-Closing, (A) make, change or revoke any material Tax election, settle or compromise any tax claim or liability or enter into a settlement or compromise, or change (or make a request to any taxing authority to change) any aspect of its method of accounting for tax purposes, or (B) prepare or file any tax return (or any amendment thereof) unless such tax return was prepared in a manner consistent with past practice;

(m) other than in the ordinary course of business, transfer cash from a Purchased Location; or

(n) authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

**5.6 <u>Transition of Services</u>**. Seller shall reasonably cooperate with Buyer before and after Closing to facilitate the orderly transfer or replacement of all utilities, telecommunications, internet, alarm and security services, waste removal, pest control, grease removal, point-of-sale services, merchant and credit-card processing, third-party delivery platforms and other services reasonably necessary for the continued operation of the Stores (collectively, the "**Transition Services**"). Seller shall not terminate, disconnect or permit the lapse of any Transition Service before Buyer has had a reasonable opportunity to transfer or replace such service and, with respect to utilities and other services necessary to keep a Store operating, Seller shall not terminate or disconnect such service until the applicable service has been transferred to Buyer or replaced by Buyer. Buyer shall use commercially reasonable efforts to complete each transfer or replacement promptly after Closing and shall reimburse Seller for all documented, out-of-pocket charges attributable to Buyer's operation of the Stores after Closing that are billed to or paid by Seller pending completion of the applicable transfer. Neither Party shall be required to take any action prohibited by applicable law or the applicable service agreement. The obligations under this Section shall survive Closing.

## ARTICLE 6

## TERMINATION

**<u>6.1</u> <u>Grounds for Termination</u>**. This Agreement may be terminated upon the occurrence of any of the following events, by:

(a) mutual written agreement of the Parties at any time prior to entry of the Approval Order;

(b) Buyer or Seller, if Buyer is not declared the successful bidder and Buyer has not agreed in writing to serve as a Backup Bidder in accordance with Section 2.3.1;

(c) any Party not in default of this Agreement, if the Closing does not occur on or before September 11, 2026 or such longer date as elected by the Seller pursuant to Section 3.1 (provided, that if the Closing does not occur prior to such date due to a material breach of this Agreement by a Party, such breaching Party may not terminate this Agreement pursuant to this Section 6.1(c));

(d) by either Party if there shall be in effect a final, non-appealable order of a governmental body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transaction contemplated hereby, it being agreed that the Parties shall promptly appeal any adverse determination that is not non-appealable (and pursue such appeal with reasonable diligence);

(e) any Party not in default of this Agreement, upon a material breach and default of this Agreement by the other Party which breach and default remains uncured for a period of three (3) business days following the date upon which written notice of the breach and default is given by the non-defaulting Party to the defaulting Party;

(f) Buyer, if as of the time of the Closing, any Seller's Representation is materially untrue, unless waived by Buyer;

(g) Seller, if as of the time of the Closing, any Buyer's Representation is materially untrue;

(h) Buyer, if any condition to Buyer's obligation to close under Section 3.3 is not satisfied or waived by Buyer; and

(i) Seller, if Buyer fails to timely satisfy any material obligation of Buyer pursuant to this Agreement required to be satisfied prior to or at the Closing.

**6.2 No Obligation to Terminate**. Except as may be otherwise set forth in this Agreement, no Party having a right to terminate this Agreement pursuant to Section 6.1 will be required to exercise such right, or otherwise be prohibited from enforcing this Agreement by reason of having any such unexercised right to terminate this Agreement.

**6.3 Notice of Termination**. Any Party desiring to terminate this Agreement pursuant to Section 6.1 shall give immediate written notice of such termination to the other Party at the notice address(es) set forth in Section 7.18, specifying in the notice the provision of this Agreement pursuant to which the termination is made.

**6.4 Effect of Exercising Right of Termination**. If this Agreement is validly terminated as provided herein, then, subject to the provisions of any Approval Order that may be entered by the Bankruptcy Court, (i) except as set forth in Section 2.3.1 and as may be required to enforce the provisions of Section 2.3.1, each Party will promptly return to the other Party any monies, documents or other property of the other Party in its possession or control received pursuant to or in contemplation of this Agreement, (ii) this Agreement will terminate and be of no further force or effect, and (iii) each Party will have no further obligation or liability to the other by reason of this Agreement. Nothing in this Section 6.4 shall relieve any Party of any liability for fraud, intentional

misrepresentation or willful breach of this Agreement prior to the date of termination. The rights and obligations under Section 2.3.3 shall survive any termination of this Agreement.

