**RAINES FELDMAN LITTRELL LLP**
Kyra E. Andrassy (State Bar No. 207959)
*kandrassy@raineslaw.com*
Robert S. Marticello (State Bar No. 244256)
*rmarticello@raineslaw.com*
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

-- and --

Jordan N. Kelly, PA State Bar No. 328896 (*Admitted Pro Hac Vice*)
jkelly@raineslaw.com
11 Stanwix Street, Suite 1500
Pittsburgh, PA 15222
Telephone: (412) 899-6487

Counsel for Bradley D. Sharp,
Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>SUN GIR INCORPORATED, *et al.*,<br><br>Debtor. | Case No.: 8:26-bk-11056-SC<br><br>Chapter: 11<br><br>(Jointly Administered with Case Nos. 8:26-bk-11057-SC; 8:26-bk-11058-SC; 8:26-bk-11060-SC; 8:26-bk-11061-SC; 8:26-bk-11062-SC) |
| ☐ Affects Sun Gir Incorporated<br>☐ Affects Harshad & Nasir, Incorporated<br>☒ Affects Senior Classic Leasing, LLC<br>☐ Affects DFG Restaurants Incorporated<br>☐ Affects Second Star Holdings, LLC<br>☐ Affects Third Star Investments, LLC<br>☐ **Affects All Debtors** | **MOTION FOR AN ORDER: (A) AUTHORIZING AND APPROVING THE SALE OF ESTATE PROPERTY FOR 5 LOCATIONS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE LEASES, SUBLEASES, AND EXECUTORY CONTRACTS FOR THE 5 LOCATIONS; AND (C) AUTHORIZING THE REJECTION OF FOUR SUBLEASES; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF BRADLEY SHARP AND MICHAEL INGRAM IN SUPPORT THEREOF** |

**[Filed concurrently with an Application for an Order Shortening Time and the Declaration of Amir Siddiqi]**

**Hearing Information**:
DATE: TBD
TIME: TBD
CTRM: 5C, 411 West Fourth Street
Santa Ana, CA 92701

[Zoom instructions available on Court's calendar]

## TABLE OF CONTENTS


I. INTRODUCTION AND BASIS FOR EXPEDITED RELIEF ....................1

II. BACKGROUND ....................2

- A. General Background ....................2
- B. Marketing Efforts ....................3
- C. Secured Creditors ....................4
- D. The Remaining Locations ....................5

III. THE PROPOSED SALE ....................5

- A. Property to Be Sold ....................6
- B. The Sale Agreement ....................7
- C. Cure Amounts ....................8

IV. LEGAL ARGUMENT ....................8

- A. The Sale Is a Proper Exercise of Business Judgment and May Be Approved Pursuant to 11 U.S.C. § 363(b) ....................8
- B. The Assumption and Assignment of the Assumed Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code ......9
- C. The Buyer Should Be Granted the Protection of Bankruptcy Code Section 363(m) ....................11
- D. Sale of the Property Should be Free and Clear of Liens, Claims, Encumbrances, and Interests ....................12
- E. The Trustee Seeks Approval to Reject the Subleases for Stores 7352, 7365, and 7494 ....................12
- F. The Trustee Seeks a Waiver of the 14-Day Stay of Enforcement Under Federal Rule of Bankruptcy Procedure 6004(h) ....................13

V. CONCLUSION ....................13

DECLARATION OF BRADLEY SHARP ....................15

DECLARATION OF MICHAEL INGRAM ....................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 240 North Brand Partners, Ltd.*, 200 B.R. 653 (9th Cir. BAP 1996) ... 8

*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) ... 11

*In re America West Airlines*, 166 B.R. 908 (Bankr. D. Ariz. 1994) ... 8

*In re Bel Air Assocs., Ltd.*, 706 F.2d 301 (10th Cir. 1983) ... 11

*In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789 (Bankr. N.D. Ill. 1985) ... 10

*In re Carlisle Homes, Inc.*, 103 B.R. 524 (Bankr. D.N.J. 1989) ... 10

*In re Coated Sales, Inc.*, 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) ... 11

*In re Elliot*, 94 B.R. 343 (E.D. Pa. 1988) ... 12

*In re Klein Sleep Prods., Inc.*, 78 F.3d 18 (2d Cir. 1996) ... 9

*In re Natco Indus., Inc.*, 54 B.R. 436 (Bankr. S.D.N.Y. 1985) ... 10

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993) ... 9

*In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830 (Bankr. C.D. Cal. 1991) ... 8, 9

**Statutes**

Bankruptcy Code section 363 ... *passim*

Bankruptcy Code Section 365 ... 9, 10, 13

**Other Authorities**

Federal Rule of Bankruptcy Procedure 6004(h) ... 13

**TO THE HONORABLE SCOTT C. CLARKSON, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTORS, AND ALL CREDITORS AND PARTIES IN INTEREST:**

Bradley Sharp, the chapter 11 trustee (the "**Trustee**") for Senior Classic Leasing, LLC, (the "**Debtor**") and its five affiliated debtors (together with the Debtor, the "**Debtors**") seeks approval to sell a package of five stores to CTW Foods, LLC, for $450,000, subject to overbid as set forth below. The sale involves the assumption and assignment of five leases and the associated franchise agreements for those locations. Carl's Jr. Restaurants consents to the sale of these stores to CTW and the sale has the support of the Debtor's secured lender, Northern Trust Company. In addition, the Trustee seeks authority to reject four subleases for stores that have closed in recent weeks. In support of the Motion, the Trustee submits the following memorandum of points and authorities and the declarations of the Trustee, Michael Ingram, and Amir Siddiqi in support thereof, and respectfully represents as follows:

## I. <u>INTRODUCTION AND BASIS FOR EXPEDITED RELIEF</u>

After an extensive and diligent marketing effort that has already resulted in the sale of 21 stores, the Trustee has now secured a stalking horse bid from CTW Foods, LLC, one of the two purchasers of the 21 stores, for an additional five restaurant locations for $450,000. The sale is subject to overbid. By this Motion, the Trustee seeks two forms of relief:

1. Approval of the sale of the "Purchased Assets" as defined in the Asset Purchase Agreement attached hereto as **<u>Exhibit 1</u>** (the "**Sale Agreement**") to CTW Foods, LLC (the "**Buyer**") for a Base Purchase Price of $450,000 (the "**Purchase Price**"), free and clear of all liens, claims, and encumbrances pursuant to 11 U.S.C. § 363(f). The sale is subject to the Package Bid Requirement set forth in the Sale Agreement, under which any competing bid must be for all five (5) stores as a single, integrated and indivisible package. The Purchased Assets largely consist of the leases or subleases (collectively, the "**Leases**") and franchise agreements necessary for the operations of the five stores.

2. Approval of the assumption of the Leases and the associated franchise agreements with Carl's Jr. Restaurants, Inc. ("**CJR**") associated with the five stores (collectively, the "**Franchise Agreements**") and the assignment of the Leases and the Franchise Agreements to the Buyer, conditioned upon payment of cure amounts by the Trustee.

The proposed sale is subject to overbid, with any overbidder needing to submit a qualified overbid three (3) days before the hearing on the Motion. Overbidders can have no contingencies. If one or more qualified overbids is received, then the Trustee will conduct an auction at the hearing on the Motion. The Trustee is informed that CJR will consent to the assumption and assignment of the Franchise Agreements upon satisfaction of the cure amounts and certain requirements of CTW Foods, and the sale has the support of Northern Trust.

The Sale Agreement contemplates a closing as promptly as practicable following entry of the order approving this Motion, but in no event later than October 29, 2026, which is the outside date for the assumption and assignment of the Leases. Given the robust marketing conducted to date, the Trustee does not expect that additional time will result in a better sale. The Trustee is seeking relief on an expedited basis so that the parties have a few days after entry of any order granting this Motion to close the transaction.

In addition, the Trustee seeks a Court order confirming the rejection of four locations that have closed in recent weeks.

## II. BACKGROUND

### A. General Background

On April 2, 2026 (the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code (the "**Bankruptcy Cases**") in the United States Bankruptcy Court for the Central District of California. The Bankruptcy Cases are being jointly administered for procedural purposes only. As of the Petition Date, the Debtors

operated fifty-nine (59) Carl's Jr. restaurant locations throughout California, with 52 in Southern California and 7 in Northern California.

In May 2026, the Court *sua sponte* issued an order to show cause why a chapter 11 trustee should not be appointed. On June 3, 2026, the Court ordered the appointment of a chapter 11 trustee. On June 17, 2026, the Court entered an *Order Approving U.S. Trustee's Application for the Appointment of a Chapter 11 Trustee* [Doc. No. 273], appointing the Trustee effective June 16, 2026.

**B. <u>Marketing Efforts</u>**

On May 12, 2026, prior to the Trustee's appointment, the Debtors executed an engagement agreement with National Franchise Sales, a nationally-recognized restaurant and franchise brokerage firm, to assist the Debtors in evaluating strategic alternatives and conducting a marketing process for certain of the Debtors' assets. On May 14, 2026, the Debtors filed an application [Doc. No. 148] seeking approval of NFS's retention, which was denied without prejudice. The Trustee filed his own application to retain NFS, which was approved by order of the Court entered on August 19, 2026.

Following the Debtors' filing of the application to employ NFS, NFS worked to identify assets to be marketed, prepare a confidential information memorandum and related marketing materials, establish an electronic data room, and develop a comprehensive marketing process. Marketing efforts commenced on or about May 22, 2026, and the electronic data room was opened on or about May 28, 2026. Since commencing the marketing process, NFS has engaged with numerous prospective purchasers, distributed marketing materials, responded to diligence inquiries, and explored potential transactions involving individual restaurant locations and groups of locations. There have been a number of potential sales that ultimately failed to materialize, with two offers to acquire all of the Debtors' assets unable to be accepted because CJR identified issues with the proposed buyers that CJR asserted prevented it from approving them as franchisees.

However, in September, the Trustee presented an asset purchase agreement to the Court for approval, proposing to sell 21 locations to CTO and its affiliate, CTW Foods, LLC,

with the support of CJR. The Court approved the sale and it closed on September 11, 2026. Prior to or in connection with that sale, the Debtors and/or the Trustee obtained authority to reject a number of locations, leaving the Debtors with 21 operating locations as of the filing of this Motion.

After closing the sale of the 21 locations, CTO decided it wanted to acquire five additional locations, and these locations are the subject of this Motion.

As noted above NFS has been actively marketing the Debtors' assets since May 12, 2026. The Debtors' assets have now been exposed to the market for over four months. NFS believes that the universe of potential purchasers has had a meaningful opportunity to learn of, evaluate, and explore a potential acquisition of the remaining locations and that the proposed sale of the Purchased Assets is the best option available for the Debtor's estate.

### C. Secured Creditors

To the Trustee's knowledge, there are two parties that assert security interests in the Stores or Purchased Assets.

Northern Trust asserts a perfected security interest in substantially all of the Debtors' assets pursuant to a prepetition term loan agreement, term note, and related security agreement, each dated September 5, 2025, evidencing a loan in the principal amount of $20,000,000, together with UCC-1 financing statements recorded in California and Nevada.

McLane asserts a purchase money security interest in the inventory sold to Senior Classic Leasing, LLC, and the proceeds thereof, pursuant to a purchase money security agreement and a recorded UCC-1 financing statement.

The Trustee is operating the Debtors' business and using cash collateral pursuant to a *Stipulation Authorizing Use of Cash Collateral* [Docket No. 406] (the "**Cash Collateral Stipulation**") among the Trustee, Northern Trust, and McLane, which permits the consensual use of cash collateral by the Trustee pursuant to an agreed budget through October 26, 2026. The Cash Collateral Stipulation was approved by order of the Court on September 3, 2026, and provides for a carveout for, among other expenses, budgeted operating expenses and professional fees. The Stipulation grants Northern Trust and McLane replacement liens and

McLane a senior post-petition lien (subject to the carveout) in the inventory purchased by and delivered to the Debtors post-petition to secure the amounts owing for such post-petition inventory.

**D. <u>The Remaining Locations</u>**

As set forth above, as of the filing of this Motion, the Debtors are operating 21 locations. Four locations have closed over the past 2 weeks and have been surrendered to CJR, which is the landlord: (1) Store 7401 at 20900 Roscoe Blvd, Canoga Park, CA, surrendered on September 24, 2026; (2) Store 7400 at 21201 Sherman Way, Canoga Park, CA, surrendered on September 24, 2026; (3) Store 7385 at 1400 Foothill Blvd., La Verne, CA, surrendered on September 30, 2026; and (4) Store 7403 at 12653 Sherman Way, North Hollywood, CA, surrendered on September 24, 2026. The Debtors are requesting an order confirming the rejection of these leases effective as of the date of their surrender to the landlords.

CJR has indicated an intention to takeover most, if not all, of the remaining locations if they are not sold to a third party. Because there is a shortfall in the projections between the revenues from operations and the cost of operations of these remaining locations, CJR is funding that difference pursuant to a stipulation that is in the process of being submitted to the Court through a separate noticed motion.

## III. <u>THE PROPOSED SALE</u>

The sale involves the following 5 locations operated by the Debtor:

| # | Store # | PS # | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| 1 | 7361 | 1100062 | 14080 Francisquito Ave. | Baldwin Park | CA | 91706 |
| 2 | 7391 | 1100350 | 2980 E. Workman Ave. | West Covina | CA | 91791 |
| 3 | 7493 | 1100641 | 5166 Vineland Ave. | North Hollywood | CA | 91601 |
| 4 | 7402 | 1100510 | 8875 Glenoaks Blvd. | Sun Valley | CA | 91352 |
| 5 | 8150 | 1101927 | 6601 Lankershim Blvd. | North Hollywood | CA | 91606 |

**A. Property to Be Sold**

The Purchased Assets are defined in the Sale Agreement and generally consist of the Leases and the franchise agreements for the 5 locations identified above and associated operating restaurant assets, including, without limitation:

a. The Leases;

b. furniture, fixtures, equipment, machinery, tools, computers, information technology infrastructure, POS machines and software, signs, smallwares, and cooking utensils, and other tangible personal property used in the operation of the Stores and any applicable warranties, representations and guarantees related thereto;

c. inventory, supplies, and other consumables onsite at the Stores;

d. transferable permits, licenses, approvals, and authorizations relating to the Stores;

e. telephone numbers and attendant telephone systems, facsimile numbers, and email addresses for the Stores;

f. executory contracts and unexpired equipment leases designated for assumption and assignment on Exhibit B to the Sale Agreement;

g. goodwill associated with the Stores;

h. prepaid expenses, deposits, rebates, credits, refunds, returns, promotional allowances, rights of setoff or recoupment, and similar amounts attributable to the Purchased Assets;

i. books and records relating to the Purchased Assets to the extent provided in the Sale Agreement; and

j. such other assets as may be identified in the Sale Agreement and approved by this Court.

The Purchased Assets do not include certain excluded assets identified in the Sale Agreement, including, without limitation, cash, bank accounts, accounts receivable, avoidance actions, tax refunds, litigation claims, and other assets expressly designated as excluded assets.

The proposed sale is structured as a stalking horse transaction. The Sale Agreement is subject to higher or otherwise better offers, but any competing bid must satisfy the Package

Bid Requirement, under which no bid for fewer than all five (5) Stores, for any individual Store or subset of Stores, or for any Purchased Assets severed from the five-Store package may be solicited, qualified, considered, accepted, or combined, and no such bid may be approved as the Successful Bid. If one or more Qualified Bids are received, the Trustee will conduct an auction at the hearing on this Motion; no separate pre-hearing auction will be held. If the Buyer is not the Successful Bidder, the Buyer is entitled to the Break-Up Fee and reimbursement of its documented, reasonable out-of-pocket expenses, in each case as more fully described below.

**B. The Sale Agreement**

The Sale Agreement is attached as **Exhibit 1**. Pursuant to the Sale Agreement, the Trustee seeks to sell the Purchased Assets to the Buyer for a Base Purchase Price of $450,000, subject to adjustment as described in the Sale Agreement. The Buyer is depositing $50,000 as a Good Faith Deposit with the escrow agent. (See Mot, Ex. 1 at § 2.3.1.) The Sale Agreement contemplates a closing as promptly as practicable following entry of the order approving this Motion, but in no event later than October 29, 2026.[1] (*See* Mot, Ex. 1 at § 3.1.) The balance of the Purchase Price, less the Good Faith Deposit, is due on or before the Closing Date. (*See id.* at § 2.3.2.)

In connection with the sale and because it is serving as a stalking horse bidder for the five locations, CTW is requesting a break-up fee of $13,500, plus reimbursement of up to $30,000 in fees incurred in connection with this sale. Therefore, the Trustee is informing potential overbidders that their overbid must be in the amount of at least $500,000. If one or more qualified overbids is received, then the Trustee will conduct an auction at the hearing. The Trustee intends to use bid increments of $10,000. In order to be determined to be a qualified overbidder, any overbidder must provide evidence of its financial wherewithal to close on or before October 29, 2026, have no contingencies of any kind, and be approved by

[1] This is the deadline for the Debtors to assume or reject the leases and subleases, as set in the Court's order entered on September 11, 2026.