ARTICLE 7

**MISCELLANEOUS**

**7.1 Allocation of Expenses**. Except as otherwise expressly set forth in this Agreement: (i) Seller shall be responsible for satisfying all liabilities incurred in relation to the Property and Business through the Closing Date; and (ii) Buyer shall be responsible only for the Assumed Liabilities and liabilities arising from Buyer's ownership of the Purchased Assets or operation of the Business after Closing. In accordance with the foregoing provision, all taxes, costs, charges and other expenses arising under the Assumed Contracts, all ad valorem taxes associated with the Property and the Business, and all other expenses affecting the Property and Business shall be prorated as of the Closing Date between Seller and Buyer. All prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and on the basis of the actual number of days of the year (based upon a three hundred sixty-five (365) day year) which shall have elapsed as of the Closing Date, as applicable. For purposes of calculating prorations, Buyer shall be deemed to be title holder of the Property, and therefore entitled to the income and responsible for the expenses therefore, for the entire day upon which the Closing occurs. Each Party shall assume and bear its own expenses, costs and fees incurred in the preparation and execution of this Agreement and in the compliance herewith, including attorneys' and accountants' fees, whether or not the Transaction is consummated; provided, that if any Party commences legal proceedings against the other Party to enforce the provisions of this Agreement or to declare any rights or obligations under this Agreement, the prevailing Party shall recover from the losing Party its costs of suit, including reasonable attorneys' fees, as determined by the Bankruptcy Court or such other court of competent jurisdiction in the event the Bankruptcy Court refuses to exercise jurisdiction of such a dispute.

**7.1.1 Post-Closing Reconciliation.** On a date mutually agreed upon by Buyer and Seller, but in no event later than thirty (30) days after Closing (the "**Reconciliation Date**"), Buyer and Seller shall jointly prepare a reconciliation, as of the Closing Date, of (a) the Assumed Liabilities and all other liabilities, expenses and obligations allocated between the Parties under this Agreement, (b) the Purchased Assets and Excluded Property actually transferred or retained, including deposits, prepaid amounts, rebates, credits and refunds, and (c) all receipts, revenues and other amounts received by either Party that are attributable to the other Party under this Agreement. Each Party shall provide the other with reasonable supporting documentation for the assets, liabilities and other amounts included in the reconciliation. Within five (5) business days after the Parties agree upon the reconciliation, the Party owing any net amount shall pay such amount to the other Party.

Without limiting the foregoing, all amounts received by Seller after Closing and on or before the Reconciliation Date that are attributable to sales made, services provided or operations conducted by Buyer from and after Closing, including amounts received through credit-card processors, gift cards, third-party delivery services, online-ordering platforms, catering services or similar arrangements, shall be included in the reconciliation and credited to Buyer. All amounts received by Buyer after Closing and on or before the Reconciliation Date that are attributable to sales made, services provided or operations conducted by Seller before Closing shall be included in the reconciliation and credited to Seller. Any such amount received after the Reconciliation Date shall

be remitted to the Party entitled to such amount, together with reasonable supporting information, within five (5) business days after receipt. The obligations under this Section shall survive Closing.If the Parties are unable to agree upon any item included in the reconciliation, they shall pay all undisputed amounts when due and continue to work in good faith to resolve the disputed item; provided that no dispute shall delay either Party's obligation to remit amounts that are undisputedly attributable to the other Party.

**7.2 INTENTIONALLY OMITTED**

**7.3 Integration**. This Agreement (including all Schedules and Exhibits) and the instruments to be executed and delivered by the Parties at Closing, as expressly identified within Section 3.2, are the sole agreements between the Parties regarding the Transaction. All prior and contemporaneous negotiations and agreements between the Parties, oral or written, regarding the Transaction, are hereby superseded, including the asset purchase agreement dated August 4, 2026. No Party has the authority to orally modify this Agreement, or to make any oral representation or oral agreement regarding this Agreement or the Transaction.