CJR as a franchisee. Overbids must include the same five locations sought to be acquired by CTW.

The Trustee believes that CJR is supportive of the proposed sale.

### C. Cure Amounts

As a condition to assumption of the Leases and the related Franchise Agreements, the Debtor's books and records reflect that the Trustee will need to pay the following cure amounts, plus any additional amounts that come due prior to the closing of the sale:

| Store | Cure Amount |
|---|---|
| Store 7361, 14080 Francisquito, Baldwin Park, CA | $31,358 in royalties; no cure on the lease |
| Store 7391, 1190 W. Foothill Blvd., Azusa | $12,656, in rent, CAM, and taxes, plus $31,499 in royalties, for a total of $44,155 |
| Store 7493, 166 Vineland, North Hollywood, CA | $33,862 in royalties; no cure on the lease |
| Store 7402, 8875 Glenoaks Blvd., Sun Valley, CA | $9,835 in rent, CAM, and taxes, plus $28,530 in royalties, for a total of $38,365 |
| Store 8150, 66601 Lankershim Blvd., North Hollywood, CA | $28,754 in royalties; no cure on the lease |

## IV. LEGAL ARGUMENT

### A. The Sale Is a Proper Exercise of Business Judgment and May Be Approved Pursuant to 11 U.S.C. § 363(b)

Section 363(b) empowers a trustee to "use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). In considering a proposed transaction to use, sell, or lease, courts look at whether the transaction is in the best interests of the estate based on the facts and history of the case. *See In re America West Airlines*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994). This requires examination of the "business justification" for the proposed sale. *In re 240 North Brand Partners, Ltd.*, 200 B.R. 653 (9th Cir. BAP 1996); *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830 (Bankr. C.D. Cal. 1991). "In approving any sale outside the ordinary course of business, the court must not only articulate a sufficient business reason for the sale, it must further find it is in the best interest of the estate, i.e. it is fair and reasonable, that it has been given adequate marketing, that it has

been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and that it is an 'arms-length' transaction." *Wilde Horse Enterprises, Inc.*, 136 B.R. at 841.

The sale is supported by a sufficient business justification. NFS has been marketing the Debtors' business since May. As set forth in the attached declaration of Michael Ingram, NFS believes that the Debtors' business has been exposed to the market for an adequate amount of time. Given franchisor requirements, the offer from the Buyer is the only viable offer to purchase the Stores that has been received to date, even after exhaustive efforts by NFS to secure a buyer. The Buyer's offer represents the highest and best offer received for the Purchased Assets, subject to higher or otherwise better offers at the hearing on this Motion, and the Sale Agreement is the product of arm's length and good faith negotiations. For these reasons, the Trustee, in consultation with his advisors and NFS, has determined that the Sale is in the best interests of the estates.

**B. The Assumption and Assignment of the Assumed Contracts in Connection with the Sale Satisfies Section 365 of the Bankruptcy Code**

Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). "The purpose behind allowing the assumption or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

Upon finding that a trustee has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 25 (2d Cir. 1996); *see also In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993).

Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if: (1) the trustee

assumes such contract or lease in accordance with the provisions of this section; and (2) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease. *See* 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

Here, there are two types of executory contracts and unexpired leases subject to the Motion. First, the Trustee seeks to assume and assign the Leases. The Leases consist of 5 real property leases for the Debtors' restaurant locations. The assumption and assignment of the Leases is supported by a sound business decision because it is part of a value maximizing sale to CTW that is beneficial to the estate. The amounts owing under the Leases, if any, that is set forth above or otherwise set by the Court will be paid as a condition to assumption and assignment. The fact that CTW is an existing CJR franchisee expected to be approved by CJR and that it has experience operating Carl's Jr. restaurants provides adequate assurance of future performance under the Leases.

Second, the Trustee seeks to assume and assign the Franchise Agreements associated with the Stores to CTW. The Trustee expects this to be consensual with CJR by the time of the hearing. CTW is already an approved franchisee in the CJR system who is familiar with CJR's requirements and who has the financial wherewithal to fulfill the financial obligations under the Leases and the Franchise Agreements, whether as Successful Bidder or, if applicable, Backup Bidder. The Debtor will cure the existing defaults in the royalty payments owing to CJR, as set forth above or otherwise ordered, as a condition to assumption and assignment of the Franchise Agreements.

The Trustee and CTW do not expect to identify any other contracts or leases that CTW will want to have assumed and assigned.

### C. The Buyer Should Be Granted the Protection of Bankruptcy Code Section 363(m)

Section 363(m) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

While the Bankruptcy Code does not define "good faith," the Third Circuit has held that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also generally In re Coated Sales, Inc.*, 1990 WL 212899 at *2 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion . . . or an attempt to take grossly unfair advantage of other bidders"); *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 n. 11 (10th Cir. 1983).

CTW is a "good faith" purchaser and was previously found to be entitled to the protections of § 363(m) in connection with its prior purchase of a number of locations owned by the Debtors. CTW has no relationship with the Debtors or their insiders. (*See* Siddiqi Decl. at ¶ 5.) CTW was brought to this transaction through NFS's marketing efforts. The Sale Agreement was negotiated at arm's length and in good faith. (*See* Siddiqi Decl. at ¶ 9.) CTW has not engaged in any collusion with the Trustee, any Debtor, or any other bidder or

person concerning the Sale. (*See id.* at ¶ 11.) Under the circumstances, this Court should find that CTW is entitled to all of the protections under § 363(m) of the Bankruptcy Code.

**D. Sale of the Property Should be Free and Clear of Liens, Claims, Encumbrances, and Interests**

The sale of estate property free and clearly of any interest therein is appropriate if:

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) is written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

Here, the sale of the Purchased Assets free and clear of liens is appropriate. The two parties who assert an interest in the Purchased Assets, *i.e.*, Northern Trust and McLane, are expected to consent. A sale free and clear of liens, claims, encumbrances, or interests is necessary to maximize the value of the Purchased Assets. Any security interests in the Purchased Assets shall attach to the proceeds thereof, subject to the terms and conditions of the Cash Collateral Stipulation. Thus, the sale of the Purchased Assets free and clear of liens, claims, and encumbrances can be approved pursuant to section 363(f).

**E. The Trustee Seeks Approval to Reject the Subleases for Stores 7352, 7365, and 7494**

Four locations have closed over the past 2 weeks and have been surrendered to CJR, which is the landlord: (1) Store 7401 at 20900 Roscoe Blvd, Canoga Park, CA, surrendered on September 24, 2026; (2) Store 7400 at 21201 Sherman Way, Canoga Park, CA, surrendered on September 24, 2026; (3) Store 7385 at 1400 Foothill Blvd., La Verne, CA, surrendered on

September 30, 2026; and (4) Store 7403 at 12653 Sherman Way, North Hollywood, CA, surrendered on September 24, 2026. These locations are not ones that CJR is interested in taking over and they operate at a net loss. Therefore, the Trustee seeks to reject them under 11 U.S.C. § 365(a) with the rejection effective as of the date that they were surrendered.

### F. The Trustee Seeks a Waiver of the 14-Day Stay of Enforcement Under Federal Rule of Bankruptcy Procedure 6004(h)

Federal Rule of Bankruptcy Procedure 6004(h) provides for a stay of enforcement of an order approving a sale of property unless the Court orders otherwise. Here, because the closing must occur by October 29, 2026, the Trustee seeks a waiver of this stay so that the Order is immediately enforceable and the Buyer can close by October 29, 2026.

## V. CONCLUSION

Based on the foregoing, the Trustee requests that the Court enter an order:

(1) Granting the Motion;

(2) Authorizing and approving the sale of the Purchased Assets on the terms of the Sale Agreement free and clear of claims, liens, and encumbrances pursuant to 11 U.S.C. § 363(f) and including a provision that the Buyer has no successor liability for any prepetition obligations of the Debtors that are not Assumed Liabilities under the Sale Agreement;

(3) Finding that the Buyer is a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m);

(4) Waiving the 14-day stay of enforcement of any order approving this Motion;

(5) Authorizing and approving the assumption and assignment of the Leases and the Franchise Agreements to CTW, conditioned upon payment of the cure amounts set forth in this Motion, or such other amount as may be agreed on or ordered by the Court;

(6) Authorizing the rejection of the subleases for the following locations, with the rejection effective as of the date of their surrender to the landlord: (a) Store 7401 at 20900 Roscoe Blvd, Canoga Park, CA, surrendered on September 24, 2026; (b) Store 7400 at 21201 Sherman Way, Canoga Park, CA, surrendered on September 24, 2026; (c) Store 7385 at 1400

Foothill Blvd., La Verne, CA, surrendered on September 30, 2026; and (d) Store 7403 at 12653 Sherman Way, North Hollywood, CA, surrendered on September 24, 2026; and

(7) Granting such other and further relief as the Court deems just and appropriate.

Dated: October 7, 2026

**RAINES FELDMAN LITTRELL LLP**

By: */s/ Kyra E. Andrassy*
Kyra E. Andrassy
Robert S. Marticello
Jordan N. Kelly
Counsel for Bradley D. Sharp,
Chapter 11 Trustee

**DECLARATION OF BRADLEY SHARP**

I, Bradley Sharp, declare as follows:

1. I am the Chapter 11 Trustee of the above-referenced bankruptcy cases. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. I make this declaration in support of the emergency motion to approve the sale of 5 locations to CTW Foods, LLC (the "**Motion**"). Unless otherwise defined in this declaration, all terms defined in the Motion are incorporated herein by this reference.

2. Since my appointment, I have worked closely with my advisors, including NFS, to evaluate the Debtors' assets, preserve going-concern value where possible, and pursue a sale process designed to maximize value for the benefit of the estates and their creditors.

3. Based upon my experience in these Bankruptcy Cases and the advice of my retained professionals, I believe the proposed sale procedures are fair, reasonable, and appropriate under the circumstances.

4. The proposed timeline appropriately balances the need for an expedited sale of the Debtors' assets to avoid expense to the Debtors' estates with the fact that the Debtors' assets have been marketed for approximately four months.

5. I, alongside NFS, identified a Stalking Horse and, following negotiations, entered into the Sale Agreement. In my judgment, the Sale Agreement is the product of extensive, arm's-length negotiations conducted in good faith by the parties in a condensed time period. The terms of the Sale Agreement are a result of sound exercise of business judgment and represent the best available transaction under the circumstances, which are difficult ones. A true and correct copy of the Sale Agreement is attached as **Exhibit 1**.

6. Although I would have preferred to make the proposed sale subject to overbids and to give creditors the full 21 days' notice of the proposed sale, under the circumstances and in my judgment, the proposed notice procedures provide interested parties with adequate and appropriate notice of the sale process, sale hearing (at which an auction will be conducted if one or more Qualified Bids are received), and the proposed assumption and assignment

procedures.

7. Accordingly, I believe that the Sale Agreement provides the best alternative in a difficult situation and is in the best interests of the Affected Debtors' estates, creditors, and all other parties in interest.

8. We have closed four locations in the past 2 weeks because the locations operate at a net loss and they are locations that Carl's Jr. Restaurants does not want to take over and that we have received no offers on. They are: (1) Store 7401 at 20900 Roscoe Blvd, Canoga Park, CA, surrendered on September 24, 2026; (2) Store 7400 at 21201 Sherman Way, Canoga Park, CA, surrendered on September 24, 2026; (3) Store 7385 at 1400 Foothill Blvd., La Verne, CA, surrendered on September 30, 2026; and (4) Store 7403 at 12653 Sherman Way, North Hollywood, CA, surrendered on September 24, 2026. I believe the rejection of these subleases is in the best interests of the estates and a proper exercise of my business judgment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 6th day of October 2026 at San Diego, California.

BRADLEY SHARP, Chapter 11 Trustee

**DECLARATION OF MICHAEL INGRAM**

I, Michael Ingram, declare as follows:

1. I know each of the following facts to be true of my own personal knowledge, except as otherwise stated and, if called as a witness, I could and would competently testify with respect thereto. I make this declaration in support of the emergency motion to approve a sale of 5 locations (the "**Motion**"). Unless otherwise defined in this declaration, all terms defined in the Motion are incorporated herein by this reference.

2. I am the Vice President of National Franchise Sales, Inc. ("**NFS**"). NFS is a national brokerage and advisory firm specializing in restaurant and franchise transactions. We have substantial experience marketing restaurant assets and assisting debtors, trustees, and other fiduciaries in connection with sales conducted under section 363 of the Bankruptcy Code.

3. On or about May 12, 2026, the Debtors engaged NFS to market substantially all of their operating assets. Following our engagement, NFS worked with the Debtors to prepare marketing materials, establish a confidential electronic data room, identify prospective purchasers, and implement a comprehensive marketing process.

4. Marketing efforts commenced in late May 2026. Since that time, NFS has contacted numerous prospective purchasers, distributed marketing materials, coordinated confidentiality agreements and due diligence, responded to purchaser inquiries, and facilitated discussions regarding potential transactions involving individual restaurant locations, groups of locations, or substantially all of the Debtors' operations.

5. Following the appointment of the Chapter 11 Trustee, NFS has continued working with the Trustee and his professionals to market the Debtors' assets, coordinate communications with interested parties, facilitate diligence, and advance the sale process.

6. As a result of these efforts, 380 parties requested information on the opportunity and executed a Confidentiality Agreement. 228 of those satisfied the minimum requirements for financial wherewithal and experience, so received the Confidential Information Memorandum. During the marketing period, NFS received LOIs or APAs from

a total of 9 different groups that were interested in serving as the stalking horse purchaser. Some of those offers were for a small number of units, which either did not work on their own or had crossover with restaurants contained in other offers that were more valuable to the estates. Some also decided not to proceed as they learned about deferred maintenance issues or had concerns with the remodeling requirements of the franchisor.

7. Two substantial offers for all locations were submitted to the franchisor for review, but both had histories that were not acceptable to the franchisor. Ultimately, the Trustee moved forward with a sale transaction for the sale of 21 of the Debtors' locations on September 8, 2026, which transaction was approved on September 10, 2026. After receiving that offer, NFS continued to try to locate a buyer for the remaining locations, focusing on franchisees that are already in the Carl's Jr. system. During this time, CTW Foods, LLC decided that it wanted to acquire an additional five locations.

8. Based on my experience with assets of this nature, I believe the APA with CTW Foods, LLC, represents a fair and commercially reasonable offer and reflects the current market value of these assets under the circumstance.

9. The extended marketing process has provided interested purchasers with sufficient time and opportunity to submit bids for individual locations, groups of locations, or substantially all of the Debtors' assets, thereby promoting competition and maximizing the potential value realized through the sale process.

10. I believe that the Debtors' assets have been marketed for an adequate amount of time and that further marketing is not likely to lead to a higher and better offer.

11. The media marketing that NFS did is summarized in the following chart:

| **Media** | **Run Date** | **Approximate Circulation/Membership** |
|---|---|---|
| **Print** | | |
| Nation's Restaurant News | 05/21/2026 | 21k+ subscribers and other affiliates |
| Restaurant Finance Monitor | June Issue | 25k subscribers |
| **Web** | | |

| | | |
|---|---|---|
| Bizben.com | 05/28/2026-09/03/2026 | 110 Views |
| Bizbuysell.com | 05/28/2026-09/03/2026 | 23,000 Views |
| Businessbroker.com | 05/28/2026-09/03/2026 | 100 Views |
| Businessesforsale.com | 05/28/2026-09/03/2026 | 1,000 Views |
| **Direct** | | |
| Notice of Sale & Opportunity to Bid | 05/19/2026 | 3,000 |
| Notice of Sale & Opportunity to Bid | 05/27/2026 | 14,500 |
| BKRF Engagement | 05/28/2026 | 100 |
| Continuous Updates to interested parties | ongoing since 06/11/2026 | 173 |
| **Notable Mentions** | | |
| Struggling Carl's Jr. franchisee plans to close 10 and sell 49 California locations – LA TIMES | 05/30/2026 | 335,000 subscribers |
| Major Carl's Jr. Franchisee Closing 10 and Selling 49 Locations amid Chapter 11 Bankruptcy Filing – People Magazine | 06/11/2026 | 2.2 million |

12. At this point in time the Stalking Horse APA reflects the only viable offer for the sale of these Stores although NFS will continue to market them to identify potential overbidders.

13. Based on my experience, approval of the Stalking Horse APA provides the best and currently only opportunity to maximize the value of the Stores for the benefit of the Debtors' estates and their creditors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 6th day of October, 2026 at Newport Beach, California.

[signature]
MICHAEL INGRAM, Vice President
National Franchise Sales, Inc.