**7.4 Amendment, Waiver and Modification**. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated except by written consent of the Party against which such change, waiver, discharge or termination is sought to be enforced, or by order of the Bankruptcy Court.

**7.5 Construction**. The Parties acknowledge that each Party was represented by legal counsel (or had the opportunity to be represented by legal counsel) in connection with this Agreement and that each of them and its legal counsel have reviewed and revised this Agreement, or have had an opportunity to do so, and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or any Exhibits or Schedules hereto or thereto.

**7.6 Captions; Capitalized Terms**. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Capitalized terms used in the Schedules and Exhibits hereto and not otherwise defined therein shall have the meanings ascribed to them in this Agreement.

**7.7 Further Assurances**. Each Party will promptly execute and deliver all documents and take all actions, including the payment of money, reasonably required and necessary to effectuate the Transaction and perform its duties pursuant to this Agreement.

**7.8 Assignment; Successors; Parties in Interest**. This Agreement shall not be assignable by Buyer without the prior written consent of Seller, which will not be delayed, conditioned or unreasonably withheld, or absent order of the Bankruptcy Court. Any attempt to assign this Agreement without such consent or order shall be void and of no effect. This Agreement shall inure to the benefit of, and be binding on and enforceable against, each Party and its successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to confer upon any employee or affiliate of either Party or any other person any rights or remedies of any nature whatsoever under this Agreement, except as expressly set forth in Section 7.2 of this Agreement.

**<u>7.9</u>** **<u>Capacity of Seller</u>**. Buyer acknowledges that Seller and his professionals shall have no personal or corporate liability whatsoever in connection with the performance of any obligations of Seller under this Agreement.

**<u>7.10</u>** **<u>Time is of the Essence</u>**. With respect to all dates and time periods set forth or referred to in this Agreement, time is of the essence, such that each Party will perform all acts required of such Party pursuant to this Agreement by the date or within the time period required pursuant to this Agreement.

**<u>7.11</u>** **<u>Business Day</u>**. As used in this Agreement, the term "business day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in the State of California are closed.

**<u>7.12</u>** **<u>Access to Books and Records after Closing</u>**. Buyer shall permit Seller to have access to the books and records relating to the Property and Business for a period of three (3) years after the Closing, or such later period as may be required by the Bankruptcy Court. Notwithstanding the foregoing, Buyer agrees to notify Seller prior to destroying any books and records relating to the Property and Business, and to allow Seller to make and retain copies, at Seller's expense, of such books and records.

**<u>7.13</u>** **<u>Sales and Transfer Taxes</u>**. To the fullest extent permitted by applicable law and the Approval Order, the transfer, assignment, conveyance, sale, or recording of any Purchased Assets or Assumed Contracts pursuant to this Agreement shall not be subject to any stamp tax, transfer tax, sales tax, use tax, recording tax, documentary tax, filing tax, real estate transfer tax, mortgage recording tax, or similar tax. To the extent any such taxes are determined to be payable notwithstanding the foregoing, Buyer shall bear and pay all sales, transfer, use, recording, documentary, filing, and similar taxes arising from the Transaction

**<u>7.14</u>** **<u>Severability</u>**. Nothing in this Agreement will be construed as requiring the commission of any act contrary to law. If there is any conflict between any provision of this Agreement and any present or future law, such provision will be limited only to the extent necessary to bring it within the requirement of the law. If any part of this Agreement is held to be indefinite, invalid, or otherwise unenforceable, the balance of this Agreement will continue in full force and effect.

**<u>7.15</u>** **<u>Schedules and Exhibits</u>**. The Schedules and Exhibits are a part of this Agreement as if fully set forth herein. All references to Sections, Articles, Schedules and Exhibits shall be deemed references to such parts of this Agreement, unless the context shall otherwise require. Disclosure of any fact or item in any Schedule hereto referenced by a particular Section in this Agreement shall, should the existence of the fact or item of its contents be relevant to any other Section, be deemed to be disclosed with respect to that other Section whether or not an explicit cross-reference thereto appears.

**<u>7.16</u>** **<u>Counterparts</u>**. This Agreement may be executed in several counterparts, each of which, when combined, shall constitute one and the same instrument. This Agreement may be executed by facsimile and PDF signatures, which shall have the same force and effect as original signatures.