# EXHIBIT 1

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is executed and entered into as of October 6, 2026 (the "**Execution Date**"), by and among one or more of the following parties as indicated on the signature blocks below (each a "Party" and collectively, the "**Parties**"): (a) Bradley Sharp, solely in his capacity as the chapter 11 trustee (the "**Trustee**" or "**Seller**") for the bankruptcy estate of Senior Classic Leasing, LLC (the "**Debtor**"); and CTW Foods, LLC, a Wyoming limited liability company (together with any Buyer Designee to which such entity assigns any of its rights or obligations pursuant to Section 7.8, "**Buyer**").

## RECITALS

A. On April 2, 2026 (the "**Petition Date**"), the Debtor and five of its affiliates filed their respective voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court, Central District of California (Santa Ana) (the "**Bankruptcy Court**"), thereby initiating their respect bankruptcy cases with the Bankruptcy Court. The debtors' bankruptcy cases are jointly administered under Case No. 8:26-bk-11056-SC (the "**Bankruptcy Case**"). By order entered on June 16, 2026, the Trustee accepted his appointment as the chapter 11 trustee.

B. The Seller, as chapter 11 trustee for the Debtor and five other affiliates, operates approximately 21 Carl's Jr. Restaurants, including the five (5) locations described on Exhibit A hereto that are owned by the Debtor (each, a "Store" and collectively, the "**Stores**"). In this Agreement, the operation of the Stores is referred to as the "**Business**".

C. Buyer desires to purchase from Seller, and Seller desires to sell and assign to Buyer, all of the Debtor's right, title and interest in and to the assets described in Section 2.1 of this Agreement with respect to all five (5) Stores as one integrated and indivisible package (the "**Transaction**"). The entire Transaction is subject to the approval of the Bankruptcy Court pursuant to Sections 105, 363 and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions of this Agreement, the Parties hereby agree as follows:

## ARTICLE 1

## BANKRUPTCY COURT APPROVAL OF THIS AGREEMENT

**1.1 Binding Effect; Entry of Approval Order**. Article 1, Section 2.3.1, Section 2.3.3, and Article 4 of this Agreement are effective upon the Execution Date. Except for the foregoing, this Agreement will become effective only upon the entry by the Bankruptcy Court of an order in the Bankruptcy Case (the "**Approval Order**") (a) approving this Agreement and the sale of the Property (as defined below) to Buyer pursuant to this Agreement, free and clear of liens, claims, encumbrances, and interests pursuant to Section 363(f) of the Bankruptcy Code, and (b) approving the assumption by the Debtor and assignment to Buyer of Assumed Contracts (as defined below) pursuant to Section 365 of the Bankruptcy Code. Notwithstanding anything herein to the contrary, no lease,

sublease, or executory contract that has been rejected by the Debtor pursuant to an order of the Bankruptcy Court shall constitute an Assumed Contract or be assigned to Buyer. The Parties acknowledge that the Transaction is intended to receive the protections afforded by section 363(m) of the Bankruptcy Code. Upon entry of the Approval Order, the Parties shall proceed toward Closing as promptly as practicable unless a stay pending appeal is entered.

**1.2** **Bankruptcy Court Approval**.

**1.2.1** **Filing of Sale Motion**. Seller and Buyer acknowledge and agree that this Agreement and the Transaction contemplated hereby are subject to an auction and/or other opportunity for overbid by other parties and that Seller reserves the right to accept a superior bid, subject to the Package Bid Requirement set forth below. Seller will have this right until just prior to the hearing on the motion to be filed by Seller for approval of the Transaction. If Seller receives one or more qualified overbids, Seller will conduct an auction just prior to or at the hearing on the Sale Motion. Any competing bid or overbid must be for all five (5) Stores and all of the Purchased Assets as a single, integrated and indivisible package (the "**Package Bid Requirement**"). Seller shall not solicit, qualify, consider, accept or combine any bid for fewer than all five (5) Stores, for any individual Store or subset of Stores, or for any Purchased Assets severed from the five-Store package, and no such bid may be considered at any auction or approved as the Successful Bid. Following selection of the Successful Bidder, however, the Successful Bidder may exclude a Store materially damaged or destroyed before Closing and receive the applicable Store Allocation reduction, subject to the casualty provisions applicable to the Successful Bidder's purchase agreement. Each Qualified Bid shall provide that the Successful Bidder's obligation to acquire the five-Store package is subject to casualty provisions substantially consistent with Section 5.4. The Sale Motion, bid procedures and Approval Order shall expressly incorporate the Package Bid Requirement. Seller shall promptly confer with Buyer regarding any written objections filed with the Bankruptcy Court to the sale motion (the "**Sale Motion**") to be filed with the Bankruptcy Court.

**1.2.2** **Obligation to Seek Approval Order**. Subject to the right to receive qualified overbids, Seller shall use its reasonable best efforts to promptly obtain entry of the Approval Order. Any changes to the form of the Approval Order affecting the economic terms of the Transaction, or the closing conditions thereto, must be approved by Buyer and by Seller in its sole and absolute discretion. Any other changes to the form of the Approval Order must be approved by Buyer in its reasonable discretion and by Seller in its reasonable discretion. The Approval Order shall establish, among other things, that: (a) Seller is authorized to transfer to Buyer all interests of Seller in the Property free and clear of liens (as defined in Section 101(37) of the Bankruptcy Code, claims (as defined in Section 101(5) of the Bankruptcy Code, including without limitation claims for successor liability under any theory of law or equity), encumbrances, and interests of any nature whatsoever, to the fullest extent allowable under the Bankruptcy Code; (b) Seller is authorized to assume and assign the Assumed Contracts to Buyer pursuant to section 365 of the Bankruptcy Code. Seller shall keep Buyer reasonably informed regarding the status of its efforts to obtain entry of the Approval Order. The Approval Order shall also determine that Buyer is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and shall enjoin the assertion against Buyer or the Purchased Assets of any liability that is not expressly assumed by Buyer under this Agreement.

**1.3** **Cooperation in Bankruptcy Court Matters**. Buyer agrees that it will promptly take such actions as are reasonably requested by to assist in obtaining entry of the Approval Order. Such

actions shall, include, without limitation, the furnishing of affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement, including with regard to providing evidence of financial assurance, or other documents or information for filing with the Bankruptcy Court, and Buyer shall make its employees and representatives available to be interviewed by Seller's attorneys and to testify before the Bankruptcy Court and at depositions in connection with the foregoing, if necessary. Additionally, with regard to each of the Assumed Contracts, Buyer shall use commercially reasonable efforts to provide adequate assurance of Buyer's future performance as required by Section 365(b)(1)(C) of the Bankruptcy Code. If a written objection to the Sale Motion is filed that, if upheld, would prohibit or otherwise prevent the Closing (as defined below) from occurring pursuant to the terms of this Agreement, Seller and Buyer shall use commercially reasonable efforts to have such objection overruled.

ARTICLE 2

**PURCHASE AND SALE OF ASSETS; PURCHASE PRICE; DEPOSIT**

**2.1 Purchase and Sale of Property; Transfer of Assumed Contracts; Assumption of Liabilities**. Subject to the terms and conditions of this Agreement, including, without limitation, approval of the Bankruptcy Court, Seller hereby agrees to sell, transfer, assign, convey and deliver to Buyer, free and clear of liens, (as defined in Section 101(37) of the Bankruptcy Code, claims (as defined in Section 101(5) of the Bankruptcy Code, including without limitation claims for successor liability under any theory of law or equity), encumbrances, and interests pursuant to Section 363(f) of the Bankruptcy Code, and Buyer agrees to purchase, assume and accept from Seller, all of Seller's right, title and interest in and to the following (collectively, the "**Property**" or the "**Purchased Assets**"), AS-IS, WHERE IS, without any representation or warranty, express or implied, to the extent the same are the Property of the Debtor and located at a Store or used or held for use primarily in connection with the Stores or the Business, whether located at a Store, the Debtor's headquarters or another location:

(a) The real property leases to which Debtor is a party for the five (5) locations identified on Exhibit A hereto (the "**Leases**"), together with all rights to any lease or utility deposits and allowances due from landlords under any Leases;

(b) All machinery, equipment, tools, computers, information technology infrastructure (switches, routers, modems, etc.) fixtures, furniture, POS machines and transferable software, signs, smallwares, cooking utensils, and other personal property owned by the Debtor and used primarily in connection with the Stores, whether located at a Store, Debtor's headquarters or another location (exclusive of cash (other than Standbanks as defined below), checks, deposits, receivables, funds payable to Seller under pending credit and debit card transactions, bank accounts, and other cash equivalents). Seller shall provide Buyer a Store-by-Store schedule identifying, to Seller's knowledge and based solely on the Debtor's existing books and records, without independent investigation or verification, all material equipment, its location, and whether it is owned by Seller, leased, financed or, to Seller's knowledge, owned by a landlord, vendor, CKE or another third party, together with copies of the applicable agreements in Seller's possession, payment obligations, and Seller's good faith estimate of Cure Costs for any such agreement proposed to be assumed and assigned pursuant to Section 365 of the Bankruptcy Code, together with any transfer or consent requirements known to Seller. Seller shall deliver such schedule and copies of the applicable agreements in Seller's

possession no later than five (5) business days after the Execution Date and shall supplement such information as and when additional information becomes available to Seller through Closing. The schedule shall identify any material equipment that Seller believes cannot be transferred and Seller shall reasonably cooperate, at Buyer's sole cost and expense, with Buyer's efforts to obtain any required consent or to arrange for replacement or transition arrangements with respect thereto;

(c) All on-site usable inventories of food, paper, operating supplies, and new uniforms as of the Closing Date at the Stores (the "**Inventory**"), and further including all supplies, goods, finished goods, materials, raw materials, work in process, perishable inventory and operating stock in trade owned by Seller, whether or not prepaid, and wherever located, held or owned, including all fresh and frozen foodstuffs, beverages, disposable paper goods (such as napkins and paper towels), soaps and detergents, condiments, retail merchandise, replacement and spare parts and fuels and other similar items;

(d) Seller customarily maintains approximately Six Hundred Dollars ($600.00) in cash at each Store for operational and change-fund purposes (the "**Standbanks**"). The Standbanks shall remain property of Seller and shall not constitute Purchased Assets. To the extent any Standbanks or other cash are transferred to Buyer at Closing, the amount thereof shall be added to the Purchase Price as an adjustment payable by Buyer at Closing;

(e) All permits, licenses, authorizations, registrations, consents and approvals relating to the Stores and/or Business (collectively, the "**Permits**"), whether governmental or otherwise to the extent they are assignable or transferable in connection with the Transaction;

(f) All telephone numbers and attendant telephone systems, facsimile numbers, email addresses, etc. for the Stores;

(g) The executory contracts and unexpired equipment leases, if any, listed on Exhibit B hereto and the Leases for the Stores identified on Exhibit A (collectively, the "**Assumed Contracts**");

(h) Subject to applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court with respect to the retention of records, copies of all books and records of the Debtor relating to the Stores and/or Business, including Store-level financial and operational records, vendor information, equipment records, Permit records and, to the extent permitted by applicable law, employee information reasonably necessary for Buyer to evaluate and make offers of employment; provided, however, that the foregoing shall not include any corporate minute books, stock books or similar corporate records of any Debtor, nor, with respect to personnel records, any gratuitous, subjective or other information which Seller, in his discretion, determines that he may not disclose to Buyer under applicable law. Seller shall deliver Store-related data maintained in excluded software or at the Debtor's headquarters in a commercially reasonable and usable electronic format;

(i) Prepaid expenses, deposits, rebates, credits, refunds, returns, promotional allowances, rights of setoff or recoupment, and similar amounts attributable to the Purchased Assets (collectively, the "**Prepaid Expenses and Rebates**") shall be prorated as of the Closing Date and reflected as a purchase price adjustment in favor of Seller. Notwithstanding anything herein to the contrary, any tax refunds, tax attributes, employee retention credits, CARES Act credits, tariff refunds, governmental incentive payments, litigation recoveries, insurance recoveries, or similar

claims arising prior to the Closing Date shall constitute Excluded Property and shall remain property of Seller.

(j) The leasehold interest or right to purchase or acquire the equipment, machinery and other tangible personal property used at the Stores (collectively, **"Leased Equipment"**), including the items described on Exhibit C hereto. Seller shall identify, to Seller's knowledge and based solely on the Debtor's existing books and records, without independent investigation or verification, all Leased Equipment and the applicable owner, agreement, payment obligations, defaults, Seller's good faith estimate of Cure Costs for any such agreement proposed to be assumed and assigned pursuant to Section 365 of the Bankruptcy Code, together with any transfer or consent requirements known to Seller. At Closing, each item of material Leased Equipment shall be transferred to Buyer under an assigned agreement or a replacement arrangement acceptable to Buyer, unless Buyer otherwise agrees in writing;

(k) all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other person to the extent relating to equipment purchased, products sold, or services provided, to the Debtor for the Stores or to the extent affecting any Property and/or assumed liabilities;

(l) all of Debtor's goodwill associated with the Business or the Purchased Assets acquired hereunder;

(m) all of Seller's transferable rights, if any, under the gift-card and promotional programs administered by CKE or its applicable program administrator that relate to the operation of the Stores from and after Closing, including the right to receive directly from CKE or its program administrator any reimbursement, settlement amount, credit or other payment attributable to gift cards or promotional obligations honored by Buyer after Closing (collectively, the "**Gift Card Settlement Rights**"), together with all related Store-level account information, data and records reasonably necessary for Buyer to receive and administer the Gift Card Settlement Rights. Seller shall execute such notices, directions and other documents as are reasonably necessary to assign or direct the Gift Card Settlement Rights to Buyer as of Closing; provided that Buyer shall not receive a Purchase Price credit for outstanding gift cards or promotional obligations, and no related cash or proceeds shall be transferred by Seller;

(n) except for Excluded Property set forth in Section 2.2(b), all other assets of the Debtor utilized in connection with the operation of the Stores.

In addition to the foregoing, and as consideration for the Transaction, Buyer shall assume, pay, perform, satisfy and discharge (i) liabilities arising out of, incurred in connection with or related to the ownership of the Property and operation of the Business solely to the extent arising from acts taken or omissions made from and after the Closing Date or related to the period from and after the Closing Date and (ii) those liabilities specifically identified by type, obligee, amount and applicable Store on Exhibit D hereto, if any (collectively, the "**Assumed Liabilities**"). Buyer shall not assume any liability arising from a pre-Closing breach, default, act, omission, operation or period, except to the extent expressly identified and approved on Exhibit D. For avoidance of doubt, the Parties expressly acknowledge that Buyer is not a joint-employer and has no joint-employment relationship with Seller, such that consequently, Buyer shall not be liable for any pre-Closing employment-related

claims under federal, state, local or common law theories of recovery brought by any Business employee as further detailed in Section 7.19.

**2.2 Assumption/Assignment of Contracts and Rights.**

(a) To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts shall be assumed by Seller and assigned to Buyer (or such affiliate of Buyer as Buyer may designate) at the Closing pursuant to Section 365 of the Bankruptcy Code. Buyer shall have the right, by written notice delivered before entry of the Approval Order, to designate the Leases and other contracts to be included as Assumed Contracts and to remove any Lease or other contract from the Assumed Contracts. Seller shall have sole responsibility for paying all amounts and costs due required to cure defaults and obtain the assumption and assignment of the Assumed Contracts (collectively, "**Cure Costs**"). Seller shall not reject, terminate, materially amend, surrender or otherwise impair an Assumed Contract without Buyer's prior written consent. Neither Buyer nor any direct or indirect owner, manager, affiliate or designee of Buyer shall be required to provide a personal guaranty or accept any material amendment, increased security deposit or other new obligation not approved by Buyer. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Property or any right thereunder if such attempted assignment would not be permitted under Sections 363 or 365 of the Bankruptcy Code and a third party objects to the assignment and it is determined by the Bankruptcy Court that the Seller is incapable as a matter of law of assigning that particular asset. If applicable counterparty consent is not obtained or such assignment is not permitted pursuant to Sections 363 and/or 365 of the Bankruptcy Code as set forth in the preceding sentence, then such assets shall not be transferred hereunder; provided that assignment of the Leases, franchise agreements and other material Assumed Contracts designated by Buyer and necessary to operate the Stores, on terms acceptable to Buyer and without any personal guaranty or other material new obligation not approved by Buyer, shall be a condition to Buyer's obligation to close. If such condition is not satisfied or waived by Buyer, Buyer may terminate this Agreement and receive an immediate return of the Good Faith Deposit.

(b) **Excluded Property**. Notwithstanding anything to the contrary contained in Section 2.1 or 2.2 above or elsewhere in this Agreement, the Property does not include, Buyer shall not acquire (nor assume any liability related to), and Seller shall retain all right, title and interest in and to the following (collectively, "**Excluded Property**"):

(b) Any personal property owned by the Debtor that is not located on the premises of any Store and is not used or held for use primarily in connection with the Stores or the Business;.