**7.17** **Governing Law**. This Agreement shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California, without giving effect to the conflict of laws and rules thereof. Each Party consents to the exclusive jurisdiction of the Bankruptcy Court.

**7.18** **Notices**. Any notice by any Party to any other Party pursuant to this Agreement must be made in writing and delivered to the other Party at the address shown below, until written notice of a different address is given by the other Party pursuant to this Section 7.18. Payments to be made pursuant to this Agreement will be deemed made only upon actual receipt. Notices given by personal service will be deemed received upon delivery. Notices given by first class mail, postage prepaid, addressed to the address required by this Section 7.18, will be deemed received three (3) business days following the deposit thereof with the United States Post Office. Notices given by overnight courier service will be deemed received on the date of delivery confirmed by the courier service. Notices given by electronic facsimile transmission will be deemed received on the date upon which the recipient's facsimile machine confirms electronically the receipt of the notice, provided that a copy of any notice given by facsimile transmission must also be sent to the recipient by first class mail, postage prepaid, addressed to the address required by this Section 7.18. The rejection by a Party of a notice, the refusal by a Party to accept a notice, or the inability of another Party to deliver a notice because of a change of address of a Party of which no notice of change of address is given pursuant to this Agreement, will constitute delivery of the notice. Telephone numbers and e-mail addresses, if listed, are listed for convenience purposes only and not for the purpose of giving notice pursuant to this Agreement.

To Seller:

Bradley Sharp, Chapter 11 Trustee
c/o Development Specialists Inc.
333 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Bsharp@dsiconsulting.com

With a copy to:

c/o Tim Skillman, Chief Restructuring Officer
CR3 Partners, LLC
[Address]
tim.skillman@cr3partners.com

and

Kyra Andrassy
Robert Marticello
Raines Feldman Littrell LLP
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
kandrassy@raineslaw.com
rmarticello@raineslaw.com

To Buyer:

CTO Foods, LLC
716 Corporate Center Drive
Pomona, CA 91718
Attn: Amir Siddiqi
asiddiqi@ocburgerboys.com

CTW Foods, LLC
716 Corporate Center Drive
Pomona, CA 91718
Attn: Amir Siddiqi
asiddiqi@ocburgerboys.com

**7.19 Employee Matters.**

**7.19.1 *Employees and Offers of Employment*.**

(a) Buyer may, but shall have no obligation to offer employment, to such employees of the Debtors employed in connection with the acquired Stores as Buyer selects in its sole discretion, on such compensation, benefits and other terms as Buyer determines. Any employee hired by Buyer shall commence new employment with Buyer or its applicable affiliate on the date Buyer hires that employee and shall receive no credit from Buyer for prior service, seniority, accrued vacation, sick leave, paid time off, benefits or other amounts or rights arising from employment by a Debtor. Each employee hired by Buyer shall be an at-will employee of Buyer.

(b) Buyer shall maintain employee records transferred to Buyer hereunder for a period of not less than two (2) years and during that period will afford Seller reasonable access to such records during Buyer's normal business hours, with such maintenance and access at Seller's sole cost and expense. Buyer shall maintain the confidentiality of such records and limit access thereto in a manner consistent with Buyer's treatment of its employee records.

(c) Nothing herein, express or implied, shall confer upon any employee or former employee of the Debtors any rights or remedies (including any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any employee or former employee of Debtors.

(d) Seller shall retain any liability for, and Buyer shall not acquire or assume, any liability related to or arising out of the employment by a Debtor or any period or event occurring before the date Buyer hires the applicable employee, whether a claim in respect thereto is brought on, before, or after the Closing Date. Buyer shall have no liability to any employees for earned vacation time, sick leave time, paid time off, severance, discrimination, harassment, retaliation, wage-and-hour violations and pending or unresolved grievances, all of which shall be the responsibility of Seller. Debtors shall remain solely liable for, and Buyer shall not assume, any claim, liability or obligation of any current or former Business employee arising out of or relating to such individual's