(c) All financial information, books or records and corporate minute books, corporate seals, stock books, charter documents and other corporate books and records pertaining to the existence and organization of the Debtor;

(d) Except to the extent described in Section 2.1(h), assets located in the Debtor's corporate headquarters in La Palma, California that are used exclusively for corporate-level functions and are not used primarily in connection with the Stores or the Business;

(e) Cash (other than Standbanks), checks, accounts and notes receivable, investments, and other cash equivalents;

(f) Prepaid Expenses and Rebates, except for those Prepaid Expenses and Rebates specifically identified on Exhibit E hereto, if any, that are to be acquired by Buyer;

(g) All bank and investment accounts maintained by or for any Debtor;

(h) All rights of each Debtor in, to and under any and all contracts or agreements of any nature for which the obligations of the Debtor party thereto are not expressly assumed by Buyer pursuant to Section 2.2 above, including such Leased Equipment and Permits relating to the Stores or the Business that by their terms are nontransferable or not assignable, unless designated by Buyer as an Assumed Contract; provided that Seller shall not elect not to seek, or fail to seek, any required consent or approval for an Assumed Contract designated by Buyer;

(i) All claims, rights, proceeds or recoveries arising out of any actual, pending, threatened or potential litigation or cause of action to which any Debtor is, or may in the future be, a party;

(j) Any software utilized by the Debtor at the headquarters location described in paragraph (c) of this Section 2.2(b) above, excluding any transferable software used primarily in connection with the Stores and any Store-related data, records, reports, files, configurations or other information maintained in or generated by such software, copies or exports of which shall be delivered to Buyer in a commercially reasonable and usable electronic format;

(k) All rights, claims, refunds, adjustments, recoveries, payments from, and/or proceeds of any insurance policies; provided that this exclusion shall not apply to any insurance proceeds, rights or claims required to be assigned, delivered or credited to Buyer under Section 5.4;

(l) All preference or avoidance claims and actions of Seller or Debtor, and all defenses to claims asserted against the Seller or Debtor and not expressly assumed by Buyer, including, without limitation, any such claims, actions and defenses arising under Sections 502, 510, 544, 545, 547, 548, 549, 550 and/or 553(b) of the Bankruptcy Code;

(m) Any rights to refunds for taxes and assessments, of any kind whatsoever, paid on or with respect to the Property and/or the Business and attributable to any period prior to the Closing Date, or with respect to any Excluded Property;

(n) Any and all claims, credits, refunds, abatements, allocations, causes of action, claims for relief, choses in action, rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Seller or Debtor to the extent related to any Excluded Property or attributable to any period prior to the Closing Date (excluding Prepaid Expenses and Rebates expressly identified on Exhibit E hereto);

(o) All rights of Seller under this Agreement and all other agreements entered into pursuant to, and instruments executed in connection with, this Agreement or the Transaction contemplated hereby;

(p) The assets specifically identified on Exhibit F and approved in writing by Buyer; provided that no asset shall be excluded solely because it is not located at a Store, and no material asset used primarily in connection with the Stores shall be excluded unless specifically identified on Exhibit F and approved by Buyer;

(q) all employee benefit plans (and any assets and liabilities that are part of or arise under such employee benefit plans) unless they are included as assigned contracts;

(q) all amounts owed to Debtor by any one or more of Debtor's Affiliates;

(r) all debts, taxes and liabilities of the Seller or the Debtor, unless expressly assumed hereunder;

(s) any liabilities to any Business employee or former Business employee under any employment or other agreement, including but not limited to any liability of the Debtor to indemnify or advance expenses to any director, officer, employee, agent, or authorized representative arising out of or in connection with any act or omission occurring prior to the Closing, and liabilities under any pension, profit sharing, savings, retirement, health, medical, life, disability, dental, deferred compensation, stock option, bonus, incentive, severance pay, group insurance or other similar employee plans or arrangements, or under any policies, handbooks, or custom or practice, collective bargaining agreement, or any employment agreements, whether express or implied, applicable to any such employees at any time through and including the Closing Date;

(t) any liability of Seller or the Debtor not related to the Business;

(u) any of the costs and expenses incurred by the Seller or the Debtor in connection with the liquidation or dissolution thereof;

(v) any liability for fees and expenses incurred by Sellers or the Debtor in connection with the negotiation of this Agreement of the consummation of the Transaction;

(w) receivables from credit card processors and all other accounts receivable (together with any claims against third parties related to the collectability thereof), in each case arising from sales made, services provided or operations conducted before Closing; provided that any amounts received by Seller that are attributable to sales made, services provided or operations conducted by Buyer from and after Closing shall be remitted to Buyer in accordance with Section 7.1.1, provided that the Gift Card Settlement Rights described in Section 2.1(m) shall constitute Purchased Assets and shall not constitute Excluded Property;

(x) any liabilities of any kind first arising or existing on or prior to the Closing Date, including but not limited to: (i) liabilities arising from illegal, fraudulent or negligent acts of any of the Seller or the Debtor or any of their respective directors, officers, agents, or employees; (ii) liabilities imposed on the Sellers by any governmental authority related to the conduct of the Business prior to the Closing; and (iii) liabilities arising out of the breach by the Sellers or Debtor of any provision set forth in any assumed contract and vendor-related claims for services or products provided prior to the Closing Date; (iv) all employment-related and workers' compensation liabilities retained by Seller or the Debtor pursuant to Section 7.19, including Sections 7.19.1 and 7.19.2; and

(v) any liability arising out of a suit, claim or cause of action relating to any act, omission, event or period occurring on or before Closing; and

(y) Notwithstanding anything herein to the contrary, no personnel files, employee records, payroll records, employment agreements, restrictive covenant agreements, confidentiality agreements, non-competition agreements, non-solicitation agreements, or other employee-related records shall constitute Purchased Assets, provided that Seller shall deliver to Buyer, to the extent permitted by applicable law, copies of the employee information and records reasonably necessary for Buyer to evaluate and make offers of employment, administer any employees hired by Buyer and evaluate employment-related liabilities, as contemplated by Sections 2.1(h) and 7.19. The Parties acknowledge that employees of Seller will be terminated by Seller on or before Closing and may be offered employment by Buyer pursuant to separate arrangements determined by Buyer in its sole discretion. Any employee offered employment by Buyer shall be employed pursuant to a new and separate employment relationship commencing on the date such employee begins employment with Buyer. Neither Buyer's offer or employment of any such employee nor any other provision of this Agreement shall constitute an assumption by Buyer of any liability, claim or obligation arising out of or relating to such employee's employment by Seller or the Debtor or the termination thereof, all of which shall remain liabilities of Seller and the Debtor.

**2.3** **Purchase Price; Good Faith Deposit**. The purchase price for the Property, excluding the Inventory and Standbanks, shall be Four Hundred Fifty Thousand Dollars ($450,000) (the "**Base Purchase Price**"), subject to adjustment in accordance with this Section and Section 5.4 (if applicable). Buyer shall acquire all five (5) Stores for the Base Purchase Price as one integrated and indivisible package, and the Closing shall occur with respect to all five (5) Stores concurrently, except that Buyer may exclude a Store materially damaged or destroyed before Closing as expressly provided in Section 5.4. The Base Purchase Price is allocated among the Stores as set forth on Schedule 2.4 (each, a "**Store Allocation**"). The Store Allocations shall be used in determining any casualty-related Purchase Price adjustment under Section 5.4 and in preparing the Allocation Statement under Section 2.3.4. Except for an exclusion arising under Section 5.4, no Store Allocation shall constitute a separate purchase price or permit Buyer or any competing bidder to acquire fewer than all five (5) Stores. Buyer shall receive all other credits and adjustments expressly provided in this Agreement, including credits for Cure Costs or other pre-Closing liabilities paid or assumed by Buyer. In addition, Buyer shall purchase the cash belonging to the Debtor from the Standbanks ("Standbank Cash") at face value on the Closing Date and shall purchase the usable Inventory based on Seller's actual third-party invoices for Inventory delivered to the Stores, subject to Buyer's review. Seller shall provide Buyer copies of the applicable third-party Inventory invoices no later than three (3) business days before Closing. Immediately prior to the Closing Date, Seller and Buyer shall take a physical inventory of all Inventory for the purpose of determining the price of the Inventory. The Base Purchase Price, as adjusted under this Agreement, inclusive of the Inventory and Standbank Cash, is referred to as the "Purchase Price." The Purchase Price shall be payable as follows:

**2.3.1** *Good Faith Deposit*. Within two (2) business days after (i) this Agreement has been fully executed by all Parties, (ii) Buyer has received a complete copy of the fully executed Agreement, and (iii) the fully executed Agreement has been delivered to East West Bank and escrow has been opened for the Transaction, Buyer shall deposit with East West Bank, the escrow agent for the Transaction, an aggregate amount equal to Fifty Thousand Dollars ($50,000) included in such Bid

(the "**Good Faith Deposit**"). The failure to timely pay the Good Faith Deposit after satisfaction of the foregoing conditions shall render this Agreement of no further force or effect.

If a qualified overbid satisfying the Package Bid Requirement is received, Buyer shall be designated as a Backup Bidder only with Buyer's written consent. Any backup bid shall expire ten (10) business days after the auction or on the Outside Date, whichever occurs first. The Good Faith Deposit shall be returned to Buyer within two (2) business days after expiration of the backup period, Seller's release of Buyer or the closing of a transaction with another bidder.

Buyer will be entitled to an immediate refund of the Good Faith Deposit if Buyer is not selected as the Successful Bidder or does not consent to serve as a Backup Bidder, if Buyer validly terminates this Agreement, or if any condition to Buyer's obligation to close is not satisfied or waived by Buyer, including the required CKE approval, assignment of the designated Leases and material contracts, or entry of the required Approval Order.

**2.3.2** *Payment of Purchase Price*. The Purchase Price shall be paid to Seller at Closing, as follows:

(a) *Application of Good Faith Deposit*. On the Closing Date, Seller and Buyer shall submit joint written instructions to the Escrow Agent directing the Escrow Agent to release the Good Faith Deposit to Seller, and the Good Faith Deposit shall be credited against the Purchase Price, as reduced by the applicable Store Allocation for any Store excluded pursuant to Section 5.4. If the Closing does not occur and Buyer is entitled to the return of the Good Faith Deposit pursuant to Section 2.3.1 or any other provision of this Agreement, Seller and Buyer shall promptly submit joint written instructions directing the Escrow Agent to return the Good Faith Deposit to Buyer. Nothing in this Section 2.3.2(a) limits Buyer's right to the return of the Good Faith Deposit under this Agreement.

(b) *Balance of Purchase Price*. On or before 4:00 p.m. (prevailing Pacific Time) on the Closing Date, Buyer shall pay the balance of the Purchase Price (after crediting the amount of the Good Faith Deposit) in cash, wire transfer or certified funds to Seller in accordance with Seller's instructions.

**2.3.3** *Stalking Horse Protections*. Subject to Bankruptcy Court approval, if Buyer is not the Successful Bidder for the five-Store package, then in consideration of Buyer's efforts in negotiating this Agreement, conducting diligence, establishing a baseline bid for the Purchased Assets, and facilitating a competitive sale process, Buyer shall be entitled to (i) a break-up fee in the amount of Thirteen Thousand Five Hundred Dollars ($13,500) (the "**Break-Up Fee**"), and (ii) reimbursement of Buyer's reasonable, documented out-of-pocket transaction expenses incurred in connection with the sale of the Stores up to Thirty Thousand Dollars ($30,000), in each case payable from the proceeds of such sale and constituting an allowed administrative expense of the Debtor's estates. Any competing bid must satisfy the Package Bid Requirement, exceed the Base Purchase Price by at least the Break-Up Fee, expense reimbursement and an additional bidding increment established in the bid procedures, and include evidence of the bidder's financial ability and adequate assurance of future performance with respect to all five (5) Stores. The bid procedures shall specify the qualifying-bid requirements, initial overbid, subsequent bidding increments and backup-bid period and shall prohibit any bid, auction lot, sale or combination of bids that does not satisfy the Package Bid Requirement.

**2.3.4** *Allocation of Purchase Price*. Within sixty (60) days after Closing, Buyer shall prepare and deliver to Seller a proposed statement (the "**Allocation Statement**") allocating the Purchase Price (together with the Assumed Liabilities) among the Purchased Assets in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local tax law) or any successor provision. The Store Allocations set forth on Schedule 2.4 shall be taken into account in preparing the Allocation Statement. Seller shall have twenty (20) business days after receipt of the proposed Allocation Statement to deliver written notice to Buyer identifying each disputed item and stating in reasonable detail the basis for Seller's objection and Seller's proposed alternative allocation. Any item not specifically disputed in such notice shall be final and binding upon the Parties. If Seller does not timely deliver an objection notice, the proposed Allocation Statement shall be deemed accepted and shall be final and binding upon the Parties. Buyer and Seller shall use commercially reasonable efforts to resolve any disputed items within fifteen (15) business days after Buyer receives Seller's objection notice. If the Parties are able to agree upon the allocation of the Purchase Price, Buyer and Seller shall report and file all tax returns consistent with such mutually agreed Purchase Price allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or other proceedings). Buyer and Seller shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules, including any required amendments to such forms, consistently with the final Allocation Statement and shall not take any position inconsistent with it in any tax return, audit, examination or other proceeding, except as required by a final determination of a taxing authority. Any adjustment to the Purchase Price or Assumed Liabilities after the Allocation Statement becomes final shall be allocated in a manner consistent with the final Allocation Statement. The preparation or resolution of the Allocation Statement shall not delay or constitute a condition to Closing. Notwithstanding any other provisions of this Agreement, if the Parties mutually agree on the allocation or the Purchase Price, Buyer and Seller's obligations under this Section shall survive Closing.

## ARTICLE 3

## CLOSING

**3.1** Closing Date and Place. Each Party shall perform all acts required of such Party pursuant to this Agreement to enable the Closing (as defined in Section 3.2 hereof) to occur as soon as reasonably practicable following entry of the Approval Order and satisfaction or waiver of the conditions to Closing set forth herein, unless otherwise ordered by the Bankruptcy Court. The Parties acknowledge and agree that the Transaction is intended to close promptly following entry of the Approval Order and shall not be delayed absent the entry of a stay pending appeal by a court of competent jurisdiction. The Closing shall take place at the offices of the Escrow Agent or such other place as may be agreed upon by Buyer and Seller in writing or ordered by the Bankruptcy Court. As used in this Agreement, "Closing Date" means the date upon which the Closing occurs. The Parties shall use their best efforts to cause the Closing Date to occur promptly following entry of the Approval Order, but in no event later than October 29, 2026 (the "**Outside Date**").

**3.2** **Closing**. The "**Closing**" means the occurrence of all of the following events, which the Parties shall cause to occur concurrently pursuant to this Agreement:

(a) Seller has delivered to Buyer a certified copy of the Approval Order. The Parties acknowledge that the Transaction is intended to receive the protections afforded by section 363(m) of the Bankruptcy Code and to close promptly following entry of the Approval Order. Accordingly, absent the entry of a stay pending appeal by a court of competent jurisdiction, the existence of an appeal shall not delay or prevent the Closing, and the Parties shall proceed with consummation of the Transaction in accordance with the Approval Order and this Agreement;

(b) Seller has executed and delivered to Buyer a Bill of Sale in substantially the form attached as Exhibit G hereto, together with an affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code stating that Seller is not a foreign person as defined in Section 1445 of the Code;

(c) Each Party has executed and delivered to the other Party two (2) counterparts to the Assignment and Assumption Agreement in substantially the form attached as Exhibit H hereto;

(d) Seller has received, by bank wire transfer of immediately funds, to the bank account(s) designated by Seller, the Good Faith Deposit from the Escrow Agent;

(e) Buyer has paid to Seller by bank wire transfer of immediately available funds, to the bank account(s) designated by Seller, an amount equal to the balance of the Purchase Price (after crediting the amount of the Good Faith Deposit);

(f) Buyer has previously delivered to Seller a certificate of good standing and evidence reasonably satisfactory to Seller demonstrating Buyer's authority to enter into this Agreement and consummate the Transaction contemplated hereby.

(g) Buyer has paid any and all escrow fees and costs of the Escrow Agent;

(h) The representations of each Party contained in Article 4 hereof are true and correct at and as of the Closing Date with the same effect as though made at and as of the Closing Date;

(i) Each Party has duly performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by such Party;

(j) Neither Party shall have terminated this Agreement pursuant to Section 6.1 hereof; and

3.3. **Conditions To Obligations Of The Buyer**. The obligation of the Buyer to consummate the Transaction is subject to the fulfillment of the following conditions precedent, each of which may be waived in writing in the sole discretion of the Buyer (unless other specified, these conditions must be fulfilled on or before the Closing Date):

3.3.1 *Truth of Representations and Warranties of the Seller; Compliance with Covenants and Obligations*. The representations and warranties of the Seller contained in this Agreement and any Exhibit or Schedule attached hereto shall be true and correct in all respects both as of the Effective Date and as of the Closing Date as though such representations and warranties were made on and as of such date, except for any changes consented to in writing by the Buyer and

the Buyer shall have received from the Seller a certificate to such effect. The Seller shall have performed and complied with all terms, conditions, covenants, obligations, agreements and restrictions required by this Agreement to be performed or complied with by him prior to or at the Closing Date.