employment by, services for, or termination from employment with Seller or the Debtors, to the extent attributable to any act, omission, event, condition or period occurring on or before Closing, whether such claim is known or unknown, asserted or unasserted, accrued or contingent, and whether asserted before, on or after the Closing Date. Such retained liabilities include claims relating to wages, salaries, commissions, bonuses, tips, overtime, minimum wages, meal or rest periods, timekeeping, off-the-clock work, expense reimbursement, wage statements, payroll practices, employee classification or misclassification, independent-contractor status, discrimination, harassment, retaliation, failure to accommodate, leaves of absence, hiring, discipline, termination, wrongful discharge, breach of contract, employment policies or practices, accrued vacation, sick leave or paid time off, employee benefits, severance, payroll taxes and withholding, unemployment insurance, workers' compensation, workplace health and safety, COBRA, the WARN Act and any similar state or local law, civil penalties, statutory penalties, representative or class claims, claims under the California Private Attorneys General Act, and any pending or unresolved complaint, charge, grievance, arbitration, administrative proceeding, investigation, litigation or other claim.

(e) Debtors shall remain responsible for all wages, salaries, payroll taxes, tax withholding obligations, employee benefits, vacation pay, sick leave, paid time off, severance obligations, COBRA obligations, WARN Act obligations (if any), and other employment-related liabilities arising from or relating to periods or events before Buyer hires the applicable employee. Buyer shall not assume any such liabilities except as expressly provided in this Agreement and specifically included as an Assumed Liability on Exhibit D. To the extent applicable, Debtors shall remain responsible for compliance with the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "**WARN Act**"), and any similar state or local law with respect to actions occurring on or prior to the Closing Date. Debtors shall remain responsible for COBRA obligations arising from qualifying events occurring on or prior to the Closing Date, subject to applicable law and the terms of any applicable employee benefit plans.

**7.19.2** ***Workers' Compensation***. Debtor shall be liable for all workers' compensation claims arising from injuries, occupational diseases, cumulative trauma or exposures occurring or originating before the applicable employee is hired by Buyer, including claims asserted after Closing. Buyer shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by any employee on and after the date Buyer hires them. . Buyer shall be liable only to the extent a claim is legally attributable to an injury or exposure occurring during employment by Buyer. Buyer shall not assume liability for an aggravation, exacerbation or reinjury of a preexisting condition except to the extent applicable law allocates liability exclusively to an injury or exposure occurring during employment by Buyer. Debtors and Buyer retain their rights to evaluate and dispute any such claims. No later than five (5) business days before Closing, Seller shall provide Buyer, to the extent permitted by applicable law, complete and current employee information reasonably requested by Buyer, workers' compensation loss runs and a schedule identifying all pending or threatened employment-related and workers' compensation claims relating to employees of the Stores.

*[Signature page follows]*

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the Execution Date.

**BUYER:**

**CTO FOODS, LLC**

Signed by:

By: ______________________
F7275B29C6B448A...

Name: Amir Siddiqi

Its: owner

**CTW FOODS, LLC**

Signed by:

By: ______________________
F7275B29C6B448A...

Name: Amir Siddiqi

Its: owner

**SELLER:**

Signed by:

By: Bradley Sharp ______________________
FEDFF3D4B66A46C...

Bradley Sharp, solely in his capacity as Chapter 11 Trustee of Senior Classic Leasing, LLC, DFG Restaurants, Incorporated, Second Star Holdings, and Third Star Investments, LLC