3.3.2 *Consents*. The Leases and other material contracts designated by Buyer and necessary to operate the Stores shall have been assumed and assigned to Buyer or its designee on terms acceptable to Buyer, all applicable Cure Costs and pre-Closing defaults shall have been paid or cured by Seller, and no personal guaranty or other material new obligation not approved by Buyer shall be required from Buyer or any owner, manager, affiliate or designee.

3.3.3 *Adverse Proceedings*. Except for the Debtor's filing of its Chapter 11 bankruptcy proceedings, there shall be no other Proceeding by or before any Governmental Authority that has been instituted or threatened by any Governmental Authority or Person whatsoever which seeks to restrain, prohibit or invalidate the Transaction or which is likely to affect the right of the Buyer to own or use the Purchased Assets after the Closing Date.

3.3.4 *Franchisor Approval*. Buyer shall have received final written approval from Carl's Jr. Restaurants LLC and its affiliates (collectively, "**CKE**") to acquire and operate each Store, and Buyer or its applicable designee shall have entered or have agreed to enter into the applicable franchise and related agreements on terms acceptable to Buyer and CKE. Any CKE right of first refusal, designation right or similar right shall have expired or been waived. Seller shall seek, to the fullest extent legally available, Bankruptcy Court authorization providing that the existing franchise agreements may not be terminated solely because of the bankruptcy or the Transaction and authorizing their assumption and assignment under Section 365 of the Bankruptcy Code. Failure of this condition shall permit Buyer to terminate this Agreement and receive an immediate return of the Good Faith Deposit.

3.3.5 *Filing of Motion for Sale*. The transaction contemplated by this agreement requires the Seller to file a motion for sale under the provisions of 11 U.S.C. §363, Rule 2002 and Rule 6004 of the Rules of Bankruptcy Procedures. Seller shall further attempt to close as soon as possible.

3.3.6. *Approval Order*. The Approval Order shall have been entered, shall not have been stayed and shall contain the protections required by Sections 1.1 and 1.2.2 and otherwise be in form and substance reasonably acceptable to Buyer.

3.3.7 *Complete Schedules*. Seller shall have delivered substantially complete and accurate Exhibits B through F, together with the supporting agreements and information required by Sections 2.1 and 2.2, sufficiently before Closing to permit Buyer's review. No Assumed Liability or asset identified on Exhibit F as an Excluded Property shall bind Buyer unless expressly approved by Buyer in writing.

ARTICLE 4

**REPRESENTATIONS**

**4.1** **Representations of Seller**. Seller hereby makes the following representations and warranties ("**Seller's Representations**") to Buyer. For purposes of the following representations and warranties, "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known by the following individuals after due inquiry:

**4.1.1** *Legal Capacity of Seller; Litigation; Permits; Etc*.

(a) Subject to the requirement of Bankruptcy Court approval of the Transaction, the Seller has the authority to own, lease and operate the Debtor's properties, including the Purchased Assets, and to carry on the Business as now being conducted. Subject to the requirement of Bankruptcy Court approval, the Seller has authority to enter into this Agreement on behalf of the Debtor.

(b) To the actual knowledge of Seller, Debtor is in material compliance with the terms and requirements of each Permit required to conduct and operate the Business in a manner consistent with the current practices of Debtor and no written notice of violation of any Permit has been received from any Governmental Authority and, to the Knowledge of Seller no proceeding is pending seeking to revoke or limit any such Permit.

(c) To the actual knowledge of Seller, Seller will have at Closing good and marketable title to, or a valid leasehold interest in, all of the Purchased Assets. Upon consummation of the transactions contemplated hereby at the Closing, Buyer will have acquired good, valid and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens (other than those liabilities that are expressly assumed) to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code. The Purchased Assets (which, for the avoidance of doubt, do not include Excluded Property) constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used (to the extent the Debtor holds rights, title and interest in such tangible personal property) or held for use by Seller, or otherwise necessary for Buyer to conduct and operate the Business (assuming that the Purchased Assets include all assets that the Buyer has the right to acquire under this Agreement) immediately after the Closing in all material respects as conducted and operated by Seller as presently conducted.

**4.1.2** *Brokers and Finders*. Except for Seller's Sales Agent, National Franchise Sales, Inc., whose fees will be paid from Seller's proceeds, Seller has not retained any broker or finder in connection with the Transaction so as to give rise to any valid claim against Buyer for any brokerage or finder's commission, fee or similar compensation.

**4.1.3** *Anti-Terrorism Laws*. Seller represents and warrants to Buyer that Seller is not, and will not be, a person or entity with whom Buyer is restricted from doing business under the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107-56 (commonly known as the "USA Patriot Act") and Executive Order Number 13224 on Terrorism Financing, effective September 24,

2001, and regulations promulgated pursuant thereto, including, without limitation, persons and entities named on the Office of Foreign Asset Control Specially Designated Nationals and Blocked Persons List (collectively, **"Anti-Terrorism Laws"**).

**4.1.4** *No Other Representations*. Seller makes no representation or warranty, express or implied, to Buyer, and hereby disclaims any representation or warranty, express or implied, with respect to the Business, the Property, the Stores or any other matter, including any representation or warranty as to merchantability, fitness for a particular purpose or future results, other than as expressly set forth in this Section 4.1. **EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 4.1 OF THIS AGREEMENT OR IN ANY CONVEYANCE DOCUMENTS EXECUTED AND DELIVERED BY SELLER, SELLER DISCLAIMS THE MAKING OF ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE ASSETS OR MATTERS AFFECTING THE ASSETS, INCLUDING THE BOUNDARIES OF THE LAND, THE FINANCIAL OR OTHER PERFORMANCE AT THE RESTAURANTS AFTER THE CLOSING, THE PHYSICAL CONDITION OF THE ASSETS OR THE RESTAURANTS (INCLUDING THE CONDITION OF THE BUILDING STRUCTURE, THE ROOF, THE ELECTRICAL, PLUMBING, AND HVAC SYSTEMS, OR THE FURNISHINGS, FIXTURES AND EQUIPMENT), PEST CONTROL MATTERS, SOIL CONDITION, HAZARDOUS WASTE, TOXIC SUBSTANCE, OR OTHER ENVIRONMENTAL MATTERS, COMPLIANCE WITH BUILDING, HEALTH, SAFETY, LAND USE, AND ZONING LAWS, REGULATIONS AND ORDERS, STRUCTURAL AND OTHER ENGINEERING CHARACTERISTICS, TRAFFIC PATTERNS, ECONOMIC PROJECTIONS, FINANCIAL DATA, EMPLOYMENT PRACTICES AND ALL OTHER INFORMATION PERTAINING TO THE ASSETS. BUYER, MOREOVER, ACKNOWLEDGES (1) THAT BUYER HAS ENTERED INTO THIS AGREEMENT WITH THE INTENTION OF MAKING AND RELYING UPON ITS OWN INVESTIGATION OF THE PHYSICAL, ENVIRONMENTAL, ECONOMIC, AND LEGAL CONDITION OF THE ASSETS AND (2) THAT BUYER IS NOT RELYING UPON ANY STATEMENTS, INFORMATION, REPORTS, REPRESENTATIONS, OR WARRANTIES OTHER THAN THOSE SPECIFICALLY SET FORTH IN SECTION 4.1 OF THIS AGREEMENT OR IN ANY CONVEYANCE DOCUMENTS EXECUTED AND DELIVERED BY SELLER, MADE BY SELLER OR ANYONE ACTING OR CLAIMING TO ACT ON SELLER'S BEHALF CONCERNING THE ASSETS, INCLUDING THE RESTAURANT EMPLOYEES OR CONTAINED IN ANY COPIES OF MANAGEMENT PERSONNEL DATA PROVIDED TO BUYER WITH RESPECT TO THE RESTAURANT EMPLOYEES. BUYER FURTHER ACKNOWLEDGES THAT IT HAS NOT RECEIVED FROM SELLER ANY ACCOUNTING, TAX, LEGAL, ARCHITECTURAL, ENGINEERING, PROPERTY MANAGEMENT, OR OTHER ADVICE WITH RESPECT TO THIS TRANSACTION AND IS RELYING SOLELY UPON THE ADVICE OF ITS OWN ACCOUNTING, TAX, LEGAL, ARCHITECTURAL, ENGINEERING, PROPERTY MANAGEMENT, AND OTHER ADVISORS. SUBJECT TO THE PROVISIONS OF SECTION 4.1 OF THIS AGREEMENT AND ANY CONVEYANCE DOCUMENT EXECUTED AND DELIVERED BY SELLER, BUYER WILL PURCHASE THE ASSETS IN THEIR "AS IS", "WHERE-IS" AND "WITH-ALL FAULTS" CONDITION ON THE CLOSING DATE WITHOUT ANY WARRANTIES, WHETHER EXPRESS OR IMPLIED (INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE) AND ASSUMES THE RISK THAT ADVERSE PHYSICAL,**

**ENVIRONMENTAL, ECONOMIC, OR LEGAL CONDITIONS MAY NOT HAVE BEEN REVEALED BY ITS INVESTIGATION**. Notwithstanding the foregoing, nothing in this Section 4.1.4 shall limit or modify Seller's express representations, warranties, covenants or obligations under this Agreement; Buyer's closing conditions or termination rights; the allocation of Assumed Liabilities and liabilities retained by Seller; the protections required under the Approval Order; or any claim based upon fraud, intentional misrepresentation, willful misconduct or deliberate concealment.

**4.2 Representations of Buyer**. Buyer hereby makes the following representations and warranties ("**Buyer's Representations**") to Seller:

**4.2.1** *Buyer's Status*. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California.

**4.2.2** *Legal Capacity of Buyer*. (a) Buyer has the requisite power, authority, and legal capacity to make, execute, enter into, and deliver this Agreement and to perform its obligations under this Agreement, (b) any person executing and delivering this Agreement on behalf of Buyer is duly authorized to do so; and (c) neither this Agreement nor the performance by Buyer of any obligation of Buyer under this Agreement will violate any provision of any article, by-law, operating agreement or partnership agreement of Buyer or any contract, covenant, agreement, condition, restriction, injunction or order by which Buyer is bound.

**4.2.3** *Consents*. Except for the entry of the Approval Order and the conditions set forth in a Sale Procedures Order that may be entered by the Bankruptcy Court, the CKE approval contemplated by Section 3.3.4 and the other consents, approvals and assignments contemplated by Sections 2.2 and 3.3, no consent, approval, authorization, permit, order, filing, registration or qualification of or with any court, governmental authority or third person is required to be obtained by Buyer in connection with the execution and delivery by Buyer of this Agreement or the consummation by Buyer of the Transaction.

**4.2.4** *Brokers and Finders*. Buyer has not retained any broker or finder in connection with the Transaction so as to give rise to any valid claim against Seller for any brokerage or finder's commission, fee or similar compensation.

**4.2.5** *Terms of Sale; Investigation*. Buyer has made such investigation as it has deemed appropriate in connection with the decision to enter into this Agreement. Buyer has had the opportunity to inspect the Property, visit with Seller and meet with Seller's representatives to discuss the Business. Buyer is relying on the results of such investigation and the advice of its own advisors and has not relied upon any statement or representation made by Seller or any director, officer, employee, agent, attorney, accountant, or affiliate thereof, other than the covenants, representations and warranties of Seller set forth in this Agreement. Seller makes no representations or warranties, express or implied, of any kind concerning the past, present or future profitability or viability of the Stores or the Business, except as expressly set forth in this Agreement. Buyer acknowledges that EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH IN THIS AGREEMENT, BUYER WILL ACCEPT THE PROPERTY AND THE ASSUMED LIABILITIES AT THE CLOSING "AS-IS, WHERE-IS" AND "WITH ALL FAULTS" WITHOUT ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED.

**4.2.6** *Anti-Terrorism Laws*. Buyer represents and warrants to Seller that Buyer is not, and will not be, a person or entity with whom Seller is restricted from doing business under any Anti-Terrorism Laws. The sources of all cash used in connection with the Transaction will be fully disclosed to Seller and the Bankruptcy Court prior to Closing, including any and all funds provided by a foreign national individual or entity of any country other than the United States of America.

## ARTICLE 5

## OTHER OBLIGATIONS PENDING CLOSING

**5.1** **Conduct of Business**. Except as otherwise specifically permitted or required by this Agreement or ordered by the Bankruptcy Court, Seller will continue to operate the Stores in the ordinary course through Closing, maintain customary staffing and Inventory levels, preserve the Purchased Assets, Permits, Leases and material contracts, and perform required maintenance. Seller shall not close or materially curtail operations at a Store without Buyer's prior written consent, except temporarily in response to an immediate health or safety emergency, in which case Seller shall promptly notify Buyer and diligently restore operations.

**5.2** **No Inconsistent Actions**. Following the Execution Date, neither Buyer nor Seller will take any action inconsistent with this Agreement pending either the Closing or the termination of this Agreement pursuant to Article 6 hereof.

**5.3** **Third-Party Consents**. Following the Execution Date, Seller and Buyer shall use commercially reasonable efforts to obtain consents and approvals from third parties (as necessary) for the assignment of the Assumed Contracts and transfer of other Property designated by Buyer for transfer or assignment under this Agreement**.** Seller shall timely seek all consents and approvals required for the assumption and assignment of the Leases and other Assumed Contracts designated by Buyer and shall keep Buyer reasonably informed regarding the status of those efforts.

**5.4** **Casualty Loss**. If, prior to Closing, any Store or material Purchased Asset is materially damaged or destroyed, Seller shall promptly notify Buyer and provide available information regarding the damage, estimated restoration cost, insurance coverage and anticipated operational impact. Buyer may elect either (a) to acquire the affected Store and receive an assignment of the applicable insurance proceeds and credits for Seller's deductible and any uninsured repair, restoration or replacement costs, or (b) not to acquire the affected Store and reduce the Purchase Price by the applicable Store Allocation. The Closing Date and Outside Date shall be extended as reasonably necessary for Buyer to evaluate the casualty. Buyer's failure to respond within a specified period shall not constitute a deemed election. Notwithstanding anything in this Agreement to the contrary, the insurance proceeds to be credited or delivered to Buyer pursuant to this Section 5.4 (if applicable) will exclude business interruption or rental loss insurance proceeds, if any, allocable to the period through the Closing Date, which proceeds will be retained by Seller. An exclusion under this Section shall constitute the sole exception to the requirement that the five Stores be acquired as an integrated package and shall not prevent the Closing from occurring with respect to the remaining Stores.