# EXHIBIT A

## Stores and Leases To Be Acquired

| # | Store # | PS # | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| | Socal Stores (CTW, LLC) | | | | | |
| 1 | 7360 | 1100061 | 1465 E. Colorado Blvd. | Pasadena | CA | 91106 |
| 2 | 7366 | 1100092 | 19305 Victory Bll/Tampa | Reseda | CA | 91335 |
| 3 | 7367 | 1100102 | 2400 S. Azusa | West Covina | CA | 91792 |
| 4 | 7374 | 1100175 | 12358 Washington Blvd | Whittier | CA | 90606 |
| 5 | 7376 | 1100213 | 11509 Laurel Cyn/Kalisher | San Fernando | CA | 91340 |
| 6 | 7377 | 1100216 | 210 S. Hacienda Blvd. | City of Industry | CA | 91744 |
| 7 | 7378 | 1100229 | 6457 Sepulveda Bl/Haynes | Van Nuys | CA | 91411 |
| 8 | 7379 | 1100254 | 9861 DeSoto Ave/Lassen | Chatsworth | CA | 91311 |
| 9 | 7381 | 1100256 | 10409 Whittier Blvd. | Whittier | CA | 90606 |
| 10 | 7387 | 1100303 | 18090 W. Chatsworth St. | Granada Hills | CA | 91344 |
| 11 | 7389 | 1100314 | 9505 Sepulveda Bl/Plummer | Sepulveda | CA | 91343 |
| 12 | 7392 | 1100359 | 2521 W. Commonwealth | Alhambra | CA | 91803 |
| 13 | 7398 | 1100479 | 19782 E. Walnut Dr. N | City of Industry | CA | 91789 |
| 14 | 7368 | 1100127 | 5575 Woodman Ave./Burbank | Van Nuys | CA | 91401 |
| 15 | 7625 | 1101414 | 3215 N. Broadway | Los Angeles | CA | 90031 |
| | | | | | | |
| | Norcal (CTO, LLC) | | | | | |
| 16 | 862 | 1100862 | 495 Story Point Rd | Santa Rosa | CA | 95401 |
| 19 | 863 | 1100863 | 1037 Vine St | Healdsburg | CA | 95448 |
| 20 | 7466 | 1101381 | 373 Aviation Blvd | Santa Rosa | CA | 95403 |
| 19 | 7780 | 1101747 | 15895 Dam Rd | Clearlake | CA | 95422 |
| 20 | 861 | 1100861 | 3640 Industrial Dr | Santa Rosa | CA | 95403 |
| 21 | 864 | 1100864 | 6460 Redwood Dr | Rohnert Park | CA | 94928 |

# EXHIBIT B

## EXECUTORY CONTRACTS AND UNEXPIRED EQUIPMENT LEASES TO BE ASSUMED

### Franchise Agreements for each Lease on Exhibit A

| # | Store # | PS # | Date of Agreement | Franchisee Party | Estimated Cure Amount |
|---|---|---|---|---|---|
| | Socal (CTW Foods, LLC) | | | | |
| 1 | 7360 | 1100061 | 9/25/17 | Senior Classic Leasing, LLC | $56,370 |
| 2 | 7366 | 1100092 | 9/25/17 | Senior Classic Leasing, LLC | $36,861 |
| 3 | 7367 | 1100102 | 9/25/17 | DFG Restaurants, Inc. | $34,607 |
| 4 | 7374 | 1100175 | 9/25/17 | Senior Classic Leasing, LLC | $46,751 |
| 5 | 7376 | 1100213 | 9/25/17 | Senior Classic Leasing, LLC | $75,573 |
| 6 | 7377 | 1100216 | 9/25/17 | Senior Classic Leasing, LLC | $41,310 |
| 7 | 7378 | 1100229 | 9/25/17 | Senior Classic Leasing, LLC | $59,655 |
| 8 | 7379 | 1100254 | 9/25/17 | Senior Classic Leasing, LLC | $46,480 |
| 9 | 7381 | 1100256 | 9/25/17 | Senior Classic Leasing, LLC | $52,589 |
| 10 | 7387 | 1100303 | 9/25/17 | Senior Classic Leasing, LLC | $45,433 |
| 11 | 7389 | 1100314 | 9/25/17 | Senior Classic Leasing, LLC | $60,037 |
| 12 | 7392 | 1100359 | 9/25/17 | DFG Restaurants, Inc. | $41,872 |
| 13 | 7398 | 1100479 | 9/25/17 | Senior Classic Leasing, LLC | $60,177 |
| 14 | 7368 | 1100127 | 9/25/17 | Senior Classic Leasing, LLC | $42,868 |
| 15 | 7625 | 1101414 | 9/25/17 | Senior Classic Leasing, LLC | $38,466 |
| | | | | | |
| | Norcal (CTO Foods, LLC) | | | | |
| 16 | 862 | 1100862 | 12/22/12 | Second Star Holdings, LLC | $36,882 |
| 17 | 863 | 1100863 | 12/22/12 | Third Star Investments, LLC | $26,492 |
| 18 | 7466 | 1101381 | 9/25/17 | Third Star Investments, LLC | $25,359 |
| 19 | 7780 | 1101747 | 12/22/12 | Third Star Investments, LLC | $37,049 |
| 20 | 861 | 1100861 | 12/22/12 | Second Star Holdings, LLC | $20,577 |
| 21 | 864 | 1100864 | 12/22/12 | Second Star Holdings, LLC | $21,820 |