**5.5.** **Certain Restricted Conduct**. Except (i) as set forth on Schedule 5.2; (ii) as otherwise set forth in this Agreement; (iii) as Buyer shall otherwise consent in advance in writing, or (iv) as

authorized by the Bankruptcy Court in connection with the sale of the Seller's assets, during the period from the date of this Agreement to the Closing, Seller shall not, with respect to the Purchased Assets:

(a) sell, lease, license, transfer, or dispose of other than in the ordinary course of business any Purchased Assets;

(b) authorize or enter into any contract, arrangement, or commitment other than a contract that is in the ordinary course of business;

(c) other than in the ordinary course, authorize, undertake, make, or enter into any commitments obligating Seller to (i) make or accelerate any capital expenditures or (ii) undertake or approve any material renovation or rehabilitation of any leased real property;

(d) (i) increase any compensation payable to or to become payable to, or enter into or amend any employment, severance or other agreement with, any of Seller's officers, directors or salaried employees, (ii) increase any compensation payable to or to become payable by Seller to any other employee of Seller, except in the ordinary course of business, (iii) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any officer, director or employee, (iv) create or adopt any new employee benefit plan or amend or terminate or increase the coverage or benefits available under any existing Employee Benefit Plan, (v) hire any employee or individual independent contractor with annual compensation in excess of $100,000 (except to the extent such hire is in replacement of an existing employee with comparable compensation), or enter into any employment, severance, deferred compensation, consulting, non-competition or similar agreements to which Seller is a party or involving a director, officer, employee or independent contractor of Seller, or (vi) assume, enter into, modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization relating to the Business, any employee, or any Purchased Asset;

(e) permit, offer, agree or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any lien, except for liens already existing prior to the date of this Agreement and liens granted before a Closing in connection with any debtor-in-possession financing facility agreement or order, and/or cash collateral agreement;

(f) do any other act that would, to the knowledge of seller, cause any representation or warranty of Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect;

(g) acquire any material properties or assets that would be Purchased Assets or sell, assign, transfer, convey, lease or otherwise dispose of any Purchased Assets (except acquisitions of inventory, equipment and similar assets in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets);

(h) cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes a Purchased Asset;

(i) transfer, to the extent that following such transfer such amounts would be treated as Excluded Property, any security deposits, prepaid rentals, unbilled charges, fees, deposits or, other than in the ordinary course of business, cash, cash equivalents or negotiable instruments, in each case constituting Purchased Assets;

(j) conduct, outside the ordinary course of business, any promotion between execution of this Agreement and the Closing Date on gift card sales, coupons or rebates or conduct any other promotion that would have the effect of increasing the amount of assumed liabilities related to gift cards, coupons or rebates;

(k) other than in the ordinary course of business, satisfy any Excluded Property with a Purchased Asset;

(l) in each case to the extent it could bind or adversely affect Buyer post-Closing, (A) make, change or revoke any material Tax election, settle or compromise any tax claim or liability or enter into a settlement or compromise, or change (or make a request to any taxing authority to change) any aspect of its method of accounting for tax purposes, or (B) prepare or file any tax return (or any amendment thereof) unless such tax return was prepared in a manner consistent with past practice;

(m) other than in the ordinary course of business, transfer cash from a Purchased Location; or

(n) authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

**5.6 Transition of Services**. Seller shall reasonably cooperate with Buyer before and after Closing to facilitate the orderly transfer or replacement of all utilities, telecommunications, internet, alarm and security services, waste removal, pest control, grease removal, point-of-sale services, merchant and credit-card processing, third-party delivery platforms and other services reasonably necessary for the continued operation of the Stores (collectively, the "**Transition Services**"). Seller shall not terminate, disconnect or permit the lapse of any Transition Service before Buyer has had a reasonable opportunity to transfer or replace such service and, with respect to utilities and other services necessary to keep a Store operating, Seller shall not terminate or disconnect such service until the applicable service has been transferred to Buyer or replaced by Buyer. Buyer shall use commercially reasonable efforts to complete each transfer or replacement promptly after Closing and shall reimburse Seller for all documented, out-of-pocket charges attributable to Buyer's operation of the Stores after Closing that are billed to or paid by Seller pending completion of the applicable transfer. Neither Party shall be required to take any action prohibited by applicable law or the applicable service agreement. The obligations under this Section shall survive Closing.

## ARTICLE 6

## TERMINATION

**6.1 Grounds for Termination**. This Agreement may be terminated upon the occurrence of any of the following events, by:

(a) mutual written agreement of the Parties at any time prior to entry of the Approval Order;

(b) Buyer or Seller, if Buyer is not declared the successful bidder and Buyer has not agreed in writing to serve as a Backup Bidder in accordance with Section 2.3.1;

(c) any Party not in default of this Agreement, if the Closing does not occur on or before the Outside Date (provided that if the Closing does not occur by such date due to a material breach of this Agreement by a Party, such breaching Party may not terminate this Agreement pursuant to this Section 6.1(c));

(d) by either Party if there shall be in effect a final, non-appealable order of a governmental body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transaction contemplated hereby, it being agreed that the Parties shall promptly appeal any adverse determination that is not non-appealable (and pursue such appeal with reasonable diligence);

(e) any Party not in default of this Agreement, upon a material breach and default of this Agreement by the other Party which breach and default remains uncured for a period of three (3) business days following the date upon which written notice of the breach and default is given by the non-defaulting Party to the defaulting Party;

(f) Buyer, if as of the time of the Closing, any Seller's Representation is materially untrue, unless waived by Buyer;

(g) Seller, if as of the time of the Closing, any Buyer's Representation is materially untrue;

(h) Buyer, if any condition to Buyer's obligation to close under Section 3.3 is not satisfied or waived by Buyer; and

(i) Seller, if Buyer fails to timely satisfy any material obligation of Buyer pursuant to this Agreement required to be satisfied prior to or at the Closing.

**6.2 No Obligation to Terminate**. Except as may be otherwise set forth in this Agreement, no Party having a right to terminate this Agreement pursuant to Section 6.1 will be required to exercise such right, or otherwise be prohibited from enforcing this Agreement by reason of having any such unexercised right to terminate this Agreement.

**6.3 Notice of Termination**. Any Party desiring to terminate this Agreement pursuant to Section 6.1 shall give immediate written notice of such termination to the other Party at the notice address(es) set forth in Section 7.18, specifying in the notice the provision of this Agreement pursuant to which the termination is made.

**6.4 Effect of Exercising Right of Termination**. If this Agreement is validly terminated as provided herein, then, subject to the provisions of any Approval Order that may be entered by the Bankruptcy Court, (i) except as set forth in Section 2.3.1 and as may be required to enforce the provisions of Section 2.3.1, each Party will promptly return to the other Party any monies, documents or other property of the other Party in its possession or control received pursuant to or in contemplation of this Agreement, (ii) this Agreement will terminate and be of no further force or effect, and (iii) each Party will have no further obligation or liability to the other by reason of this Agreement. Nothing in this Section 6.4 shall relieve any Party of any liability for fraud, intentional

misrepresentation or willful breach of this Agreement prior to the date of termination. The rights and obligations under Section 2.3.3 shall survive any termination of this Agreement.

ARTICLE 7

**MISCELLANEOUS**

**7.1 Allocation of Expenses**. Except as otherwise expressly set forth in this Agreement: (i) Seller shall be responsible for satisfying all liabilities incurred in relation to the Property and Business through the Closing Date; and (ii) Buyer shall be responsible only for the Assumed Liabilities and liabilities arising from Buyer's ownership of the Purchased Assets or operation of the Business after Closing. In accordance with the foregoing provision, all taxes, costs, charges and other expenses arising under the Assumed Contracts, all ad valorem taxes associated with the Property and the Business, and all other expenses affecting the Property and Business shall be prorated as of the Closing Date between Seller and Buyer. All prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and on the basis of the actual number of days of the year (based upon a three hundred sixty-five (365) day year) which shall have elapsed as of the Closing Date, as applicable. For purposes of calculating prorations, Buyer shall be deemed to be title holder of the Property, and therefore entitled to the income and responsible for the expenses therefore, for the entire day upon which the Closing occurs. Each Party shall assume and bear its own expenses, costs and fees incurred in the preparation and execution of this Agreement and in the compliance herewith, including attorneys' and accountants' fees, whether or not the Transaction is consummated; provided, that if any Party commences legal proceedings against the other Party to enforce the provisions of this Agreement or to declare any rights or obligations under this Agreement, the prevailing Party shall recover from the losing Party its costs of suit, including reasonable attorneys' fees, as determined by the Bankruptcy Court or such other court of competent jurisdiction in the event the Bankruptcy Court refuses to exercise jurisdiction of such a dispute.

**7.1.1** *Post-Closing Reconciliation*. On a date mutually agreed upon by Buyer and Seller, but in no event later than thirty (30) days after Closing (the "**Reconciliation Date**"), Buyer and Seller shall jointly prepare a reconciliation, as of the Closing Date, of (a) the Assumed Liabilities and all other liabilities, expenses and obligations allocated between the Parties under this Agreement, (b) the Purchased Assets and Excluded Property actually transferred or retained, including deposits, prepaid amounts, rebates, credits and refunds, and (c) all receipts, revenues and other amounts received by either Party that are attributable to the other Party under this Agreement. Each Party shall provide the other with reasonable supporting documentation for the assets, liabilities and other amounts included in the reconciliation. Within five (5) business days after the Parties agree upon the reconciliation, the Party owing any net amount shall pay such amount to the other Party.

Without limiting the foregoing, all amounts received by Seller after Closing and on or before the Reconciliation Date that are attributable to sales made, services provided or operations conducted by Buyer from and after Closing, including amounts received through credit-card processors, gift cards, third-party delivery services, online-ordering platforms, catering services or similar arrangements, shall be included in the reconciliation and credited to Buyer. All amounts received by Buyer after Closing and on or before the Reconciliation Date that are attributable to sales made, services provided or operations conducted by Seller before Closing shall be included in the

reconciliation and credited to Seller. Any such amount received after the Reconciliation Date shall be remitted to the Party entitled to such amount, together with reasonable supporting information, within five (5) business days after receipt. The obligations under this Section shall survive Closing.

If the Parties are unable to agree upon any item included in the reconciliation, they shall pay all undisputed amounts when due and continue to work in good faith to resolve the disputed item; provided that no dispute shall delay either Party's obligation to remit amounts that are undisputedly attributable to the other Party.

**7.2 Intentionally Omitted**

**7.3 Integration**. This Agreement (including all Schedules and Exhibits) and the instruments to be executed and delivered by the Parties at Closing, as expressly identified within Section 3.2, are the sole agreements between the Parties regarding the Transaction. All prior and contemporaneous negotiations and agreements between the Parties, oral or written, regarding the Transaction, are hereby superseded, including the asset purchase agreement dated August 4, 2026. No Party has the authority to orally modify this Agreement, or to make any oral representation or oral agreement regarding this Agreement or the Transaction.

**7.4 Amendment, Waiver and Modification**. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated except by written consent of the Party against which such change, waiver, discharge or termination is sought to be enforced, or by order of the Bankruptcy Court.

**7.5 Construction**. The Parties acknowledge that each Party was represented by legal counsel (or had the opportunity to be represented by legal counsel) in connection with this Agreement and that each of them and its legal counsel have reviewed and revised this Agreement, or have had an opportunity to do so, and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or any Exhibits or Schedules hereto or thereto.

**7.6 Captions; Capitalized Terms**. The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Capitalized terms used in the Schedules and Exhibits hereto and not otherwise defined therein shall have the meanings ascribed to them in this Agreement.

**7.7 Further Assurances**. Each Party will promptly execute and deliver all documents and take all actions, including the payment of money, reasonably required and necessary to effectuate the Transaction and perform its duties pursuant to this Agreement.

**7.8 Assignment; Successors; Parties in Interest**. This Agreement shall not be assignable by Buyer without the prior written consent of Seller, which will not be delayed, conditioned or unreasonably withheld, or absent order of the Bankruptcy Court. Any attempt to assign this Agreement without such consent or order shall be void and of no effect. This Agreement shall inure to the benefit of, and be binding on and enforceable against, each Party and its successors and permitted assigns, and nothing in this Agreement, express or implied, is intended to confer upon

any employee or affiliate of either Party or any other person any rights or remedies of any nature whatsoever under this Agreement, except as expressly set forth in Section 7.2 of this Agreement.

**7.9** **Capacity of Seller**. Buyer acknowledges that Seller and his professionals shall have no personal or corporate liability whatsoever in connection with the performance of any obligations of Seller under this Agreement.

**7.10** **Time is of the Essence**. With respect to all dates and time periods set forth or referred to in this Agreement, time is of the essence, such that each Party will perform all acts required of such Party pursuant to this Agreement by the date or within the time period required pursuant to this Agreement.

**7.11** **Business Day**. As used in this Agreement, the term "business day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in the State of California are closed.

**7.12** **Access to Books and Records after Closing**. Buyer shall permit Seller to have access to the books and records relating to the Property and Business for a period of three (3) years after the Closing, or such later period as may be required by the Bankruptcy Court. Notwithstanding the foregoing, Buyer agrees to notify Seller prior to destroying any books and records relating to the Property and Business, and to allow Seller to make and retain copies, at Seller's expense, of such books and records.

**7.13** **Sales and Transfer Taxes**. The Parties intend that the Transaction qualify for the exemption provided by section 1146(a) of the Bankruptcy Code. To the fullest extent permitted by applicable law and the Approval Order, the transfer, assignment, conveyance, sale, or recording of any Purchased Assets or Assumed Contracts pursuant to this Agreement shall not be subject to any stamp tax, transfer tax, sales tax, use tax, recording tax, documentary tax, filing tax, real estate transfer tax, mortgage recording tax, or similar tax. To the extent any such taxes are determined to be payable notwithstanding the foregoing, Buyer shall bear and pay all sales, transfer, use, recording, documentary, filing, and similar taxes arising from the Transaction

**7.14** **Severability**. Nothing in this Agreement will be construed as requiring the commission of any act contrary to law. If there is any conflict between any provision of this Agreement and any present or future law, such provision will be limited only to the extent necessary to bring it within the requirement of the law. If any part of this Agreement is held to be indefinite, invalid, or otherwise unenforceable, the balance of this Agreement will continue in full force and effect.

**7.15** **Schedules and Exhibits**. The Schedules and Exhibits are a part of this Agreement as if fully set forth herein. All references to Sections, Articles, Schedules and Exhibits shall be deemed references to such parts of this Agreement, unless the context shall otherwise require. Disclosure of any fact or item in any Schedule hereto referenced by a particular Section in this Agreement shall, should the existence of the fact or item of its contents be relevant to any other Section, be deemed to be disclosed with respect to that other Section whether or not an explicit cross-reference thereto appears.

**7.16 Counterparts**. This Agreement may be executed in several counterparts, each of which, when combined, shall constitute one and the same instrument. This Agreement may be executed by facsimile and PDF signatures, which shall have the same force and effect as original signatures.

**7.17 Governing Law**. This Agreement shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of California, without giving effect to the conflict of laws and rules thereof. Each Party consents to the exclusive jurisdiction of the Bankruptcy Court.

**7.18 Notices**. Any notice by any Party to any other Party pursuant to this Agreement must be made in writing and delivered to the other Party at the address shown below, until written notice of a different address is given by the other Party pursuant to this Section 7.18. Payments to be made pursuant to this Agreement will be deemed made only upon actual receipt. Notices given by personal service will be deemed received upon delivery. Notices given by first class mail, postage prepaid, addressed to the address required by this Section 7.18, will be deemed received three (3) business days following the deposit thereof with the United States Post Office. Notices given by overnight courier service will be deemed received on the date of delivery confirmed by the courier service. Notices given by electronic facsimile transmission will be deemed received on the date upon which the recipient's facsimile machine confirms electronically the receipt of the notice, provided that a copy of any notice given by facsimile transmission must also be sent to the recipient by first class mail, postage prepaid, addressed to the address required by this Section 7.18. The rejection by a Party of a notice, the refusal by a Party to accept a notice, or the inability of another Party to deliver a notice because of a change of address of a Party of which no notice of change of address is given pursuant to this Agreement, will constitute delivery of the notice. Telephone numbers and e-mail addresses, if listed, are listed for convenience purposes only and not for the purpose of giving notice pursuant to this Agreement.

To Seller:

Bradley Sharp, Chapter 11 Trustee
c/o Development Specialists Inc.
333 South Grand Avenue, Suite 4100
Los Angeles, CA 90071
Bsharp@dsiconsulting.com

With a copy to:

c/o Tim Skillman, Chief Restructuring Officer
CR3 Partners, LLC
[Address]
tim.skillman@cr3partners.com

and

Kyra Andrassy
Robert Marticello
Raines Feldman Littrell LLP
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
kandrassy@raineslaw.com
rmarticello@raineslaw.com

To Buyer:

CTW Foods, LLC
716 Corporate Center Drive
Pomona, CA 91718
Attn: Amir Siddiqi
asiddiqi@ocburgerboys.com

**7.19 Employee Matters.**

7.19.1 *Employees and Offers of Employment*.

(a) Buyer may, but shall have no obligation to, to offer employment, to such employees of the Debtor employed in connection with the acquired Stores as Buyer selects in its sole discretion, on such compensation, benefits and other terms as Buyer determines. Any employee hired by Buyer shall commence new employment with Buyer or its applicable affiliate on the date Buyer hires that employee and shall receive no credit from Buyer for prior service, seniority, accrued vacation, sick leave, paid time off, benefits or other amounts or rights arising from employment by a Debtor. Each employee hired by Buyer shall be an at-will employee of Buyer.

(b) Buyer shall maintain employee records transferred to Buyer hereunder for a period of not less than two (2) years and during that period will afford Seller reasonable access to such records during Buyer's normal business hours, with such maintenance and access at Seller's sole cost and expense. Buyer shall maintain the confidentiality of such records and limit access thereto in a manner consistent with Buyer's treatment of its employee records.

(c) Nothing herein, express or implied, shall confer upon any employee or former employee of the Debtor any rights or remedies (including any right to employment or continued employment for any specified period) of any nature or kind whatsoever, under or by reason of this Agreement. Buyer and Seller agree that the provisions contained herein are not intended to be for the benefit of or otherwise be enforceable by, any third party, including any employee or former employee of Debtor.