# EXHIBIT C

## FINANCING AGREEMENTS TO BE ASSUMED

# EXHIBIT D

## ASSUMED LIABILITIES

# EXHIBIT E

## PREPAID EXPENSES AND REBATES

# EXHIBIT F

## ASSETS USED IN CONNECTION WITH THE STORES THAT ARE EXCLUDED ASSETS

# EXHIBIT G

## [FORM OF BILL OF SALE AND ASSIGNMENT]

## BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** is made as of this ___ day of _________, 2026, by Bradley Sharp, solely in his capacity as the chapter 11 trustee ("**Trustee**" or "**Seller**") for the bankruptcy estates of Senior Classic Leasing, LLC, and DFG Restaurants, Incorporated (together the "**Debtors**"), in favor of CTW Foods, LLC**,** a Wyoming limited liability company, and CTO Foods, LLC**,** a Wyoming limited liability company (collectively, "**Buyer**").

## RECITALS

A. Seller and Buyer have entered into that certain Asset Purchase Agreement, dated as of September 8, 2026 (the "**Agreement**").

B. The Agreement provides, among other things, that Seller shall convey and assign its interest in certain personal property to Buyer. All capitalized terms used but not defined herein have the meanings given such terms in the Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller hereby bargains, sells, conveys, assigns and transfers to Buyer, all of Seller's right, title and interest in and to all personal property constituting Purchased Assets under the Agreement, whether located at a Store, the Debtors' headquarters or another location, set forth on **Schedule 1** attached hereto and incorporated herein by this reference, including, but not limited to machinery, equipment, fixtures, furniture, POS software, signs, smallwares, and cooking utensils, all usable inventories of food, paper, operating supplies, and serviceable uniforms, all permits, licenses, authorizations, registrations, consents and approvals relating to the Stores and/or Business, and all other personal property. Notwithstanding the foregoing, the property transferred hereby does not include the Excluded Property, which shall remain the property of Seller.

The property transferred hereby is transferred "AS IS", "WHERE IS" and "WITH ALL FAULTS", and without any representation or warranty whatsoever, except as expressly provided in the Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale and Assignment as of the day and year first above written.

**SELLER:**

**By:** ____________________________
Bradley Sharp, solely in his capacity as the
chapter 11 trustee Senior Classic Leasing, LLC,
and DFG Restaurants, Incorporated

Schedule 1 to Bill of Sale for CTW Foods, LLC

| # | Store # | PS # | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| | Socal Stores (CTW, LLC) | | | | | |
| 1 | 7360 | 1100061 | 1465 E. Colorado Blvd. | Pasadena | CA | 91106 |
| 2 | 7366 | 1100092 | 19305 Victory Bll/Tampa | Reseda | CA | 91335 |
| 3 | 7367 | 1100102 | 2400 S. Azusa | West Covina | CA | 91792 |
| 4 | 7374 | 1100175 | 12358 Washington Blvd | Whittier | CA | 90606 |
| 5 | 7376 | 1100213 | 11509 Laurel Cyn/Kalisher | San Fernando | CA | 91340 |
| 6 | 7377 | 1100216 | 210 S. Hacienda Blvd. | City of Industry | CA | 91744 |
| 7 | 7378 | 1100229 | 6457 Sepulveda Bl/Haynes | Van Nuys | CA | 91411 |
| 8 | 7379 | 1100254 | 9861 DeSoto Ave/Lassen | Chatsworth | CA | 91311 |
| 9 | 7381 | 1100256 | 10409 Whittier Blvd. | Whittier | CA | 90606 |
| 10 | 7387 | 1100303 | 18090 W. Chatsworth St. | Granada Hills | CA | |
| 11 | 7389 | 1100314 | 9505 Sepulveda Bl/Plummer | Sepulveda | CA | 91343 |
| 12 | 7392 | 1100359 | 2521 W. Commonwealth | Alhambra | CA | 91803 |
| 13 | 7398 | 1100479 | 19782 E. Walnut Dr. N | City of Industry | CA | 91789 |
| 14 | 7368 | 1100127 | 5575 Woodman Ave./Burbank | Van Nuys | CA | 91401 |
| 15 | 7625 | 1101414 | 3215 N. Broadway | Los Angeles | CA | 90031 |
| | | | | | | |
| | Norcal (CTO, LLC) | | | | | |
| 16 | 862 | 1100862 | 495 Story Point Rd | Santa Rosa | CA | 95401 |
| 19 | 863 | 1100863 | 1037 Vine St | Healdsburg | CA | 95448 |
| 20 | 7466 | 1101381 | 373 Aviation Blvd | Santa Rosa | CA | 95403 |
| 19 | 7780 | 1101747 | 15895 Dam Rd | Clearlake | CA | 95422 |
| 20 | 861 | 1100861 | 3640 Industrial Dr | Santa Rosa | CA | 95403 |
| 21 | 864 | 1100864 | 6460 Redwood Dr | Rohnert Park | CA | 94928 |