(d) Seller shall retain any liability for, and Buyer shall not acquire or assume, any liability related to or arising out of the employment by a Debtor or any period or event occurring before the date Buyer hires the applicable employee, whether a claim in respect thereto is brought on, before, or after the Closing Date. Buyer shall have no liability to any employees for earned vacation time, sick leave time, paid time off, severance, discrimination, harassment, retaliation, wage-and-hour violations and pending or unresolved grievances, all of which shall be the responsibility of

Seller. Debtor shall remain solely liable for, and Buyer shall not assume, any claim, liability or obligation of any current or former Business employee arising out of or relating to such individual's employment by, services for, or termination from employment with Seller or the Debtor, to the extent attributable to any act, omission, event, condition or period occurring on or before Closing, whether such claim is known or unknown, asserted or unasserted, accrued or contingent, and whether asserted before, on or after the Closing Date. Such retained liabilities include claims relating to wages, salaries, commissions, bonuses, tips, overtime, minimum wages, meal or rest periods, timekeeping, off-the-clock work, expense reimbursement, wage statements, payroll practices, employee classification or misclassification, independent-contractor status, discrimination, harassment, retaliation, failure to accommodate, leaves of absence, hiring, discipline, termination, wrongful discharge, breach of contract, employment policies or practices, accrued vacation, sick leave or paid time off, employee benefits, severance, payroll taxes and withholding, unemployment insurance, workers' compensation, workplace health and safety, COBRA, the WARN Act and any similar state or local law, civil penalties, statutory penalties, representative or class claims, claims under the California Private Attorneys General Act, and any pending or unresolved complaint, charge, grievance, arbitration, administrative proceeding, investigation, litigation or other claim.

(e) Debtor shall remain responsible for all wages, salaries, payroll taxes, tax withholding obligations, employee benefits, vacation pay, sick leave, paid time off, severance obligations, COBRA obligations, WARN Act obligations (if any), and other employment-related liabilities arising from or relating to periods or events before Buyer hires the applicable employee. Buyer shall not assume any such liabilities except as expressly provided in this Agreement and specifically included as an Assumed Liability on Exhibit D.. To the extent applicable, Debtor shall remain responsible for compliance with the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. (the "**WARN Act**"), and any similar state or local law with respect to actions occurring on or prior to the Closing Date. Debtor shall remain responsible for COBRA obligations arising from qualifying events occurring on or prior to the Closing Date, subject to applicable law and the terms of any applicable employee benefit plans.

7.19.2 *Workers' Compensation*. Debtor shall be liable for all workers' compensation claims arising from injuries, occupational diseases, cumulative trauma or exposures occurring or originating before the applicable employee is hired by Buyer, including claims asserted after Closing. Buyer shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by any employee on and after the date Buyer hires them. . Buyer shall be liable only to the extent a claim is legally attributable to an injury or exposure occurring during employment by Buyer. Buyer shall not assume liability for an aggravation, exacerbation or reinjury of a preexisting condition except to the extent applicable law allocates liability exclusively to an injury or exposure occurring during employment by Buyer. Debtor and Buyer retain their rights to evaluate and dispute any such claims. No later than five (5) business days before Closing, Seller shall provide Buyer, to the extent permitted by applicable law, complete and current employee information reasonably requested by Buyer, workers' compensation loss runs and a schedule identifying all pending or threatened employment-related and workers' compensation claims relating to employees of the Stores.

*[SIGNATURE PAGE FOLLOWS]*

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the Execution Date.

**BUYER:**

**CTW FOODS, LLC,** a Wyoming limited liability company

Signed by:

By: ______________________
F7275B29C6B448A...
Name: Amir Siddiqi
Its: Owner

**SELLER:**

Signed by:

By: Bradley Sharp ______________________
FEDFF3D4B66A46C...
Bradley Sharp, solely in his capacity as Chapter 11 Trustee of Senior Classic Leasing, LLC

**SCHEDULE 2.4**
**Store Allocations**

| CJ Store # | Store # | Store Name | Store Allocation |
|---|---|---|---|
| 1100062 | 7361 | 7361 Baldwin Park | $100,000 |
| 1100350 | 7391 | 7391 West Covina | $100,000 |
| 1100641 | 7493 | 7493 North Hollywood | $100,000 |
| 1100510 | 7402 | 7402 Sun Valley | $75,000 |
| 1101927 | 8150 | 8150 North Hollywood | $75,000 |
| | | TOTAL | $450,000 |

# EXHIBIT A

## Stores and Leases To Be Acquired

| CJ Store # | Store # | Store Name | Address 1 | Address 2 |
|---|---|---|---|---|
| 1100062 | 7361 | 7361 Baldwin Park | 14080 Francisquito Ave | Baldwin Park, CA 91706 |
| 1100350 | 7391 | 7391 West Covina | 2980 E Workman Ave | West Covina, CA 91791 |
| 1100641 | 7493 | 7493 North Hollywood | 5166 Vineland Ave | North Hollywood, CA 91601 |
| 1100510 | 7402 | 7402 Sun Valley | 8875 Glenoaks Blvd | Sun Valley, CA 91352 |
| 1101927 | 8150 | 8150 North Hollywood | 6601 Lankershim Blvd | North Hollywood, CA 91606 |

# EXHIBIT B

## EXECUTORY CONTRACTS AND UNEXPIRED EQUIPMENT LEASES TO BE ASSUMED

**Franchise Agreement for each Lease on Exhibit A**

# EXHIBIT C

## FINANCING AGREEMENTS TO BE ASSUMED

# EXHIBIT D

## ASSUMED LIABILITIES

# EXHIBIT E

## PREPAID EXPENSES AND REBATES

# EXHIBIT F

## ASSETS USED IN CONNECTION WITH THE STORES THAT ARE EXCLUDED ASSETS

# EXHIBIT G

## [FORM OF BILL OF SALE AND ASSIGNMENT]

## BILL OF SALE AND ASSIGNMENT

**THIS BILL OF SALE AND ASSIGNMENT** is made as of this ___ day of September, 2026, by Bradley Sharp, solely in his capacity as the chapter 11 trustee ("**Trustee**" or "**Seller**") for the bankruptcy estate of Senior Classic Leasing, LLC (the "**Debtor**"), in favor of CTW Foods, LLC, a Wyoming limited liability company ("**Buyer**").

## RECITALS

A. Seller and Buyer have entered into that certain Asset Purchase Agreement, dated as of October ______, 2026, (the "**Agreement**").

B. The Agreement provides, among other things, that Seller shall convey and assign its interest in certain personal property to Buyer. All capitalized terms used but not defined herein have the meanings given such terms in the Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller hereby bargains, sells, conveys, assigns and transfers to Buyer, all of Seller's right, title and interest in and to all personal property constituting Purchased Assets under the Agreement, whether located at a Store, the Debtor's headquarters or another location, set forth on **Schedule 1** attached hereto and incorporated herein by this reference, including, but not limited to machinery, equipment, fixtures, furniture, POS software, signs, smallwares, and cooking utensils, all usable inventories of food, paper, operating supplies, and serviceable uniforms, all permits, licenses, authorizations, registrations, consents and approvals relating to the Stores and/or Business, and all other personal property. Notwithstanding the foregoing, the property transferred hereby does not include the Excluded Property, which shall remain the property of Seller.

The property transferred hereby is transferred "AS IS", "WHERE IS" and "WITH ALL FAULTS", and without any representation or warranty whatsoever, except as expressly provided in the Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale and Assignment as of the day and year first above written.

**SELLER:**

**By: ______________________________**
Bradley Sharp, solely in his capacity as the
chapter 11 trustee of Senior Classic Leasing ,
LLC

Schedule 1 to Bill of Sale

# Locations

| Store # | Address | City, State Zip |
|---|---|---|
| 7361 | 14080 Francisquito Ave. | Baldwin Park, CA 91706 |
| 7391 | 2980 E. Workman Ave. | West Covina, CA 91791 |
| 7493 | 5166 Vineland | North Hollywood, CA 91601 |
| 7402 | 8875 Glenoaks Blvd. | Sun Valley, CA 91352 |
| 8150 | 6601 Lankershim Blvd. | North Hollywood, CA 91606 |

# EXHIBIT H

## [FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT]

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** (the "**Assignment**") is made as of [October] ______, 2026 by Bradley Sharp, solely in his capacity as the chapter 11 trustee ("**Trustee"** or **"Assignor"**) for the bankruptcy estate of Senior Classic Leasing (together the "**Debtor**"), in favor of CTW Foods, LLC, a Wyoming limited liability company ("**Assignee**").

WHEREAS, Assignor and Assignee have entered into that certain Asset Purchase Agreement, dated as of [September] ____, (the "**Agreement**"); and

WHEREAS, the Agreement provides, among other things, that Assignor shall assign to Assignee certain contracts, rights, permits, licenses and other agreements, and Assignee shall assume all of the obligations of Assignor under such contracts, rights, permits, licenses and other agreements from and after the date of such assignment, and that Assignor and Assignee shall enter into this Assignment. All capitalized terms used but not defined herein have the meanings given such terms in the Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

1. <u>Assignment and Assumption of Agreements and Permits</u>. Assignor hereby assigns, sets over and transfers to Assignee all of its right, title and interest in, to and under the Assumed Contracts, the Permits and all other agreements, contracts rights, permits, licenses and the like which constitute Property and are not otherwise conveyed to Assignee under that certain Bill of Sale and Assignment, dated as of [October] ____, 2026, executed by Assignor (collectively, the "**Assigned Agreements**") as required by the Asset Purchase Agreement. Assignee hereby assumes the performance of all of the terms, covenants, obligations and conditions imposed upon Assignor under and with respect to the Assigned Agreements accruing or arising on or after the Closing.

2. <u>Attorneys' Fees</u>. If either party hereto brings any action or suit against the other party hereto by reason of any breach of any covenant, condition, agreement or provision of this Assignment on the part of the other party, the prevailing party shall be entitled to recover from the other party all costs and expenses of the action or suit, including reasonable attorneys' fees, charges and costs, in addition to any other relief to which it may be entitled.

3. <u>Governing Law</u>. The parties agree that this Assignment and any disputes, controversies or claims arising hereunder or related to the transactions contemplated hereby shall be interpreted according to the laws of the State of California, excluding its choice of law rules that would apply any other law. If any matters in dispute are required to be settled by litigation, then such trials will be decided by a judge. THE PARTIES WAIVE TRIAL BY JURY IN ANY SUCH ACTION(S) AND CONFIRM THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO TRANSACTIONS CONTEMPLATED BY THIS ASSIGNMENT. Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain

exclusive jurisdiction to enforce the terms of this Assignment and to decide any claims or disputes which may arise or result from, or be connected with, this Assignment, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 7.18 of the Agreement; provided, however, that if the Bankruptcy Case shall have been closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the state or federal courts located in Orange County, California. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

4. Successors and Assigns. This Assignment shall apply to and bind the successors and assigns of the parties hereto.

5. Captions. The marginal headings or titles to the sections and paragraphs of this Assignment and the title of this instrument are not part of the Assignment but are inserted for convenience only and shall have no effect upon the construction or interpretation of any part of this Assignment.

6. Amendments. No provision of this Assignment may be amended, changed or waived except by a written instrument signed by Assignee and by Assignor (or, in the case of a waiver, by the party against whom enforcement of the waiver is sought).

7. Further Acts. Each party, upon the request of the other, agrees to perform such further acts and to execute and deliver such other documents as are reasonably necessary to carry out the provisions of this Assignment.

8. Counterparts. This Assignment may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same instrument.

*[SIGNATURES ON FOLLOWING PAGE]*

**ASSIGNOR:**

**By:** ___________________________
Bradley Sharp, solely in his capacity as the chapter 11 trustee of Senior Classic Leasing, LLC

**ASSIGNEE:**

**CTW Foods, LLC**, a Wyoming limited liability company

**By:** ___________________________
Name: Amir Siddiqi
Its:

# EXHIBIT 2

**RAINES FELDMAN LITTRELL LLP**
Kyra E. Andrassy (State Bar No. 207959)
*kandrassy@raineslaw.com*
Robert S. Marticello (State Bar No. 244256)
*rmarticello@raineslaw.com*
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

-- and --

Jordan N. Kelly, PA State Bar No. 328896 (*Admitted Pro Hac Vice*)
jkelly@raineslaw.com
11 Stanwix Street, Suite 1500
Pittsburgh, PA 15222
Telephone: 412899-6487

Counsel for Bradley Sharp,
Chapter 11 Trustee

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>SUN GIR INCORPORATED, *et al.*,<br><br>Debtor. | Case No.: 8:26-bk-11056-SC<br><br>Chapter 11<br><br>(Jointly Administered with Case Nos. 8:26-bk-11057-SC; 8:26-bk-11058-SC; 8:26-bk-11060-SC; 8:26-bk-11061-SC; 8:26-bk-11062-SC) |
| ☐ Affects Sun Gir Incorporated<br>☐ Affects Harshad & Nasir, Incorporated<br>☐ Affects Senior Classic Leasing, LLC<br>☐ Affects DFG Restaurants Incorporated<br>☐ Affects Second Star Holdings, LLC<br>☐ Affects Third Star Investments, LLC<br>☒ **Affects All Debtors** | **[PROPOSED] ORDER GRANTING MOTION FOR AN ORDER: (A) AUTHORIZING AND APPROVING THE SALE OF ESTATE PROPERTY FOR 5 LOCATIONS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE LEASES, SUBLEASES, AND EXECUTORY CONTRACTS FOR THE 5 LOCATIONS; AND (C) AUTHORIZING THE REJECTION OF FOUR SUBLEASES** |

**Hearing Information:**
Date: [__________], 2026
Time: 10:00 a.m.
Place: [Courtroom 5C]
411 West Fourth Street
Santa Ana, CA 92701

[Zoom instructions available on Court's calendar]

At the above date and time, the Court held a hearing on an emergency basis on the *Motion for Order: (A) Authorizing and Approving the Sale of Estate Property for 5 Locations Free and Clear of All Liens, Claims, Encumbrances, and Interests; (B) Authorizing and Approving the Assumption and Assignment of the Leases, Subleases and Executory Contracts for the 5 Locations; and (C) Authorizing the Rejection of Four Subleases (*the "**Motion**") [D.I. ___] filed by Bradley Sharp, the chapter 11 trustee ("**Trustee**") for the bankruptcy estates of Senior Classic Leasing, LLC (the "**Debtor**"). Appearances were as noted on the record. For the reasons set forth in the Motion, the Declaration of Amir Siddiqi filed in support of the Motion [Doc. No. ____], and the Declarations of Bradley Sharp and Michael Ingram filed in support of the Motion, and all parties in interest having been heard, or having had the opportunity to be heard, and for all of the reasons set forth on the record at the above-noted hearing, and the Court having found that notice of the Motion was proper and that a hearing on shortened notice was justified based on the exigencies of the sale, and after due deliberation thereon and good cause appearing therefor,

**IT IS ORDERED AS FOLLOWS:**

(1) The Motion is granted as set forth in this Order;

(2) The terms and conditions of the Asset Purchase Agreement (the "**APA**") attached to the Motion as Exhibit "1" are approved and the Trustee is authorized to sell the Purchased Assets[1] to CTW Foods, LLC, a Wyoming limited liability company (the "**Buyer**"). The Trustee is authorized to enter into the APA and to execute any other

[1] Capitalized terms not defined herein shall have the meaning given to them in the APA.

documents or take any other actions reasonably necessary to consummate the sale of the Purchased Assets. Buyer's obligation to consummate the Sale Transaction remains subject to the satisfaction or written waiver by Buyer of all conditions to Closing under the APA, including (a) the assumption and assignment of the executory contracts and unexpired leases designated by Buyer, and (b) receipt of the franchisor's final written approval of the assignment, franchise and related documents required by CJR, in each case on terms acceptable to Buyer.

(3) Conditioned upon the payment of the cure amounts, if any, set forth in the Motion, as may be modified by this Order, the following leases or subleases (together, the "**Leases**") and their corresponding franchise agreements with Carl's Jr. Restaurants, LLC (the "**Franchise Agreements**" and, together with any other executory contract or unexpired leases subsequently authorized by the Court to be assumed and assigned, the "**Assumed Contracts**") are assumed and assigned to the Buyer:

| Store # | CKE # | Address |
|---|---|---|
| 7361 | 1100062 | 14080 Francisquito Ave., Baldwin Park |
| 7391 | 1100350 | 2980 E. Workman Ave., West Covina |
| 7493 | 1100641 | 5166 Vineland Ave., North Hollywood |
| 7402 | 1100510 | 8875 Glenoaks Blvd., Sun Valley |
| 8150 | 1101927 | 6601 Lankershim Blvd., North Hollywood |

Together, the above locations are referred to in this Order as the "**Franchised Restaurants**." In addition, the amounts due postpetition in the ordinary course of business shall be paid by the Trustee as a condition to assumption and assignment of the Leases and the Franchise Agreements.