**EXHIBIT H**

TO BE PROVIDED

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
4675 MacArthur Court, Suite 1550, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*): **NOTICE OF SUBMISSION OF THE FULLY EXECUTED COPY OF EXHIBIT 1 TO THE TRUSTEE'S EMERGENCY MOTION FOR ORDER: (A) AUTHORIZING AND APPROVING THE SALE OF ESTATE PROPERTY FOR 21 LOCATIONS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE LEASES, SUBLEASES, AND EXECUTORY CONTRACTS AND UNEXPIRED LEASES FOR UTHE 21 LOCATIONS; AND (C) REJECTION OF THREE LEASES**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **September 8, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **September 8, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Hon. Scott C. Clarkson
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 8, 2026 | Connie-Marie Santiago | /s/ Connie-Marie Santiago |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1. **<u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:

- **Michael John Agoglia** michael.agoglia@alston.com, melanie.Mizrahie@alston.com
- **Kyra E Andrassy** kandrassy@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Neama Cory Barari** nbarari@caskeyholzman.com
- **Eric Bensamochan** eric@eblawfirm.us, G63723@notify.cincompass.com;services@infotrack.com;paulinab@eblawfirm.us
- **Dustin P Branch** branchd@ballardspahr.com, carolod@ballardspahr.com;zarnighiann@ballardspahr.com
- **Max Casal** mcasal@shulmanbastian.com, avernon@shulmanbastian.com;twooten@shulmanbastian.com
- **Martin P Eramo** MPEramo@aol.com
- **Alan J Friedman** afriedman@shulmanbastian.com, lgauthier@shulmanbastian.com
- **Eric D Goldberg** eric.goldberg@dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
- **Michael I. Gottfried** mgottfried@elkinskalt.com, lwageman@elkinskalt.com,docketing@elkinskalt.com,lmasse@elkinskalt.com
- **David S Hagen** davidhagenlaw@gmail.com, LawOfficesofDavidSHagenCA1@jubileebk.net
- **Lior Katz** lior@katzlaw.com
- **Jolene E Kramer** courtnotices@unioncounsel.net, jkramer@unioncounsel.net
- **Melissa Davis Lowe** mlowe@shulmanbastian.com, avernon@shulmanbastian.com
- **Robert S Marticello** rmarticello@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Kenneth Misken** Kenneth.M.Misken@usdoj.gov
- **Matthew D. Resnik** matt@rhmfirm.com, roksana@rhmfirm.com;russ@rhmfirm.com;sloan@rhmfirm.com;susie@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;rosario@rhmfirm.com;gabriela@rhmfirm.com;lesley@rhmfirm.com
- **Atle T. Saterbak** asaterbak@winthrop.com
- **William Schumacher** wschumacher@winthrop.com, mfinley@winthrop.com;breznecheck@winthrop.com
- **Bradley D. Sharp (TR)** bsharp@dsi.biz
- **Andrew J Steil** asteil@winthrop.com
- **United States Trustee (SA)** ustpregion16.sa.ecf@usdoj.gov
- **Nahal Zarnighian** zarnighiann@ballardspahr.com, garciaej@ballardspahr.com;carolod@ballardspahr.com