(4) Upon the Closing, the transfer of the Purchased Assets to Buyer pursuant to the APA shall constitute a legal, valid and effective transfer of the Purchased Assets, and shall vest Buyer with all right, title and interest of the Debtor in and to the Purchased Assets, free and clear of all interests, obligations, liabilities, liens (as such term is defined in section 101(37) of the Bankruptcy Code), claims (as such term is defined in section 101(5) of the Bankruptcy Code), or other encumbrances, of any kind, nature or description in, against or relating to any of the Purchased Assets, whether direct or indirect, absolute or contingent,

choate or inchoate, fixed or contingent, matured or unmatured, liquidated or unliquidated, arising under or imposed by agreement, law, equity or statute, including all labor, employment, employee-benefit and workers' compensation claims and liabilities retained by Seller or the Debtor under Section 7.19 of the APA, whether asserted before, on or after the Closing, including without limitation under any theory of successor or transferee liability arising from or relating to such assets, in each case to the extent having arisen or accrued or otherwise existing as of the Closing (collectively, the "**Interests**"), except for any Assumed Liabilities or as expressly provided in this Order. Upon the Closing, the lien of The Northern Trust Company and any lien of McLane Food Service shall attach to the net proceeds of the Sale Transaction with the same priority, validity, force and effect as existing in or to the Purchased Assets prior to the Closing. For purposes of this Order, "net proceeds" means the gross cash purchase price paid by Buyer at Closing, less only (i) customary and reasonable closing costs and prorations expressly provided for in the APA, (ii) cure amounts payable under paragraph (3) of this Order, and (iii) the amounts constituting the "Carve-Out" as defined in the August 14 Cash Collateral Stipulation (but shall not include any deduction for professional fees, wind-down costs, or other administrative expenses of the estates, other than in accordance with August 14 Cash Collateral Stipulation). The Trustee shall deposit all sale proceeds into a segregated, interest-bearing account (the "**Proceeds Account**") and shall not disburse any funds from the Proceeds Account without (a) the prior written consent of Northern Trust Company, or (b) further order of this Court upon notice to Northern Trust Company. The Trustee shall distribute the net proceeds, less the amounts necessary to fund the "Carve-Out" as defined in accordance with the August 14 Cash Collateral Stipulation, to Northern Trust Company and McLane Foodservice promptly following the Closing, subject only to resolution of any priority dispute with McLane Foodservice as to proceeds attributable to McLane-supplied inventory. For the avoidance of doubt, Buyer shall not be liable for any labor, employment, employee-benefit or workers' compensation claim retained by Seller or the Debtor under Section 7.19 of the APA, including under any theory of successor, joint-employer or transferee liability.

(6) Without limiting the foregoing, except for the Assumed Liabilities or as expressly provided in this Order, the Buyer has not assumed and does not assume any liabilities or obligations of the Debtor, and the transfer of the Purchased Assets to the Buyer, and the assignment to Buyer of the Assumed Contracts, do not and will not subject Buyer to any liability under any theory of law or equity, including without limitation the Interests and any theory of successor or transferee liability for the Interests or otherwise arising from or relating to any of the Purchased Assets or the Debtor's operations or existence before the Closing. For the avoidance of doubt, the Excluded Assets are not Purchased Assets, and the Excluded Liabilities are not Assumed Liabilities, and nothing in the APA or in this Order effects any assumption or assignment of the Excluded Assets or Excluded Liabilities by or to Buyer. All Excluded Assets shall remain property of the Debtor's estate and shall remain subject to all liens, security interests, and encumbrances of Northern Trust Company, which liens are expressly preserved and are not released, modified, or otherwise affected by this Order or the sale of the Purchased Assets.

(7) Except for the Assumed Liabilities or as expressly provided in this Order, the sale, transfer, assignment and delivery of the Purchased Assets shall not be subject to any Interests, and all such Interests shall remain with, and continue to be obligations of, the Debtor and its estate (except to the extent satisfied from proceeds of the sale). Except with respect to the Assumed Liabilities, including, for the avoidance of doubt, all liabilities under assumed and assigned Franchise Agreement and Leases, or as otherwise expressly provided in this Order, all persons holding Interests against or in the Debtor or the Purchased Assets of any kind or nature whatsoever hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against Buyer or its officers, directors, shareholders or partners, its property or its successors and assigns or the Purchased Assets, as an alleged successor or otherwise, any Interest of any kind or nature whatsoever that such person or entity had, has or may have against or in the Debtor, its estate, their respective officers, directors or shareholders or the Purchased Assets.

(8) This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA. The Trustee, Buyer, and their respective officers, employees and agents are hereby authorized and empowered to execute and file, on behalf of any person or entity which has filed statements or other documents or agreements evidencing any Interests (except for the Assumed Liabilities or as otherwise expressly provided in this Order) in, against or on all or any portion of the Purchased Assets, any termination statements, instruments of satisfaction, releases of liens and easements and any other documents appropriate to document the release of such Interests in accordance with this Order. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to cancel any liens and other encumbrances of record existing as of the Closing with respect to any Purchased Assets. Notwithstanding the foregoing, the authorization to execute and file termination statements and releases of liens under this paragraph is limited to Interests in the Purchased Assets only, and shall not extend to any lien, security interest, or encumbrance held by Northern Trust Company in (a) the Excluded Assets, (b) the net proceeds of the Sale Transaction, or (c) any other property of the Debtor's estate not constituting Purchased Assets.

(9) The transactions contemplated by the APA are undertaken by Buyer without collusion and in good faith, within the meaning of section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of the Purchased Assets shall not affect the validity of the sale, unless such authorization and the sale of the Purchased Assets are duly stayed pending such appeal.

Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

(10) No bulk sales law, bulk transfer law or any similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes) shall apply to the Trustee's conveyance of the Purchased Assets or this Order.

(11) The Trustee is authorized to take all steps and pay all amounts necessary or appropriate to implement the relief granted in this Order.

(12) The Trustee is authorized and empowered to execute, deliver, perform under, consummate, and implement the APA, together with all additional instruments and documents that Buyer reasonably deems necessary or appropriate to implement the APA and effectuate the sale of the Purchased Assets, and to take all other and further actions as may be reasonably requested by Buyer for the purpose of assigning, transferring, granting, conveying and conferring to Buyer the Purchased Assets, or as may be necessary or appropriate to the performance of the obligations of Buyer and the Debtors as contemplated by the APA.

(13) The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, and in consultation with Northern Trust Company and CJR, but without further order of this Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

(14) The failure specifically to include any particular provisions of the APA in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the APA is hereby authorized and approved in its entirety, as it may be amended or supplemented in accordance with its terms and this Order.

(15) Nothing in this Order or the APA shall affect, modify, or extinguish CJR's rights under any assumed Franchise Agreements or subleases, or any newly executed franchise or sublease documents entered into by the Buyer, which shall be in form satisfactory to CJR and Buyer in all respects.

(16) Notwithstanding anything to the contrary in the APA or this Order (including, for the avoidance of doubt, sections 2.1(d) and 2.2(e) of the APA), (i) any cash that is the sole and exclusive property of CashConnect (including any "**Standbanks**," as defined in the APA) pursuant to any services and cash purchase agreement (each, an "**MSCPA**") between Wilmington Savings Fund Society, FSB (a federal savings bank and its division, CashConnect) ("**CashConnect**") and any of the Debtors shall be Excluded Property (as defined in the APA) and shall not be transferred to the Buyer; and (ii) any MSCPA between CashConnect and the Debtors shall not be (a) assumed and assigned to the Buyer or (b) designated as an Assumed Contract under the APA.

(17) The terms of this Order shall control in the event of any conflict or inconsistency with the Sale Motion, the APA, or any ancillary documents executed in connection therewith.

(18) This Order shall be binding on the Trustee and the Debtor and their successors and assigns, including any chapter 7 trustee that may be appointed for the estates of the Debtors. Nothing in any plan of reorganization or liquidation, or any other order entered in these cases, shall impair or derogate the effectiveness of any provision of this Order.

(19) This Order shall be effective and enforceable immediately upon entry, and any stay of the effectiveness and enforceability of this Order otherwise applicable under the Bankruptcy Rules or Local Rules is hereby waived.

(20) This Court shall retain exclusive jurisdiction over any and all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

###

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
4675 MacArthur Court, Suite 1550, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled (*specify*): **MOTION FOR AN ORDER: (A) AUTHORIZING AND APPROVING THE SALE OF ESTATE PROPERTY FOR 5 LOCATIONS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (B) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE LEASES, SUBLEASES, AND EXECUTORY CONTRACTS FOR THE 5 LOCATIONS; AND (C) AUTHORIZING THE REJECTION OF FOUR SUBLEASES; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF BRADLEY SHARP AND MICHAEL INGRAM IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **October 7, 2026**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **October 7, 2026**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **October 7, 2026**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

**Federal Express**
Hon. Scott C. Clarkson
U.S. Bankruptcy Court
Ronald Reagan Federal Building
411 West Fourth Street, Suite 5130
Santa Ana, CA 92701-4593

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 7, 2026 | Connie-Marie Santiago | /s/ Connie-Marie Santiago |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

1. **<u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:

- **Michael John Agoglia** michael.agoglia@alston.com, melanie.Mizrahie@alston.com
- **Kyra E Andrassy** kandrassy@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Neama Cory Barari** nbarari@caskeyholzman.com
- **Eric Bensamochan** eric@eblawfirm.us, G63723@notify.cincompass.com;services@infotrack.com;paulinab@eblawfirm.us
- **Dustin P Branch** branchd@ballardspahr.com, carolod@ballardspahr.com;zarnighiann@ballardspahr.com
- **Max Casal** mcasal@shulmanbastian.com, avernon@shulmanbastian.com;twooten@shulmanbastian.com
- **Martin P Eramo** MPEramo@aol.com
- **Alan J Friedman** afriedman@shulmanbastian.com, lgauthier@shulmanbastian.com
- **Eric D. Goldberg** eric.goldberg@us.dlapiper.com, eric-goldberg-1103@ecf.pacerpro.com
- **Jeffrey I Golden** jgolden@go2.law, kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;dfitzgerald@go2.law;golden.jeffreyi.b117954@notify.bestcase.com
- **Michael I. Gottfried** mgottfried@elkinskalt.com, lwageman@elkinskalt.com,docketing@elkinskalt.com,lmasse@elkinskalt.com
- **David S Hagen** davidhagenlaw@gmail.com, LawOfficesofDavidSHagenCA1@jubileebk.net
- **Lior Katz** lior@katzlaw.com
- **Jolene E Kramer** courtnotices@unioncounsel.net, jkramer@unioncounsel.net
- **Melissa Davis Lowe** mlowe@shulmanbastian.com, avernon@shulmanbastian.com
- **Robert S Marticello** rmarticello@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Kenneth Misken** Kenneth.M.Misken@usdoj.gov
- **Matthew D. Resnik** matt@rhmfirm.com, roksana@rhmfirm.com;russ@rhmfirm.com;sloan@rhmfirm.com;susie@rhmfirm.com;priscilla@rhmfirm.com;rebeca@rhmfirm.com;rosario@rhmfirm.com;gabriela@rhmfirm.com;lesley@rhmfirm.com
- **Atle T. Saterbak** asaterbak@winthrop.com
- **William Schumacher** wschumacher@winthrop.com, mfinley@winthrop.com;breznecheck@winthrop.com
- **Bradley D. Sharp (TR)** bsharp@dsi.biz
- **Andrew J Steil** asteil@winthrop.com
- **United States Trustee (SA)** ustpregion16.sa.ecf@usdoj.gov
- **Nahal Zarnighian** zarnighiann@ballardspahr.com, garciaej@ballardspahr.com;carolod@ballardspahr.com

2. **<u>SERVED BY UNITED STATES MAIL</u>**:

***<u>20 Largest Unsecured Creditors</u>***
***Consolidated with Case Nos.:***
***8:26-bk-11056-SC; 8:26-bk-11057-SC;***
***8:26-bk-11058-SC; 8:26-bk-11060-SC***
***8:26-bk-11061-SC; & 8:26-bk-11062-SC***

Burbank City Hall
275 E Olive Ave
Burbank, CA 91502

Glendale City Hall
613 E. Broadway
Glendale, CA 91206

Humana Dental Insurance Co
1100 Employers Boulevard
De Pere, WI 54115

Steve Cerveris
246 N Pass Ave.
Burbank, CA 91505

Super Star Plumbing Inc
6447 Clarat St.
Bell Gardens, CA 90201

Airgas USA LLC
259 N Radnor-Chester Rd., Ste 100
Wayne, PA 19087

All Temperatures Controlled Inc
9720 Topanga Canyon Pl
Chatsworth, CA 91311

California Water Service Co
1720 N 1st St,
San Jose, CA 95112

Southern California Edison
P.O. Box 600
Rosemead, CA 91771-0001

Flue Steam, Inc
5734 Bankfield Ave.
Culver City, CA 90230

Freund Baking Company
2050 S. Tubeway Ave.
Los Angeles, CA 90040

Lauro Manuel Escobedo
11330 Frankmont St.,
El Monte, CA 91732

Sheppard, Mullin, Richter & Hampton LLP
333 South Hope St., 43rd Fl.
Los Angeles, CA 90071

Xenial, Inc.
3420 Toringdon Way, Suite 400
Charlotte, NC 28277

California Department of Tax and Fee Administration
651 Bannon St., Ste 100
Sacramento, CA 95811-0299

LADWP
PO Box 30808
Los Angeles, CA 90030

The Gas Company
P.O. Box C
Monterey Park, CA 91754

United States Fire Insurance Co.
Crum & Forster Legal Department
305 Madison Ave.
Morristown, NJ 07960

McMillion & Hirtensteiner, LLP
16835 Algonquin Street, Suite 303
Huntington Beach, CA 92649

Republic Services
PO Box 60586
City of Industry, CA 91716

Carl's Jr. Restaurants LLC
c/o Eric Goldberg, Esq.
2000 Avenue of the Stars, Ste 400 N Tower
Los Angeles, CA 90067

California State Controller's Office
Unclaimed Property Division
P.O. Box 942850
Sacramento, CA 94250-5873

Carl Karcher Enterprises, Inc (CKE)
6700 Tower Circle, Ste 1000
Franklin, TN 37067

City of Santa Rosa
Business Tax Support Center
8839 N Cedar Ave. # 212
Fresno, CA 93720

Michael Blaich
MB Mechanical
PO Box 146
Vacaville, CA 95696

Pacific Gas and Electric Company
P.O. Box 997300
Sacramento, CA 95899-7300

Direct Energy Business
P.O. Box 70220
Philadelphia, PA 19175-0220

Harshad Dharod
Chetna Dharod
38 Shoreridge
Newport Coast, CA 92657

McLane Foodservice, Inc
c/o Alston & Bird LLP
Attn: Jacob Johnson
1201 West Peachtree St.
Atlanta, GA 30309

Tiger Inc.
7812 East 108th St, Suite C
Tulsa, OK 74133

Recology Sonoma Marin, Inc.
3400 Standish Ave.
Santa Rosa, CA 95407

City of Pasadena
100 N. Garfield Ave.
Pasadena, CA 91101

Coca-Cola North America,
a Division of The Coca-Cola Company
One Coca-Cola Plaza NW
Atlanta, GA 30301

City of Healsburg
PO Box 787
Healdsburg, CA 95448

Clearlake Waste Solution, Inc
A Waste Connections Company
PO Box 7428
Pasadena, CA 91109

Internal Revenue Services
P.O. Box 7346
Philadelphia, PA 19101-7346

Smythe Law Group, Inc.
1028 N Lake Ave #101
Pasadena, CA 91104

Suburban Propane LP
PO Box 12027
Fresno, CA 93776

Blue Valley Investments, LLC
1 Centerpointe Dr, Ste 400
La Palma, CA 90623

CDP Leasing
1 Centerpointe Dr., Ste. 400
La Palma, CA 90623

Dharod Family Trust
1 Centerpointe Drive, Suite 400
La Palma, CA 90623

NWS Star Management, LLC
1 Centerpointe Drive., Suite 400,
La Palma, CA 90623

RCIH LLC
1 Centerpointe Drive., Suite 400
La Palma, CA 90623

Third Star Investments LLC
1 Centerpointe Dr., Ste. 400
La Palma, CA 90623

Sun Gir Incorporated
1 Centerpointe Dr., Suite 400
La Palma, CA 90623

SVS Network Hardees
1 Centerpointe Dr., Suite 400
La Palma, CA 90623

Senior Classic Leasing, LLC
1 Centerpointe Dr., Ste 400
La Palma, CA 90623

Employee wage claims (aggregate)
1 Centerpointe Dr. Ste. 400
La Palma, CA 90623

Central Street Management, LLC
1 Centerpointe Dr., Ste. 400
La Palma, CA 90623

DFG Restaurants, Incorporated
1 Centerpointe Dr., Ste. 400
La Palma, CA 90623

Friendly Franchisees Corporation Central
Street Management LLC
1 Centerpointe Dr., Ste 400
La Palma, CA 90623

Harshad & Nasir, Incorporated
1 Centerpointe Dr., Ste. 400
La Palma, CA 90623

Second Star Holdings, LLC
1 Centerpointe Dr., Ste 400
La Palma, CA 90623

SNSD Restaurants LLC
1 Centerpointe Drive, #400,
La Palma, CA 90623

Third Star Investments LLC
1 Centerpointe Dr., Ste. 400
La Palma, CA 90623

Friendly Maintenance, LLC
1 Centerpointe Dr., Ste 400
La Palma, CA 90623